## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
450 5th Street, NW, Suite 4100
Washington, DC 20530

STATE OF DELAWARE
820 North French Street, 5th Floor
Wilmington, DE 19801

DISTRICT OF COLUMBIA
441 4th Street, NW
Washington, DC 20001

STATE OF FLORIDA
PL-01, The Capitol
Tallahassee, FL 32399-1050

STATE OF GEORGIA
40 Capitol Square, SW
Atlanta, GA 30334-1300

STATE OF ILLINOIS
100 West Randolph Street
Chicago, IL 60601

STATE OF IOWA
1305 East Walnut Street, 2nd Floor
Des Moines, IA 50319

STATE OF OHIO
150 East Gay Street, 22nd Floor
Columbus, OH 43215

COMMONWEALTH OF PENNSYLVANIA
14th Floor, Strawberry Square
Harrisburg, PA 17120

and

COMMONWEALTH OF VIRGINIA
202 North 9th Street
Richmond, VA 23219

*Plaintiffs,*

v.

AETNA INC.
151 Farmington Avenue
Hartford, CT 06156

and

HUMANA INC.
500 West Main Street
Louisville, KY 40202

*Defendants.*

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, and the States of Delaware, Florida, Georgia, Illinois, Iowa, and Ohio, the Commonwealths of Pennsylvania and Virginia, and the District of Columbia ("Plaintiff States"), acting by and through their respective Attorneys General, bring this civil antitrust action to prevent Aetna Inc. from acquiring Humana Inc.

## I.  INTRODUCTION

1.      Aetna's proposed $37 billion merger with Humana would lead to higher health-insurance prices, reduced benefits, less innovation, and worse service for over a million Americans.

2.      Today, Aetna and Humana compete across the country to sell Medicare Advantage plans, a market-based alternative to traditional Medicare. They also compete to sell health insurance on the public exchanges established by the Affordable Care Act. Their competition benefits Americans who can least afford health insurance. It benefits seniors, who visit doctors and hospitals more than twice as much as the average person and have less income than the

average American household. It also benefits low- and moderate-income individuals and families who buy insurance on the public exchanges. The merger would end this rivalry and deny consumers its benefits.

3.      Like most Americans, these individuals turn to Aetna, Humana, and other health insurance companies to provide affordable access to doctors and hospitals, process medical claims, and provide security against unexpected medical costs. Competition to attract consumers causes insurance companies to offer lower premiums, improved benefits, more attractive networks of doctors and hospitals, and more effective care management.

4.      This competition is now at risk. Today, the industry is dominated by five large insurers commonly referred to as "the big five" or, as Humana's CEO described the group, the "G-5." In a scramble to become even bigger, four of the big five now propose to merge: Aetna seeks to buy Humana for $37 billion, and Anthem seeks to acquire Cigna for $54 billion. These mergers would reshape the industry, eliminating two innovative competitors—Humana and Cigna—at a time when the industry is experimenting with new ways to lower healthcare costs. Other insurers lack the scope and scale to fill this competitive void. After the mergers, the big five would become the big three, each of which would have almost twice the revenue of the next largest insurer.

5.      Today, the United States and a number of states have filed lawsuits in this Court to enjoin both mergers. This complaint seeks to block Aetna's attempt to buy Humana. If allowed to proceed, this merger would enhance Aetna's power to profit at the expense of seniors who rely on Medicare Advantage and individuals and families who rely on the public exchanges for affordable health insurance.

6.    Congress created the Medicare Advantage program in 1997 to offer seniors a market-based alternative to traditional Medicare. Humana and Aetna are two of the largest and fastest-growing Medicare Advantage competitors in the country.

7.    Humana was one of the first large insurers to enroll seniors in private Medicare health-insurance plans, now called Medicare Advantage. Humana is the second-largest Medicare Advantage insurer, providing coverage to more than 3.1 million individuals around the country. And it continues to grow. Over the past three years, Humana has added more Medicare Advantage customers than any other insurer. Before agreeing to merge with Aetna, Humana was projecting continued enrollment growth in its Medicare Advantage business.

8.    Aetna is also a major, and growing, Medicare Advantage competitor. It is the fourth-largest Medicare Advantage insurer in the country. Between 2012 and 2016, Aetna entered more new counties—over 300—than any other Medicare Advantage insurer, almost doubling its footprint. Before agreeing to this merger, Aetna had planned to grow on its own, including "the largest [Medicare Advantage] expansion in [the] company's history" in 2017.

9.    Aetna's aggressive expansion has led to increased competition with Humana. The two now compete in more than 600 counties—nearly 90 percent of the counties where Aetna offers Medicare Advantage. Medicare Advantage serves over six million seniors in these counties, nearly two million of whom have enrolled with Aetna or Humana. The two companies compete to enroll these seniors in their Medicare Advantage plans, and each describes the other as a "formidable competitor." Competition between Humana and Aetna has led to lower premiums, more generous benefits, better provider networks, and improved coordination of care.

10.    This merger is unprecedented in the Medicare Advantage industry and affects hundreds of markets across the country. The loss of competition and harm to consumers is likely

to be particularly acute in the 364 counties listed in the Appendix and depicted in the map below. In these counties, Medicare Advantage serves approximately 1.6 million seniors, nearly 980,000 of whom have enrolled with Aetna or Humana.



11.    In addition to putting an end to this present-day competition between Aetna and Humana, the merger would deny consumers the benefits of the additional competition likely to occur as both defendants continue to expand their Medicare Advantage offerings in new areas.

12.    This merger is also likely to raise prices and reduce benefits for individuals and families buying health insurance on the public exchanges. Aetna and Humana have been two of the most active insurers on the exchanges. This deal would eliminate competition between them on public exchanges in at least Florida, Georgia, and Missouri, reducing choice for more than 700,000 people. The adverse effects would fall most heavily on individuals and families with low or moderate incomes.

13.    Aetna's attempt to buy Humana undermines the central role that competition is meant to play in Medicare Advantage and on the public exchanges in holding down healthcare

costs and improving quality for seniors, families, and individuals. Indeed, one of the governing principles of the Medicare Advantage program, as described by the Centers for Medicare and Medicaid Services ("CMS"), is that insurers "are under continued competitive pressure to improve their benefits, reduce their premiums and cost sharing, and improve their networks and services."

