UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,   .
et al.,   .
   . CA No. 16-1494
      Plaintiffs,   .
   .
  v.   .
   . Washington, D.C.
AETNA, INC., et al.,   . Monday, December 5, 2016
   . 9:09 a.m.
      Defendants.   .
. . . . . . . . . . . . . . . .  Pages 1 through 118


DAY 1, A.M. SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For Plaintiff United States:   CRAIG W. CONRATH, ESQ.
   RYAN M. KANTOR, ESQ.
   ERIC J. MAHR, ESQ.
   JUSTIN T. HEIPP, ESQ.
   PETER J. MUCCHETTI, ESQ.

   U.S. Department of Justice
   Antitrust Division
   450 Fifth Street, NW
   Washington, DC 20530

For Plaintiff State of Iowa:   LAYNE M. LINDEBAK, ESQ.
   Office of the Attorney General
   1305 East Walnut Street
   2nd Floor
   Des Moines, IA 50319


For Plaintiff   JAMES A. DONAHUE, III, ESQ.
Commonwealth of Pennsylvania:   Office of the Attorney General
   Public Protection Division
   14th Floor
   Strawberry Square
   Harrisburg, PA 1701

For Defendant Aetna:                JOHN M. MAJORAS, ESQ.
                                    GEOFFREY S. IRWIN, ESQ.
                                    PAULA RENDER, ESQ.
                                    CHRISTOPHER N. THATCH, ESQ.

                                    Jones Day
                                    51 Louisiana Avenue, NW
                                    Washington, DC 20001

For Defendant Humana:               KENT A. GARDINER, ESQ.
                                    SHARI R. LAHLOU, ESQ.
                                    DAVID M. SCHNORRENBERG, ESQ

                                    Crowell & Moring LLP
                                    1001 Pennsylvania Avenue, NW
                                    Washington, DC 20004

Court Reporter:                     BRYAN A. WAYNE, RPR, CRR
                                    U.S. Courthouse, Room 4704-A
                                    333 Constitution Avenue, NW
                                    Washington, DC 20001
                                    (202) 354-3186

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

Court Ruling .......................................... 5

Opening Statement of the United States .................. 11

Opening Statement of State of Pennsylvania .............. 39

Opening Statement of Defendant Aetna  ................... 41

Opening Statement of Defendant Humana ................... 72

WITNESS:                                        PAGE:

Richard G. Frank:    Direct Examination................. 87

```
 1                      P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Your Honor, we have Civil Action

 3      16-1495, United States of America versus Aetna, Inc. and Humana,

 4      Inc.  I'll ask that counsel please approach the lectern and

 5      identify yourself and those at your respective tables.  Thank

 6      you.

 7           MR. CONRATH:  Good morning, Your Honor, Craig Conrath

 8      for the United States.  With me this morning at counsel table

 9      are Eric Mahr, Alexandra Ampudia, Justin Heipp, Peter Mucchetti,

10      Layne Lindebak of Iowa, James Donahue of Pennsylvania, Eric

11      Welsh and Ryan Kantor.

12           THE COURT:  It will be the hardest thing you do this

13      morning is remember all those names.

14           MR. CONRATH:  It might be.

15           THE COURT:  Mr. Gardiner, good morning.

16           MR. GARDINER:  Good morning, Your Honor.  Ted Gardiner

17      from Crowell & Moring for Humana.  With me at counsel table are

18      my colleagues Shari Lahlou and David Schnorrenberg, and we have

19      the general counsel and senior VP of Humana, Chris Todoroff.

20           THE COURT:  Good morning to all of you.  Mr. Majoras.

21           MR. MAJORAS:  Good morning, Your Honor.  John Majoras

22      from Jones Day on behalf of Aetna.  With me at counsel table

23      this morning are my colleagues, Tom Demitrack, Geoff Irwin,

24      Chris Thatch, and Paula Render.  And I would also like to

25      introduce to the Court our corporate representative, Mr. Thomas
```

Sabatino, who is the general counsel of Aetna and is sitting at the bench.

THE COURT:  Good morning to all of you as well.  All right.  We're here for the start of trial in this proceeding. There's one preliminary matter that I said I would deal with, and I'll try to deal with it fairly efficiently.  And I'll call it a motion by the government to exclude certain evidence.

The dispute concerns Defendant's Exhibit 462, it's a four-page memorandum from Kevin Griffis, an assistant secretary at HHS, and Ben Wakana, a deputy assistant secretary at HHS, to the HHS secretary, Sylvia Burwell.  The government seeks to prevent defendants from introducing certain paragraphs of this memorandum into evidence on the basis that they are protected by the deliberative-process privilege.

Just so we're straight on what paragraphs we're talking about, it is most everything under the heading "Conclusion, Proposal for OE4," except for the last bullet point under that heading, which has a heading itself of "Rollout Strategy," and then the two paragraphs that precede that heading on page 2 as well.

The government has submitted a declaration of Mr. Wakana in support of its privilege claim.  I got that on Friday afternoon. Neither party has submitted a brief, although I did hear some argument from you on this issue at the pretrial conference on Friday.

1    Deliberative-process privilege.  The Supreme Court has

2    indicated quite clearly that the privilege rests on the

3    realization that officials will not communicate candidly among

4    themselves if they have to worry that their remarks are subject

5    to discovery and then perhaps to publication on the front page

6    of newspapers, and hence, the privilege seeks to preserve open

7    and frank discussion that is needed for effective agency

8    decision-making.  And I cite for that to Department of the

9    Interior v. Klamath Water Users Protective Association at 532

10   U.S. 1, jump cite 8, 8-9, a 2001 case.

11   The deliberative-process privilege applies to information

12   that is both predecisional and deliberative.  Information is

13   predecisional if it precedes the decision to which it relates.

14   Senate of the Commonwealth of Puerto Rico v. Department of

15   Justice, 823 F.2d 574, jump 585, D.C. Circuit 1987.  And the

16   information is deliberative if it is part of the agency give and

17   take by which the decision is made.  Vaughn v. Rosen, 523 F.2d

18   1136, jump 1144, D.C. Circuit 1975.

19   So the government's declaration here establishes that the

20   information contained in the disputed paragraphs is both

21   predecisional and deliberative.  The opinions and analysis

22   expressed in those paragraphs are the basis for the authors'

23   recommendation to their superior, the secretary of HHS, on an

24   upcoming agency decision.  And recommendations of this kind are

25   generally protected by the deliberative-process privilege.

1    Indeed, the D.C. Circuit so noted last year in the case of _

2    Abtew v. United States Department of Homeland Security, 808 F.3d

3    895, jump cite 899, a 2015 case, indicating that a

4    recommendation to a superior on a matter pending before the

5    supervisor, or superior, is a classic example of a deliberative

6    document.

7        The defendants haven't really attempted to argue otherwise.

8    Instead, what they argue is that the relevant analysis lost its

9    privileged status when the agency adopted it as its public

10   position in a later press release.

11       Defendants are correct that, generally speaking, an agency

12   cannot assert the deliberative-process privilege as to opinions

13   that have been adopted as the agency position on a particular

14   issue or in dealings with the public.  Supreme Court citation to

15   NLRB v. Sears Roebuck and Company, 421 U.S. 132, jump cite 161,

16   a 1975 case; and the D.C. Circuit case in Coastal States Gas

17   Corp. v. Department of Energy at 617 F.2d 854, jump cite 866,

18   D.C. Circuit 1980.

19       I haven't seen in the record before me that type of

20   adoption that is being relied on by the defendants.  Most of

21   what HHS has done is publicly adopted figures that reflect the

22   memorandum's bottom-line recommendations.  That doesn't mean,

23   however, that it has publicly adopted all of the memorandum's

24   analysis.  And the D.C. Circuit recently addressed a very

25   similar situation in the Abtew case.

1    There, a FOIA requester whose asylum application had been

2    denied by the Department of Homeland Security sought access to

3    an internal agency document that was called an assessment to

4    refer, which had made a recommendation on the disposition of the

5    application.  The plaintiff in that case argued that even if the

6    assessment might normally be privileged, the privilege was

7    forfeited when the ultimate decision-maker on the application

8    had initialed the assessment and adopted its recommendation to

9    deny the application.

10    But the D.C. Circuit rejected that argument.  The Court

11    reasoned that the agency had explained its final decision in a

12    separate document, which is not mentioned in the assessment at

13    all.  The Court also declined to interpret the fact that the

14    ultimate decision-maker had initialed the assessment as an

15    endorsement of its reasoning.  Because the agency had not

16    expressly adopted the assessment or incorporated it by reference

17    into its final decision, the assessment remained privileged.

18    808 F.3d at 899.  And I think Abtew controls the outcome here.

19    As far as the record before me reveals, HHS has never

20    publicly adopted the analysis contained in the memorandum.  The

21    press release that defendants point to in support of their

22    adoption argument does not refer to or incorporate that

23    memorandum or its analysis.  The press release only states

24    numbers, really, not the reasoning behind them.

25    And there's no evidence of adoption akin to the initialing

that was at issue in <u>Abtew</u>, and it was found to be insufficient

there.   As in <u>Abtew</u>, the supervisor, here the Secretary of HHS,

made the decision, and there is no indication that the analysis

and explanation at issue in the contested memorandum was

adopted.

Hence, I conclude that the analysis identified by the

government is subject to the deliberative-process privilege.

There's also an argument here that the privilege, which is a

qualified privilege, is overcome by the defendant's need for the

information in this trial.   I find that argument unpersuasive.

It certainly is relevant to an issue or issues in the case, and

the litigation is of obvious public importance.   But I believe

there will be other evidence on this issue, and that can be

admitted without the threat to the government candor that is

posed here.

So because the analysis identified by the government is

privileged and defendants have not shown a sufficient need for

its admission so as to overcome that privilege, the analysis is

inadmissible in this case and therefore the government's motion

to exclude will be granted.

With that, I believe we're ready for openings.

Mr. Conrath, it will be you first and then some time also given

to someone else, and I don't know who that will be, so please

tell me when you get up to the microphone.

MR. CONRATH:   I will begin, Your Honor, and

1    Mr. Donahue of Pennsylvania will have something to say after

2    I have finished.

3              THE COURT:  All right.

4              MR. CONRATH:  We may have one pending matter, which is

5    I think maybe now is the time for me to move admission of -- now

6    that Your Honor has resolved, I think, the last question about

7    the exhibits, I move the admission of all the exhibits that have

8    been previously submitted to the Court.

9              THE COURT:  You're moving both plaintiffs' and

10   defendants' exhibits?  Or do you want to give them the privilege

11   of moving their own exhibits?

12             MR. CONRATH:  I think we'll give them the chance to

13   move their own, Your Honor.

14             THE COURT:  Mr. Majoras.

15             MR. MAJORAS:  Your Honor, defendants do not object to

16   the motion by the plaintiffs, and we would also move for the

17   admission of exhibits that we have likewise agreed upon, the

18   defense exhibits, between the parties.

19             THE COURT:  All right.  The totality of the

20   plaintiffs' exhibits and defendants' exhibits are admitted

21   without objection.

22        All right.  Mr. Conrath.  And I did issue a supplemental

23   order this morning on the use of confidential information.  It's

24   the order that was proposed by the parties.

25             MR. CONRATH:  Thank you, Your Honor.  May it please

the Court.  We come before you today on behalf of the seniors,

individual consumers, and taxpayers who will be harmed by the

merger of two of the largest health insurance companies in the

United States, Aetna and Humana.  And I see I have neglected my

first step, which is to ask if you would like a hard copy of the

slides we'll be using.

THE COURT:  I think I'm all right with the screen.

**OPENING STATEMENT BY COUNSEL FOR THE GOVERNMENT**

MR. CONRATH:  This is an important case.  I don't have

to explain why people's health insurance is important to them,

but it's especially important for the consumers at issue in this

case, seniors and the mostly low or moderate income people who

buy individual insurance on the public exchanges.

While this is an important case, the antitrust analysis is

relatively straightforward.  The merger of Aetna and Humana

would be a merger of leading competitors that's presumptively

illegal under Supreme Court precedent and D.C. Circuit

precedent.  This presumption cannot be overcome or avoided by

the defendants.

The evidence that we will present will show why protecting

competition to provide health insurance in these markets is

critically important.  I'm going to talk first today about what

the evidence will show about competition in Medicare Advantage

markets.  Second, I will talk about competition in the public

exchange markets.  And then I'll briefly discuss the questions

of claimed efficiencies, and then I'll briefly outline how our presentation of evidence will proceed.

Let's talk first about Medicare Advantage.  There's no question that the principal focus of this trial will be Medicare Advantage.  In Medicare Advantage there's a loss of competition in over 350 counties.  It would be a merger to monopoly in 70 of those counties.  If the merger substantially lessens competition in any relevant market, then there's a violation and the proper remedy is to enjoin it.

In the Medicare Advantage part of the case, there are three principal issues the Court will be called upon to decide. First, market definition.  Is Medicare Advantage its own separate relevant product market?  Which means that competition among Medicare Advantage insurers is important and worth protecting.  Or is the market all Medicare, including government-provided Original Medicare and its various add-ons? That's an extreme claim because it would mean that there's so much competition from Original Medicare that even a merger of all Medicare Advantage providers would have to be allowed.

Second, the next principal question the Court will be called upon to decide is competitive effects.  If Medicare Advantage is the market, then the question is whether the merger is presumptively unlawful because of the substantial elimination of competition.

And third, the third principal issue that the Court will be

called upon to decide is the remedy proposed by the defendants, whether a partial spin-off of contracts with individuals to a firm with a record of failure in the Medicare Advantage market would be a remedy for a presumptively unlawful merger.

This merger would put together two strong competitors. Humana is the largest Medicare Advantage insurer of individuals by number of members.  Aetna is the fourth largest.  Aetna has been growing fast; it's added more new counties than any other Medicare Advantage insurer, over 600 in the last six years.

The evidence will show that as Aetna has grown, it has been brought into increasing competition with Humana.  In 2011, Aetna competed with Humana in 79 counties.  By 2016, Aetna competed with Humana in 675 counties.

So what is Medicare Advantage?  It's a way in which seniors can get their Medicare benefits from private insurers.  This in front of you now is a slide that Mr. Broussard, the CEO of Humana, used in a public presentation.  It highlights how Medicare Advantage is differentiated from Original Medicare.

As Mr. Broussard's document says, Medicare Advantage, better benefits, lower costs.  So you can see here that Humana is making a sharp distinction between Medicare Advantage and Original Medicare.

All of the evidence taken together will show that the sale of Medicare Advantage insurance is a relevant product market. But what's the standard on which that evidence will be judged?

Well, market definition, as we apply it here, comes from the
Supreme Court's decision in <u>Brown Shoe</u>, which says that products
are in the same market if they are reasonably interchangeable.
The reasonable interchangeability standard focuses on how
consumer demand responds to small price changes.

Reasonable interchangeability is different from functional
interchangeability.  Two products can be functionally
interchangeable but still not in the same relevant product
market.  The key question for the Court is what consumers would
do in the event of a small price increase.  If consumers would
mostly stick with one type of product -- here, Medicare
Advantage -- in response to a small price increase in that
product, well, then those products form a properly defined
relevant market.  But if instead, after that small price
increase, so many consumers would switch away from those
products to buy some other product, so much that the price
increase itself becomes unprofitable, well, then the market has
to be broader.

Defining a market can sometimes seem like it's a
formalistic exercise, but at its heart it's a really practical
exercise and it has a very important substantive point.  A
relevant market is a group of products where competition
matters, competition among those products matters.  It's a group
of products where there could be anticompetitive harm if
competition is reduced or if there were even a monopoly in those

1    products.

2         That group of products is under the law called reasonably

3    interchangeable.  It's called a relevant product market.  And

4    that leads us to the first key issue for decision by the Court,

5    how to treat Original Medicare.

6         This is a page from an HHS handbook, "Medicare and You."

7    You can see that it points out to seniors, the first choice it

8    suggests that has to be made is between original Medicare on the

9    one hand and Medicare Advantage on the other.  In their pretrial

10   materials, defendants put a lot of emphasis on the fact that

11   seniors have an initial choice between Original Medicare and

12   Medicare Advantage.

13        Well, there's no question that Medicare Advantage and

14   original Medicare are both ways for seniors to get their

15   Medicare benefits.  They're alternatives, options, choices.  But

16   that's not the question the Court is called upon to decide.  The

17   question is whether Original Medicare is so much of a

18   competitive constraint on Medicare Advantage that even a

19   monopolist of Medicare Advantage wouldn't be able to do anything

20   of the things that a monopolist might normally like to do in a

21   market, like raise prices or reduce quality or cut back on

22   service.

23        And we actually have to fine-tune that question a little

24   bit more because it's likely that at some point, even a

25   monopolist of all Medicare Advantage plans could raise the price

so high that it would drive people away to Original Medicare.
In that sense, Original Medicare is a backstop.  It's a cap,
really, on what even a Medicare Advantage monopolist would do.