14.     If permitted to proceed, Aetna's purchase of Humana likely would lead to higher prices and reduced benefits for seniors, families, and individuals. It would also likely reduce competition to provide innovative wellness programs and likely would lower the quality of care that Aetna's and Humana's customers receive. Because this merger threatens to reduce competition across the country, it violates Section 7 of the Clayton Act. To prevent this unlawful harm, the Court should enjoin this merger.

## II.   THE DEFENDANTS AND THE MERGER

15.     Aetna is the nation's third-largest health-insurance company and is rapidly growing. It has a broad national footprint and competes in every state and the District of Columbia. In 2015, 23.5 million Americans obtained health insurance through Aetna, and the company earned revenue of $60 billion. Before this merger, Aetna planned to achieve $100 billion in revenue by 2020, in large part by expanding its Medicare Advantage business and growing its presence on the public exchanges. Aetna already has significantly grown these lines of business. For example, its Medicare Advantage membership increased by approximately 19 percent from 2014 to 2016. Aetna's government-sponsored products (including Medicare Advantage) now account for approximately 40 percent of its revenue.

16.     Humana is the nation's fifth-largest health-insurance company, with nearly 14.2 million enrollees and more than $54 billion in revenue. Like Aetna, it has a broad national

footprint and competes in every state and the District of Columbia. Humana is now the second-largest Medicare Advantage insurer in the country. Between 2014 and 2016, it added more individual Medicare Advantage enrollees than any other insurer in the nation. Its government-sponsored products account for over 75 percent of its revenue.

17.     In March 2015, Aetna began to talk to Humana about a potential deal. Mindful that Anthem and Cigna were also seeking to combine, Aetna asked its board of directors to authorize formal discussions with Humana and told the board it could get a "first mover advantage." Aetna entered into a definitive agreement to acquire Humana for $37 billion in cash and stock on July 2, 2015. Just a few weeks later, on July 23, 2015, Anthem agreed to acquire Cigna for $54 billion.

18.     From the outset, Aetna and Humana realized that their deal raised significant antitrust issues. To convince Humana to proceed in the face of antitrust risks, Aetna agreed to pay a $1 billion break-up fee if the merger is not consummated by December 31, 2016. Aetna sought to downplay the antitrust issues it knew this deal would raise. When preparing a presentation for the company's board of directors, senior Aetna executives circulated a list of "words to avoid," which included terms likely to raise law enforcement concerns, such as "markets," "dominate/dominance," and "consolidate." But merely avoiding those words does not make the merger any less likely to harm consumers by eliminating competition.

## III.  THIS MERGER LIKELY WOULD SUBSTANTIALLY LESSEN COMPETITION FOR THE SALE OF MEDICARE ADVANTAGE PLANS

19.     Since they began their negotiations, Aetna and Humana knew that their competition against each other in Medicare Advantage was an antitrust problem. The facts explain why. In nearly 90 percent of the counties where Aetna offers Medicare Advantage, it

competes directly with Humana. That competition benefits many of the people who rely on the Medicare Advantage program to help cover their healthcare costs.

20.     Americans 65 or older and other Medicare-eligible individuals can enroll in traditional Medicare; they also can purchase supplemental insurance plans to help cover out-of-pocket expenses and prescription-drug costs that traditional Medicare does not cover. With traditional Medicare and these supplemental plans, enrollees are not limited to a specific network of doctors and hospitals.

21.     But many seniors instead choose Medicare Advantage, the program Congress introduced in 1997 to bring the benefits of competition among private insurers to Medicare. The program has proved to be immensely popular, and enrollment in Medicare Advantage has more than tripled since 2004. More and more seniors are choosing Medicare Advantage because it offers them better benefits at a lower cost than their options under traditional Medicare. Medicare Advantage provides all the insurance coverage of traditional Medicare, but also caps out-of-pocket costs and frequently covers additional services that traditional Medicare does not cover, including dental, vision, and hearing care. Medicare Advantage insurers are able to offer these benefits at lower costs by partnering with networks of doctors and hospitals to effectively manage and coordinate treatments, identify gaps in care, and comprehensively treat chronic conditions.

22.     As Medicare Advantage enrollment continues to grow, preserving competition among Medicare Advantage insurers is more important than ever. More than 50 million Americans are now eligible for Medicare, and as "baby boomers" reach retirement age, approximately 10,000 more people qualify for Medicare every day. For many of them, Medicare Advantage is, or will be, their best option for health insurance. These individuals will be worse

off if Aetna is permitted to acquire Humana because they are unlikely to consider insurance plans under traditional Medicare to be cost-effective substitutes for Medicare Advantage.

> **A.     Medicare Advantage is a relevant product market.**

23.     The typical starting point for merger analysis is defining the relevant market. Courts define relevant product markets to help determine the areas of competition most likely to be affected by the merger. The sale of Medicare Advantage plans is one such relevant product market and line of commerce under Section 7 of the Clayton Act. As used in this Complaint, Medicare Advantage plans are health-insurance plans sold to individuals eligible for Medicare, except for plans designed for those who are also eligible for Medicaid or have special needs.

24.     Medicare Advantage is different from the products available under traditional Medicare. By itself, traditional Medicare is administered by the government and requires seniors to pay for a significant portion of their medical care. For example, seniors with traditional Medicare must pay annual deductibles and 20% coinsurance for most services, including physician and outpatient services. Traditional Medicare does not limit how much seniors must pay out-of-pocket annually. If seniors want to limit these out-of-pocket costs, they must pay an additional monthly premium for a separate Medicare Supplement plan. Additionally, to receive prescription drug coverage under traditional Medicare, seniors must purchase a separate Medicare Part D prescription drug plan, again for an additional premium each month. Medicare Supplement and Part D prescription drug plans are sold by private insurance companies, including Aetna and Humana, but these plans offer a different set of terms and benefits than Medicare Advantage and are more expensive for many seniors.

25.     Medicare Advantage was designed to harness the benefits of competition among private insurers, and it is a much better deal for many seniors. Medicare Advantage plans receive funding from CMS based on the amount that would be required to cover a patient under

traditional Medicare, and they provide all of the insurance coverage that traditional Medicare does. And Medicare Advantage plans offer seniors additional benefits. Most Medicare Advantage plans feature lower copayments and lower coinsurance than traditional Medicare. Medicare Advantage plans also cap annual out-of-pocket costs and typically offer prescription drug coverage without additional charges. Because Medicare Advantage usually covers both medical expenses and prescription drugs, it is easier for seniors to navigate than if they had multiple insurance plans under traditional Medicare. Medicare Advantage plans also frequently offer dental, vision, and hearing coverage, as well as care management and wellness programs, hotlines staffed with nurses, home safety assessments, education, preventive care, gym memberships, and transportation to and from doctors' offices.