But that's not the question the antitrust law directs us to
ask.  Rather, the question is whether a Medicare Advantage
monopolist could raise price a modest amount and keep it up
there profitably.  In antitrust jargon, the question is could a
hypothetical monopolist impose a SSNIP, a small but significant
and non-transitory increase in price.  We normally talk about 5
percent.

Put another way, the question for the Court is whether
competition among Medicare Advantage companies is meaningful; is
that what really drives competition in Medicare Advantage?  Is
competition among Medicare Advantage companies worth protecting?

The plaintiffs' evidence will show that there are seniors
who have strong preferences for Medicare Advantage, and seniors
who have strong preferences for Original Medicare.  These
preferences are based on their financial situation, their health
status and other personal characteristics.  However, evidence
will show that these consumer preferences are durable.
Consumers rarely switch between the two categories.

Our evidence will show that competition among Medicare
Advantages is meaningful, it does benefit consumers, and it is
worth protecting under the antitrust clause.  That means that
Medicare Advantage is a relevant product market.

1    Just because consumers have options doesn't mean that all

2    the options would belong in a properly defined relevant market

3    for antitrust purposes.  In a merger of soft drink producers,

4    for example, just because consumers had the option to quench

5    their thirst with water or milk or fruit juice, it didn't mean

6    that all those other drinks belonged in a market with carbonated

7    soft drinks.  Those other drinks may have been functionally

8    interchangeable for thirst quenching, but they were not in the

9    same relevant product market.

10    In a merger of tax preparation software companies, just

11    because consumers had the option to use the government-supplied

12    forms and instructions and fill in the forms themselves with

13    their pencils, that didn't mean that every tax preparation was

14    in the same relevant product market with tax preparation

15    software.  Competition among tax preparation software companies

16    mattered, it was meaningful, and it deserved to be protected.

17    And by the same logic, in this merger of Medicare Advantage

18    companies, just because consumers have the option to get their

19    Medicare benefits from original Medicare does not mean that

20    original Medicare belongs in the same relevant product market

21    with Medicare Advantage.

22    What kind of evidence will show that Medicare Advantage is

23    a relevant product market?  Courts have looked at two main types

24    of evidence:  the practical indicia that the Supreme Court set

25    forth in <u>Brown Shoe</u>, and testimony from experts in the field of

economics.  We will present both kinds of evidence.  Both will show that Medicare Advantage is a relevant product market.

Practical indicia first.  That's such things as, for example, industry recognition for the product's particular characteristics and uses.  Let me show you a couple of the types -- examples of the types of evidence of practical indicia that we'll be introducing.

Medicare Advantage is substantially different from original Medicare, including original Medicare with its various private add-ons, Med Supp plans and Part D prescription drug plans that seniors can buy.  Basically, Medicare Advantage plans generally include a lot more coverage than is found in most original Medicare options.

The evidence will show that these extra benefits are important to many seniors, and, Medicare Advantage is generally less costly for the senior.  Med Supp insurance, by contrast, is significantly more expensive than what most seniors pay for Medicare Advantage, but the tradeoff is that a senior in a Medicare Advantage plan generally has a limited network of providers, doctors and hospitals.  This is a sharp difference from original Medicare, where a senior can generally go to any medical provider.

The evidence will show that Medicare Advantage's characteristics and uses, to use the phrase from Brown Shoe's list of practical indicia, are distinct from those of Original

Medicare.

We saw an earlier slide that Mr. Broussard of Humana recognized the differences between Medicare Advantage and original Medicare.  Well, Aetna also recognizes the difference between Medicare Advantage on the one hand and Original Medicare with its private add-ons like Med Supp on the other.  Here, they describe the products as apples and oranges.  This is evidence of the Brown Shoe indicator of industry recognition.

But what's especially important evidence of industry recognition is what marketplace actors do, not just what they say.  The evidence will show that Aetna and Humana employees not only use the words "Medicare Advantage market," but they calculate market shares in that market and report it to their superiors.  That tells you that it's meaningful to them.  That's Brown Shoe evidence of industry recognition.

The evidence will show that Aetna and Humana separately calculate profit and loss for their Medicare Advantage business.  That's Brown Shoe evidence of industry recognition.  And the evidence will show that Medicare Advantage's characteristics and uses, to use the phrase from Brown Shoe's list of practical indicia, are distinct from those of Original Medicare.

The evidence will also show that Aetna and Humana organize their businesses in such a way that they separate the part that runs the Medicare Advantage business from the parts that run the add-ons to original Medicare.  Mr. Soistman, who's Aetna's head

of government services, explains here that Medicare Advantage
and Med Supp run on different platforms.   They have dedicated
teams, a dedicated leader.   You know, they're different.   Their
business models are different.   That's a <u>Brown Shoe</u> indicator
both of industry recognition and unique production facilities.

When Aetna and Humana are planning their benefits and
pricing their products, they look principally to other Medicare
Advantage competitors, rather than to Original Medicare or Med
Supp providers.

This document is an Aetna document.   Aetna creates similar
documents each spring in conjunction with preparing to file
their Medicare Advantage bids with HHS.   It's presented by Nancy
Cocozza, who's the head of Aetna's Medicare business, who will
testify here.   It's a document where Aetna is focusing on what
they want to do to compete in the coming year, and their focus
is on other Medicare Advantage companies.

Here you can see in the slide labeled "Competitive
Analysis" they focus on Humana, United, Cigna, and Anthem,
the other members of the Big 5 or G5 as they sometimes call
themselves, and they focus on all of them for their Medicare
Advantage products.

But in addition to this <u>Brown Shoe</u> evidence, we will
present economic evidence.   The first category of economic
evidence I want to talk about is consumer-switching evidence.
What do seniors actually do when they switch health insurance

1    coverage?

2        Well, the first thing to remember is it's important to

3    recognize that most seniors who have a Medicare Advantage plan

4    actually stick with this plan.  They don't switch at all.  But

5    if we just focus on those who do make a change, the evidence

6    will show that the vast majority of seniors who have a Medicare

7    Advantage plan and make a switch, they switch to another

8    Medicare Advantage plan, not back to original Medicare.

9        This evidence, which is taken from Professor Nevo's report,

10   shows that in three different ways of examining that kind of

11   switching, about 85 percent of seniors with a Medicare Advantage

12   plan who make a change switch to another Medicare Advantage

13   plan.  Particularly interesting is the middle bar of this chart.

14   There are seniors faced with involuntary switching.

15       Their prior Medicare Advantage plan was canceled, so they

16   had to make the change.  They were free to choose either

17   Original Medicare, with or without add-ons like Med Supp, or

18   Medicare Advantage, and yet 86 percent of those seniors chose a

19   Medicare Advantage plan.  That shows a strong consumer

20   preference to stick with Medicare Advantage.

21       One question that might arise about the switching data is

22   this:  Market definition, as we mentioned before, is focused

23   particularly on what will consumers do in response to price

24   changes.  And you'd say, well, switching data probably includes

25   people who are switching for reasons other than price.

Now, with numbers like 85 percent, that evidence is pretty clear on its own, but we will present one additional item of evidence about switching.  Professor Ford, a survey expert, examined a survey about switching that Humana commissioned.

He can identify from the responses the switching that's for price-related reasons, and he identified that the price-related switching is consistent with this general switching number of about 85 percent.  In short, the switching data is strong, real-world economic evidence that consumers who choose Medicare Advantage plans have a strong preference for Medicare Advantage plans.

Expert econometric evidence will also show that Medicare Advantage is a relevant product market.  Our economic expert is Professor Nevo of the Wharton School of Business.  He's a widely published and respected expert in econometrics.  Among the evidence that Professor Nevo will present is his use of some standard econometric tools to do a hypothetical monopolist test, which has been a test established in the merger guidelines and has been used by many courts in defining markets.

He estimated the demand for Medicare Advantage plans and for original Medicare options based on real-world data based on past choices that have been made by seniors, then he tested whether it would make sense for a firm that was the only seller of Medicare Advantage in each of the 364 markets -- a hypothetical monopolist in those markets, in other words -- he

1    tested whether it would make sense for that monopolist to raise

2    price.  He found that it would.  That's the top line in this

3    chart.  Every one of the counties.

4         As a check, he reran his calculations using the demand

5    estimates of defendants' expert, Mr. Orszag.  That's the next

6    eight lines on this chart.  As you can see, even using

7    Mr. Orszag's results as inputs, in almost all of the counties,

8    it is confirmed that the hypothetical monopolist would raise

9    price.  And so Medicare Advantage, on this econometric evidence,

10   is a relevant product market.

11        Professor Nevo did other applications of the hypothetical

12   monopolist test, using both his estimates and Mr. Orszag's

13   estimates as inputs.  All the tests, whether they used

14   Professor Nevo's estimates or Mr. Orszag's, confirmed that

15   Medicare Advantage is a relevant product market.  In sum, both

16   the <u>Brown Shoe</u> evidence and the expert economic evidence will

17   show that Medicare Advantage is a relevant product market.

18        Next let's talk about competitive effects of the merger in

19   the Medicare Advantage market.  First, what competition are we

20   talking about?  Aetna and Humana compete, as I mentioned, in

21   675 counties, and Aetna's plan before the merger deal was to

22   continue to expand.  We're focused today on over 350 of those

23   counties that are in the complaint.  The merger is presumptively

24   unlawful in those over 350 counties, and those are the counties

25   identified in the complaint and shown on this slide.

1        In the complaint counties, there are over 1.6 million

2    consumers, seniors who are enrolled in Medicare Advantage plans,

3    and over 970,000 of them, about 59 percent, have Aetna or Humana

4    Medicare Advantage plans.

5        So what does it mean to say that the merger is

6    presumptively unlawful?  Well, under Philadelphia National Bank

7    and Baker Hughes, it means there's a concentrated market and the

8    merger would produce a substantial increase in concentration.

9    This chart shows the complaint counties and how their facts

10   establish that presumption.

11       Each dot represents a county, a market, and the effect of

12   the merger of Aetna and Humana.  As you go to the right side of

13   this chart, you're looking at markets that are more concentrated

14   using the Herfindahl-Hirschman Index, or HHI, which is a

15   standard measure of market concentration.  To the left would be

16   the very dispersed competitive markets.  Monopolies are at the

17   right, and you can see that stack of the 70 monopoly markets in

18   this case.

19       As you go up and down in this chart, you're looking at how

20   big is the change in concentration.  Near the bottom are small

21   increases, near the top are large increases.  The two red lines

22   mark the standards for presumption of illegality under the

23   horizontal merger guidelines.  As you can see, all the counties

24   we included in the complaint meet the presumptive illegality

25   standards.

1    Let's take a closer look at a couple counties to illustrate

2    the information behind this chart.  We're going to look at these

3    three counties.  First, Mecklenburg County, North Carolina,

4    that's the Charlotte area.  You can see the merger of Aetna and

5    Humana would create a very large firm, and probably an oligopoly

6    in this market.

7    Next let's look at Polk County, Iowa.  That's Des Moines.

8    You can see that the merger would create a dominant firm in that

9    market.  Finally, let's look at Shawnee County, Kansas, which is

10   the Topeka area.  In this county, the merger would produce a

11   monopoly.

12   In addition to the statistical evidence about the reduction

13   of competition from calculating market shares, there's other

14   evidence about competitive effects.  What we look at is how

15   Aetna and Humana compete today.  Today the two companies compete

16   directly with each other and aggressively with each other, and

17   their documents show it.  You can just look at some of the

18   expressions of competition between them.

19   In addition, Aetna called Humana a formidable competitor.

20   Humana called Aetna a formidable competitor.  And they're both

21   right.  And all this competition would be eliminated by the

22   merger.

23   In addition, we're going to present expert econometric

24   evidence.  Professor Nevo calculated the likely effect of the

25   merger using data on seniors' demand for health insurance and a

standard approach for modeling price competition.  He concluded
that there would likely be half a billion dollars in harm every
year.  Let's break that down.  That's, according to his
calculations, $358 million of harm to seniors in the form of
higher prices for Medicare Advantage plans, or lower benefits or
quality for those plans.

In addition, the merger would likely impose $145 million of
additional costs on taxpayers because of the loss of competition
in bidding to supply Medicare Advantage plans, because that
competition helps to keep down the government's cost of
providing Medicare benefits.

So the evidence will show that the merger would produce an
anticompetitive effect.  But that takes us to the next question.
The final main area of contention in the Medicare Advantage
markets is the proposed remedy that Aetna wants to put forward.

First let's talk about how to think about this.  As we just
discussed, the evidence will show that there's a substantial
competition between Aetna and Humana in more than 350 markets.
This competition will be eliminated.

Now, the other side comes along and says, well, we can
replace that lost competition with something that's just as
good.  That's the posture in which this issue -- this third
issue will come before the Court; they're trying to rebut the
presumption that the merger is a substantial lessening of
competition.

1        The evidence will show that they cannot rebut that

2    presumption.  They cannot show that their partial divestiture to

3    Molina will maintain the vigorous competition that was

4    previously provided by Aetna or Humana.  First, there's not even

5    a guarantee that the divestiture transaction will even close.

6    It's not a done deal.  It requires a number of federal and state

7    approvals that are by no means certain.

8        But what's much more important is how inadequate this

9    proposed remedy would be.  It's not uncommon, Your Honor, that

10   merger disputes are settled with a divestiture.  What that

11   normally involves is selling off a viable ongoing business unit,

12   a business entity, division, something like that, something

13   that's got management, employees, production capability, a

14   brand, supplier relationships, and a proven track record, all

15   the stuff that goes into a realistic prediction that the

16   divested entity could function and thrive on its own.

17       That's not what Aetna proposes here.  You can see this

18   list of what would not transfer in the proposed divestiture.

19   Instead, what would happen is that in a few months, hundreds of

20   thousands of seniors who had chosen Aetna or Humana as their

21   health insurer would get a letter in the mail that says

22   something like pursuant to a federal court order, the contract

23   you had to get your health insurance from Aetna has now been

24   transferred to a company called Molina.  Molina will be your

25   insurer going forward, or at least until the next open season.

And if you look at this chart, it's clear that Molina will be no Aetna or Humana.  It's not a real divestiture of an ongoing business entity.

So let's take a little closer look at just who is Molina and whether it could really replace the competition that's today provided by either Aetna or Humana.  Molina is a company focused on Medicaid, not Medicare.  Medicaid is the government's program of health insurance for people with low incomes.  Molina has the highest debt-to-equity ratio in the industry.  Molina has junk bond rated debt.  Molina itself was not even initially interested in the Medicare Advantage divestiture assets.

Back in January of this year, when there was starting to be discussion in the industry about the possibility that there might be some divestitures arising out of this merger, Molina took note.  But what they took note of was the possibility that there might be some divestitures in the Medicaid business. Molina's CFO, you can see here, e-mails Aetna, saying:

"For the past 35 years Molina has been focused on the Medicaid population.  You've probably already received numerous inquiries for your Medicare and commercial business, but not Medicaid.  This is where Molina can help."

It's a clear indication, Molina itself saw that its expertise is Medicaid, not Medicare.  In fact, one of the clearest indications of the difficulties Molina would face is found in the divestiture contract itself.  Molina needs a

transition services agreement where it would pay the merged
Aetna and Humana to actually do the work for it.  This could go
on for up to two years.  It means that Molina would be dependent
on Aetna at the same time that it's supposed to be competing
with Aetna.

Molina's just not going to have the ability to replace the
lost competition from Aetna and Humana.  Humana's Medicare
Advantage competitiveness is based on its experience -- I'd
forgotten the explanation of Molina, Molina's failure.  They
explained their record of failure.

They said, given our inability to produce a competitive
product, I don't see a clear path of success for us in this line
of business because Molina had previously tried to enter the
Medicare Advantage business.  They entered 63 counties.  Today
they're in just six counties.  And you can see the explanation
of the reasons why in this chart.  And as a result, Molina today
is a trivial participant in individual Medicare Advantage.

Humana's Medicare Advantage competitiveness is based on its
experience serving over two and a half million members.  Aetna's
over 700,000 members.  Molina has just 424 members in Medicare
Advantage of the kind that's at issue in this case.  In six
counties in Utah and California.  That's not 424,000; that's 424
individuals.

A fact about divestitures in general is that the risk falls
primarily on consumers.  In this case the other side is

proposing a risky remedy, but neither the merged firm nor really Molina is taking the principal risk.  Rather, consumers would have to take that risk.  That's because consumers, seniors today depend on vigorous competition to provide Medicare Advantage at an affordable price with good benefits.

A divestiture buyer like Molina can make money out of a divestiture deal even if they don't wind up replacing the competition that's lost.  One of the ways that can happen is where the price they pay is really low.  Here Molina describes the price it's paying as a "screaming buy."

But even if the price is so good that Molina can make money even as a weak or a limited competitor, it's the consumers, the seniors who face the risk of what a weak or limited competitor will produce in the marketplace.  Molina itself recognized the risk that it might not succeed.