26.     Seniors with Medicare Advantage receive these additional benefits and typically pay less for them than if they had traditional Medicare, with or without a Medicare Supplement or Part D plan. As Aetna's CEO testified, for seniors on a fixed income, choosing traditional Medicare over Medicare Advantage is "economically irrational." Medicare Advantage insurers are able to lower their costs—and offer lower prices to many seniors—because they work with networks of doctors and hospitals to care for patients more effectively. For seniors willing to accept a network of healthcare providers, the relationships between insurers and doctors can provide more comprehensive care while lowering overall healthcare costs. In contrast, the products available under traditional Medicare do not involve provider networks and typically do little to coordinate patients' care.

27.     Because of these differences in cost and benefits, many seniors using Medicare Advantage are unlikely to consider any of the traditional Medicare products to be adequate alternatives for Medicare Advantage. Indeed, despite funding cuts to the Medicare Advantage

program over the last several years—cuts that will be fully phased in by 2017—the total number of individual Medicare Advantage enrollees and the percentage of Medicare-eligible individuals enrolled in the program have continued to grow.

28.     Aetna and Humana and other industry participants recognize Medicare Advantage as a distinct product. Health insurers, including Aetna and Humana, have different business units for their Medicare Advantage plans than for their Medicare Supplement plans, including different salespeople, actuaries, and managers. Insurers separately monitor and report their Medicare Advantage enrollment, premiums, plan benefits, and financial performance.

29.     Finally, Medicare Advantage satisfies the well-accepted "hypothetical monopolist" test set forth in the U.S. Department of Justice and Federal Trade Commission 2010 Horizontal Merger Guidelines. A hypothetical monopolist selling Medicare Advantage plans likely would impose a small but significant and non-transitory price increase because an insufficient number of seniors would switch to alternatives to make that price increase unprofitable. For many seniors, combinations of traditional Medicare, Medicare Supplement plans, and Part D prescription drug plans are not cost-effective substitutes for Medicare Advantage.

**B.     The merger would harm seniors in each of the relevant geographic markets.**

30.     Aetna and Humana compete against each other to enroll consumers in their Medicare Advantage plans in hundreds of counties across the United States. CMS allows seniors to enroll only in those Medicare Advantage plans that have been approved for the county in which they live. Therefore, competition in each county is limited to the insurers that have applied to and been approved by CMS to operate in that county, and seniors cannot switch to a plan offered in another county without moving. Each of the 364 counties listed in the Appendix is a relevant geographic market and section of the country under Section 7 of the Clayton Act.

**C.** **This merger is presumptively unlawful in hundreds of counties where Aetna and Humana currently compete against each other.**

31.     The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI") as described in the Merger Guidelines. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has a 100 percent market share. According to the Guidelines, mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive. Accordingly, Aetna's proposed merger with Humana is presumptively unlawful under Supreme Court precedent and the Merger Guidelines in hundreds of counties across the country.

32.     The loss of competition and harm to consumers is likely to be particularly acute in the 364 counties listed in the Appendix. In 70 of these counties, the combined company would have a Medicare Advantage monopoly. In nearly 100 additional counties, Aetna and Humana are the two largest sellers of Medicare Advantage plans.

33.     But harm from this deal is not limited to these counties. If this merger goes through, seniors in many other counties likely would lose the benefits of significant head-to-head competition. For example, in 2017 Aetna is introducing Medicare Advantage plans in 11 counties where Humana previously had a Medicare Advantage monopoly. As Aetna and Humana continue to target other counties for expansion, even more head-to-head competition would result. Competition between Aetna and Humana would be lost in all of these markets.

**D.** **This merger likely would harm seniors by eliminating competition to sell Medicare Advantage plans.**

34.     Aetna and Humana compete against each other to attract seniors enrolled in Medicare Advantage plans by offering lower prices, more generous benefits, better wellness and

care management programs, and higher quality plans. The merger would eliminate this competition between them, and substantially lessen competition in the market generally, in violation of Section 7 of the Clayton Act.

35.     The ordinary course business documents of Aetna and Humana detail their rivalry. Just three months before the merger was announced, Aetna's head of Medicare Advantage described Humana as Aetna's "most formidable competitor," stating that "[w]e compete with them everywhere and they have momentum." Aetna and Humana executives repeatedly discuss the intense competition between the two companies:

- In Atlanta, Georgia, Humana expressed concern in late 2014 that Aetna had "the most competitive benefits for a major plan in the market" and worried that its own plan would "suffer from Aetna's potential gain."

- The next year, an Aetna executive called Humana one of their "strongest competitors" in Atlanta.

- When preparing its 2016 plan offerings in Kansas City, Missouri, Aetna sought to "maximize the opportunity of competing against Humana."

- Upon seeing that Aetna had lowered premiums in Kansas City, a Humana executive observed, "They are going to be a really tough competitor this year."

36.     Aetna and Humana compete to offer seniors lower-cost coverage by working to keep premiums, maximum annual out-of-pocket costs, and the amounts of copayments and coinsurance low. For example, in 2015 Aetna introduced a "low price PPO to compete with Humana's $10 [Regional] PPO that led market growth" in San Antonio, Texas. Aetna introduced a similar PPO product "with competitive premium to compete with Humana PPO" in Las Vegas, Nevada.

37.     Aetna and Humana also compete by offering wellness and care management programs. Both companies have invested successfully in programs designed to keep seniors healthier and in their own homes longer by, for example, installing ramps and providing

transportation services. Aetna and Humana are also leaders in collaborating with doctors and hospitals to improve quality of care and reduce costs by improving patients' health. For example, Aetna's Healthagen subsidiary and Humana's Transcend subsidiary provide doctors and hospitals with the technology to share health data across various platforms, allowing healthcare providers to coordinate care more effectively, catch health issues sooner, and reduce unnecessary treatment.

38.     Aetna and Humana also compete to distinguish themselves by offering higher quality plans. The Centers for Medicare and Medicaid Services assesses the quality of Medicare Advantage plans using a star-rating system and assigns plans up to five stars based on a number of quality metrics, such as success in managing chronic conditions and resolving customer complaints. This system rewards insurers with bonus payments and other financial incentives if they perform well.