Let's take a look at Molina documents from before they had a vested interest in defending the deal, when they were still thinking about whether to make the offer, when they could afford to be candid.  This is a Molina board member:

"The image that comes to my mind is the dog chasing the car, and we are the dog.  What happens if we catch it?"  And the reason why they had to be worried about catching the car is set forth in another Molina document.  "This" -- Medicare Advantage -- "is a very different business from what we do, including commercial marketing, pricing, contracting, etc."

And in this e-mail, when Molina was still thinking about whether to do the deal, Lisa Rubino, the Molina executive who would have to lead the new business, listed some of the problems she knew that they would face.  Her summary of what Molina would face if it caught the car:  "A big fricken lift..."

So, in short, this merger is presumptively unlawful in hundreds of Medicare Advantage markets, and the proposed remedy would not come close to replacing the lost competition that's provided today by Aetna or Humana.

Let's turn now to the other product markets at issue in this case, which is the sale of insurance on the public exchanges.  There are three issues here too, but really one principal issue.  First there's market definition.  I think it's virtually not contested.  Second, competitive effects, which really all rolls into the third question, which is whether a firm can evade antitrust liability by the equivalent of closing up shop and saying, look, no competition, no issue.

Let me first briefly talk about market definition.  The product market here is individuals who don't get their health insurance from their employer or from Medicare or from Medicaid. They have to buy it directly from insurance companies like the defendants.  And most of them in large numbers do so through the public exchanges.

The relevant market question is, if prices went up on the public exchanges, would these people switch to something else.

And the answer is pretty clearly no because they can't switch to employer insurance or Medicaid or Medicare by definition, or they wouldn't be here.  And while they technically could switch to buying off exchange, for the vast majority of these consumers that wouldn't be realistic because they receive -- are able to receive subsidies on the exchange, and it's unrealistic to think that a small price increase would cause them to give up the subsidies.  So it's a relevant product market.

Now, defendants may suggest that the future of the exchanges is uncertain, but all this Court can do is evaluate markets as they exist today.  Competition among private insurers is not likely to become less important, regardless of any change in how individual health insurance is sold.  And protecting competition in the market as it exists today will likely protect competition in any future version of this market.

Let's turn next to the question of competitive effects. Here it's clear that the merger would be presumptively unlawful based on the market shares.  This slide follows the pattern of the earlier slide.  The dots are the 17 counties in the complaint.  These are relatively populous with about 700,000 people buying insurance on the exchanges in these counties.  All 17 counties show a substantial increase in concentration in an already concentrated market.

And that brings us to the key litigation issue in these markets.  Aetna announced its withdrawal from these 17 counties

in August of this year as of January 2017.  The case law says
that post-complaint evidence that's subject to manipulation can
be disregarded, for very good reason.  In this case, the
evidence was not just subject to manipulation, but actually
manipulate, as we will show.  So it should be disregarded.

The Court shouldn't look at the "Closed" sign, but at the
store behind it, the underlying competitive reality.  Given
Aetna's actions, the best picture of the underlying competitive
reality is the reality just before Aetna's withdrawal in an
attempt to evade antitrust scrutiny.

Let's look at what happened.  Aetna, as you can see, was an
active participant in the exchanges and a supporter of the
exchanges from their beginning, right up until the moment when
it started to look like their merger might be challenged.  When
that became a clear possibility, in May of 2016, they told HHS
that if their merger were blocked, they would have to revisit
their plans for the exchanges.

Then, on July 5, Aetna wrote to DOJ.  They first suggested
that they might actually increase their participation in the
exchanges if their merger could be approved.  But, they said, if
a lawsuit is filed to block the merger, they will immediately
take action to reduce our 2017 exchange footprint.

Then on July 21, this lawsuit was filed to block the
merger.  And by three weeks later, Aetna had immediately taken
action to reduce its 2017 exchange footprint.  They withdrew

from a substantial number of markets, most particularly

including all 17 counties in the complaint.  They withdrew, it's

important to note, in a way that preserves their ability to

reenter in the future.

Now, it's no secret that a number of companies have been

reevaluating and changing or reducing their participation in the

exchanges, and maybe there was cause for Aetna to do some of

that.  But we have to look at what actually happened, at least

with regard to the 17 complaint counties.

The question is was the market behavior evidence

manipulated in response to the lawsuit.  There were about three

weeks between when the complaint was filed and when Aetna

announced its withdrawal.  What was happening at Aetna during

those three weeks?

Day 1 Post Complaint.  Fran Soistman, head of government

programs at Aetna, wrote to John Stelben, another Aetna

executive involved in the decision of what to do in the exchange

markets.  Soistman says:  "By the way, all bets are off on

Florida," a complaint state, "All bets are off on Florida and

every other state given the DOJ rejected our transaction."

Stelben responded to this statement:  "Got it.  Agree."

Day two post complaint.  Steven Kelmar, chief of staff to

the CEO of Aetna, Mark Bertolini, wrote to Karen Lynch, the

president of Aetna, about their future plans for exchanges,

Kelmar wrote:  "Most of this is a business decision, except

where DOJ has been explicit about the exchange markets.  There

we have no choice."  Lynch responded:  "Agreed."

Day three post complaint.  Jonathan Mayhew, head of the

exchanges business at Aetna, sends Karen Lynch a list of states

to withdraw from.  Lynch asks:  "Does this include the 17 places

in the DOJ complaint?"  Mayhew responds:  "I was told to be

careful about putting any of that in writing.  I will have the

attorney-client privilege cc'd by tomorrow."

And by three weeks later, Aetna had withdrawn from the 17

places in the DOJ complaint.

Companies should not be able to evade antitrust scrutiny by

manipulating their marketplace behavior.  That's the question at

stake here.  Competition should be assessed without crediting

Aetna's tactical maneuvering.  The way to do that is to look at

the underlying competitive reality without the tactical

maneuvering.  Don't focus on the "Closed" sign, look at the shop

behind it.  The Court should send a clear message that a company

cannot dodge an antitrust problem by closing up shop.

The next issue I'm going to talk about is efficiencies.

The defendants would like to say that the point of the merger is

to produce a lot of synergies and efficiencies and do health

care better by combining instead of competing.  There are a

couple of points to keep in mind on this question.  First is the

origins of the merger.  It was really not the product of a

search for ways to help health care consumers.  Rather, there

was a merger frenzy, in the words of Aetna CEO Mark Bertolini.
Aetna didn't want to be left out, and Humana saw the writing on
the wall and didn't want to be acquired by Cigna.   This merger
wasn't contemplated as a move to enhance either company's
business for the sake of consumers, but rather because neither
company wanted to be the last one standing when the music
stopped.

Second, the law on efficiencies.   No district court has
ever held that claimed efficiencies have excused an otherwise
unlawful merger.   In this case, it's not even a close call.   The
idea, the idea behind the principle that efficiencies might
theoretically rebut a presumption of anticompetitive harm is
that even though there's a loss of competition and prices might
go up, there's so many efficiencies that costs will go so far
down that consumers in the relevant market will actually see
lower prices.   That's the idea.

Now, it's contrary to the basic principle of antitrust law
that it's competition that puts -- pushes companies to keep
costs low.   So the standard of proof for an efficiencies defense
is high.   In this case, the parties did not even make any
attempt to assign the claimed efficiencies to the relevant
markets where competition would be reduced.   This alone is
fatal.

But the third point in addition to the law is the evidence.
In this case the evidence about efficiencies, such as it is,

will not meet the established standards for what a defendant
needs to prove in order to rebut the presumption.  Most of the
claimed efficiencies are not independently verifiable, most of
the claimed efficiencies are not merger-specific, that is, they
could do a lot of them on their own without merging.  And
finally, the evidence will not support the idea that any savings
they achieve will be passed on to consumers.

On this topic, they claim that a prior merger when Aetna
bought Coventry, a Medicare Advantage insurer, shows how they
were able to achieve efficiencies after the merger.  They say
that they achieved a lot of cost savings in that merger.  But
did consumers see any of that benefit?  No.  This slide shows
quality adjusted prices for Aetna-Coventry and for the rest of
the industry both before and after that prior merger.

Everybody's prices were going up in this period, but
Aetna-Coventry's prices were going up more.  So if there were
efficiencies, there's no indication that seniors saw any of the
benefits.  And that's one more reason why seniors would be
unlikely to see any benefits from claimed efficiencies in this
case.

In sum, evidence of possible efficiencies will not rebut
the presumption of anticompetitive harm.

Let me briefly describe what we expect to present in this
trial.  We will begin with Professor Richard Frank, who is a
health care economist with over 30 years of experience,

including time at HHS.  He will explain the programs and the
role of competition in them.  Then, as in many antitrust cases,
most of the facts are in the hands of the merging parties, so a
substantial part of our evidence will come from calling
witnesses who are employees of defendants.

We also will present broker witnesses.  Brokers explain
Medicare to seniors, and they'll give a front-line view of how
the products operate in the market.  We will have some witnesses
who will address the question of Molina, and we will present
Professor Aviv Nevo, our econometric and economic expert.

Overall, Your Honor, the evidence will show that this is a
straightforward case of two formidable competitors in Medicare
Advantage in the public exchanges markets who decided to merge
and eliminate competition between them.  Frankly, they recognize
the big antitrust problems that they faced, and they've tried to
evade the consequences in two different ways.  In Medicare
Advantage, they created a divestiture plan, sell off a lot of
individual seniors' contracts to a firm, Molina, that is not a
formidable competitor, but a failed competitor.  They hoped that
with this plan they could evade the implications of the
fastest-growing Medicare Advantage competitor buying the largest
Medicare Advantage competitor.

In the public exchanges markets, Aetna decided to just duck
out of the market for 2017.  They hoped if they could with that
plan evade the implications of two big competitors combining in

markets with 700,000 consumers.

The merger's presumptively unlawful.  The various explanations, stratagems, and defenses will not rebut the presumption, and when the evidence is all in, we will ask you to enjoin the merger in order to protect the seniors, individual consumers and taxpayers who would be harmed by the loss of competition that the merger would bring.  Thank you.

THE COURT:  All right.  Thank you, Mr. Conrath.  We have someone from --

(Court Reporter conferring with the Court.)

THE COURT:  All right.  We're going to have to take a technological break for a moment in order to accommodate the realtime feeds that are important to those outside the courtroom especially.  So let's take, hopefully it will only be a five-minute break.  We'll see.  This may eat into the 15-minute break later on, but hopefully it won't.  But let's take a five-minute break.

(Recess from 10:08 to 10:19 a.m.)

THE COURT:  All right.  Please proceed.

**OPENING STATEMENT BY COUNSEL FOR STATE OF PENNSYLVANIA**

MR. DONAHUE:  Good morning, Your Honor.  May it please the Court.  My name is James Donahue of the Pennsylvania Office of Attorney General.  And I'm here today on behalf of the plaintiff states.  In addition to myself, Layne Lindebak of Iowa, who is here today, Tim Fraser, Liz Brady, and Rachel

Steinman of Florida and a couple of others will be here over the course of the trial on behalf of the plaintiff states.

THE COURT:  Glad to have you here.

MR. DONAHUE:  Thank you.  Mr. Conrath has described substantively why this merger should be enjoined.  I just want to touch on why the states are here.  The plaintiff states are home to millions of seniors.  In fact, using data from the 2015 census estimates, Pennsylvania, Florida, and Iowa have some of the largest populations of seniors of all the states.  Florida and Pennsylvania in particular, in terms of raw numbers, are two of the largest states of any states in the country in terms of their senior populations.

Seniors, though, are more than just numbers to our states. All of the plaintiff states operate hotlines, websites, and do community outreaches where we try to address consumer problems. The largest group of people that contact us, either by phone or through the Internet or in person, are seniors, and seniors are coming to us and telling us about the roofer who takes the deposit and doesn't fix the roof or the unexpected medical bill they get that they thought was covered by insurance.

Each time they do this, the one thing that seniors emphasize over and over to us is the fact that seniors are on fixed incomes.  And these unexpected bills, whether they be from a contractor or they be from a medical provider, are a big hardship for them.

1    And that is at the core of why we're here.  As you will see

2    through the course of this trial, and as Mr. Conrath outlined,

3    this transaction is likely to result in an increase in Medicare

4    Advantage premium cost to seniors.  Seniors on fixed incomes

5    have a very difficult time dealing with these types of increased

6    costs.  And the plaintiff states have joined with the Department

7    of Justice and the United States to seek through this court to

8    enjoin this transaction.  Thank you very much for your

9    consideration.

10              THE COURT:  Thank you.  Mr. Majoras.

11              MR. MAJORAS:  Thank you, Your Honor.  Good morning.

12              THE COURT:  Good morning.

13         **OPENING STATEMENT BY COUNSEL FOR AETNA**

14              MR. MAJORAS:  I will lead the defense presentation of

15    our opening statement, and Mr. Gardiner will follow me a bit

16    more briefly on some additional points.

17         We agree with the government that we are here for two

18    primary issues.  The question is whether the government can

19    prove that there is a substantial lessening of competition in

20    the market for Medicare products, and whether they can prove a

21    substantial lessening of competition in the sale of the

22    Affordable Care Act exchange products.  You may hear me from

23    time to time talk about the ACA, the Affordable Care Act, which

24    established the exchanges.  I'll get to that in a moment.

25         What you'll see from the presentation of the evidence in

this case is that the DOJ's case is built on theory, it's built on models, it's built on, in some cases, flat-out guesswork when it gets to the exchanges because they don't exist in the form that the government would like them to be, while defendants address the realities in the marketplace and use the data and the information that is readily available and apparent to demonstrate that there is vigorous competition in these markets, that the markets are different, especially in the Medicare area, than the government asserts, and that following this transaction there will not be any lessening of competition in either of those markets.

With respect to Medicare, the DOJ is trying to fit a multi-dimensional market into traditional tests without acknowledging the fit problems.  When those are addressed, it will be clear that the Medicare market includes Original Medicare.  And I'll talk about that in some detail.

With respect to the ACA exchanges, the DOJ chooses to address a pretend world, one that simply does not exist anymore. They choose to ignore the realities of the ACA exchanges, the problems with the ACA exchanges, and the responses that insurers -- not just the insurers in this case but insurers throughout the country -- have had because of those problems and the viability of the exchanges.

But before I go into some of these legal issues, let me talk just briefly about my client, Aetna.  Aetna was founded in

1   1850.  It is a health benefits company that offers health

2   insurance products and services across a wide range of customers

3   that include individuals, businesses, and government.

4       As you can see here on the screen, the Aetna business can

5   be broken down into multiple segments, only a few of which are

6   going to be at issue in this case in terms of the Medicare

7   Advantage products and the individual exchange products.

8       As you can see, Aetna's historical focus has been on the

9   commercial side of the business, particularly the sale of

10  products to large groups.  That is not at issue in this case.

11  By contrast, only about 3 percent of Aetna's medical members are

12  enrolled in Medicare Advantage programs.

13      Now let's talk about the transaction, the merger at issue

14  here between Aetna and Humana.  The merger encompasses far more

15  than the products and the counties that the DOJ is challenging

16  here.  The merger, which was announced about a year and a half

17  ago, brings together two complementary health care businesses.

18  You see the comparison to Humana on the screen.  Mr. Gardiner is

19  going to talk a little bit more about Humana in a moment.

20      But its essential business is the flip side to Aetna's

21  because of Humana's focus on government-sponsored programs and

22  Medicaid.  The combined company, when they merge together, is

23  going to be a more balanced business than what we saw between

24  the two companies, and that balance is important to the business

25  considerations behind the reasons for the merger.  And you're

going to hear about those reasons, primarily from the CEOs of
the two companies, Mark Bertolini of Aetna, and Bruce Broussard
of Humana.

It's important we think for the Court to understand because
when the government challenges slices of the merger, it's
important to realize the benefits and the reasons behind the
merger and what that will eventually bring to the consumers and
to beneficiaries in the market.

The two CEOs will testify about those benefits and that the
combined entity will bring them to the beneficiaries of their
programs and the delivery of value-based health care throughout
the country.  You'll also hear, as Mr. Conrath headlined, that
there are going to be vast efficiencies and savings as a result
of those mergers.

Unlike what Mr. Conrath said, the value of those
efficiencies will be available not only for improved products,
for improved pricing, but for the improvement of health care
generally as these companies move forward and address that in a
constantly evolving world.

So let's turn to the Medicare part of this case.  Let's
start with a couple of basic facts, because these basic facts
really underlie so much of what this case is about.  Seniors.
Seniors 65 and above.  They've been paying their FICA taxes
regularly.  Paycheck after paycheck.  And finally, at the age of
65, they're going to see the benefit that the government is

1    offering them.  That benefit is Medicare.  Not Medicare

2    Advantage, not original Medicare, it's Medicare.

3         And what is Medicare?  Medicare is effectively insurance.

4    It's a way for them to pay, to be able to afford their health

5    insurance as they move forward into their senior years.  There

6    are two fundamental features of Medicare.  The first is payment

7    for hospitalization and stays at institutions, and also the

8    second is coverage for doctor and outpatient services.  It's

9    known as Part A and Part B.