39.     Star ratings, despite being phased in just four years ago, are a key factor that distinguishes Medicare Advantage insurers from each other. First, the ratings provide seniors with clear information about the quality of a plan. Second, CMS gives plans that earn ratings of four stars or higher a number of financial benefits, including at least a five percent bonus payment and a larger portion of the savings if the insurer is able to lower costs. By regulation, insurers must use part of these savings to offer more generous benefits or lower premiums. As a result of this reinvestment, plans with high star ratings are generally more attractive to seniors than lower star-rated competitors.

40.     Aetna and Humana are leaders in star ratings. In many of the highly concentrated counties listed in the Appendix, Aetna and Humana are the only insurers with plans that have four or more stars. Across all counties in the Appendix, over 75% of Aetna's and Humana's Medicare Advantage members are in plans with four or more stars. Other Medicare Advantage

insurers in these counties do not perform as well. According to Aetna's CEO, the "key driver of Aetna's Medicare Advantage membership growth trajectory has been [its] star ratings."

41.     Because of their plans' high star ratings, Aetna and Humana receive large bonus payments from CMS. In turn, each is able to offer more generous benefits. Insurers that are unable to achieve at least four stars for their plans are less likely to have long-term competitive significance because the bonus payments reinforce high-quality plans and allow them to become even better. As Aetna's CEO testified, it will be "tough" for plans that do not have four stars to be viable in the long run. As consumers leave low star-rated plans, they are likely to choose higher-quality plans that offer greater benefits. In the vast majority of their competitive territories, Humana and Aetna are the competitors best positioned to offer these high-quality plans. The merger would eliminate competition that has led Aetna and Humana to offer these high-quality plans, substantially lessen competition in the market generally, and end a rivalry that has led to lower prices, better benefits, more choices, and higher-quality care for seniors around the country.

## IV.   THIS MERGER LIKELY WOULD SUBSTANTIALLY LESSEN COMPETITION FOR THE SALE OF HEALTH INSURANCE ON THE PUBLIC EXCHANGES

42.     Aetna's merger with Humana also threatens to harm those individuals and families who rely on the public exchanges to buy health insurance, particularly in Florida, Georgia, and Missouri. Since they began selling insurance on the public exchanges in 2014, Aetna and Humana have competed aggressively and viewed each other as major competitors. Aetna sells insurance on the public exchanges in 15 states and described itself as the "Number One" insurer on the public exchanges. Humana also sells insurance on the public exchanges in 15 states, and the two compete in more than 100 counties.

43.     Competition on the public exchanges is evolving. UnitedHealthcare, one of the big five, recently announced plans to exit most public exchanges next year. In addition, after it agreed to be acquired by Aetna, Humana decided to reduce its public exchange offerings— including exiting several states and discontinuing plans in many counties. Even as it scales back, Humana plans to continue to compete on the public exchanges in 11 states in 2017. Both Aetna and Humana remain committed to competing on the exchanges. For example, Aetna's CEO has testified that "we believe that putting people on the public exchange in the individual market is the best way to go" because "I am running a for-profit company," and the company expects "modest growth on the exchanges." Likewise, Humana's CEO has testified that the company wants to keep its options open "to see how it progresses" so that Humana is "able to then come back into the marketplace" and expand its presence. Eliminating the competition between Aetna and Humana would further reduce the choices available to hundreds of thousands of consumers, many of whom could not afford health insurance purchased off the public exchanges.

A.     **The sale of health insurance on the public exchanges is a relevant product market.**

44.     The sale of commercial health insurance on the public exchanges is a relevant product market and line of commerce under Section 7 of the Clayton Act. The majority of consumers who purchase individual health-insurance plans purchase them through the public exchanges. Through these exchanges, consumers can learn about their coverage options, compare health plans, and enroll in one. Financial assistance in the form of tax credits and cost-sharing reductions is available for most individuals and families who purchase through the public exchanges.

45.     Aetna, Humana, and other insurers recognize individuals purchasing health insurance on the public exchanges as a separate group of customers. These customers have

distinct characteristics, and insurers may offer them different provider networks and different sets of benefits than other customers. Insurers consider different factors when setting prices for the public exchanges, both because most consumers receive financial assistance and because insurers selling on public exchanges incur additional fees and costs, such as user fees and the cost of technology required to connect with the exchange platform.

46.     The sale of health insurance on the public exchanges satisfies the hypothetical monopolist test because consumers who use the exchanges have no reasonable substitutes that they could turn to in response to a small but significant and non-transitory increase in price. Individuals below certain income thresholds are eligible for tax credits and cost-sharing reductions, but only if they purchase their health insurance through a public exchange. Approximately 85 percent of consumers who purchase health insurance on the public exchanges receive some financial assistance. And purchasing healthcare directly from doctors and hospitals is prohibitively expensive for individuals and their families.

**B.     This merger would harm individuals and families in 17 relevant geographic markets.**

47.     Today, Aetna and Humana compete against each other to enroll consumers in their public exchange plans in many counties across the United States. As with Medicare Advantage, individuals in the counties listed below may only enroll in exchange plans that have been approved for sale in their county. Therefore, competition in each county is limited to the insurers that have been approved to operate in that county, and individuals cannot practicably switch to a plan offered in another county. Likewise, the amount of any financial assistance is calculated based on the plans available to a consumer in their county. Each of the following counties is a relevant geographic market and section of the country under Section 7 of the Clayton Act:

(a)  *Florida*: Broward, Palm Beach, and Volusia counties;

(b) **_Georgia_**: Bibb, Chatham, Cherokee, Forsyth, Fulton, Gwinnett, Houston, Muscogee, and Peach counties; and

(c) **_Missouri_**: Clay, Greene, Jackson, Jasper, and Newton counties.

**C.    This merger is presumptively unlawful in each of the relevant geographic markets.**

48.    Aetna and Humana have been two of the most significant participants on the public exchanges in Florida, Georgia, and Missouri. After it agreed to be bought by Aetna, Humana decided to stop competing in numerous counties in these states and elsewhere. Taking Humana's decision into account, the proposed merger is presumptively unlawful in at least each of the 17 relevant geographic markets, where Aetna and Humana will continue to compete and where more than 700,000 people secure health insurance through the public exchanges.