10        Original Medicare covers Part A and Part B.  Medicare

11   Advantage, which is sometimes called Part C, covers Part A and

12   Part B.  Fundamentally, whether someone chooses Original

13   Medicare or chooses Medicare Advantage, they're seeking coverage

14   for hospitalization and institutional care, and for doctors'

15   visits and outpatient services.

16        Both Original Medicare and Medicare Advantage provide those

17   alternatives for seniors seeking that coverage.  And between

18   them, they have various options, various features that are

19   available to meet the needs of the seniors.  Seniors' choices

20   are made on a variety of factors.  We'll hear some testimony in

21   the case about the four Cs: convenience, choice, conditions and

22   cost.

23        If one wants to have coverage, if one wants to be able to

24   go to a doctor anywhere in the country, that might move that

25   person to choose Original Medicare versus Medicare Advantage.

1     If someone is concerned that they don't want to go somewhere

2     where you'll constantly have to get a referral before you can

3     see a specialist, that also may dictate where their choices go.

4         And of course costs matter.  But you have to look at the

5     cost as a whole.  When someone is evaluating the coverage they

6     want to choose, whether it's Medicare or whether it's

7     employer-sponsored coverage, you're usually looking to see

8     what's the ultimate cost going to be?  When I look at my

9     out-of-pockets, when I look at my coinsurance, when I look at

10    the types of conditions that I might need covered, the

11    specialists I might need, those are all the four Cs.  Those are

12    all the factors a senior looks to as they go to make their

13    choice, whether it's Original Medicare or Medicare Advantage.

14        You'll hear from a number of witnesses who will explain how

15    those preferences might lead them to one or the other.  You'll

16    also hear from witnesses who talk about how those products are

17    sold in the marketplace, because how the products are sold is a

18    very good indication of whether the Medicare Advantage and the

19    Original Medicare products are in the same market.

20        Let's take a look at how these choices have shaken out over

21    time for seniors.  A couple of key factors here.  The first is,

22    on average, about two-thirds of seniors are enrolled in Original

23    Medicare program and options, and about a third are in Medicare

24    Advantage.  This shows clearly the choices that are being made

25    over time, and they've been consistent over time.  There's been

some growth here and there, but for the most part, it's a two-thirds/one-third breakdown.

The other important feature to always keep in mind here -- and it's something that Mr. Conrath did not address but the witnesses will -- and that is the fact that every day, every day, 10,000 additional 65-year-olds age in to coverage under Medicare benefits.

That fact is important on a number of levels, one of which is trying to look and see how the market functions, but also addressing things that Mr. Conrath brought up about what he called the diversion ratios, whether people move in and out among those products.

In fact, there are two different points where seniors are primarily making choices.  The first is when they age in at 65. Wherever that happens to be in the year, they're given the option of trying to determine what type of Medicare products they want.  Those are the 10,000 every day.

The second occurs during the annual election period.  In fact, we're right still in the middle of the election period. It runs from October 15 through December 7.  Every year, seniors who are already in Medicare or Medicare Advantage have the option to make an election, to change, stay where they are, look to see if their circumstances have changed, whether the four Cs are different, and whether those other products offer alternative choices for which they can substitute their Medicare

coverage.

So if you think about it from the insurer's standpoint, the insurer selling the Medicare Advantage product, the insurer to grow that business can't simply wait until the annual election period.  And take the group that Mr. Conrath talked about, a group that may have already made an election previously that they like Medicare Advantage for whatever reason, and then simply attack that group and try to gain more, get that diversion that he talked about.

To grow the business, the real growth in this business is the 10,000 every single day.  As more and more seniors age into the market, if insurers are not going to be able to compete and move that dynamic of the two-thirds/one-third, then they're just fighting over the people who have made choices as they get to the annual election period.  Businesses don't operate that way. They can't operate that way.  To gain the growth that they need to grow and to try to gain the customers that they need, the focus has to be on both sides of those elections, at the age-in point -- let's get them to Medicare Advantage and our product if we can -- or at the election period each year.

Importantly, the insurance companies, by law, cannot differentiate between those two periods.  They can't say, oh, I've got this group that Mr. Conrath talked about.  They've already chosen Medicare Advantage.  I think I'm going to focus my sales tactics on them.  I'm going to design programs.  And

under the government's theory, I'm going to raise their prices because I already know they want to stay in Medicare Advantage. The same plans offered to Medicare Advantage beneficiaries during the election period are the same ones that have to be available at the time of the initial selection.  You can't discriminate between the two.

So if I'm trying to get that 10,000 people every day that are coming into Medicare benefits, I can't try to take advantage of the people I know might have already made that choice at other periods, because I've now lost that initial battle.  That initial battle is key to growth.  We hear the executives and the sales people who are involved in this process from the companies talk about that.

Let's look at the geographic market that's at issue in this case, and Mr. Conrath gave some slides.  I'll move through these pretty quickly.  The first you see are the Medicare Advantage footprint of Aetna as it exists today.  Then our second slide shows the Medicare Advantage footprint of Humana.  This is consistent with the charts I showed you of the two companies earlier.  Medicare Advantage is a much larger part of Humana. And then our next slide shows where the merged company would have their Medicare Advantage footprint.

And finally, these are the counties that the DOJ is challenging in the Medicare Advantage area.  364 counties. Those are the ones that they have asserted there's going to be a

competitive imbalance that causes this merger to be shut down.

The bigger issue I think in this case, however, is going to be the product market question.  Again, Mr. Conrath talked about it.  Is Original Medicare and the options available under those programs in the same market as Medicare Advantage products?

We look to the merger guidelines, often the source of reference.  Section 4.1.3 of the guidelines states, "The agencies take into account any reasonable, available, and reliable evidence."  Mr. Conrath talked about the type of evidence that Brown Shoe talks about.  It's the same thing. Let's look at the whole market.  Let's look at how things are sold, how things are purchased, how decisions are made, how other competitors are going to influence that, and importantly here, how the government regulation is going to influence that, and finally, the economic analysis.

Let's start with the common sense test, as I would call it. The guidelines use the phrase "subjective evidence."  We've already seen that two-thirds of seniors choose Original Medicare.  Remember, they're not deciding relevant antitrust markets.  They're deciding where to get their Medicare benefits. This is a benefit that's available to them, they're looking to determine what are the options that are available, how is this going to impact my coverage, how is this going to impact whether I get to go to the doctor I want to go to, how is this going to impact the prescription coverage I want.  That's the choice

they're making.  And we already see that two-thirds of them are choosing Original Medicare.

It's even easier to see what that decision is if you look at what the government says.  Let's take a look at a website that is part of the website that the government produces in which someone who's deciding what to choose between Medicare -- how to choose their Medicare benefits.  The very first issue that CMS -- let me stop for a moment on CMS.  CMS is the Center for Medicare and Medicaid Services.  It's part of the government, it's part of the HHS agency, and it's the agency that regulates Medicare, and it, as you'll see, also has a role in the exchange process.

I'm actually a little surprised that I have to explain who they are because Mr. Conrath never mentions them.  As you will see throughout this case, the role CMS plays, the regulations that CMS has and how CMS interacts with the parties is critical.

But if you look at the Medicare website, the first thing that CMS asks, or tells someone looking at Medicare is there are two main ways to get your Medicare coverage -- Original Medicare (Part A and Part B) or a Medicare Advantage plan (Part C).  Some people get additional coverage, like Medicare prescription drug coverage or Medicare supplemental insurance, which they refer to as Medigap in this slide.  Sometimes we hear Med Supp.

The government, every day, if I go to their website, says to me, make this choice, and the consumer looks at that and

compares between the two and looks at their preferences as to what they need, that's exactly the choice they make; that is the product market.

You'll also hear some testimony about a government document known as Plan Finder.  This is another tool that seniors and sales brokers use to help explain the benefits and options that are available for Medicare.  It too always poses the question of whether OM, Original Medicare, is an option to Medicare Advantage.  And in a portion that the seniors look to as they look at the different plans and try to compare and contrast, they get a printout, or a slide on the screen which says here's what your potential costs are if you choose this, this, or this.

Every single time that comes up, the first option available is here's what it would be under Original Medicare.  And you'll see that, and you'll see that there again we have the indicia of what the market really exists like in this case.

The government talks about what do the industry participants say and they refer to documents from Aetna and Humana.  But one of the industry participants, and a significant participant in this industry, is CMS.  It's the government.  The government in the government's documents and how CMS looks at the market are all relevant to the question of what is the indicia of whether OM and MA are in the same marketplace.

Let me show you a couple of quotes we've taken from some of the CMS documents, and we'll do this more with the witnesses

once they appear.  On the very first one is a document, an
internal document at CMS.  And I wanted you to see that it came
directly from the document because if you actually read the
quote I'm going to show you, you might think it's a quote I made
up.

This is Defense Exhibit 87, page 101 of that document.  And
the quote is, "Original Medicare is a public program that
competes directly with private insurers in a highly regulated
market, and in principle is in a position to 'discipline'
competition."  That is our case, Your Honor.  That's why it is
in the market, the same market -- Original Medicare is in the
same market as Medicare Advantage.  The existence of that
gorilla, the gorilla that's attracting 63, 64 percent of seniors
every year, the existence of that is going to discipline the
rest of the market, including Medicare Advantage.

That was a memo to the Secretary of Health and Human
Services at the time.  Our next memo I'll show you is from the
Health and Human Services Assistant Secretary for Planning and
Evaluation.  It is Defense Exhibit 97.  Again, it says, "A major
competitor to any Medicare Advantage plan is traditional
Medicare, Original Medicare, which cannot be pushed out of the
market."  It cannot be pushed out of the market because it's a
government service providing the benefits that the seniors have
paid for.

These are just examples demonstrating that CMS is keenly

aware of what they tell 10,000 new 65-year-olds every single day.  Original Medicare options are a substitute for Medicare Advantage and vice versa.

We also have to look at the regulatory conduct and the restrictions that are put on businesses in the Medicare Advantage, and you'll hear testimony showing that over time, to the extent there is a separation, a larger separation between Original Medicare and Medicare Advantage, it's shrunk.  It's shrunk because of what the government can do in terms of imposing pricing on the Medicare Advantage programs, and it's designed to move the programs together.  It's also a part of the Original Medicare these days that's getting more and more emphasis in which they're putting in PPO type structures under the Original Medicare program, also, again, making it look more and more like Medicare Advantage options.

And, of course, no antitrust case comes without economic experts and information from them.  Rather than go through and explain what everyone's going to say or not -- you're going to hear it -- I'm going to point out some things that I think will be of interest to the Court as the experts appear to testify.  Because there are some significant results, but understandable results between the models they use.  Some of the models they agree on, the type of analysis they agree on.  It's what are the inputs to those models.

You've heard already that we'll have testimony on the

hypothetical monopolist test, the test that asks the question of
whether a hypothetical monopolist within a possible market can
raise prices above a competitive level.  There are several ways
to implement the hypothetical monopolist test.  The economists
agree on that proposition.  One, you can use actual data.  You
can use market realities and plug those into the models to
determine what has happened and what will happen.  Or you can
make assumptions and hypotheses derived from other analyses or
other tests, and then you take the results of those tests and
you plug it into the model.

The question is which is the appropriate method to use?
Often in antitrust cases it comes down to is there data
available?  I've never met an economist yet who doesn't want
more data.  And I'm sure that was the case of both the
economists here.  But the Court should focus, as the testimony
comes in, on which economists and how the economists used that
data.

You'll hear from John Orszag, the defense economist, and
he's going to look at the complexities of the marketplace,
including the many available choices under Original Medicare and
under Medicare Advantage programs.  And then he looks at the
actual behavior of the market participants, whether from a
consumer standpoint or the seller's standpoint, to answer the
hypothetical monopolist test.

As you'll hear Mr. Orszag say -- it always surprises me a

little bit when he says it this way, but he says, when I've got data, when I've got rich data, I ask the data, I question the data.  What happens?  What does this mean?  And that's what he does in his analysis.  He uses the wealth of data, the data that's available, even at the county level, the geographic market that the government challenges in this case, to determine what would happen in the hypothetical world going forward after the merger.

One of the things he does, he asks the real-world data to determine or examine whether there's any correlation between prices, whether those prices are expressed as a premium, a total beneficiary cost, or a margin.  And what effect does that have on competition, or vice versa.  What's the correlation.  And what he determines is there is not.

The next slide we see is one that he will use in his testimony.  This slide depicts a series of markets in which there are multiple Medicare Advantage competitors.  What he shows is that if you look at the margin, and the gain-loss margin, you're not seeing a correlation between the less competitors and the higher margins, which is what the government suggests is going to happen in this case.  It hasn't existed.  We already see markets and we know markets that have a single competitor.  We know markets that have minimal competitors.  We know markets that have multiple competitors.

What Mr. Orszag will tell you is that as you examine them

and look at the real-world data, the real-world information, and
ask it, what should I find from this, he determines there is no
correlation between margin and the number of entries.  And the
same thing with pricing.

The government's economist, Professor Nevo, chooses a
different approach.  Instead of using a statistical analysis --
I'm sorry.  He uses instead a statistical analysis.  But also,
even when he does that, it shows there's no correlation between
the prices and the margins and the number of competitors in the
different markets.  That is showing real-world information as to
what one can expect in the future because it's already been
happening.

Professor Nevo tries to answer the hypothetical monopolist
question by making a calculation known as critical loss.  That
calculation attempts to distill this very complex industry down
into two numbers.  One is the aggregate diversion ratio -- we
heard a little bit about that from Mr. Conrath -- and margin.
These derived numbers, the numbers that he pulls out of his
model, not real-world data points, is what he then feeds into
his tests.  If either of those is wrong, the test is invalid,
the results are not worth considering.

I want to focus just a bit on a second number that
Professor Nevo needs.  This is the margin, the margins that
exist today.  He does a merger simulation model, and the model
tells him that the margins today should be 24 percent.  The

1    problem is that number is demonstrably wrong if you look at what

2    is happening in the marketplace today from the data that exists.

3    We can look at those margins, and we know that on average,

4    variable margins for Medicare Advantage plans are around 11

5    percent.

6        Importantly, CMS, the government regulation, caps variable

7    margins at 15 percent.  Let's look at a slide to make that

8    point.  So if you look at every dollar that's paid into Medicare

9    in the real world, at least 85 percent of that has to go to

10   medical costs.  It gets broken down a little bit.  Which means

11   there's 15 percent available for administrative cost, fixed cost

12   and profits.  And from which the margin would be derived.

13       He says the margin today should be 24 percent.  How?  Let's

14   take a look.  Take a look at how his slide compares to reality.

15   On the next slide.  The red line represents the 15 percent.  The

16   blue line is the actual 11 percent margin that we see in the

17   real world.  The 24 percent, the green bar, is Professor Nevo's

18   analysis.

19       Compare the derived analysis to the real world.  It's a

20   comparison that must be made throughout the testimony that

21   you'll hear from the economists, and you'll see that when the

22   comparison is made and you look at the real-world data and take

23   historic data, then the answers are more reliable and they show

24   that the government's contention is incorrect.

25       The bottom line to all of this, Your Honor, is that the

hypothetical monopolist test gives you useless information if it ignores the real-world data and relies instead on information that we know is wrong.

All of these indicia that we talked about, the common-sense test, how do consumers look at things, how do economists look at it, all of that is indicia and evidence that you will hear and point to the conclusion that Original Medicare and the products associated with it are certainly within the same product market as Medicare Advantage.  The significance of that is that the presumption that Mr. Conrath talks about doesn't exist.  It doesn't exist when you factor in the 68 percent of the market that is controlled by the government through its payment of Medicare and the various options available to it, which even skews the ability to try to determine a concentration.  How do you factor in the government as a competitor to other competitors?  The fact is that won't need to be done because the government cannot prove their case.

Nonetheless, I have to go on.  I hope we won't at trial. Even if the Court were to find that Original Medicare is not in the product market, the evidence will show that the competitive dynamics in the Medicare market belie the use of the structural type data that Mr. Conrath talked about, the HHIs and market shares.

One of the key things that we always have to look to in a market is ease of entry.  If there is a competitive imbalance at

some point, if somebody sees the opportunity that a party is
taking advantage of the market and making profits that are
larger than usual, can I come in and make that competition to
bring those levels to where they should be in an equilibrium
market.  What you'll see from the evidence here is that entry
has been common and it has been widespread.

Let me give you a few examples of that on the screen here.
There's really two points from this.  There's been lots of entry
in the past, there will be lots of entry and sources of new
entry in the future, and that entry will be well positioned to
respond to any hypothetical market opportunities that the
government would like to pose.