49.    Moreover, these current market-concentration levels likely understate the competitive harm from the merger. With UnitedHealthcare's recent announcement that it will exit most public exchanges, including in Florida, Missouri, and most of Georgia, the number of competitors in those areas will decrease and concentration—and the importance of Aetna and Humana as independent competitors—will increase. In each of the relevant markets in Missouri, for example, where currently only four competitors participate on the public exchange, UnitedHealthcare's exit would leave only one significant competitor to Aetna other than Humana. If Aetna acquired Humana, Aetna's market share would substantially increase, further entrenching its position in those markets.

**D.    This merger would harm individuals and families who buy health insurance on the public exchanges.**

50.    Aetna and Humana regard one another as formidable competitors on the public exchanges. Both companies have closely followed and responded to the other's strategies. For example, in Atlanta, Georgia, Aetna monitored and expressed concern about the pricing of its

"number one competitor, Humana." Similarly, Humana developed an "approach of monitoring Aetna's filings closely in our largest markets, and amending or revising our rates (by a few points) to maintain share" in Florida and other states where they compete. Aetna is "well-positioned for long-term growth" because of its value-based arrangements with doctors and hospitals—"where there's financial gain share and risk share with the [healthcare] providers"—and Humana's low prices allowed it to become "a market leader regarding overall share."

51.     Further, both Aetna and Humana view health insurance sold directly to individuals and families as central to future competition in the health-insurance industry. Humana's CEO sees health insurance "moving to an individual-based insurance product," and Aetna's CEO echoed that the "market is moving more toward a retail marketplace." Without the proposed merger, Aetna and Humana would likely continue to invest in and compete for business on public exchanges in Florida, Georgia, and Missouri.

52.     The merger would eliminate competition between Aetna and Humana and likely lead to higher premiums, reduced quality of products and services, and reduced choice for many consumers that have no other affordable health-insurance options. It likely would also lead to increases in the amount of financial assistance offered through the public exchanges, harming taxpayers as well. Because the proposed merger likely would substantially lessen competition in the sale of health insurance on the public exchanges in the relevant markets, it violates Section 7 of the Clayton Act.

## V.   ABSENCE OF COUNTERVAILING FACTORS

53.     Entry of new health insurers or expansion of existing health insurers in the relevant markets is unlikely to prevent or remedy the proposed merger's anticompetitive effects.

54.     The proposed merger would be unlikely to generate verifiable, merger-specific efficiencies sufficient to reverse or outweigh the anticompetitive effects that are likely to occur.

## VI.   AETNA'S PROPOSED REMEDY WILL NOT FIX THE MERGER'S ANTICOMPETITIVE EFFECTS

55.     Restoring competition is the key to any effective antitrust remedy. The only acceptable remedy for an anticompetitive merger is one that completely resolves the competitive problems created by the merger. Proposed remedies including divestitures must give the buyer both the means and the incentive to effectively compete. Defendants bear the burden of showing that any remedy they propose meets these standards.

56.     Aetna has proposed divesting limited pieces of its or Humana's Medicare Advantage business in an attempt to remedy the anticompetitive effects of the merger. Aetna has had some discussions with potential buyers, but has not entered into a purchase agreement.

57.     The proposal, as Aetna has described it to the Plaintiffs, would include transferring to another health insurer parts of Aetna's and Humana's contracts with CMS to cover individual enrollees in numerous counties throughout the United States. These enrollees would have no choice but to move from the Medicare Advantage plan they had chosen to one that Aetna has chosen for them. During the next period when seniors are able to switch plans, nothing would prevent these enrollees from simply switching back to the Aetna or Humana plan they had originally chosen. Having lost these enrollees, the buyer would not restore the competition that had existed between Aetna and Humana.

58.     The plan outlined to Plaintiffs has many problems, including:

- The buyer would not receive any intact business units. Instead, the Defendants propose to sell only parts of contracts to cover individual enrollees, stripped out from the infrastructure that currently operates to provide those enrollees high-quality health insurance. The buyer would be unable to replicate that infrastructure.

- The buyer would not have the necessary contracts with doctors and hospitals, technology platforms, claims processing systems, or employees with specialized knowledge, and no guarantee that the enrollees it just bought would not immediately return to Aetna or Humana.

- The buyer would not receive complete groups of Medicare Advantage enrollees enrolled under particular contracts between Aetna or Humana and CMS. The proposed divestiture would involve picking out enrollees from within these contracts, transferring some of them to the buyer, and leaving others with Aetna or Humana. This process would require significant oversight by CMS.

- The buyer would not receive assets sufficient to give it the scope and scale of Aetna and Humana because the buyer would not acquire enrollees in related lines of business or geographic areas, including:

  o   Enrollees in Medicare Advantage special needs plans;

  o   Enrollees in group Medicare Advantage plans;

  o   Enrollees in any plans sold to employer groups;

  o   Enrollees in Medicare Advantage plans in counties adjacent to the counties where Aetna and Humana have proposed divestitures.

- Neither the Aetna nor the Humana brand would transfer to the buyer.

- The proposal only seeks to address the harm to Medicare Advantage consumers. It does not even attempt to address the loss of competition for individuals and families purchasing health insurance on the public exchanges.

59.     Under Aetna's proposal, no buyer could compete as effectively as Aetna or Humana do today, nor would a buyer be as well-positioned as Aetna or Humana to expand. The buyer's business would be smaller in both the affected and neighboring counties and across different types of plans, diminishing the buyer's ability to negotiate favorable contracts with doctors and hospitals—contracts that form much of the basis of Aetna's and Humana's success.

60.     The buyer would not be an independent competitor as Humana is today. The proposed remedy would leave the buyer dependent on Aetna—potentially for years—for providing basic services. Since the buyer would not have a healthcare provider network in place or be acquiring an intact business unit that would enable it to operate on its own, it would have to

rely on Aetna's healthcare provider network and receive administrative services from Aetna for a lengthy period. Because the buyer would receive only limited assets, the buyer would be highly unlikely to timely replicate Aetna's and Humana's existing provider networks and competitive strengths in the relevant markets.

61.     For these reasons, among others, the assets that Aetna proposes to divest would have lower sales volume and lower market shares, be less efficient, be of lower quality, provide fewer opportunities for innovation, and otherwise fail to replicate the competition between Aetna and Humana today. The proposed remedy would also impose a heavy burden on the Court, the Plaintiffs, and CMS, as it would require oversight of Aetna, Humana, and the buyers' businesses in hundreds of markets throughout the United States. CMS would be required to manage the transfer of some enrollees in some counties from Aetna or Humana to the buyer, and the Plaintiffs would need to monitor the ongoing relationship between Aetna and the buyer. If offered by Aetna as a remedy in this case, the Court should reject this proposal as wholly inadequate to resolve the harm to competition that the merger would cause.