Our expert, Mr. Orszag, also evaluated whether there is a
likelihood of entry in the future.  He found that each complaint
county, every single one of the 364 counties has several
well-positioned potential entrants, and would -- they have the
necessary assets to be able to compete effectively.  All this
confirms that entry barriers are low.

Then we also have to look at the government's role, the
regulatory role, and how that affects the provision of Medicare
benefits and Medicare Advantage benefits.  The government has
powerful levers to alleviate any competitive harm that could
arguably be caused by the merger between Aetna and Humana.

Many of these take place in the bid process.  Mr. Gardiner
will talk a bit more about that.  That's the process each year

in which bids are submitted to CMS.  What CMS has is the ability

as the bids come in, because of what's required in the bid and

how they can respond to the bid, to regulate what ultimately the

plan is going to be.  So it regulates beneficiary costs.  It

regulates the insurers' profits.  It looks at the margins that

have to be submitted as part of the bid.  It regulates the plan

quality, the types of benefits that are available.  And it

regulates the insurer behavior as they sell those products to

individuals.  Those aren't theoretical.  CMS fully anticipates

using these levers if necessary.

What we see on the screen now is a letter from Kathryn

Coleman.  She's the director of the contract administration

group at CMS.  And she responds directly to a letter that she

received expressing concerns about the Aetna-Humana merger.  She

responds, "All Medicare Advantage organizations must comply with

our contract and benefit requirements."  Just like we saw.

"Should the merger be approved, the resulting Medicare Advantage

plans will be subject to the same standards and requirements as

all other plans, such as those that protect beneficiaries from

high out-of-pocket costs, increases in premiums or decreases in

benefits, provide meaningful differences in plan options, and

among other important protections."

That cannot be factored out.  We can't simply ignore CMS.

We can't pretend they don't exist.  CMS is a powerful

organization.  We believe that the market forces and the

evidence you will see will show that the market forces will take

care of competition among the providers, whether it's OM or MA,

but CMS stands ready, and we hear that very clearly from

Ms. Coleman, and we'll hear Ms. Coleman testify.

Now let's talk about Molina and the divestiture.  We heard

the government's contention that they think Molina is just this

little organization that is going to be unable to respond to the

competition and stand up to the opportunity they have as a

result of the divestiture.

And the result of the divestiture will be the elimination

of any competitive overlap between Aetna and Humana in each one

of the 364 counties in the complaint.  There will be no change

in the concentration levels that exist today versus those once

the divestiture is concluded.  In certain counties, the Humana

assets will be sold to Molina, in other counties, the Humana

assets will be sold.  And a large part of the grouping of that

is to allow Molina to have the best opportunity to build the

plans and build the networks that they need to be competitive.

At the end of the process, roughly 290 ,000 Medicare

Advantage beneficiaries would move to Molina across those

counties.

There are two key parts to the agreement with Molina.  The

first is the asset purchase agreement, which is effectively the

sale of the plans and the benefits, and effectively the moving

of the beneficiaries to Molina as a result of the transaction.

And the second is the services agreement.  Mr. Conrath mentioned

that briefly.  He said that the service agreement is actually a

problem.

So, first, Aetna's not good enough, not big enough, not

experienced enough, but if there's a service agreement to help

then get over whatever bumps in the road might exist, that's a

problem too.  Mr. Gardiner is going to talk a little bit more

about that and the efforts that have been made over the last

number of months to put Molina in the position to hit the ground

running.

The effect of the two agreements will allow for a seamless

and uninterrupted experience for plan beneficiaries.  That's the

key.  That's also the key that CMS will look to as they go

through the approval process of the transfer over to Molina.

And you will see that the evidence will make it clear that that

transition, that seamless transition has been accounted for in

the agreement, it's been accounted for in the interactions among

the parties, and it's going to put Molina in a position to get

those approvals and start working with those beneficiaries.

So who is Molina?  We heard the government's view.  Molina

is a Fortune 500 company, ranked No. 201.  It's a sizable

business organization.  Not that well known on the East Coast.

They're based in Southern California.  Their 2015 revenue is $14

billion.  They're the 10th largest insurer nationwide.  This

isn't some feeble little company as the government would like to

1    present.

2        And let me focus on one number Mr. Conrath talked about,

3    the 424 Medicare Advantage beneficiaries that it has.  I'm not

4    sure exactly how he sliced and diced the numbers, but Molina has

5    100,000 beneficiaries in Medicare programs that it's already

6    operating.  It operates in the government sponsored program

7    field.  But you don't have to listen to me.  You're going to

8    hear directly from the Molina witnesses, the principals at

9    Molina, you're going to hear from Dr. Mario Molina, who's the

10   CEO.  You're also going to hear from his colleague who is

11   responsible for the implementation of the agreements.

12       You may even find, as Dr. Molina is likely to testify and

13   certainly believes, that the new combined Aetna and Humana will

14   quickly regret --

15            THE COURT:  I hope he does testify if you're going to

16   tell me what he believes.

17       (Laughter)

18            MR. MAJORAS:  We won't allow him to tell about others,

19   Your Honor.  He's going to tell you that his belief and

20   everything that Molina is doing is going to put the new Aetna in

21   a position where it regrets inviting Molina into that business

22   because that's the strength of competition that they're going to

23   offer.

24       The evidence will show that the DOJ's criticism and

25   critiques of Molina are off base, they're primarily done through

an expert witness who's going to testify, though he's never been
involved in divestitures himself or trying to implement
divestitures.  And he's going to candidly acknowledge, all I
looked at is what could be the bad parts.  I didn't look to see
what the strengths of Molina might be, the fact that it's been
operating these businesses for quite some time.

Finally, let me turn to the ACA exchanges, Your Honor.
Quite simply, there's no overlap.  Aetna has made the decision
to leave the exchanges, and that decision has already taken
effect.  Today, through I believe December 15 of this year, the
enrollment process is happening with the ACA exchanges.  Aetna
is not an option.  Aetna is gone.  Those decisions which will
govern what the competitors are and who's in the business
throughout 2017 have been made, they're irrevocable, and for the
government to say you ought to be looking at the competitive
effects looking forward, that answers the question.

Let's take a look real quickly in terms of the maps again
of where the public exchange presences are.  In the first one,
you can see where both Aetna and Humana were at the beginning of
2016, there's some overlap between the two.  In our next slide,
these are the public exchange presence as they exist in the
election process right now, as they will exist in 2017 going
forward.  There is no overlap between the two.  The government
focuses on three states, Missouri, Georgia, and Florida.  Within
those three states, they go down to 17 counties, and in those 17

counties, there's no overlap in 2017.

By law, Aetna cannot return any earlier than 2018.  But if it were to do so, it would have to be ready with new plans and new applications by the first quarter of 2018.

THE COURT:  '18 or '17?

MR. MAJORAS:  '17, I'm sorry.  Thank you.  There will not be a single witness, not a single witness, not a single document presented in this trial that shows that there's any inkling that Aetna has that it will get back into the exchange markets in 2018.  And the reason for that will be clear.  It will be the business decisions that govern the decision to leave the markets in the first place.

Nonetheless, the DOJ seems intent on putting the ACA exchanges on trial.  And that's what we're going to have here. This isn't a trial about competition.  The trial is going to be, was the decision -- did it make sense in light of how the ACA exchanges work, and the effects they've had on businesses that try to operate in that.

Mr. Conrath talks about an attempt to evade competitive scrutiny.  There's no attempt to evade.  I'm not even sure there's an attempt to evade in any kind of statute that would apply to this case.  But there is not only an attempt to avoid but a decision to avoid, and the decision was to avoid the hundreds of millions of dollars of losses that Aetna and Humana have seen on the exchanges, as well as multiple other insurers.

1        More than 30 of them.  Look at the slide.  Over the last

2    three years, these various carriers have been selling ACA

3    exchange products.  All of them have decided to exit in large

4    part or completely.  They made the same decision that Aetna

5    made, to pull out.

6        The exchanges, frankly, were always on shaky ground.

7    There's been a great deal of discussion about that, among

8    academics, media, we've seen it certainly come up in various

9    elections.  But you'll hear evidence to show what the real

10    problems were.  The biggest problem is they're always going to

11    be populated by the sickest members of the uninsured population.

12    Now, that in itself doesn't mean there's going to be a problem.

13    Insurance companies think in terms of risk pools.  Once a pool

14    is stabilized, once you know what the pool of beneficiaries are,

15    what their conditions might be, what their likely costs are

16    going to be, you can make decisions about pricing to account for

17    that risk.

18        But there's never been any stability on the exchanges.  The

19    enrollments have barely surpassed half of what has been

20    predicted for 2016.  There's constant turnover.  In this the

21    third year of the exchanges, if you look just at Aetna's

22    business at the beginning of 2016 after the enrollment period,

23    50 percent of those were new beneficiaries.  That means there's

24    50 percent of your pool that you know nothing about.  You're

25    going to learn with them over time.  And that is a risk, and

1    that is what insurance companies must focus on and what they do.

2         And you'll hear that there are a variety of other factors

3    that led to the risk pools that ended up being far riskier than

4    what had been anticipated and will only grow worse over time.

5    But you don't have to listen simply to the company witnesses on

6    this score.  Let's hear what the government has to say.

7         (Video is played.)

8         MR. MAJORAS:  Your Honor, what you just heard

9    described is the classic insurance industry death spiral.  It's

10   a market in which risks grow larger and larger every year, and

11   premiums, even if they increase, can't increase enough because

12   they can't anticipate the risk.  And the way the exchanges were

13   designed, the pricing has to be done before you even know what

14   the risks are because you don't have the data from the

15   government until the middle of the following year as to what the

16   experience was on the previous year.

17        You'll also hear that some of the features of the ACA

18   exchanges that were supposed to be safeguards, while everyone

19   waited for the stability that had been hoped for, that either

20   have already expired or were never funded in the first place,

21   and they're unlikely to be reinstituted.

22        The result to Aetna has been mounting losses.  You'll hear

23   Shawn Guertin, the CFO of Aetna, testify.  And this chart shows

24   each year Aetna walked in with some optimism.  Maybe this is the

25   year, this is the year the markets stabilize, the risks

stabilize, and we can either make some money or break even, is all they were looking for.  But each year the disappointment was significant.

The losses were huge, and to the point that in July of this year -- remember, July is the period that Mr. Conrath talks about in his day 1, 2, or 3.  He doesn't mention in the middle of the year, prior to the complaint even being filed, Aetna has to take a premium deficiency reserve of $60 million because of this business.

Humana's losses were actually even a bit worse.  Similar comparison.  And they made their decisions about what to do in the market.  And to the extent they're staying in any markets, they've increased prices significantly, but as we talked about, there's no way to anticipate whether those price increases will matter.

As Mr. Guertin will testify, there can be no more compelling case for the exit of a business than what they saw with the exchange business in the summer of 2015.  And that was only confirmed by the third quarter of this year, where, again, Aetna had to take additional premium deficiency reserves of $20 million.

Even if the DOJ could prove that the withdrawal decision was somehow motivated by this lawsuit as opposed to the disastrous nature of this business, it doesn't matter.  This is a competition case.  The question is what is the competition?

1   We know what the competition is in 2017.  Aetna is not competing

2   in any of the 17 counties that the Department of Justice is

3   complaining about.  This isn't we put up a sign, "Door Closed,"

4   or we raised some prices.  This is an irrevocable decision.

5   They are not there.  There is no competition.  There is no

6   competition case.

7       The DOJ's suggestion that the Court should just focus on

8   the competitive conditions that existed as of 2016 makes

9   absolutely no sense.  The question for the Court is what is the

10  expectation going forward?  Is there going to be a competition

11  problem as a result of this merger?  And again, there is no

12  overlap.  There's nothing to fix here.

13      In fact, there's really a question even as to what the ACA

14  exchanges are going to look like over the next couple of months,

15  maybe over the next year or so.  And we've seen predictions of

16  that in the popular media.

17      Your Honor, the ACA exchanges have been in operation for

18  three years.  This merger has been under review for a year and a

19  half, basically half of that time.  Is the government seriously

20  suggesting that the filing of this lawsuit should prevent Aetna

21  from making the same decision that over 30 other carriers have

22  made?  Especially when faced with the facts you're going to see

23  about the financial impact and the problems in the exchanges.

24      And then, even if they could do that, what's the solution?

25  Pretend that markets might exist the way they existed earlier

this year?  That makes no sense, it has no basis in the law, and
it's a claim that should be rejected.

Finally, the efficiencies, Your Honor.  There are going to
be vast efficiencies that result from this merger.  There has
been significant work that has been done to try to calculate
these efficiencies.  The process is one you're going to hear
about from Mr. David Horst of Aetna, who will go though in
detail as to the efforts that have been made to try to determine
what the efficiencies will be going forward, what the savings
will be.  He's documented that, he's worked with hundreds of
company employees and multiple teams, and spent hundreds of
thousands of hours working on this project.

From that, we'll have an expert economist, Dr. Gilcow will
come in, and he'll testify that in his role as an economist, an
antitrust economist, he's looking at the efficiencies as they
relate to the merger and whether they're cognizable under the
law.  And you'll see that his conclusion is over $2 billion,
$2.3 billion in efficiencies.  And he and Mr. Orszag will also
talk about the fact that historically, because of past deals
that Aetna has done, their expectation and the history indicates
that those efficiencies will inure to the benefit of plan
beneficiaries, whether it's from a cost standpoint, a benefit
standpoint, and certainly as the American health care system
moves more to value-based care.

Your Honor, as a result of all the evidence in this case,

1    it will be clear that there is not a competitive problem.  The

2    government cannot prove that there's a substantial lessening of

3    competition for Medicare products nor for ACA exchange products.

4    Thank you.

5            THE COURT:  Thank you, Mr. Majoras.

6        Mr. Gardiner.

7              **OPENING STATEMENT BY COUNSEL FOR HUMANA**

8            MR. GARDINER:  Thank you, Your Honor.  Your Honor, I

9    would like to spend a few minutes talking about two categories

10   of things.  One is Humana's views about the merger, about its

11   vision, about its rationale and how it came to the decision to

12   engage in the transaction with Aetna.  And the second is to

13   touch on in a little bit more detail a few of the key dimensions

14   of competition in the Medicare market and what the evidence will

15   show about both of those.

16       First as to the merger -- and you'll hear this initially

17   and mainly from Bruce Broussard, who is the CEO of Humana.  And

18   what you'll hear from him is that Humana is incredibly proud of

19   its Medicare Advantage business.

20       It views itself as an innovator for many, many years in

21   improving people's health and reducing medical costs, and of

22   course that is the fundamental business model of Medicare

23   Advantage.  That's the way the government set up the market.

24   You can only actually earn a return if you succeed in reducing

25   costs and improving people's health.  But Humana has adopted it

as a core value, a core vision, core part of its culture, and very much has wanted to continue that going forward as its mission and its business.

But a year or so before the merger was agreed to, it began to ask itself questions about whether it was fully equipped to compete at the level of that vision, to actually continue to innovate and continue to reduce health care cost, to continue to increase wellness.  It asked questions about the weighting of its business.

You heard Mr. Majoras talk about how most of Humana's business is in Medicare Advantage, which means most of its business is geared towards helping, dealing with people who are 65 or older, not so much directed at the population younger than that.  So the weighting of its business caused it to ask questions about its competitiveness and its ability to fulfill its mission.

It also was looking at a very dynamic competitive environment, new competitors entering into that business, increasing competitiveness from Original Medicare -- and we'll talk more about that -- and an increasing thicket of regulations that surrounded the business and potentially made it harder for Humana to have all of its focus or nearly all of its focus on the 65-and-older group of customers it was serving.

And so, as Mr. Broussard will testify, Humana went through a process, a very studious process of evaluating potential

candidates for combination.  Evaluating whether there were

candidates out there, companies out there that shared its

vision.  And as he will testify, at the end of that process, he

concluded -- and he had substantial interaction with Mark

Bertolini, the CEO of Aetna -- that Aetna was far and away the

best candidate company for a combination with Humana that would

satisfy those business concerns, satisfy those competitive

concerns, and keep Humana on the road it wanted to be on in

terms of its vision of improving health.

     The best way I think to illustrate that and what the shared

vision and ultimately the rationale for the merger, is to go

back to the slide that you saw from Mr. Majoras, and develop it

a bit further.

     So if you look at this slide, and you see over on the right

the big blue circle which in this depiction is Original Medicare

and Medicare Advantage together.  There's a debate in this case

about the relevant market, but this is about how Humana looks at

the market as it's competing; and as it looks at that market, it

finds itself a quite small slice of that market, and even adding

Aetna doesn't make it a very large slice of it.  It makes it

larger, but that's not the rationale for the merger, as you'll

hear from Mr. Broussard and others.