## VII.   VIOLATION ALLEGED

62.     The United States brings this action, and this Court has subject-matter jurisdiction over this action, under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

63.     The Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Plaintiff States, by and through their respective Attorneys General, bring this action as *parens patriae* on behalf of and to protect the health and welfare of their citizens and the general economy of each of their states.

64. The Defendants are engaged in, and their activities substantially affect, interstate commerce. Aetna and Humana sell products and services to numerous customers located throughout the United States, and that insurance covers enrollees when they travel across state lines.

65. This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22. Aetna and Humana both transact business in this district.

66. Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

67. The effect of the proposed merger, if approved, likely would be to lessen competition substantially, and to tend to create a monopoly, in interstate trade and commerce in each of the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

68. Among other things, the merger would likely have the following effects:

    (a) eliminating significant present and future head-to-head competition between Aetna and Humana in the relevant markets;

    (b) reducing competition generally in the relevant markets;

    (c) causing prices to rise for customers in the relevant markets;

    (d) causing a reduction in quality in the relevant markets; and

    (e) reducing competition over innovation and new product development.

## VIII.   REQUEST FOR RELIEF

69.   Plaintiffs request:

(a)   that Aetna's proposed acquisition of Humana be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)   that the Defendants be permanently enjoined and restrained from carrying out the planned acquisition or any other transaction that would combine the two companies;

(c)   that Plaintiffs be awarded their costs of this action, including attorneys' fees to the Plaintiff States; and

(d)   that Plaintiffs be awarded such other relief as the Court may deem just and proper.

Dated: July 21, 2016

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**


SONIA K. PFAFFENROTH (D.C. Bar #467946)
Deputy Assistant Attorney General


PATRICIA A. BRINK
Director of Civil Enforcement


ERIC MAHR (D.C. Bar #459350)
Director of Litigation


PETER J. MUCCHETTI  (D.C. Bar #463202)
Chief, Litigation I

RYAN M. KANTOR
Assistant Chief, Litigation I

SANFORD M. ADLER
DYLAN M. CARSON (D.C. Bar #465151)
CRAIG CONRATH
EMMA DICK
JUSTIN T. HEIPP (D.C. Bar #1017304)
BARRY JOYCE
PATRICK M. KUHLMANN
JAMES RYAN
MATTHEW D. SIEGEL
PATRICIA L. SINDEL (D.C. Bar #997505)
MARK B.TOBEY
ERIC D. WELSH (D.C. Bar # 998618)

U.S. Department of Justice, Antitrust Division
Litigation I Section
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Phone: (202) 514-8430
Facsimile: (202) 307-5802
E-mail: ryan.kantor@usdoj.gov

Attorneys for the United States

**FOR PLAINTIFF STATE OF DELAWARE:**

MATTHEW P. DENN
Attorney General


MICHAEL A. UNDORF
Deputy Attorney General
Delaware Department of Justice
820 North French Street, 5th Floor
Wilmington, Delaware 19801
Phone: 302-577-8924
Facsimile: 302-577-6499
E-mail: michael.undorf@state.de.us

**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE (D.C. Bar # 186585)
Deputy Attorney General
Public Interest Division

CATHERINE A. JACKSON (D.C. Bar # 1005415)
Assistant Attorney General
441 Fourth Street, N.W., Suite 630-South
Washington, DC  20001
Phone:  (202) 442-9864
Facsimile:  (202) 741-0655
Email:  catherine.jackson@dc.gov

**FOR PLAINTIFF STATE OF FLORIDA:**

PAMELA JO BONDI
Attorney General

PATRICIA A. CONNERS
Deputy Attorney General

LIZABETH A. BRADY
Chief, Multistate Enforcement
Florida State Bar Number: 457991
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Phone: 850-414-3851
Facsimile: 850-488-9134
E-mail: liz.brady@myfloridalegal.com

Christopher R. Hunt
Assistant Attorney General
Florida State Bar Number: 832601

Timothy M. Fraser
Assistant Attorney General
Florida State Bar Number: 957321

Rachel Michelle Steinman
Assistant Attorney General
Florida State Bar Number: 109775

**FOR PLAINTIFF STATE OF GEORGIA:**

SAMUEL S. OLENS
Attorney General

DANIEL WALSH
Georgia Bar No. 735040
Senior Assistant Attorney General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
Phone: 404-657-2204
Facsimile: 404-656-0677
E-mail: dwalsh@law.ga.gov

**FOR PLAINTIFF STATE OF ILLINOIS:**

LISA MADIGAN
Attorney General

ROBERT W. PRATT
Chief, Antitrust Bureau
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
Phone: 312-814-3722
Facsimile: 312-814-4209
E-mail: RPratt@atg.state.il.us

FOR PLAINTIFF STATE OF IOWA

THOMAS J. MILLER
Attorney General

LAYNE M. LINDEBAK
Assistant Attorney General

Iowa Department of Justice
Special Litigation Division
1305 East Walnut Street, 2nd Floor
Des Moines, Iowa 50319
Ph: 515-281-7054
Fax: 515-281-4902
Layne.Lindebak@iowa.gov

**FOR PLAINTIFF STATE OF OHIO:**

MIKE DEWINE
Attorney General

THOMAS N. ANGER
Assistant Attorney General

BRIAN F. JORDAN
Assistant Attorney General

BETH A. FINNERTY
Assistant Attorney General
Ohio Bar No. 0055383
150 E. Gay Street, 22nd Floor
Columbus, OH 43215
Phone: 614-466-4328
Facsimile: 614-995-0266
E-mail: beth.finnerty@ohioattorneygeneral.gov

**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA**

Bruce L. Castor, Jr.
First Deputy Attorney General

James A. Donahue, III
Executive Deputy Attorney General
Public Protection Division

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

Jennifer A. Thomson
PA ID # 89360
Senior Deputy Attorney General
Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
Telephone: (717) 787-4530
Fax: (717) 787-1190
Email: jthomson@attorneygeneral.gov