     Let's first focus on their slice.  So in some sense the

defensive side of this is that by its very nature, that slice

that they have erodes.  It erodes every year.  The nature of

serving seniors is that, as they age, their health care needs

change, they become more complicated, they lose members back to

Original Medicare in many of those circumstances.  Obviously,

the nature of this business is that seniors pass away, and

others switch out to other competitors.  So that slice is always

under attack, if you will, under erosion.

And so as a business and as a business that wants to be

competitive and of course grow and execute its vision, it has to

compete for the rest of that blue circle.  It has to compete for

seniors who have made an initial choice, they're in Original

Medicare, and what Humana wants to do and wants the combined

company to do is to make itself more attractive to them.

It also wants to broaden its reach beyond 65.  This is the

issue about the weighting of its business.  So that's the

complementarity point.  The combination of Aetna's larger

commercial business, which is largely people under 65, with

Humana's over 65 business, creates an opportunity for the

combined company to affect the lives and health of people for a

longer part of their life span.

The combined company can bring their collective innovations

to people who have not yet reached 65, improve their health,

reduce medical costs, and know them better so that as they age

in, as they come into the Medicare program, they will know this

competitor better, and they'll have had a positive experience,

and therefore the combined company will be more competitive

1   against Original Medicare than it is.

2        The other dimension to it -- so the complementarity point

3   is their ability to impact lives over a longer period.  The

4   other is how is it that they can more effectively compete for

5   that blue circle?  The first thing to remember about that blue

6   circle is it's getting dramatically larger.  Mr. Majoras talked

7   about the age-in.  So 10,000 people a day.  But we know from the

8   demographics of the baby boomers -- it's in the census data --

9   that that number is just going up.  That there's an accelerating

10  number of people going into that and becoming part of this large

11  blue circle.  20 million in it today.  Over the next five years,

12  another 20 million will be in there.  So the business must

13  compete for those people.

14       What's the key to competing for those people?  The key,

15  as you will hear in the evidence, is effective interaction

16  with providers.  So this is doctors and hospitals.  Medicare

17  Advantage doesn't exist, neither does Original Medicare, if

18  it can't effectively engage providers.  But today, Original

19  Medicare has a much more effective way to interact with

20  providers.  Providers' whole business, hospitals' business,

21  doctors' business, historically built on a fee-for-service model

22  as opposed to a value-based model.

23       Fee-for-service model, you provide as much medical care as

24  a patient needs.  Value-based model, you work to improve the

25  health and wellness of that individual so they need less medical

care.  Fundamental difference.  Hospitals and doctors historically not built to enhance wellness and reduce need for medical services.  So it's a tough sell to convince these providers, these doctors and hospitals, to make the shift.

Humana's been successful at that, but there are limitations to that, which is really their slice, a much larger share of the business and the thinking of these hospitals and doctors is built around their fee-for-service model.

So what is the hoped-for vision, the shared vision, and ultimately the core rationale for the deal?  It's to become better at persuading those doctors and hospitals to move, through innovation, through programs, through wellness, into value-based health care.

And the ultimate goal of the shared vision of the companies, the ultimate rationale of the merger  is that if they can succeed in doing that, they will enhance wellness further, they will innovate more together, they'll reduce health care costs further, and they'll become more effective competitors to original Medicare.  That's the rationale for the merger, that's what led Humana into it, and is the shared vision of the two companies.

I indicated that I wanted to talk about some key dimensions of competition in the Medicare business, and I'd like to talk about three.

The first is something that the Court has no doubt seen in

1    the pretrial briefs, and that is a discussion about competition

2    in Medicare is local, and that's in our view a very, very

3    important concept to explore because the government would like

4    to think about this case as a big national, two national

5    companies, how can that be?  But if the Court understands, and

6    the evidence will show, what it means to say the competition is

7    actually local, it provides much greater insight into

8    competitive impact of this merger.

9        And so what does it mean?  Let's just take an example.  If

10   we go from the nation down to a state.  Competition occurs in a

11   state, businesses are built around that.  But where they really

12   occur, where competition really occurs is at the county level.

13   So we'll just pick a county.  This is one of the counties at

14   issue in the case, one of the many.  We picked Guilford County,

15   which is where Greensboro is.  What does local competition mean

16   and what does it look like at that level?

17       Well, this is what it looks like.  So in this county today,

18   you have six Medicare Advantage competitors.  Every county's got

19   a different mix and the mix is changing all the time, but in

20   this county today, one of the challenged counties, you have six.

21   Five of them are traditional Medicare Advantage companies.  One

22   of them, Cone Health, is a provider.  It's actually a hospital

23   system that has also created its own Medicare Advantage plan.

24   So it is both a provider and a payor, if you will, also

25   competing there in Medicare Advantage.

1       They're all competing against Medicare.  And you can see

2   from the members that Medicare here has significantly the

3   largest share, about 40 percent of this market.  In most of the

4   challenged counties, that share is much, much larger.

5       What does it mean to say Medicare here?  It actually is

6   four things.  It's a combination.  Seniors choose different

7   bundles, if you will, of original Medicare.  Sometimes original

8   Medicare by itself, sometimes combined with a Med Supp policy.

9   You've seen that in the papers, no doubt.  Sometimes with a

10  prescription drug plan, sometimes with all three.  But

11  collectively that is the Original Medicare offerings, and that

12  is what is competing against Medicare Advantage.

13      One other dimension of local competition worth mentioning

14  is Molina.  So how does Molina fit in?  Yes, Molina is taking

15  over a large number of counties, but analyzing the competitive

16  impact of Molina occurs again at the county level.  So what's

17  the concept?  The concept is that in any given county, Molina

18  will be stepping into the shoes of one or the other.  Here, in

19  this county, it is Aetna.  It's stepping into the shoes of

20  Aetna, will replace it, will take over the plans associated with

21  those members, and it will be part of this competitive landscape

22  going forward.

23      That is its task.  That is what the divestiture is designed

24  to do.  And the question for the Court is -- if it gets this far

25  in the case -- is how effective can Molina be in this local

1   environment and in other local environments where it is.

2       The second dimension that -- sorry.  Before I go on, I

3   wanted to mention one other thing about Molina here since I'm on

4   it.  You've heard from Mr. Majoras about the Molina witnesses.

5   You will also hear from a Humana employee, Renee Buckingham, who

6   among her other duties has the job of being on point in

7   interfacing with Molina about its transition under the

8   divestiture.  That's an ongoing process, it's a preparatory

9   process, of course, because they can't actually go out and

10  contract yet with providers and get going until authorized, if

11  so.

12      But there's a tremendous amount of preparatory work going

13  on.  Ms. Buckingham is on point to assist Molina.  That's her

14  job.  She's also a competitor.  So she's looking at Molina as a

15  competitor, but that's her job.  You'll hear her testify about

16  that.  And what she'll testify about is the progress, the very

17  substantial progress that Molina is making in preparing to

18  develop its own provider networks in these counties, in these

19  markets, so that there's seamless transition in terms of

20  providers for those members.

21      She also will talk about the agreement that is set up to

22  help Molina, if it needs it -- this is the ASA Mr. Majoras

23  referred to -- as it transitions these 290,000 members across

24  all the geographies.  The ASA is in a sense optional for Molina.

25  Part of what you'll hear from Ms. Buckingham is that she's not

1    sure they'll need it, given the progress that they're making.

2        But it is there available to them.  And what it basically

3    does is say that for at least all of 2017, and Molina's election

4    beyond that, to the extent it's needed, Aetna and Humana, in the

5    jurisdictions where they have the plans, will provide the

6    support services.  They will make it seamless for the customer,

7    whether it's providers, benefits handling, claims

8    administration.  Whatever is the customer experience now will be

9    carried forward through this ASA period so that there is no

10    disruption, giving Molina time to get itself all set up to be

11    able to take it all on on its own unless it can do it faster

12    than that.

13        Second dimension of competition that I wanted to talk about

14    is the role of CMS.  You've heard Mr. Majoras talk about it.

15    What you'll hear from the evidence is the right way to look at

16    CMS is they really have three roles here, three very powerful

17    roles in managing competition.

18        The first is they're the funder.  Right?  They fund

19    original Medicare as a competitor.  They also fund Medicare

20    Advantage, and they link the two, and they move the funding in

21    the two.  Reimbursement levels are dictated by CMS to Medicare

22    Advantage companies based on Original Medicare.  What the

23    evidence will show Your Honor is that because of the ACA, since

24    2011, there's been a steady decline in the reimbursement levels

25    that are paid to Medicare Advantage competitors.

So what that has meant is that it's become harder and harder for Medicare Advantage companies to compete, to get under the reimbursement level.  They've had to work harder, innovate more to reduce cost.  What that also means, of course, is that Original Medicare and Medicare Advantage have become closer together.  The tighter that delta gets in terms of reimbursement, the closer they are.

The second role of CMS is as a regulator.  So, Mr. Majoras talked about the box that showed a broader set of CMS regulations that in a sense surround Medicare Advantage companies and tells them what they can and can't do in terms of all aspects of how they're competing.  CMS's mandate is to protect beneficiaries.  That's what that set of regulations is about.  But it's more substantial than that.

CMS as regulator.  In addition to an overarching set of regulations about almost every aspect of how a Medicare Advantage company does business, CMS has a very, very specific approach to regulating every single bid.

So you can see from here, just an example, if they set a benchmark of $1,000 in a county based on original Medicare, and a Medicare Advantage company comes in with an $800 bid, good thing, generates savings.  CMS regulates every single slice of that bid.  So if you look at the cost side, their regulations are at least 85 percent of that bid has to go to medical costs. Can't go to profit, can't go to overhead, has to go to medical

1    costs.

2    The admin.  CMS, you'll hear during the case, not going to

3    go into it now, they regulate admin, what you can charge to

4    admin, so you can't stick it in margin.  They regulate the

5    margin itself in all sorts of ways that you'll hear.

6    They even regulate the savings.  The savings doesn't go

7    back to the Medicare Advantage company.  The first slice, CMS

8    keeps it, goes back to the taxpayers.  The second slice -- and

9    the slice is different and you'll hear why -- the Medicare

10   Advantage company has to use it to either reduce premiums or

11   increase benefits.  So CMS is on every bid.

12   Now, I suspect that you're going to hear a quite humble CMS

13   in this courtroom during the trial, claiming they don't have a

14   whole lot of regulatory authority.  But I think, Your Honor,

15   that that will be belied by the evidence.  In one respect, you

16   saw it.  You saw the documents that Mr. Majoras showed you.

17   There are other documents in which CMS is expressing quite a bit

18   more confidence in its ability to regulate, prevent price

19   increases, protect beneficiaries, et cetera.

20   And it's also belied by the bid process itself.  Humana has

21   to submit every year more than 400 bids.  And it spends months

22   interacting actively, bid by bid, with CMS over whether CMS

23   thinks the bid is good enough for beneficiaries.  And CMS has

24   virtually unbridled discretion to reject any bid.

25   And so that just -- what all that has created is a business

model for Medicare Advantage companies that has resulted -- and you'll hear the evidence of this -- in very stable pricing over time, very low margins over time.  In a sense, the whole system has been set up to sort of self-regulate competition.

And where do we see that?  Mr. Majoras mentioned this. When you look at counties with only one Medicare Advantage provider and you compare it to counties that have many, what do you see?  Now, the government bestows the heavy label of monopoly on those counties, but we would argue that the evidence is going to show that that -- those counties don't live up to the billing of monopoly counties in any sense of the word.

The evidence is going to show that premiums are no higher in counties that have only one MA competitor.  Benefits are no lower than in counties that have four, five, six competitors. What is that telling us?  This is real-world evidence of the heavy hand of CMS regulation and the looming presence of Original Medicare as a competitor in every single one of those markets.  There's really no other way to explain why a so-called monopoly county performs at the same competitive level as counties that have a multitude of MA competitors.  There's more going on here.  This is different, fundamentally different, than a purely private market without a government competitor in it.

Last competitive dynamic I wanted to mention is providers as competitors.  I mentioned earlier cone Health, the hospital system that had become a Medicare Advantage competitor in North

Carolina.  You'll hear more about that particular example, but it is not anywhere near an isolated example.

Why is that?  Once providers start to understand value-based care and shift their business model, they have substantial benefits and advantages to becoming an MA competitor in their own right.  And by definition, they are in every single county.  That's the whole point.  And so what we're seeing, what the evidence shows, what the documents show, is that this is a growing and critical competitive threat, and one very actively supported and pushed by CMS again as funder and as competitor.

They're both putting restrictions and penalties on providers and giving them financial inducements to compete both on the Original Medicare side and as MA competitors by offering their own MA type benefits.

So once again, you've got this large competitive threat, and if you look at -- this is a document from Humana's files. It's one of their foundational documents.  Every year they do a guiding principles document that is what is the strategy for how we are going to market across our 400 bids.  And here is what they say.

"Provider-owned plans" -- and this is early 2016. "Provider-owned plans becoming more common, pressuring growth. Provider-owned plans represented 58 percent of the new MA organizations entering the market in 2016."

So we talk about new entry.  The government has said not a

1    word about this very substantial incidence of new entry.   64

2    percent of Medicare eligibles have access to such plans.   So

3    this is an area that you'll see.   It's growing, it's one of the

4    examples of new entry, but it's a particularly potent form of

5    new entry because of their incumbency in every single county.

6        I will just close by saying that in a sense these three

7    competitive dimensions of the market are illustrative of what in

8    our view is wrong with the government's case.   These are

9    examples of actual competition and the dynamism of the market.

10   The government is looking backwards and looking backwards in a

11   very static way.   It's defining a market by red-lining out the

12   most potent competitor in every county, it's taking that and

13   creating market share statistics that it wants the Court to

14   believe should lead to a presumption, and it is ignoring all the

15   dynamism here as well as this looming presence of a government

16   regulator that is wrapped around every aspect of the business.

17       Because of the delta between the theory and what actually

18   is going on in this market, we believe that the government's

19   case really founders on a fundamental speculativeness.   They're

20   trying to predict the future without taking any of that dynamism

21   into account.   Thank you, Your Honor.

22            THE COURT:   Thank you all.   I guess what we'll do is

23   take our morning break here, a little late in the morning.   I'm

24   going to curtail it only slightly.   Let's try to be back in 10

25   minutes or just over 10 minutes, and we'll begin -- we'll

1    probably only run for another hour before we take a lunch break,

2    but I'll see you in about 10 minutes.  Thank you.

3         (Recess from 11:35 to 11:48 a.m.)

4              THE COURT:  Mr. Mahr.

5              MR. MAHR:  Good morning, Your Honor.  Eric Mahr for

6    the United States and the plaintiff states.  The United States

7    calls as its first witness Dr. Richard G. Frank.

8         **RICHARD G. FRANK, WITNESS FOR THE GOVERNMENT, SWORN**

9              THE COURT:  Good morning, Dr. Frank.

10             THE WITNESS:  Good morning.

11             THE COURT:  Mr. Mahr.

12                        DIRECT EXAMINATION

13   BY MR. MAHR:

14   Q.   Good morning, Professor Frank.  Would you please state your

15   full name for the record.

16   A.   Richard G. Frank.

17   Q.   How are you currently employed?

18   A.   I am a professor at Harvard University.

19   Q.   How long have you been a professor at Harvard University?

20   A.   I've been there since 1994.

21   Q.   Would you please provide the Court with a brief overview of

22   your educational background?

23   A.   I have a bachelor's degree in economics from Bard College.

24   I spent a year as a graduate student at the University of Rhode

25   Island, and then I returned a little bit later to Boston

1    University and got a Ph.D. in economics.

2    Q.    In what field was your Ph.D.?  I'm sorry.  Is there a

3    specific subspecialty within economics?

4    A.    I wrote my dissertation in the area of health economics.

5    Q.    After obtaining your Ph.D. where did you first work?

6    A.    My first job after my Ph.D. was at the University of

7    Pittsburgh.

8    Q.    And after that?

9    A.    I went to Johns Hopkins University at the School of Public

10   Health and joint appointment in economics.

11   Q.    When did you leave Johns Hopkins?

12   A.    In 1994.

13   Q.    Where did you go then?

14   A.    I went to Harvard Medical School.

15   Q.    Would you please tell the Court a little bit about what you

16   do as a professor of health economics at Harvard Medical School?

17   A.    I guess I would classify my activities into three buckets:

18   teaching, research, and what I call service.

19   Q.    Have you taught courses in health economics at Harvard?

20   A.    Yes, I have.

21   Q.    Do you have an example of a couple of those?

22   A.    Yes.  I taught a course in the economics department called

23   the industrial organization of health care, and I've taught the

24   Kennedy School introduction to health policy course.

25   Q.    What's the Kennedy School?

A.    The Kennedy School is the graduate school of governmental

public affairs at Harvard.

Q.    Have you supervised any doctoral candidates during your

career?

A.    Yes, many.

Q.    You also mentioned research as one of your activities at

Harvard Medical School.  In what field is your academic

research?

A.    My work is primarily in health economics and health policy.

Q.    Could you provide Judge Bates with a brief explanation of

just what health economics is referring to?