Aaron L. Schwartz
PA ID #319615
Deputy Attorney General
Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
Telephone: (717) 787-4530
Fax: (717) 787-1190
Email: aschwartz@attorneygeneral.gov

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

MARK R. HERRING
Attorney General

CYNTHIA E. HUDSON
Chief Deputy Attorney General

RHODES B. RITENOUR
Deputy Attorney General
Civil Litigation Division

RICHARD S. SCHWEIKER, JR.
Senior Assistant Attorney General and Chief
Consumer Protection Section

SARAH OXENHAM ALLEN
Senior Assistant Attorney General and Unit Manager
Antitrust Unit
Consumer Protection Section
Virginia State Bar No. 33217
Phone: 804-786-6557
Facsimile: 804-786-0122
E-mail: SOAllen@oag.state.va.us


TYLER T. HENRY
Assistant Attorney General
Antitrust Unit
Consumer Protection Section
Virginia State Bar No. 87621
202 North 9th Street
Richmond, Virginia 23219
Phone: 804-692-0485
Facsimile: 804-786-0122
E-mail: THenry@oag.state.va.us

# APPENDIX

## *Relevant Geographic Markets — Medicare Advantage*

As alleged above, Aetna's merger with Humana is likely to substantially lessen competition for the sale of Medicare Advantage plans in the following geographic areas:

| STATE | COUNTY | | STATE | COUNTY |
|---|---|---|---|---|
| Alabama | Barbour | | Georgia | Clayton |
| Alabama | Henry | | Georgia | Cobb |
| Alabama | Houston | | Georgia | Columbia |
| Alabama | Russell | | Georgia | Coweta |
| Arkansas | Benton | | Georgia | DeKalb |
| Arkansas | Carroll | | Georgia | Douglas |
| Arkansas | Crawford | | Georgia | Elbert |
| Arkansas | Franklin | | Georgia | Evans |
| Arkansas | Logan | | Georgia | Fayette |
| Arkansas | Madison | | Georgia | Forsyth |
| Arkansas | Montgomery | | Georgia | Fulton |
| Arkansas | Pulaski | | Georgia | Gwinnett |
| Arkansas | Scott | | Georgia | Hall |
| Arkansas | Sebastian | | Georgia | Hancock |
| Arkansas | Washington | | Georgia | Harris |
| Delaware | Kent | | Georgia | Lincoln |
| Delaware | New Castle | | Georgia | Marion |
| Florida | Broward | | Georgia | McDuffie |
| Florida | Charlotte | | Georgia | McIntosh |
| Florida | Duval | | Georgia | Muscogee |
| Florida | Manatee | | Georgia | Newton |
| Florida | Martin | | Georgia | Paulding |
| Florida | Polk | | Georgia | Richmond |
| Florida | Sarasota | | Georgia | Rockdale |
| Florida | St. Johns | | Georgia | Stewart |
| Florida | St. Lucie | | Georgia | Warren |
| Georgia | Bryan | | Iowa | Adair |
| Georgia | Burke | | Iowa | Appanoose |
| Georgia | Camden | | Iowa | Benton |
| Georgia | Chatham | | Iowa | Boone |
| Georgia | Chattahoochee | | Iowa | Buchanan |
| Georgia | Cherokee | | Iowa | Butler |

| STATE | COUNTY |
|-------|--------|
| Iowa | Carroll |
| Iowa | Cedar |
| Iowa | Clinton |
| Iowa | Crawford |
| Iowa | Dallas |
| Iowa | Decatur |
| Iowa | Delaware |
| Iowa | Dickinson |
| Iowa | Fremont |
| Iowa | Grundy |
| Iowa | Hamilton |
| Iowa | Ida |
| Iowa | Iowa |
| Iowa | Jasper |
| Iowa | Johnson |
| Iowa | Jones |
| Iowa | Keokuk |
| Iowa | Linn |
| Iowa | Lucas |
| Iowa | Lyon |
| Iowa | Madison |
| Iowa | Mahaska |
| Iowa | Marion |
| Iowa | Marshall |
| Iowa | Mills |
| Iowa | Monona |
| Iowa | Monroe |
| Iowa | Muscatine |
| Iowa | O'Brien |
| Iowa | Osceola |
| Iowa | Page |
| Iowa | Plymouth |
| Iowa | Polk |
| Iowa | Pottawattamie |
| Iowa | Poweshiek |
| Iowa | Sioux |
| Iowa | Story |
| Iowa | Tama |

| STATE | COUNTY |
|-------|--------|
| Iowa | Union |
| Iowa | Warren |
| Iowa | Washington |
| Iowa | Wayne |
| Iowa | Webster |
| Iowa | Winneshiek |
| Iowa | Woodbury |
| Iowa | Wright |
| Illinois | Bond |
| Illinois | Boone |
| Illinois | Brown |
| Illinois | Carroll |
| Illinois | Cass |
| Illinois | Christian |
| Illinois | Clinton |
| Illinois | DeKalb |
| Illinois | Effingham |
| Illinois | Fayette |
| Illinois | Fulton |
| Illinois | Greene |
| Illinois | Hancock |
| Illinois | Jersey |
| Illinois | Kendall |
| Illinois | Logan |
| Illinois | Macon |
| Illinois | Macoupin |
| Illinois | Marshall |
| Illinois | Mason |
| Illinois | Menard |
| Illinois | Montgomery |
| Illinois | Morgan |
| Illinois | Moultrie |
| Illinois | Ogle |
| Illinois | Peoria |
| Illinois | Pike |
| Illinois | Randolph |
| Illinois | Sangamon |
| Illinois | Scott |

| STATE | COUNTY |
|---|---|
| Illinois | Stephenson |
| Illinois | Tazewell |
| Illinois | Washington |
| Illinois | Winnebago |
| Illinois | Woodford |
| Kansas | Allen |
| Kansas | Anderson |
| Kansas | Atchison |
| Kansas | Bourbon |
| Kansas | Butler |
| Kansas | Cherokee |
| Kansas | Douglas |
| Kansas | Franklin |
| Kansas | Harvey |
| Kansas | Jackson |
| Kansas | Jefferson |
| Kansas | Johnson |
| Kansas | Labette |
| Kansas | Leavenworth |
| Kansas | Linn |
| Kansas | Miami |
| Kansas | Montgomery |
| Kansas | Osage |
| Kansas | Pottawatomie |
| Kansas | Sedgwick |
| Kansas | Shawnee |
| Kansas | Wyandotte |
| Louisiana | Ascension |
| Louisiana | Bossier |
| Louisiana | Caddo |
| Louisiana | East Baton Rouge |
| Missouri | Audrain |
| Missouri | Barry |
| Missouri | Barton |
| Missouri | Bates |
| Missouri | Benton |
| Missouri | Caldwell |
| Missouri | Callaway |