A.    Sure.  Health economics is really the study of the

institutions, regulations, and market forces that really shape

the delivery of health care and the health outcomes that stem

from that.

Q.    Have you published in the field of health economics?

A.    Yes, I have.

Q.    Can you give us a rough estimate of how many publications

you've done in the field?

A.    I would say that across all the different types of

publications, I published over 300 papers.

Q.    Were any of those papers peer-reviewed publications?

A.    Yes.  Quite a few.

Q.    About how many, do you know?

A.    About 245.

1   Q.   There should be a black binder on the witness stand with

2   you with your name on it.  Do you see that?

3   A.   Yes.

4   Q.   If you open it behind the first tab, you'll see what is

5   marked as Plaintiffs' Exhibit PX 0553, entitled "Expert Report

6   of Richard Frank, Ph.D." dated October 21, 2016.  Is that a copy

7   of the expert report you submitted in this matter?

8   A.   Yes.  That's my initial expert report.

9   Q.   If you turn to appendix 2 of PX0553, did you attach a copy

10  of your CV to your expert report?

11  A.   Yes, that's my CV.

12  Q.   Does your CV set forth the entire list of your publications

13  in the field of health economics?

14  A.   As best I know, yes.

15  Q.   Could you give us a couple examples of the kind of topics

16  that you've published on in the field?

17  A.   Yes.  Some of my recent work that's particularly germane to

18  the proceedings here are I've done a few papers on how consumers

19  choose among insurance plans, both in health insurance broadly,

20  but in the area of Medicare specifically.  I've done some recent

21  work also on competition in the pharmaceutical industry, and in

22  particular what we've learned about competition affects the way

23  antitrust is conducted.  And then I've done some work on just

24  the economics of health care spending overall.

25  Q.   Have you served on the editorial board of any economic

1    journals?

2    A.    Yes, I have.  I served as the editor of the Journal of

3    Health Economics for about 10 years.

4    Q.    Does your CV list any honors and awards you received in the

5    field of economics?

6    A.    Yes, it does.

7    Q.    Are there any of those you could flag for Judge Bates as

8    particularly noteworthy?

9    A.    Well, I can tell you about the ones that I like, which --

10         (Laughter)

11             THE COURT:  Doesn't mean I'll like them.

12         (Laughter)

13             THE WITNESS:  Exactly.  But one of them, I was elected

14   to the Institute of Medicine, which is now called the National

15   Academy of Medicine, which is part of the National Academy of

16   Sciences, in 1997.  I've won several best-paper awards, one on

17   my work on pharmaceutical pricing, and another on long-term care

18   financing.

19   BY MR. MAHR:

20   Q.    I believe you mentioned as part of your work at Harvard

21   you've also had the opportunity to engage in public service.

22   Can you describe that?

23   A.    Yeah.  I'll focus on more recent activities.  In 2009 I was

24   appointed as the Deputy Assistant Secretary For Planning and

25   Evaluation at HHS, and there I ran an office called Disability,

1    Aging, and Long-Term Care Policy that focused, obviously, on

2    those areas, but also on mental health and addiction policy at

3    HHS.

4         And then I left HHS to return to Harvard, and then I was

5    brought back first as a special advisor to the office of the

6    secretary in 2013, and in 2014 I was confirmed by the Senate as

7    the Assistant Secretary for Planning and Evaluation at HHS.

8    Q.   Is the office of the Assistant Secretary for Planning and

9    Evaluation more commonly known as ASPE?

10   A.   Yes, it is, it is known as ASPE.

11   Q.   And as the assistant secretary yourself, were you also

12   known as the ASPE of ASPE?

13   A.   Yes.  I was the ASPE.

14   Q.   Did you have any other duties as Assistant Secretary for

15   Planning and Evaluation?

16   A.   Well, typically when the ASPE is an economist, that person

17   serves the role of chief economist at HHS.

18   Q.   Did you serve in that position as chief economist during

19   the entire period in which you were the ASPE?

20   A.   Yes.  They were essentially one and the same.  The chief

21   economist role was a subset of the activities of the ASPE.

22   Q.   When did you step down from that position?

23   A.   In June of this year, 2016.

24   Q.   Why did you step down?

25   A.   I was facing two important constraints.  The first is a

1   thing called the Kissinger rule, which is named after former

2   Secretary of State Henry Kissinger, who kept taking leaves from

3   Harvard, and they decided to nip that practice in the bud.  And

4   so the rule is you have to return after two years or lose your

5   tenure.

6       Then there was the Elizabeth Frank rule, which is actually

7   much more constraining in my particular case as that involves my

8   marriage.

9       (Laughter)

10      So, as a result, I returned to Boston.

11  Q.   Do you continue to work in any capacity with the Department

12  of Health and Human Services today?

13  A.   Yes.  I have continued to play the role of a special

14  advisor to the Secretary of HHS.

15  Q.   Would you describe what that role is?

16  A.   Well, as I mentioned, one of my duties was as chief

17  economist, and the person who replaced me at HHS as acting ASPE

18  is not an economist, and because there were a number of key

19  issues before the Secretary involving competition and market

20  dynamics, she asked if I would be able to continue to advise her

21  part-time after I left.  And so she made arrangements with

22  Harvard to allow me to do that.

23  Q.   Would you describe for the Court the kind of projects

24  you've worked on in that role?

25  A.   Yes.  There have been a variety of issues particularly

1    related to competition.  So we worked on consolidation in the

2    hospital industry and sort of pricing and profit margins there,

3    pharmaceutical pricing, the performance of the exchanges, the

4    health insurance exchanges as part of the Affordable Care Act,

5    and matters of consolidation in the private health insurance

6    market.

7    Q.   In addition to that work, do you currently hold any

8    positions with any state governments?

9    A.   Yes.  I've been appointed by the governor of Massachusetts

10   to a commission on price variation in health care in the

11   Commonwealth.

12   Q.   Professor Frank, prior to this case, have you previously

13   provided expert testimony in any litigation?

14   A.   Yes, I have.

15   Q.   About how many times?

16   A.   Probably about eight or nine times.

17   Q.   Were all of those instances in the field of health

18   economics?

19   A.   Yes.

20   Q.   And when was the last of them?

21   A.   The last time I participated in any litigation prior to

22   today was in 2009.

23   Q.   Were any of the matters you worked on previously antitrust

24   matters involving health economics?

25   A.   Several of them were, yes.

1    Q.    And have you been qualified by a federal court as an expert

2    in health economics in any of those cases?

3    A.    Yes, I have.

4    Q.    Which court was that?

5    A.    The federal court in Baltimore.

6    Q.    Has any court ever excluded any of your proposed testimony,

7    whether in whole or in part, in any of those litigations?

8    A.    No.

9    Q.    Are you familiar with something called a Daubert motion?

10   A.    Yes, I am.

11   Q.    Has your proposed expert testimony in the field of

12   economics ever been the subject of a Daubert motion in any of

13   those litigations?

14   A.    No.

15   Q.    How are you being compensated in this matter?

16   A.    Well, as I mentioned a few minutes ago, the Department of

17   Health and Human Services pays for a portion of my time at

18   Harvard, and so that covers everything that I do associated with

19   the Department.  And so in terms of, for example, spending an

20   extra hour working on this matter, I don't get any extra

21   compensation.

22            MR. MAHR:  Your Honor, the United States would like to

23   offer Professor Frank as an expert in health economics, the

24   Medicare program, the Medicare Advantage program, and the ACA

25   health insurance exchanges.

1          THE COURT:  Any voir dire?

2          MR. IRWIN:  Good morning, Your Honor.  Geoff Irwin for

3   Aetna.  We have no objection.

4          THE COURT:  All right.  Without objection, Professor

5   Frank will be admitted to provide expert testimony on the

6   subjects of health economics, the Medicare program, the Medicare

7   Advantage program, and the Affordable Care Act health insurance

8   exchanges.  You may proceed with the examination.

9          MR. MAHR:  Thank you, Your Honor.

10  BY MR. MAHR:

11  Q.   Professor Frank, have you been asked by the United States

12  to provide your expert opinion in this litigation?

13  A.   Yes, I have.

14  Q.   Have you expressed those opinions in the form of written

15  reports?

16  A.   Yes.  I've provided two written reports, an initial report

17  and a rebuttal report.

18  Q.   You've already identified PX 0553 as your initial report.

19  If you will look behind the tab in your witness binder marked

20  PX 0554, there's a document entitled "Supplemental and Rebuttal

21  Report of Richard Frank Ph.D." dated November 11, 2016.  Are

22  those two documents true and correct copies of your reports in

23  this matter?

24  A.   Yes.  They appear to be.

25  Q.   In addition to your reports, have you prepared some slides

1  as a demonstrative to help explain your testimony today?

2  A.  Yes, I have.

3  Q.  If you look at the last tab of your witness binder, are

4  those the slides that you prepared for today?

5  A.  Yes, they are.

6           MR. MAHR:  Your Honor, may we display the slides that

7  Professor Frank has prepared?

8           THE COURT:  Without objection?

9           MR. IRWIN:  No objection, Your Honor.

10           THE COURT:  Without objection, you may.

11  BY MR. MAHR:

12  Q.  Professor Frank, on what subjects have you been asked to

13  opine in this case?

14  A.  So I've been asked to really talk on three broad areas.

15  The first is just the role of competition in the two programs

16  that are at issue here today, Medicare, Medicare Advantage, and

17  then the health insurance exchanges.  The idea is to really

18  explain how the program works and how competition fits into it.

19        The second area is to examine the degree to which there is

20  market power and whether that market power is exercised in the

21  markets that are within those two programs.

22        And then third is to sort of outline the role of regulation

23  in this sort of larger -- two sets of systems that I would say

24  fall under the umbrella of what I would term "regulated

25  competition."

1   Q.    Would you describe at a high level the conclusions you

2   reached based on your work, first with respect to the Medicare

3   Advantage program?

4   A.    Sure.  Can I get the next slide, please?  Thank you.

5         So the first conclusion -- and I'm going to do Medicare

6   Advantage first and then the exchanges.  Medicare Advantage

7   relies on competition among private insurers to promote

8   efficient coverage for older adults and some disabled

9   populations.  And the program is specifically designed to do so

10  in a way that shares the benefits of competition with both

11  taxpayers in the form of money, and with program beneficiaries

12  in the form of extra benefits and reasonable premiums.  And the

13  design of the program is specifically set to promote the

14  competition in order to produce those benefits.

15        My second conclusion is that the design of the Medicare

16  Advantage program is particularly susceptible to the exercise of

17  market power.  That is, first, that occurs because the

18  competition is really focused inside of the Medicare Advantage

19  program, and it occurs primarily between Medicare Advantage

20  participating insurers.

21        Second, the evidence I think points strongly to the fact

22  that there already exists market power in this market, and that

23  furthermore the exercise -- there's evidence suggesting that

24  were market power increased, we would see reduced benefits to

25  both consumers and taxpayers in the form of higher premiums,

1    higher bids and fewer benefits being delivered to consumers.

2         The third area is that regulation in this market defines

3    the contours of the market, sets the rules for how the game will

4    be played, if you will, but is not in any way there to replace

5    competition, and it doesn't replace competition.

6    Q.   Would you please also summarize your conclusions and

7    opinions with respect to the exchanges.

8    A.   Again, in the same way that in the sense of principles of

9    the health insurance exchanges, again in this area of what I

10   call regulated competition, that is that the drivers of

11   efficiency and choice here are really the market.  And what the

12   health insurance exchanges did is they set up a new market with

13   new rules that allowed private health insurers to compete to

14   offer many people who had never had the opportunity to get

15   health insurance before, to give them choices that are

16   relatively rich, and to do so in a way that is affordable and

17   minimized the burden on taxpayers.  So that's the first

18   conclusion.

19        The second conclusion is that a substantial reduction in

20   competition would result in both higher premiums and a higher

21   burden on taxpayers, and there is evidence both from the field

22   and from the work that I did while I was the assistant secretary

23   with my staff supporting that.

24        Third is that the way the program is designed in terms of

25   making health insurance affordable for low income populations

1   involves subsidies, and the design of those subsidies in

2   particular makes this market susceptible to the exercise of

3   market power.

4        And then finally, much as I mentioned in connection to

5   Medicare Advantage, regulation sets the contours of the market,

6   the rules under which competition occurs.  It is meant to

7   actually promote competition, not in any way replace

8   competition.

9   Q.   Before we turn to the substance of your opinions, would you

10  please give the Court a sense of the process by which you

11  conducted your analysis in these areas?

12  A.   The work I did here is very similar to the work I've done

13  my entire career in terms of studying policy and economic issues

14  in the health care sector, and that is the first thing to do is

15  to really understand the programs themselves, the regulations,

16  the institutions involved, and the nature of the people that are

17  participating in the programs, in this case older adults in the

18  Medicare program and then sort of people participating in the

19  individual health insurance market in the exchanges.

20       And to really understand those institutions, the rules and

21  the people, and then to really examine the incentives that are

22  created by those rules and those institutions in a lot of

23  detail, and then to take data and evidence and understand how

24  market participants behave in response to those rules and those

25  incentives and to understand what their actual behavior is.

1      And based on that, I sort of formed my opinions.  And I

2    think this is pretty much the way that I and most of my peers

3    would sort of approach this kind of task.

4    Q.   Turning first then to the work you did in the Medicare

5    Advantage area, would you explain what Medicare is?

6    A.   Sure.  Medicare is, at its highest level, is the federal

7    program that provides health insurance or health coverage to

8    older adults in this country and people who are disabled and

9    qualify for the Social Security disability insurance program.

10   They can qualify after a waiting period.  And there are about 57

11   million people enrolled in the Medicare program, and the

12   spending on that program is just under two-thirds of a trillion

13   dollars per year, so about 630 million a year.  So that's the

14   broad contour of the Medicare program.

15            THE COURT:  That was 630 billion a year, right?

16            THE WITNESS:  I thought I said billion, but yes.

17            THE COURT:  I was just looking at the transcript.

18            THE WITNESS:  Yes.  It is definitely billion.

19   BY MR. MAHR:

20   Q.   What are the elements of Medicare?

21   A.   Medicare has basically four parts, and they're displayed on

22   your screen.  And let me sort of just briefly walk you through

23   it starting with the upper left-hand quadrant in green, which is

24   the Part A program, and that is the part of Medicare that is

25   focused on covering hospitalization services and to some extent

hospice as well.  So anything that happens inside the hospital
where you have to stay overnight typically is covered under
Part A.  And that part of the program is mandatory.  Everybody
at age 65 is automatically enrolled in that.

Part B, which is on the upper right-hand side, covers
outpatient care, doctor visits, and also physician-administered
drugs.  So, for example, if you were to be treated for a cancer
at the outpatient department of a clinic, that chemotherapy
would be administered by a doctor, and that would be covered
under Part B.  And that is an optional program, but it's heavily
subsidized so that participation rates are well over 90 percent.

Part C, which today is known as Medicare Advantage, but has
had several names in the past, is the part of Medicare that
involves giving consumers an option to have private plans
organize and finance their health care.  And in a sense, it was
designed to mimic what we see in the private commercial sector.
So the kind of insurance that we probably all have, which is
employee-sponsored insurance, sort of kind of resembles and
serves as a model for Part C.

And then Part D is the most recent entry into this program,
which is outpatient prescription drugs.  Those are the drugs
that we most commonly go to the drug store for and take a pill.
And that is an optional program.  It was put into place as part
of the Medicare Modernization Act of 2003 and was implemented
starting in 2006.  And it is an optional program, but it too is

1   heavily subsidized so participation rates are quite high.

2   Q.   Are Parts A and B together what we've been referring to as

3   original Medicare?

4   A.   The Parts A and B were really the parts of Medicare that

5   started in 1965, passed in '64, but started in '65.  And it's

6   either called Original Medicare, sometimes it's called

7   traditional Medicare, other times it's called fee-for-service

8   Medicare, and those are used more or less interchangeably.

9   Q.   Are Parts C and D ever included as part of what's referred

10  to as original Medicare or traditional Medicare?

11  A.   Well, Part C certainly isn't.  In a sense, Part D can be

12  considered sort of an add-on or an appendage to traditional

13  Medicare.

14  Q.   Could you just briefly describe for the Court what some of

15  the key features of original Medicare are?

16  A.   Yes.  So, again, let's go back and start with the benefit

17  design Part A.  As I said, Part A covers hospital care, and it

18  comes with roughly a $1,300 deductible.  That is, you have to

19  incur $1,300 in costs before your insurance actually kicks in,

20  and then you're covered.

21       Part B, again, is the outpatient side and doctor visits and

22  physician-administered drugs.  It too has a deductible, $166,

23  but it has, in addition, typically a 20 percent co-insurance.

24  And what that means is, for example, if you were to go to a

25  doctor's office and have a routine visit for $100, you would be

required to pay $20 out of pocket.  And the premium for that,
most people pay a premium this year, in 2016, of $104.90, which
is known as a Part B premium.