| STATE | COUNTY |
|---|---|
| Missouri | Carroll |
| Missouri | Cass |
| Missouri | Cedar |
| Missouri | Christian |
| Missouri | Clay |
| Missouri | Clinton |
| Missouri | Cole |
| Missouri | Cooper |
| Missouri | Dade |
| Missouri | Dallas |
| Missouri | Douglas |
| Missouri | Franklin |
| Missouri | Greene |
| Missouri | Henry |
| Missouri | Hickory |
| Missouri | Howard |
| Missouri | Jackson |
| Missouri | Jasper |
| Missouri | Johnson |
| Missouri | Laclede |
| Missouri | Lafayette |
| Missouri | Lawrence |
| Missouri | Lincoln |
| Missouri | Livingston |
| Missouri | McDonald |
| Missouri | Miller |
| Missouri | Moniteau |
| Missouri | Montgomery |
| Missouri | Newton |
| Missouri | Osage |
| Missouri | Ozark |
| Missouri | Perry |
| Missouri | Pettis |
| Missouri | Phelps |
| Missouri | Platte |
| Missouri | Polk |
| Missouri | Pulaski |
| Missouri | Ray |

| STATE | COUNTY |
|---|---|
| Missouri | Saline |
| Missouri | St. Charles |
| Missouri | St. Clair |
| Missouri | Ste. Genevieve |
| Missouri | Vernon |
| Missouri | Warren |
| Missouri | Washington |
| Missouri | Webster |
| Missouri | Wright |
| North Carolina | Alexander |
| North Carolina | Cabarrus |
| North Carolina | Caldwell |
| North Carolina | Caswell |
| North Carolina | Catawba |
| North Carolina | Durham |
| North Carolina | Gaston |
| North Carolina | Guilford |
| North Carolina | Iredell |
| North Carolina | Mecklenburg |
| North Carolina | Orange |
| North Carolina | Person |
| North Carolina | Randolph |
| North Carolina | Rowan |
| North Carolina | Union |
| North Carolina | Wake |
| Nebraska | Cass |
| Nebraska | Dodge |
| Nebraska | Douglas |
| Nebraska | Lancaster |
| Nebraska | Sarpy |
| Nebraska | Saunders |
| Nebraska | Washington |
| Nevada | Clark |
| Ohio | Brown |
| Ohio | Butler |
| Ohio | Clermont |
| Ohio | Columbiana |
| Ohio | Delaware |

| STATE | COUNTY |
|---|---|
| Ohio | Franklin |
| Ohio | Hamilton |
| Ohio | Hancock |
| Ohio | Jefferson |
| Ohio | Marion |
| Ohio | Meigs |
| Ohio | Muskingum |
| Ohio | Seneca |
| Oklahoma | Kingfisher |
| Oklahoma | Muskogee |
| Pennsylvania | Chester |
| Pennsylvania | Clinton |
| Pennsylvania | Cumberland |
| Pennsylvania | Dauphin |
| Pennsylvania | Erie |
| Pennsylvania | Franklin |
| Pennsylvania | Lancaster |
| Pennsylvania | Lebanon |
| Pennsylvania | Lycoming |
| Pennsylvania | Perry |
| South Dakota | Clay |
| South Dakota | Union |
| Texas | Aransas |
| Texas | Bandera |
| Texas | Bastrop |
| Texas | Bexar |
| Texas | Blanco |
| Texas | Caldwell |
| Texas | Comal |
| Texas | Cooke |
| Texas | Gillespie |
| Texas | Gregg |
| Texas | Harrison |
| Texas | Hays |
| Texas | Kerr |
| Texas | Limestone |
| Texas | Matagorda |
| Texas | Medina |

| STATE | COUNTY |
|-------|--------|
| Texas | Parker |
| Texas | San Jacinto |
| Texas | Travis |
| Texas | Wharton |
| Texas | Wise |
| Utah | Daggett |
| Utah | Uintah |
| Virginia | Alexandria City |
| Virginia | Arlington |
| Virginia | Chesterfield |
| Virginia | Danville City |
| Virginia | Fairfax |
| Virginia | Fairfax City |
| Virginia | Franklin |
| Virginia | Fredericksburg City |
| Virginia | Gloucester |
| Virginia | Hampton City |
| Virginia | Hanover |
| Virginia | Henrico |
| Virginia | Henry |
| Virginia | Loudoun |
| Virginia | Manassas City |
| Virginia | Manassas Park City |
| Virginia | Martinsville City |
| Virginia | Newport News City |
| Virginia | Pittsylvania |
| Virginia | Prince William |
| Virginia | Richmond City |
| Virginia | Spotsylvania |
| Virginia | Stafford |
| Virginia | York |
| West Virginia | Barbour |
| West Virginia | Berkeley |
| West Virginia | Boone |
| West Virginia | Braxton |
| West Virginia | Brooke |
| West Virginia | Cabell |

| STATE | COUNTY |
|-------|--------|
| West Virginia | Clay |
| West Virginia | Fayette |
| West Virginia | Gilmer |
| West Virginia | Greenbrier |
| West Virginia | Hancock |
| West Virginia | Harrison |
| West Virginia | Jackson |
| West Virginia | Jefferson |
| West Virginia | Kanawha |
| West Virginia | Lewis |
| West Virginia | Lincoln |
| West Virginia | Logan |
| West Virginia | Marion |
| West Virginia | Marshall |
| West Virginia | Mason |
| West Virginia | Mercer |
| West Virginia | Monongalia |
| West Virginia | Morgan |
| West Virginia | Nicholas |
| West Virginia | Preston |
| West Virginia | Putnam |
| West Virginia | Raleigh |
| West Virginia | Randolph |
| West Virginia | Ritchie |
| West Virginia | Roane |
| West Virginia | Taylor |
| West Virginia | Tucker |
| West Virginia | Tyler |
| West Virginia | Upshur |
| West Virginia | Wayne |
| West Virginia | Webster |
| West Virginia | Wetzel |
| West Virginia | Wirt |
| West Virginia | Wood |
| West Virginia | Wyoming |