Now, in general, Medicare is a very important program, and
it's done a great deal to improve the lives of older adults, but
there are certain things that it doesn't cover and there are
certain sort of gaps in coverage.  The first is that there is no
upper limit on the outpatient cost that an individual or
household can incur.  And so it is not catastrophic insurance in
that sense.

It also doesn't cover certain types of services and
products that are commonly used by older Americans: dental,
vision, and hearing aids in particular are not part of the
standard A and B packages.  And then prescription drugs, as I
mentioned, can be covered if you enroll and purchase a so-called
Part B plan, which is set out, as I said, by the Medicare
Modernization Act.  And the average premium after subsidies, the
out-of-pocket premium is about $39 across all the different
plans that are available, that's the average, per month.

Now, one of the important features of this which will help
us distinguish it from either current commercial practices or
Part C is that enrollees are free to get care from any provider
that participates in the Medicare program.  So you can go to any
specialist, any primary care doctor, any hospital that
participates in the program without a referral.  So it's

1    entirely open to the individual and their household to make

2    decisions about where they get their care.

3    Q.   Just turning back a second to the lack of a limit on

4    out-of-pocket costs, are you aware of any research concerning

5    the magnitude of medical costs that Original Medicare enrollees

6    can be exposed to as a result of not having that limit in place?

7    A.   Yes, there's a variety of research that has shown that

8    those costs can be significant.  Perhaps I can drive this home

9    with an example.  There have been a lot of headlines recently

10   about sort of new biological cancer drugs that are costing 80 or

11   $90,000 a year for treatment.  Well, think about applying that

12   20 percent to that, say, $90,000 treatment.  You know, that's

13   $18,000 right there per year.

14        And so you could imagine that, when a household of older

15   adults are surviving typically on something around $36,000 a

16   year, that is a serious burden for them to carry.

17   Q.   Will you please describe what Medigap is?

18   A.   Yeah.  Medigap -- and some people refer to it as Med Supp,

19   but I'll refer to it as Medigap -- is a set of products,

20   insurance products that fill in for some of the holes that I

21   identified earlier.  But let me be careful about that.  The

22   holes that it is targeted at are the deductibles, the

23   co-payments, and the co-insurances in Parts A and Part B.  They

24   do not cover things like dental, vision, or hearing that are

25   outside of this, nor by statute are they allowed to cover

prescription drugs, because that's what Part D does.

The typical premium in 2010, which is the last year that there was a broad national study, showed that the average premium for a Medigap policy across all of the different types of policies was $183.  Now, I want to highlight that this is a regulated set of products in that there are 10 types of Medigap policies that are standardized that were set out by the Congress.  Insurers compete within each of those product groupings to offer Medicare beneficiaries the opportunity to purchase that type of coverage.

Another important rule is that during the first six months of your enrollment in Medicare, you have the opportunity to purchase one of those policies under conditions where the insurer cannot turn you away, cannot apply any underwriting. However, if you wait for more than six months, then the insurer can either turn you away because of, say, a pre-existing condition, or you can be subjected to underwriting rules.

Q.   Let's now turn to Part C, Medicare Advantage.  Would you first describe again at a high level to the Court what Medicare Advantage is?

A.   Yes.  The Medicare Advantage program is in a sense modeled on what we've been seeing since the early 1980s in the commercial sector in employer-sponsored insurance, which is managed care.  Beginning in 1985, Congress put in place a program where Medicare beneficiaries would be given a set of

1   options that more resemble sort of what at the time was the new,

2   modern managed care approach to health insurance delivery

3   alongside what had been in place since the mid-1960s.

4       And so the idea really was to make a program for people

5   that were comfortable having the choices that looked like what

6   you saw in the commercial side happen within the Medicare

7   program.  And today there's about 70 and a half million people

8   enrolled in the Medicare Advantage program, and that's been

9   growing steadily for the last 10 or 11 years or so.

10  Q.   What kind of coverage do Medicare Advantage plans provide

11  for enrollees?

12  A.   Yes.  If you turn to the slide.  So by statute, Medicare

13  Advantage must cover all Part A and Part B services.  And on top

14  of that, though, they must essentially offer a catastrophic

15  benefit.  So there is a statutory cap on out-of-pocket spending

16  of $6,700 a year, and most plans in practice actually offer a

17  lower cap than that.

18      Cost sharing is, in a sense, a decision made by the plan as

19  they sort of organize and finance a package of services for

20  older adults.  So they can use cost-sharing arrangements to help

21  steer care and control cost.  And they typically -- or more

22  often than not, they have additional benefits -- dental, vision,

23  hearing.  And most plans are so-called Medicare Advantage

24  prescription drug plans which -- the acronym is MAPD, which sort

25  of brings together Part C and the Part D programs.

1    So that's the benefit design side of things.  Let me turn

2    to sort of the management side.  There are two important

3    distinguishing features in the way business is done here.

4    First, Medicare Advantage uses limited provider networks as a

5    way of influencing both cost and quality.  That is steering

6    beneficiaries and enrollees to providers that provide value,

7    quality for cost.  And they do so by having limited provider

8    networks which allows them some extra negotiating power but also

9    allows them to choose based on other criteria.

10   In addition to the networks, there are a variety of

11   administrative processes that are put in place in order to

12   contribute to quality and control cost.  Those include, for

13   example, prior authorization for high-expense procedures.  Heart

14   bypass surgery might be an example.  A second would be

15   utilization review.

16   So, if you're in the hospital, a managed care plan

17   typically checks on the progress and whether you're getting

18   ready to be discharged and where you're going to go in terms of

19   rehabilitation afterwards and the like.  So there are those

20   types of administrative procedures that sit alongside the

21   benefit design and the network design.

22   Most people -- most plans offer a so-called zero premium

23   plan, which is really something you hear a lot but is kind of a

24   misnomer.  Because what a zero premium plan means here is that

25   you pay $104.90 out of your Social Security check every month

1    for the most part, because you're still responsible for the

2    Part B premium.  But some enrollees have that premium reduced a

3    bit, as a function of the benefits that accrue from the

4    competition in the Part C sector.

5    Q.   Professor Frank, do you have a view as to what drives an

6    insurer to decide whether to offer a zero premium plan or a

7    negative premium plan?

8    A.   The degree of competition is certainly important to that

9    decision, but the cost of the population, the cost of the

10   program is also important.

11   Q.   You likewise mentioned that, for the out-of-pocket cost

12   limit, the mandatory limit was $6,700, I believe, but that many

13   insurers offer limits below that.  Do you have an opinion as to

14   what drives insurers to offer caps below that?

15   A.   Again, part of that has to do with competition, the

16   benefits of competition.  And part of it is that when -- and

17   I'll come to this probably in a few minutes -- when the bids

18   come in below the benchmark standard, there's the opportunity to

19   offer extra benefits.

20   Q.   Do you have a slide that summarizes the key differences

21   between Original Medicare and the Medicare Advantage you've been

22   discussing?

23   A.   Yes.  If you turn to the next slide.  And here, really, the

24   point here is to highlight the basics.  And in a sense, Original

25   Medicare is just sort of the standard Part A and Part B, which

1    is the core of the matter.  And on the other side you see

2    Medicare Advantage.  The point here is that on the benefit

3    design front, we highlight that original Medicare does not have

4    that catastrophic coverage.  There are those missing benefits

5    that often are used by older adults such as hearing, vision, and

6    dental, that are not part of that, and again, prescription drugs

7    are not part of the basic program; you have to make an

8    additional purchase in order to get the prescription drug

9    coverage.  But at the same time, that comes with the benefit of

10   being completely free to choose who your provider is without any

11   kinds of referrals.

12         On the other side, obviously, there's a catastrophic

13   coverage set in law under Medicare Advantage.  And then

14   typically there are both supplemental benefits and prescription

15   drug coverage that are part of the vast majority of those plans.

16   However, at the same time, there are these administrative

17   restraints and network restraints that constrain the choice of

18   the enrollee.

19   Q.   If a traditional Medicare beneficiary sought to replicate

20   the coverage provided by a Medicare Advantage plan, could they

21   do so?

22   A.   They cannot fully replicate.  What they can do is they

23   could get comparable coverages for Parts A and B and a drug

24   benefit by purchasing additional coverage.  But they cannot, at

25   least through the usual connections to the program, get coverage

1    for the dental, the vision, and the -- dental and the vision

2    pieces.  So those -- and the hearing pieces.  So you'd have to

3    find some other insurance somewhere else that would cover that

4    if you wanted to.

5         So that would be difficult.  But you can get somewhat

6    similar coverage at least within the confines of A, B, and drug

7    coverage.

8    Q.   How would they replicate or attempt to replicate the

9    out-of-pocket cap on catastrophic losses?

10   A.   There are some of the -- some of the Medigap plans do cover

11   some of the catastrophic spending above the -- I'd say $6,700.

12   Q.   If a traditional Medicare beneficiary attempted to do that,

13   would there be a cost difference in putting together those

14   various elements you just described and a single Medicare

15   Advantage plan?

16   A.   Yes.  If you look at the next slide, I put together an

17   example here using some recently available data.  What I did is

18   I took sort of national averages and I just built up what it

19   would cost to get original Medicare, a modestly priced Medigap

20   policy plus a prescription drug plan.

21        And what you see is that at least on average it's

22   considerably more expensive to try to get a comparable level of

23   coverage within the Original Medicare or traditional Medicare

24   program compared to the Medicare Advantage, and you can see

25   that -- what I mentioned earlier is that inside of the Medicare

1    Advantage program, it cost about $37 to have a prescription drug

2    coverage inside of Medicare Advantage.

3        It's $39 if you buy it inside of Original Medicare.  They

4    both pay the Part B premium, so the real difference is that

5    Medigap premium.  That is like the vast majority of the

6    difference, and that's what really accounts for it.  So filling

7    in that gap is pretty expensive.

8    Q.   Does Medicare Advantage tend to appeal to a certain portion

9    of the Medicare-eligible population as compared to traditional

10   Medicare?

11   A.   Yes.  As you can imagine, in a sense the characteristics of

12   the program are set up so that they're actually quite different

13   and they would appeal to people who had different

14   characteristics and different proclivities.  And there's been

15   quite a bit of research on this, and that research generally

16   shows that people with lower incomes, lower levels of education,

17   tend to join Medicare Advantage plans disproportionately to the

18   rest of the population.

19       Similarly, minorities and residents of urban areas are

20   disproportionately joining Medicare Advantage programs.  And

21   finally, people in Medicare Advantage tend to be healthier, and

22   this is evidenced by something that you'll hear a lot about

23   called a risk score.  And what that does is it's a composite

24   indicator of how sick you are, and sort of what your risks are

25   for expenditures.

1          The research that's out there suggests that people in

2     Medicare Advantage are about 20 to 30 percent healthier in a

3     sense than people in traditional Medicare.

4               MR. MAHR:  Your Honor, I'm going to move on to another

5     topic.  I don't know what your plans are for lunch but this

6     would be a reasonable point to stop, or I can continue on.

7               THE COURT:  Eight minutes.

8          (Laughter)

9               MR. MAHR:  Eight minutes.

10              THE COURT:  Those are my plans.

11              MR. MAHR:  Thank you.

12    BY MR. MAHR:

13    Q.   Professor Frank, did you look at the extent to which

14    Medicare Advantage enrollees switch their coverage?

15    A.   Yes, I did.

16    Q.   Did you find it is common for Medicare Advantage enrollees

17    to engage in voluntary switching?

18    A.   No.  Perhaps this is best illustrated by turning to the pie

19    chart that you have in front of you.  So this is a pie chart

20    that was based on some work by the Kaiser Family Foundation that

21    does a lot of research on Medicare generally.  And this is

22    recent data from 2013-2014.

23         What it shows -- so the circle encompasses everybody that's

24    enrolled in Medicare Advantage.  So that's that 17.6 million

25    people, roughly, that I mentioned.  And this shows that about 78

1   percent stay where they are from year to year, and that an

2   additional 11 percent switch plans, but they switch from one

3   Medicare Advantage plan to a different Medicare Advantage plan.

4   Then there's about 5 percent of people who are involuntarily

5   switched.  And I'll come back to why that matters later.

6       Three percent die, and then 2 percent leave Medicare

7   Advantage entirely and go to original Medicare.  So it's about

8   2 percent a year there that switch.  And so primarily, the

9   switching that happens happens within the Medicare Advantage

10  program.

11  Q.   And does that inform your opinion as to where competition

12  occurs in the Medicare Advantage program?

13  A.   That partially -- that helps.  What I've just told you

14  about represents sort of the big picture on switching.  In

15  addition, we've examined, both in preparing for this day, today,

16  but also as part of my duties at HHS and my research program

17  before I came to the government, have looked at what happens in

18  response to price differences or premium differences.

19      What we've seen is that for the most part, when there are

20  some significant premium increases in a Medicare Advantage plan,

21  what you see is people switching to another Medicare Advantage

22  plan.  And I think the numbers, some recent numbers suggest that

23  about 97 percent of people, in response to a significant, $20 or

24  more a month price increase in their Medicare Advantage premium,

25  they tend to switch to another Medicare plan almost universally.

1   Just a very small number of people go elsewhere.

2   Q.   Have you done any analysis, looking at the pie chart here,

3   of just those voluntary switchers, that is the 11 percent who

4   voluntarily switched to Medicare Advantage and the 2 percent who

5   voluntarily switched to original Medicare?

6   A.   Yes.  You can see on the next slide that what this picture

7   represents is a breakdown of that 13 percent of people who

8   voluntarily switch either to traditional Medicare or within

9   Medicare Advantage.  And what you see here is that 85 --

10  somewhere between 80 and 85 percent of switchers, over time, are

11  switching within the Medicare Advantage program.  And that's

12  incredibly stable over time, and that's a stability during

13  periods where the economy changed dramatically, where the

14  demographics are changing dramatically, and you still see this

15  sort of very stable pattern of switching where most of the

16  action happens within the Medicare Advantage program.

17  Q.   Do you have an opinion as to what accounts for the rarity

18  in switching between Original Medicare and Medicare Advantage?

19  A.   Yes.  I have four basic reasons.  The first has to do with

20  preferences, in that Medicare Advantage plans just are a

21  different model, a different way of delivering health care to

22  people, and people who are kind of comfortable with that prefer

23  it.

24       And as I mentioned a few minutes ago, the people who choose

25  are different, and I think one of the best bits of evidence for

1     that focuses on that group that was involuntarily switched that

2     I mentioned in the pie chart.  There, there's evidence out there

3     showing that when people are involuntarily switched from

4     Medicare Advantage to traditional Medicare because their health

5     insurance issuer left the market, they overwhelmingly returned

6     to Medicare Advantage.

7          So what the inference from that is that people who choose

8     to participate in Medicare Advantage have a preference for that

9     type of delivery system, that way of delivering health care.

10         The second is, over time, as the demographics have changed

11    and the population is growing older, people who are relatively

12    new to Medicare come from a background where most of their adult

13    lives were spent in managed care arrangements.  And so they're

14    used to having administrative procedures and networks in place

15    and are not thrown by that.  And so what you see is

16    disproportionately new arrivals for Medicare signing up for

17    Medicare Advantage, much less among older participants.

18         Finally, there are sort of some economic risk reasons.

19    Employers tend to offer wrap-around services.  So in my case at

20    Harvard University, when I go on to Medicare, those things that

21    would be covered by a Medigap policy are provided by Harvard and

22    they wrap around me if I join in one of those types -- if I join

23    traditional Medicare.  Those might not be available to me if I

24    go to Medicare Advantage.

25         Likewise, if I leave -- for many cases, if you leave

1    traditional Medicare and go to a Medicare Advantage program and

2    you own a Medigap policy, if you're there for more than a year

3    and you return, you don't have that guarantee of issue.

4         And then finally, there's a set of behavioral reasons which

5    I would put under the heading of status quo bias.  But what that

6    really means is that health insurance choices, particularly

7    among older adults, are viewed as complicated, messy, and high

8    stakes.  And it makes people anxious, and people -- it's a very

9    taxing decision.  And what has been observed is that once people

10   make that decision, they don't like to revisit it.  And they

11   felt it was confusing the first time but they fought their way

12   through it; they don't want to come back to it again.  So unless

13   something really dramatic happens, they don't want to switch.

14   Q.   Could you just summarize the conclusions you draw from the

15   switching data and evidence that you reviewed and you've

16   discussed here?

17   A.   Yes.  In totality, this has led me to conclude what I said

18   early on, which is that I view competition happening primarily

19   within the Medicare Advantage program.

20             MR. MAHR:  Thank you.

21             THE COURT:  All right.  We will adjourn for lunch,

22   resume in one hour.  See you all then.  Thank you.

23        (Lunch recess taken at 12:45 p.m.)

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


_____/S/_____

BRYAN A. WAYNE