UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
et al.,                            .
                                   .  CA No. 16-1494
          Plaintiffs,              .
                                   .
     v.                            .
                                   .  Washington, D.C.
AETNA, INC., et al.,               .  Monday, December 19, 2016
                                   .  9:18 a.m.
          Defendants.              .
. . . . . . . . . . . . . . . . .  Pages 2880 through 2996


DAY 11, A.M. SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff United States:      CRAIG W. CONRATH, ESQ.
                                  RYAN M. KANTOR, ESQ.
                                  ERIC J. MAHR, ESQ.
                                  PETER J. MUCCHETTI, ESQ.
                                  SANFORD M. ADLER, ESQ.
                                  U.S. Department of Justice
                                  Antitrust Division
                                  450 Fifth Street, NW
                                  Washington, DC 20530

For Plaintiff State of Iowa:      LAYNE M. LINDEBAK, ESQ.
                                  Office of the Attorney General
                                  1305 East Walnut Street
                                  2nd Floor
                                  Des Moines, IA 50319

For Plaintiff                     JAMES A. DONAHUE, III, ESQ.
Commonwealth of Pennsylvania:     Office of the Attorney General
                                  Public Protection Division
                                  14th Floor
                                  Strawberry Square
                                  Harrisburg, PA 17011

For Defendant Aetna:                    JOHN M. MAJORAS, ESQ.
                                        GEOFFREY S. IRWIN, ESQ.
                                        PAULA RENDER, ESQ.
                                        CHRISTOPHER N. THATCH, ESQ.

                                        Jones Day
                                        51 Louisiana Avenue, NW
                                        Washington, DC 20001

For Defendant Humana:                   KENT A. GARDINER, ESQ.
                                        SHARI R. LAHLOU, ESQ.
                                        DAVID M. SCHNORRENBERG, ESQ

                                        Crowell & Moring LLP
                                        1001 Pennsylvania Avenue, NW
                                        Washington, DC 20004

Court Reporter:                         BRYAN A. WAYNE, RPR, CRR
                                        U.S. Courthouse, Room 4704-A
                                        333 Constitution Avenue, NW
                                        Washington, DC 20001
                                        (202) 354-3186

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription

C O N T E N T S

WITNESS:                                              PAGE:


RAJIV GOKHALE:   Direct Examination Continued........... 2883
                 Cross-Examination...................... 2923
                 Redirect Examination................... 2986

```
 1                       P R O C E E D I N G S

 2              THE DEPUTY CLERK:  Your Honor, we have Civil Action

 3      16-1494, United States of America versus Aetna, Inc. and Humana,

 4      Inc.  And, Your Honor, for the record, all counsel are present.

 5              THE COURT:  All right.  Are we ready to proceed?

 6              MR. SHUMAKER:  Yes, Your Honor.

 7         (The witness resumes the stand.)

 8              THE COURT:  Good morning, Mr. Gokhale.

 9              THE WITNESS:  Good morning, Your Honor.

10              THE COURT:  Good to see you.  And we're ready now,

11      Mr. Shumaker.

12              MR. SHUMAKER:  All right.  And, Your Honor, just as a

13      preliminary, we've handed up to the witness and to Your Honor a

14      new supplemental binder.  It's essentially the same exhibits as

15      we had last Friday but --

16              THE COURT:  So I can get rid of the binder and now use

17      the supplemental binder.

18              MR. SHUMAKER:  Yes, sir.

19              THE COURT:  Good.

20                   DIRECT EXAMINATION CONTINUED

21      BY MR. SHUMAKER:

22      Q.   Good morning, Mr. Gokhale.

23      A.   Good morning.

24      Q.   At the end of Friday's testimony in response to Judge

25      Bates's question, you had indicated that Aetna had actually
```

1    scored the Coventry efficiencies.  Is that significant to you

2    for some reason?

3    A.   It is.  As I spoke about in using the demonstrative, these

4    were actual efficiencies.  These were measured after the close

5    of the transaction.  They were discussed internally, I believe

6    in a national accounts meeting.  Ms. Karen Lynch discussed the

7    1 billion in actual efficiencies they realized from the Coventry

8    transaction.  In fact, the transcript of that meeting was

9    publicly disclosed as an attachment to some SEC filing.

10        So for all those reasons, it gives me comfort -- when I'm

11   thinking about the efficiencies I find cognizable in the Humana

12   transaction, it gives me comfort that they actually realized

13   that level of efficiencies in a recent similar transaction.

14   Q.   Okay.  At the end of Friday's hearing, we were also

15   starting to go through the various efficiencies that appeared in

16   your Table 1-1 to your report.  Could I direct you to that

17   report, sir?  And it's DX 0577, and it's at page 033.

18   A.   I have it open.

19   Q.   Okay.  And we talked about the SG&A FTE efficiencies.  The

20   next bucket we see there are SG&A non-FTEs.  What falls into the

21   non-FTE SG&A efficiency category?

22   A.   So, we're still in the administrative expenses, and this is

23   the non-FTE, i.e., these expenses and therefore savings from

24   related to anything that's not the headcount related, directly

25   headcount related saving.

1        So, for example, a couple of things that jump out here,

2    there's a fair number of IT-related savings, information

3    technology, where the two companies expect to coordinate and

4    combine their platforms, therefore being able to eliminate some,

5    and therefore save from the elimination.  There are some

6    FTE-related savings to that, but now we're talking about the

7    non-FTE.  Likewise, there are procurement savings which fall

8    into the sales, general, administrative bucket.  And by

9    procurement, I mean various vendors, whether they're parties

10   that the companies have outsourced, they're call centers to --

11   all the way down to whether -- the outsource of the cost of

12   retrieving medical records, or consulting services.

13       And so post transaction the expectation is -- and I

14   understand that this is a lot of clean room analysis here -- but

15   post transaction, the expectation is, some of the overlap in

16   those procurement services can be eliminated, but importantly,

17   you can now look at each company's rates and match rates and

18   match the services better to eke out savings.

19   Q.   What amount of non-FTE SG&A efficiencies did you find

20   cognizable?

21   A.   And that's the second row on this exhibit, 1-1.  It's the

22   highlighted part, I find 399 million cognizable.

23   Q.   How much of that amount relates to IT platform

24   consolidation?

25   A.   I would flip for that to Exhibit 4-1 that starts at Bates

stamp 046.  And there's a couple of places IT shows up here.
The first one is just a consolidation, that's the subset on the
top of that page, and I find about 168 million cognizable.  And
a lot of this simply comes from, for example, we look at the
second row that says "MTV (MetaVance) platform shutdown."  So
this is one where the companies will have duplicate platforms,
not need to carry and maintain one of them, and shutting down
will lead to cash savings of 14.9.

I think it's worth talking a little bit about the first
line, which is the IT amortization adjusted.  And that's 122
million.  And normally, when I hear "amortization," it seems
like a noncash item, and therefore one asks -- and I did here --
whether that's really a savings or not.  And in this case it
turns out that while it's counted as a reduction in
amortization, I really think of it as economic depreciation.  In
other words, if the platform were to be maintained, the company
would incur another $122 million a year on average to maintain
the platform.

And all that amortization does is maybe take a bulky
investment which may happen every few years and spread it out
over a few years, but that's why, because it's sort of an
economic depreciation, it has a cash effect, and this simply
says on average on an annual basis, it will be about 122
million.  And since I'm calculating a run rate, I think it's
fair to leave in the 122 as a cost saving.

1   There's also a second bucket down at the bottom of the page

2   which says "procurement savings related to IT."  This was done

3   by a third-party consultant, ISG, and they estimated IT

4   procurement savings about 18 million.  But I understand that

5   there was a change in the underlying baseline, which is the

6   numbers that ISG worked off of.  The baseline had been

7   significantly reduced because the company, whether in

8   anticipation of the transaction or simply otherwise improving

9   its IT, had a lower baseline, and therefore I didn't think it

10  was fair to take the 18 million and count all of that as a

11  merger-related synergy knowing that the expense would be

12  reduced, and because I didn't get enough comfort to say exactly

13  what portion of that would be merger-related and cognizable, I

14  set aside the entire 18 million as not cognizable.

15  Q.   How did you determine that the non-FTE SG&A efficiencies

16  were merger specific?

17  A.   Again, we looked at the underlying analysis, especially

18  like in the example of the 122, we asked for some information

19  that allowed me to understand what the amortization was, and

20  very simply, I asked a question, and not just in this case but

21  in prior work I've done, which is it's fairly common that

22  because of a merger, companies don't need duplicate platforms.

23  And when they don't need duplicate platforms, not having to

24  maintain one leads to a saving that you would be unlikely to

25  achieve without the merger.

1    Q.   How about procurement savings?  Did you prepare any

2    demonstrative to help you explain merger specificity with

3    respect to the procurement savings?

4    A.   I did.  And just to -- before we look at the demonstrative,

5    so for the procurement savings that were not related to the IT

6    that we just looked at, BCG, the Boston Consulting Group -- I

7    don't know if they still call themselves that, but BCG had a

8    clean room analysis in which they analyzed -- started with about

9    what would be $3 billion of spend combined for the companies,

10   and it was spread over 200 top vendors, I believe.  But they

11   said they would analyze 2 billion of that before the transaction

12   and a billion after.

13        And in that 2 billion, they categorized it in several

14   buckets.  And what I've prepared is a demonstrative for one of

15   those to help understand how they did some of this analysis.

16   Q.   Let me direct you, Mr. Gokhale, to demonstrative Exhibit 16

17   in your binder.  Can you tell me if this is the slide that

18   you're referring to?

19   A.   Let me find it.  12, 15.  Yes.

20        MR. SHUMAKER:  Your Honor, I'd like to move DX DEM 16

21   into evidence for demonstrative purposes.

22        MR. ADLER:  Your Honor, I'm having a little trouble

23   finding the exhibit, but if it's as Mr. Gokhale described it --

24        THE COURT:  You're having trouble finding it?

25        MR. ADLER:  Yes.  In the binder.

1          THE COURT:  It's near the back of the binder, DX DEM

2   016.  Back of their binder.

3          MR. ADLER:  Oh, okay.  Thank you.

4          MR. SHUMAKER:  It's on the screen as well.

5          MR. ADLER:  We'd object.  It's hearsay.  The

6   witness --

7          THE COURT:  Well, let's lay a foundation for how this

8   was developed so we have a better basis to decide whether it can

9   be utilized.

10         MR. SHUMAKER:  Sure.

11  BY MR. SHUMAKER:

12  Q.   Mr. Gokhale, was this a document that you reviewed and on

13  which you formed your opinion?

14  A.   Yes.  It's a document that was available to us in the

15  record.  It's a document that we looked at and used in some of

16  our interviews to make sure we understood the document

17  correctly.  But it is a document to me that is powerful because

18  it reveals several things.

19         THE COURT:  I'm more interested in how it was

20  developed, where the information came from.

21         THE WITNESS:  This information literally is pulled

22  from an underlying document that's in the record, and that was

23  cited in my --

24         THE COURT:  In the record as part of your report, you

25  mean?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  And that document, where would that

3    information be gathered?

4          THE WITNESS:  That, either it was -- it became

5    available to us either because we asked the attorneys and we

6    received the document, or in one of our -- because either before

7    or during one of our phone calls to BCG, we may have become

8    aware that such a document exists and asked for it.  So sitting

9    here, Your Honor, I don't recall exactly how, but it became

10   available to us or it was part of the underlying record that we

11   reviewed.

12         THE COURT:  All right.  I'm going to go ahead and

13   allow you to use it.  I still don't know that you actually have

14   a sufficient foundation for it, but I'll sort that out as I

15   consider the evidence.

16         MR. SHUMAKER:  Sure.

17         THE COURT:  I'll go ahead and allow you to use it at

18   this point, as a demonstrative.

19         MR. SHUMAKER:  Sure, Your Honor.

20   BY MR. SHUMAKER:

21   Q.   And let me ask you this, Mr. Gokhale.  Are there numbers in

22   here per se significant to you as compared to helping explain

23   your process?

24   A.   Yes, they are.

25   Q.   Can you explain for me or explain for the Court what this

indicates to you and why it was helpful to your opinion?

A.    So this document is an example of the -- from one

particular vendor, a consultant retained by both companies, of

the rates that the vendor charged Aetna and the rates that the

same vendor charged Humana.

So in order to understand whether there are merger-specific

savings, and if so, how I would calculate them, this document is

very helpful.  And other numbers like this that are available in

the record.  But this is an example of if you -- post

transaction, if you put the two vendor rates for the same vendor

next to each other, you can do the following calculation as it's

demonstrated here.

If I may draw Your Honor's attention to the block on the

left-hand side that's under the Aetna analysis, and going down

the rows, you see by level within the consultant, the rates vary

from partner all the way down to associate, and it tells us what

the weekly rate is, i.e., the weekly rate that this particular

vendor was charging Aetna.

You see a lot of zeros next to it, but the math is in the

columns that fall under the Humana analysis.  You also see the

rates that the same vendor was charging Humana.  Now, if you ran

the following math, which is for a project that would require --

while it says total days, that's actually per weeks to the right

of the column, that's the Humana weekly rate.  If you asked what

the rate differential would be for those many weeks by that

1    category of consultant, you get to a column that says Humana

2    cost at Humana rate.

3         And just as an example, if I went down four rows, and you

4    see the number 35 weeks, that math is simply saying if you took

5    32,500, which is what they charged Humana for a consultant's

6    rate, times 35, that would be a million 138 at the Humana rate,

7    but it would be a million 026 at the Aetna rate.  If you follow

8    that math down, what you see is for the cost of the professional

9    fees alone, Humana would actually come in higher, 2.57 million

10   instead of 2.3.

11        But then there's other differences.  The expenses, actually

12   Aetna pays expenses and Humana doesn't.  So that would increase

13   the overall billings to 299.  But they have different levels of

14   rebates, so the net effect is that at Humana's cost structure,

15   this vendor would cost Humana 2,254,000, but at Aetna's cost

16   structure, it would cost Aetna 2,164,000.  That's where the 4

17   percent difference in cost comes from, and if you then take that

18   4 percent difference in cost and apply it to -- in the last row

19   in sort of the middle horizontally you see the Aetna total spend

20   with that vendor was 27 million in that year.  And if you could

21   shave off 4 percent off of that, you would get a saving of

22   1,124,000.

23        So this is an example to me of how you put rates next to

24   each other after a transaction to actually achieve savings.  And

25   this is from the same vendor.  And then they go on to say if you

1    match rates across similar vendors in similar territories, what

2    happens.  But these are the building blocks.

3              THE COURT:  What year is this for?

4              THE WITNESS:  Well, the rates are the latest, which I

5    understand were 2015 rates.

6              THE COURT:  And the Humana total days was time

7    actually expended on a project that this company did for Humana?

8              THE WITNESS:  I understand it's either an actual

9    project or a sample project that this would be on average

10   what --

11             THE COURT:  What do you mean by sample as opposed to

12   actual?  You mean fictitious.

13             THE WITNESS:  Not quite.  I think on average a project

14   would have looked like this sort of distribution.

15             THE COURT:  It would have if it occurred?  I guess I'm

16   asking you, was it an actual project or not?

17             THE WITNESS:  It is a representative project.  That's

18   my understanding.

19             THE COURT:  Rather than an actual project.

20             THE WITNESS:  Yes, sir.

21             THE COURT:  And what about for Aetna?  It's all zeros

22   there.  What is it for Aetna?

23             THE WITNESS:  The way they did this math here was to

24   compare the rates for a Humana project across the rates.  We

25   asked and I didn't see a calculation if you -- I could flip it

1   and do for an Aetna actual project what it would look like.

2            THE COURT:  What I'm wondering is, these Aetna rates,

3   were they on actual work done?

4            THE WITNESS:  Yes, Your Honor.  That's my

5   understanding.  So if you did the math differently, which is if

6   you asked what's an actual project for Aetna look like, and you

7   had the weeks down for that, the Aetna project, instead of the

8   Humana project, mathematically, it would work out to be similar

9   because on the same basis you should get a similar result in the

10  total expenses for the two companies based on their rates.

11  BY MR. SHUMAKER:

12  Q.   Mr. Gokhale, how did you go about verifying the non-FTE

13  SG&A efficiencies?

14  A.   So this is where I do want to make a distinction between

15  the raw data as I call it.  So when we see average actual weekly

16  rates that are listed here, I did not go back and ask to see

17  whether those were the actual rates; I took it at face value

18  that Aetna and Humana had provided the actual rates correctly to

19  BCG and that we were receiving from the underlying documents the

20  actual rates.  I did not go back and check against invoices or

21  agreements to make sure these were the rates.

22       But from that point on, I asked the questions, which is why

23  these many number of days, why this kind of party structure, and

24  given the rate structure, then I was able to verify that in fact

25  you would experience savings to that tune, because now I can

1    take a calculator and work this calculation myself

2    independently, given the actual rate structure.

3              THE COURT:  Where do I find the underlying documents

4    that provide this information?

5              THE WITNESS:  They would be cited, Your Honor, in my

6    footnotes, and --

7              THE COURT:  They're just cited but they're not

8    anywhere in the report?

9              THE WITNESS:  They're generally cited in footnotes

10   either in the report where I discussed this, and/or in the

11   exhibits to the calculations.

12             THE COURT:  And this information was provided to you

13   by the lawyers for Aetna and Humana?

14             THE WITNESS:  Well, yes.  And we did have access,

15   although it was efficient enough to simply ask and receive the

16   information this way, but we did -- my team did have access to

17   the record so they could have searched for it themselves had

18   they not received it directly.  But, yes, this was part of the

19   record we received.  I may have discussed this Friday, but we

20   did receive lots of documents at the beginning, but sort of

21   iteratively, we got more as we continued our analysis.

22   BY MR. SHUMAKER:

23   Q.   Mr. Gokhale, did you have access to the entire discovery

24   file in this case?

25   A.   I did.

Q.   The third part of cognizability, how did you determine that these efficiencies would not result in a reduction in output or service?

A.   Well, I think the very math tells me why in a sense, because what we're doing here, especially for procurement, is we're not reducing the amount of services that would be purchased from third-party vendors.  We're just asking whether they can be purchased more efficiently or at a lower cost.  With one exception in this, which is in consulting, the parties noticed that Humana on average uses fewer consultants; i.e., if you look at the spend on consulting as a percent of their revenue, Humana spent a lower amount than Aetna did.

And in the clean room analysis, BCG realized that what Humana does is a slightly different process which Aetna doesn't use, which is Humana actually measures the return on investment for consulting and asks whether it's more efficient to hire somebody to do some of the work in-house, even a third-party consultant, as against just retaining a consultant every time.

So one part of BCG's analysis is that post transaction, the expectation is that Aetna can borrow from Humana's ability on how to control this, lower its consulting spend.  But other than that, for the most part, it's comparing -- not changing the usage.

Q.   Did you classify any portion of the non-FTE SG&A efficiencies as not cognizable?

A.    Yes.   In the overall category we were looking at, I did.
There was at least a couple of places, including in the BCG
analysis, and there were a few instances where as we were
analyzing and doing our own math, that the rates they were using
to estimate the savings are the rates that were listed to us as
what would be the rate after the transaction.  It was in fact
within the same organization.  And so we set that aside as not
merger-specific, because we assumed, I think correctly, that
within the same organization you can use the same rate for the
same vendor.  So we set that part aside.

But there were a couple of larger items.  And if I may go
back to 4-1, there was an about 79.9, almost $80 million in
what -- and this partly I think PwC analyzed, partly BCG
analyzed, but -- it's at page 14 of 4-1.  That would be Bates
059.  And there's a block on the bottom half of the page that
says "Broker commissions" under noncognizable.  What that means
is, the reason I set pretty much all of this aside, the 79.9
million, is that the explanation was that post transaction the
companies would align their broker commissions with the market.

And when we asked for further explanation, it turned out it
wasn't a strict assumption about aligning broker commissions
with the lower of the two companies' level of broker
commissions, because whatever market went, we set that aside as
not merger-specific.

And earlier I referred to the ISG part of the IT

1    procurement as non -- so those are the two main categories here.

2    Q.    Did the Coventry transaction have any relevance to your

3    conclusions with respect to non-FTE SG&A efficiencies?

4    A.    It did, and this is the demonstrative we discussed Friday.

5    But if we look at the row for the SG&A non-FTE, the ratio of the

6    savings that I've determined cognizable here to the baseline in

7    the Humana transaction is lower than it was based on what they

8    actually achieved in the Coventry transaction.  So that gives me

9    some comfort that my level of cognizable is reasonable.

10   Q.    Mr. Gokhale, let's move on to pharmacy efficiencies.  What

11   amount of cognizable efficiencies did you find in the pharmacy

12   category?

13   A.    It's a total of about 340 million.

14   Q.    And what type of efficiencies fall into that category?

15   A.    It's broadly three buckets.  One is what's called rebate

16   maximization.  A second is the sourcing, i.e., picking the lower

17   cost sourcing for the pharmaceuticals.  This is a bucket that

18   really pertains mostly to the delivery of pharmaceuticals and

19   medical devices to customers.  And the third category is some

20   remaining smaller items which for the most part I've determined

21   are not cognizable.

22   Q.    What are rebate maximization savings?

23   A.    These savings, as I said, come from the structure and the

24   rebate levels that insurance companies or PBMs get from

25   manufacturers of drugs.  And so the formulary for each insurance

company pretty much lists the drugs that the company makes

available at -- under its plans.  And the rebates can differ

quite a bit from company to company and drug to drug within the

formulary.

So there's really two types of rebate maximizations here.

One is where when both Aetna and Humana have the same drug on

their formularies, and one has a higher rebate than the other,

then we can simply shift over the purchases of that drug to the

higher rebate contract.  That's just straight up.  So if both

don't have the same drug, obviously that type of efficiency

isn't available.

There's a second piece that is what's called a formulary

shift, which means given the combined formulary, there's an

assumption that you can shift some of the usage from drugs, say

from one particular type of drug which may have a lower rebate,

to another that has the higher rebate, given the same efficacy

of those two drugs.

THE COURT:  Why can't they do that already?  Why does

it take the merger to enable either company to do that?

THE WITNESS:  We did ask that question, and there are

a couple of examples in, say -- couple of therapy classes where

one drug, for example, in say Humana's or Aetna's formulary,

stand-alone formulary, has a slightly -- a lower rebate than

another drug within the formulary.  But there is one difference

here, which is that I understand, given the mix of Aetna's

1   customers, which are a lot of them are commercial even on the

2   Medicare side, Aetna has a higher proportion of group, what are

3   called Medicare group customers.

4       I understand that means that if Aetna is able to better

5   control or direct purchases towards certain drugs that may have

6   a prime position on their formulary, and as a mathematical

7   entity, it may be in some instances possible that small shifts

8   can achieve higher savings.  But again, because Humana has a

9   more independent Medicare sample, they're just not able to

10  control that or direct that purchase better.  But whereas after

11  the transaction, the combined volume in adding Humana's volume

12  of Medicare individuals also to Aetna's group volume should

13  allow a better usage of the formulary.

14  BY MR. SHUMAKER:

15  Q.   These drug pharmacy contracts, are they confidential and

16  proprietary?

17  A.   Very much so.  I understand these are the -- these rebate

18  structures and the levels of rebate come from individual or

19  one-on-one negotiations between an insurer and the rebate

20  manufacturer.  And the rebates end up in very different places

21  depending on how much the manufacturer thinks they actually will

22  generate in sales from a particular formulary, depending on when

23  the negotiations take place.

24      And so these are very confidential.  These are closely held

25  information by both the manufacturers and the insurers, and I

understand it's important enough that personnel who are involved

in these negotiations actually have very strict nondisclosure

agreements and non-compete agreements.

Q.   Did you prepare any demonstrative to help you explain how

these efficiencies come?

A.   I did.

Q.   Let me direct you to DX DEM 11 in your binder, sir.  Is

that the demonstrative to which you're referring?

A.   It is, yes.

Q.   And do you know how this demonstrative was prepared,

Mr. Gokhale?

A.   Again, this is information that, simply placed in this

format, but it's available in the underlying documents that I've

cited in my reports.

Q.   Okay.  And do you know who prepared it?

A.   You mean this actual document?

Q.   Yes, sir.

A.   The information comes from documents that -- where PSG, the

Pharma Services Group, did some of the clean room analysis, and

we obtained that data to test it ourselves.

Q.   And was the information that was used to create --

         THE COURT:  I don't know that he answered your

question.  Who prepared it?

         THE WITNESS:  The demonstrative we prepared, but the

information comes from underlying spreadsheets.

1    BY MR. SHUMAKER:

2    Q.   And in looking at -- is there a particular source for the

3    information in this document?

4    A.   Yes.  We list, in fact, on the bottom right, the source

5    PSG.xlss.  That's a spreadsheet that was turned over with my

6    reports, and in that spreadsheet is where we gathered some of

7    the underlying data and analyzed ourselves these numbers.

8         MR. SHUMAKER:  Your Honor, I move DX DEM 11 into

9    evidence for demonstrative purposes only.

10        MR. ADLER:  We object to it coming into evidence.

11        THE COURT:  It's only being used for demonstrative

12   purposes.  For demonstrative purposes, I will allow it.

13   BY MR. SHUMAKER:

14   Q.   Mr. Gokhale, what does this demonstrative show?

15   A.   This demonstrates a little bit about what I was saying

16   earlier.  There's two panels on this page, and these are therapy

17   class.  If you notice the column that says "therapy class,"

18   under that lists the different therapy classes.  And the reason

19   it's broken out into two is the top panel really talks about the

20   rebate maximization coming from instances where you simply

21   compare the rates for the two drugs, i.e., for the same drug if

22   Aetna were to receive a higher rebate than Humana, then you

23   purchase under the Aetna contract, which would increase the

24   rebate and therefore lead to a merger-specific cost saving, or

25   vice versa.

1      At the bottom is what I described earlier.  This is where

2  they also, one would assume a shift within the formulary.  So

3  the numbers on the right, the 421 and the 137, that's for

4  Medicare and commercial, adding up to about 560 million almost,

5  but about 200 of that comes from this formulary shift.  The

6  rest, two-thirds, comes from simply comparing the rebates on the

7  two drugs for the two insurers.

8  Q.   How did you go about verifying the savings?

9  A.   So what we did is we actually received also the underlying

10  data, and that is cited in my reports.  Again, we started with

11  the data, i.e., under each contract for a particular drug, what

12  the level of rebate was for Aetna versus what the level of

13  rebate was for Humana.  We know the units purchased.  And the

14  units purchased here were from quarter 4 of 2015.  That's used

15  as a representative time period.  Of course, times four would be

16  the annual.

17      And then we can ourselves do the math to ask, if you took

18  the better of the two contracts in terms of the rebate per unit,

19  what would the total saving be, and compare that to the actual

20  rebates that the two parties received.  And when this is higher,

21  that's something we call is an efficiency, and that's what you

22  see added up therapy class by therapy class.

23      In the bottom half, we spoke with PSG, and one of the

24  assumptions there is there is something called a market share

25  movement assumption.  Because there is this move from, in some

1   cases, one type of drug to another within the combined

2   formulary, for the most part, there's an assumption that 80

3   percent would move over, 20 percent would not.  So you would in

4   effect get savings only on 80 percent of the usage that moves

5   over.  And I'm thinking in one particular therapy class, they

6   assume only 50 percent would move over.

7           THE COURT:  Where did those numbers come from, 80

8   percent, 20 percent?

9           THE WITNESS:  Those, Your Honor, are PSG's estimates.

10  They were the clean room consultants that did this.  They are

11  subject matter experts in the field.  We discussed it at length

12  with them, and those really are a -- their best estimate based

13  on their experience.  I did not independently test that 80

14  percent.

15  BY MR. SHUMAKER:

16  Q.   Mr. Gokhale, you indicated that the fourth quarter of 2015

17  was the time period that was utilized.  In your opinion, is that

18  an appropriate time period?

19  A.   It was the most recent quarter at the time this analysis I

20  believe was started, and from -- to the best of my

21  understanding, from the data I've seen, if anything, rebates and

22  dollar amount of drug purchase have increased for Aetna over

23  time.  I haven't seen the Humana data for that.

24  Q.   The second subcategory you mentioned was sourcing.  What

25  are pharmacy sourcing savings?

A.   Sourcing really comes from a comparison of the cost basis.
So Aetna outsources its pharmacy function currently, and has for
a few years.  Humana does most of the function in-house.  And so
if you compare the cost of what it's taking Aetna to do under
its current contract versus theoretically what it might cost
under Humana's in-sourced operation, that difference in cost,
which theoretically would be not available without a merger, but
because of a merger, to the extent Aetna can benefit from
Humana's cost base, that's where the efficiency comes from.

Q.   How did you verify the sourcing savings as merger-specific?

A.   I think this is listed in my Exhibit 5-1.  Basically, there
are two or three important inputs.  One is Humana, over time,
has had a much higher portion of the pharmacy coming from mail
order.  Aetna has not.  And I understand that Humana does things
differently.  They have a particular way in which they
communicate and message and therefore are successful in
converting people to mail order.

So if one -- if post transaction Aetna gets the same
percentage or close to it off the compliance with mail order,
then there's a fairly significant saving, and it's sometimes
millions of dollars.  Actually, I can look at the exact number.
It's at 5-1, so the savings, about $50 million of cognizable
benefit.

And there are a couple of other things, which is if you
have the mail order in house, one can, one, forgo the fees you

1    would pay to a third party for filling your prescriptions, or

2    when third parties prescribe on your behalf, you collect from

3    them a fee for filling prescriptions.  So, taken together, all

4    that adds up to about $126 million for this comparison of what

5    it would be under Humana's cost structure versus what Aetna

6    would experience right now.

7                THE COURT:  Aetna's a pretty sophisticated health care

8    company.  Aren't they?

9                THE WITNESS:  They are.

10               THE COURT:  Mail-order pharmacy has been around for a

11   decade or more, hasn't it?

12               THE WITNESS:  It has.

13               THE COURT:  Why can't Aetna do it without the merger?

14               THE WITNESS:  One of two things.  One, they're

15   currently outsourcing.  So the question becomes, you know --

16               THE COURT:  Well, I'm not asking what they're

17   currently doing; I'm saying why can't they do it without the

18   merger.

19               THE WITNESS:  Right.  Maybe I started in the wrong

20   place, Your Honor.  A few years back, Aetna actually did analyze

21   the exact same question, and given the base they had -- and

22   remember, we're talking about, with mail penetration, we're

23   talking about the Medicare side of the equation.  Aetna was

24   predominantly commercial, not as much in Medicare, and they did

25   analyze themselves what the exact terms, what the net present

value, i.e., the cost/benefit would be of outsourcing versus

doing it themselves as they were in the past.  They still

continued to do some of the front end work, but the back end

work they outsourced because they -- for their structure at the

time, they concluded that it was actually more profitable to

outsource it and therefore have it combined with somebody else's

larger pharmacy structure than do their own.

     And after the transaction, given Humana has a larger

Medicare base, the math of whether it would be then cheaper for

Aetna to use that base as against continuing with some outsource

structure or try to do it themselves turns out to be implied

that it would be cheaper, because of the merger, to strap on and

therefore benefit from the scale.

BY MR. SHUMAKER:

Q.   Why did you determine, Mr. Gokhale, that the pharmacy

efficiencies would not lead to a reduction in output or service?

A.   Because there is -- it starts with what would it cost to

deliver the -- well, let me separate.  In the sourcing area we

were talking about, it clearly starts with what would it cost to

deliver the same amount of medications as there are now.  So

there is no reduction.  There is a cost side benefit to it.

     As for the formulary, a lot of the therapy classes we

discuss here are, I understand where the drugs are

substitutable, i.e., there is no adverse effect by moving within

the formulary, subject of course to clinical guidance.

1    And when I thought about it, when you go back and ask how

2    the formulary is created in the first place, it is created by a

3    committee which I think Mr. Horst described also, it's a P&T, or

4    pharmaceutical and therapeutic committee, which is comprised of

5    people with medical and clinical knowledge.  The business

6    consideration or the cost of that is a secondary concern.

7        So formularies change all the time.  Even individual

8    companies will have drugs come on and off the formulary.  And

9    so, again, it's worth separating the two.  When all you're doing

10   is comparing a rebate for one company with a rebate for another,

11   again there's no change in output, the customers are getting the

12   exact same drugs; it's just at a lower cost.

13       That question may arise only in the case where there's a

14   shift within the formulary.  But again, there's two things that

15   come to play.  One is the calculation does assume only 80

16   percent will shift over, and I understand that for the remaining

17   20 percent, if the doctor and/or the customer feels like there

18   is a drug that is appropriate for him or her, then they have the

19   ability to appeal that.  And there's an appeal process whereby

20   they can continue to purchase the drug they used to without any

21   adverse cost effect.

22   Q.   Did you reject any of the pharmacy efficiencies estimated

23   by Aetna?

24   A.   I did.  There's on page 2 of 3 of that exhibit on page 65,

25   there was a category of expenses that I really didn't either

1   analyze enough or didn't get comfort enough that I would call

2   them merger-specific, so I set them aside.  On page 1, Your

3   Honor, there's a couple of rows, there's one row, for example,

4   that says --

5           THE COURT:  What exhibit are you on?

6   BY MR. SHUMAKER:

7   Q.   Let's make sure -- what's the page number you're looking

8   at?

9   A.   5-1, I'm at Bates 064.

10          MR. SHUMAKER:  In Exhibit 577, Your Honor.

11          THE COURT:  Okay.

12          THE WITNESS:  I'm sorry.  So the couple rows from the

13  bottom that says Aetna commercial, mail order, traditional, and

14  you see in parentheses it says Deloitte.  So this is as I

15  discussed on Friday, given the disagreement between Deloitte and

16  the company, I've generally set aside anything Deloitte

17  estimated as not cognizable.

18      On the next page, which is page 065 Bates number, again you

19  see there are several categories that either I didn't analyze

20  well enough to get comfort around or seemed to me as not

21  merger-specific, that I set aside as not cognizable.  The one

22  thing I did keep here is the consolidation of mail front end

23  sites.  This is what I said earlier, Aetna does do some front

24  end work which post transaction Humana has the scale to absorb

25  and that will free up some front-end expense.

1    BY MR. SHUMAKER:

2    Q.   Let's go to a new bucket.  What amount of medical cost

3    efficiencies did you find to be cognizable?

4    A.   I found just under 500 million.

5    Q.   Did you prepare any exhibit to your report that addresses

6    the medical cost efficiency category?

7    A.   I did.

8    Q.   I'm sorry.  Did you prepare an exhibit related to the

9    medical cost efficiency category?

10   A.   Yes.  That's Exhibit 6-1 to my rebuttal report, and that's

11   at Bates 067.  It's a two-page exhibit.  On the second page it

12   shows the 496.6.  That's the just under 500 million number I

13   found cognizable.

14   Q.   What are the efficiencies that fall into the medical cost

15   category?

16   A.   Here too there are three areas.  First is what is generally

17   termed clinical.  And under clinical, a substantial portion of

18   the efficiencies come from something called concurrent review.

19   The second is the reimbursement-related efficiency.  The second

20   large bucket is the network medical costs, and there's some

21   specialty on the next place which is mostly dental.

22   Q.   Let's talk about concurrent review.  What is your -- what

23   are cocurrent review efficiencies?

24   A.   I really think of concurrent review as a real-time

25   optimization of the quality and quantity of medical care and the

1    cost of that care.  And what concurrent review does -- and this

2    actually starts in this case from the -- prior to the Coventry

3    transaction.  Even then the parties realized that the two

4    insurers did things slightly differently.

5         For example, one may have a higher denial rate for certain

6    things, certain services or procedures.  But one may also have a

7    higher what's called a conversion to observation rate, which is

8    instead of being admitted to the hospital, you may be on the

9    premises, but you will be put under what is called observation.

10   And the cost of observation at a hospital is lower generally

11   than the cost of an admission.

12        So what concurrent review does is, it -- really in the

13   clean room also, this compares the denial rates and the

14   conversion to observation rates within the two companies by

15   area, by state, and asks if you assume the -- say the higher

16   conversion to observation rate or the higher admission denial

17   rate of the two companies, what level of savings can be

18   achieved.

19   Q.   How did you determine the amount of concurrent review

20   efficiencies that were cognizable?

21   A.   So, again, these documents are available to us, the data on

22   state by state, if you put together Medicare group, Medicare

23   individual, commercial, what the two companies' membership base

24   is, what their admission rates were, and what their denial rates

25   were.  And you can pick off the higher of the two denial rates

for that area or state and ask, once you accept the higher

denial rate, what is the saving associated with that higher

denial rate?

The savings is simply the change in the number of denials

that would go up times the cost of the -- what we would

generally use is a short stay admission.  But in this case also

the Aetna IMO office did impose 40 to 60 percent discounts,

i.e., they reduced these estimates by 40 to 60 percent, and I

accepted those discount levels.

Q.   Can I direct you to --

THE COURT:  Let me ask a question on that.

MR. SHUMAKER:  Sure, Your Honor.

THE COURT:  The providers aren't changing.  It's just

the health care companies that are changing.  Why do you assume

that in every instance this better denial rate will prove to be

the case in the future when the providers are the same, both

companies are very sophisticated already and should presumably

be doing the best job they can?  Why is it all of a sudden going

to change so that in every instance it'll be this higher denial

rate?

THE WITNESS:  Absolutely.  And that was a question I

asked too.  Because all else equal, if it's the same ailment for

lack of a term, to the extent clinical guidelines tell you how

to treat something, my starting point also was why is there a

difference.  And this was revealing.  In fact, after the

Aetna-Coventry transaction, both before in the clean room and after, the companies realized that they often approach the same ailment very differently.

So one example I learned was angina.  Someone comes in with some -- thinking he or she has a heart attack or some issue, Aetna I understand has been traditionally reluctant or conservative in their approach in saying that that patient would be put under observation, but generally in that category Aetna's admission rate -- so the patient would be admitted to the hospital as against observed for some time -- was much higher than that of Coventry.

And Coventry's conversion to observation rate in that specific instance across the board I understand was higher.  So that's why I asked the next question.  How does it happen that two companies, insurance patients that come to the hospital with a similar ailment, and they have these different -- one's under observation and one's admitted?

And this is where the devil is a little bit in the detail, which is it's easy enough to theoretically assume that over time every company will treat every ailment the same way.  But what I understand happens, and I've seen this in other instances, is these companies would tend to focus on the heavier aspects of their cost base.

So they either don't have the experience or they don't have the procedures worked out over time that allows them to know

1    when it is appropriate to take somebody like that patient and

2    put him or her under observation as against an admission.

3    That's something they learned from the Coventry transaction and

4    that's something they're doing now, is because they learned that

5    from the Coventry transaction.

6         Another example I have --

7              THE COURT:  If they learned it from the Coventry

8    transaction, they should already be doing it well.  But

9    apparently you're saying they're not doing it as well as Humana.

10             THE WITNESS:  Well, what the clean room finds is that

11   they again have different areas where they're better.  Aetna is

12   a company, whether partly due to Coventry or otherwise,

13   generally is considered better or best in class in what are

14   called acute side of the equation.  And Humana is considered

15   better in the post-acute side of the equation.  And again, that

16   may be because Humana has a higher Medicare population and Aetna

17   has a higher commercial population, what drives their focus and

18   where their learning has come from.

19        But that's what I understand to be the case, is that Aetna

20   did learn from Coventry.  It has been incorporating successfully

21   and improving these higher convert to observation or denial

22   rates, and there's room to do the same in the Aetna-Humana

23   transaction because generally Aetna on that score is better than

24   Humana.

25        And there's a related question, which is does higher denial

automatically mean some patient is now not as well off.  And

there's a two or three-part answer to that, maybe.  One is, to

Your Honor's first question, each company does have clinical

guidelines.  So what's happening here isn't that suddenly

patients will get any care that's lower than either company's

clinical guideline.  So there's -- the basic minimum requirement

of what each company -- how each company's patients have been

treated will stay.

Importantly, after the Aetna and Coventry transaction, the

star ratings, which are a measure of quality, have actually gone

up for Aetna-Coventry.  So despite this higher denial rate and

higher convert to observation rate, quality of their care has

actually improved.  So that's why I take comfort that there is

room for improvement.  If you put next to each other these rates

even in the Aetna and Humana, there are differences to be mined.

THE COURT:  But it sounds, and I'll let you take this

back over, but it sounds like there's room for improvement.

Aetna should have realized that from the Coventry transaction,

as you're saying, but all of a sudden it's going to take a

merger in order for them to move forward on areas of

improvement.  Why does it take the merger to do that?

THE WITNESS:  I see.  I don't think I fully understood

Your Honor's question earlier.  Aetna has improved, learning

from Coventry.  And now, for the most part, there's a lot of

improvement that should come from the Humana side of the

1    equation.  So, for example, if we look at the underlying data in

2    many instances, Aetna's conversion to observation rate, now the

3    Aetna-Coventry combined, is higher than what it is for Humana.

4    So the goal is that post merger, Aetna can take its own

5    learnings and the Coventry learnings and apply them to the

6    Humana side of the equation to improve these rates and therefore

7    save cost.

8              THE COURT:  Mr. Shumaker.

9    BY MR. SHUMAKER:

10   Q.   Let me ask you this, Mr. Gokhale.  Are we talking about the

11   same actions that were used in Coventry that we're talking about

12   that are driving the efficiencies with respect to Humana?

13   A.   We are.  That's what I started to get to earlier.  The

14   learning from Coventry is what they hope to impart to this

15   transaction now.

16   Q.   How do you -- why do these efficiencies not result in a

17   reduction in output or service?

18   A.   I'd say the clearest evidence of that is that after the

19   Aetna-Coventry transaction, the star ratings have gone up.

20   Q.   You also mentioned reimbursement policy.  What are the

21   efficiencies that come from reimbursement policy?

22   A.   This is one in which they actually ran an experiment.  For

23   certain categories such as 30-day admission or ER coding, and

24   they have clauses about early notification or lack of

25   notification and what that means for the level of reimbursement.

So the experiment they ran was Aetna asked Humana to go back to

its base for these four categories and test the effect of

employing certain rules.

And the answer from Humana's experiment is that they would

save up to 50-something million dollars a year by imparting

these rules.  Now, we scratch a little bit below that surface

and it turns out that Humana does actually have the ability in

its current contracts to enforce the rules that Aetna asked it

to run an experiment on.

So the next question becomes, well, why does it take a

merger if it's already in the contract?  And this is where I

understand that Humana has had a culture of simply not enforcing

the rules, and that post transaction, you get a way to switch or

fix the culture, and now you'll start -- if you did start

enforcing the rules now, you would save about $50 million.

Q.   Mr. Gokhale, the last big bucket in medical costs are

network and specialty efficiencies.  What amount of cognizable

efficiencies did you find in that category?

A.   In the network really the two largest come from the first

two rows on this page, on 067, which is the commercial and

Medicare.  And network simply means -- again, this is the flip

side of what you would do in the pharmaceutical area.  But here,

if you had the same hospital that is a provider to both Aetna

and Humana, pre transaction as they did in the clean room or

post transaction, you can compare the rates that the two

insurers get from the hospital, and use the lower of the two

rates.  So that's a straight-up comparison of the rates.

There isn't as much shifting in this case but simply a

comparison of the rates, which would not be available without

the merger.  One party wouldn't know what the other's rates are.

That's what's called a par to par analysis.

And sometimes it happens that one hospital -- one insurer

may have a hospital as a provider under contract, and the other

may not.  So that's nonpar, i.e. -- the best explanation I've

heard for par is participating.  So a hospital that goes from

not participating in network to becoming one that participates,

both those yield savings.

Q.   Moving on to what are referred to as revenue efficiencies.

What are the revenue efficiencies that you find to be cognizable

in this case?

A.   There's two areas of revenue efficiencies, and I think the

first area is I'd say the revenue risk adjustment, which is 7-1

or at Bates 70.  There's a revenue side to this and a medical

cost side to this.  The revenue side is an interesting thought

experiment, and again, this is an experiment they actually ran

to see if the merger would lead to savings.

When, especially on the Medicare side, a coding -- a

patient chart comes up and that's to be submitted for

reimbursement, a patient that had, say, diabetes is a more

complicated person to treat than one that didn't.  And sometimes

what happens is because of coding errors the chart isn't coded

correctly, and so, all else equal, the insurer over time would

collect less in reimbursement from CMS than they would

otherwise.

So there's a whole data analytic science associated with

this, and it turns out that Humana is much better at that side

of the data analytics.  Aetna has actually outsourced that side

of data analytics.  And here is where Aetna sent to Humana

patient records that were deidentified so that any personal

information was gone.  Over 300,000 patient records.  Humana

analyzed it and estimated how many more medical charts they

would pull based on their data analytics, so that they could

correctly code, they could point to whether the patient was

diabetic or not in my example.  But then obviously you have some

cost of actually obtaining the charts.

And when you do that math, and I've explained this in my

reports, but when you do that math, it turns out you would pull

more charts, but because you would code correctly, you would

also earn more revenue on the other side.  So while this cost

revenue, I really think of this as an opportunity cost because

this doesn't affect the output at all because the patients have

already been treated.  It's simply a matter of whether you're

collecting the right amount for the treatment you have provided.

Q.   Mr. Gokhale, that was our last bucket.  Did you have a

demonstrative prepared to sum up all of the cognizable

1    efficiencies you found?

2    A.   I did.   There's one that summarizes.   It was in Exhibit

3    1-1, but I think we also have a demonstrative.

4    Q.   Sure.   If you turn to DX DEM 17.

5    A.   As soon as I find it.

6              THE COURT:   Last page in the book.

7              THE WITNESS:   Oh.   Thank you, Your Honor.   Okay.   I'm

8    there.

9    BY MR. SHUMAKER:

10   Q.   Was this a demonstrative created to summarize your final

11   opinion?

12   A.   It is.   So the bottom on the left, that dovetails the

13   Exhibit 1-1 that we looked at earlier, and if you add up all

14   those different buckets, you see the bar ends at somewhere

15   around 2 billion.   But the additional efficiencies I describe

16   which are the elements, almost 300 million that flowed directly

17   through to customers and/or the government, if you added that

18   up, that's how you get the total of 2.3 billion in efficiencies.

19             MR. SHUMAKER:   Your Honor, I move for -- DX DEM 17

20   into evidence for demonstrative purposes only.

21             MR. ADLER:   No objection, Your Honor.

22             THE COURT:   Yeah, I think this one is simply charting

23   what's in Exhibit 1.1.

24             MR. SHUMAKER:   Correct, Your Honor.

25   BY MR. SHUMAKER:

1    Q.   Mr. Gokhale, based upon your work and your expert opinion,

2    what is the total amount of run rate cognizable efficiencies

3    that will result from the Aetna-Humana transaction?

4    A.   2 billion that would accrue to the merged companies and

5    another 300-something million.  So 2.34 total to the companies

6    and/or customers and government.

7    Q.   Are those all of the efficiencies that you believe will

8    result from the transaction?

9    A.   Remember, I started with an estimate that Aetna had

10   prepared that was over 2.8 billion after their adjustments.  And

11   I set aside many categories for the reasons I've explained.  So

12   it's possible that some of the individual categories may be

13   lower than what the estimate says, but there are enough

14   categories I set aside without necessarily fully analyzing that,

15   if anything, the actual efficiencies may be higher than what I

16   have concluded.

17   Q.   Mr. Gokhale, did you read the DOJ's expert's report,

18   Christine Hammer's, in this case?

19   A.   I did.

20   Q.   Did any of the views expressed by her cause you to question

21   your final cognizability number?

22   A.   They did not.

23   Q.   Why is that?

24   A.   My team and I did first a fair bit of work in ascertaining

25   that what I was going to term as cognizable was merger-specific,

that we were able to verify it.  Second, I think I was a little

surprised but Ms. Hammer appears to find no cognizable

efficiencies in this transaction, and she prescribes some tests

in her reports which frankly if applied to other mergers would

always find zero of cognizable efficiencies.  So I don't agree

with that.

          And finally, I would say when I was on the other side of

the equation, when I testified for the government last year

where I was I guess playing the opposite side of this equation,

I did myself independently analyze, and I did find cognizable

efficiencies in that case.

          MR. SHUMAKER:  Thank you, Mr. Gokhale.  I pass the

witness, Your Honor.

          THE COURT:  Let me just ask one question before you do

that.  The 2.347 billion, that's through what year?

          THE WITNESS:  That is a run rate it's expected the

companies will achieve by 2020.

          THE COURT:  By 2020 or through 2020?

          THE WITNESS:  By 2020, and it'll be that level

thereafter.  There is some spreadsheet I've noted, by 2019 it's

a little bit lower.  I think I have that number somewhere.

          THE COURT:  When you say run rate, and forgive me if

I'm asking something you've already testified to, does that mean

that for each succeeding year it will be this much, or this is a

total of what will be achieved over a multi-year period?

1            THE WITNESS:  Starting in 2020, every year the

2    companies, from my opinion, will lower their cost base by $2

3    billion and 300 million will flow directly through to the

4    customers or the government.

5            THE COURT:  So this doesn't actually reflect any

6    savings that are achieved prior to the year 2020?

7            THE WITNESS:  That's correct, Your Honor.

8            MR. SHUMAKER:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. ADLER:

11   Q.   Good morning, Mr. Gokhale.

12   A.   Good morning.

13           THE COURT:  I don't know your name.  Forgive me.

14           MR. ADLER:  Oh, I'm sorry.  Sanford Adler.

15   BY MR. ADLER:

16   Q.   I'd like to begin by asking you to turn back to defendants'

17   demonstrative Exhibit 16.

18   A.   Okay.

19   Q.   And in response to the Court's questions, you said that

20   this was a representative actual example of a procurement

21   project for Humana?

22   A.   Well, I think what I said was, we were talking about the

23   number of days or the number of weeks in that column.  My

24   understanding is it was a representative engagement, for lack of

25   a better term.  Or I think they may have used the word sample

1    engagement in their analysis.

2    Q.   Was it an actual representative sample?

3    A.   I don't think so.  I think it was what they call a

4    representative or sample engagement.

5    Q.   And, sir, out of curiosity, I note that the Humana analysis

6    contains Humana's weekly rate for partners for the consultants

7    as zero?

8    A.   For the partner rate, yes.

9    Q.   Do you think that that's representative of the rates that

10   Humana pays for partners?

11   A.   I don't think it's representative of the zero.  It may just

12   mean that Humana tends to have engagements where they don't have

13   a partner as part of the engagement.  But rather, it's principal

14   on down.

15   Q.   Okay.  But if this is a representative example as you've

16   told the Court, you note that in this representative example,

17   Humana uses three days of partners on the project.

18   A.   That's right.

19   Q.   So that would mean they do use partners.  Correct?

20   A.   Yes.  But like I said, that's why it says sample

21   engagement.  And here they don't have a rate for a partner

22   because for this contract they didn't have a rate for a partner.

23   Q.   And, sir, would I be correct, since we have this exhibit

24   up, would I be correct to assume that the consultants who

25   actually did the work would know better what these numbers mean

1    than you do?

2    A.   By "consultants," who do you mean?  The clean room

3    consultants --

4    Q.   Yeah.

5    A.   -- or the ones whose rates are reflected here?

6    Q.   The clean room consultants.  Thank you.

7    A.   You would hope so or think so.  But again, we discussed

8    this at length with them and I understand this is what they term

9    a sample engagement.

10            THE COURT:  As a follow-up on that, I don't

11   understand, maybe you can explain it, how if there are three

12   days allocated for partner as time, there's no cost associated

13   with it.

14            THE WITNESS:  Well, I think --

15            THE COURT:  So this representative sample anticipates

16   that a partner contribution of three days is going to be done as

17   a gift?

18            THE WITNESS:  No.  That's why I think the

19   representative sample may have looked to what they see as a

20   representative sample, not necessarily every engagement doesn't

21   have a partner.  So I think Humana's contract in this particular

22   case with this vendor says, typically, we won't pay for

23   partners.  But they think a representative engagement going

24   forward or based on actual data may need, if it needed three

25   weeks of partner, they're comparing what cost it would be.

1            THE COURT:  Sounds to me, Mr. Gokhale, that you're

2      speculating as to that.  Is that right?

3            THE WITNESS:  With all due respect, no, Your Honor.

4      This is the discussion we have had with the company with what

5      does the sample engagement represent.  So I understand these

6      rates are what they are, which is per their contract.  And the

7      sample engagement they draw to compare the cost structure is

8      three.  So this is what I was saying earlier, is you can do some

9      different math with a slightly different sample engagement, or

10     you can draw from Aetna's sample engagement, and the question is

11     what level of savings you would see from Aetna versus Humana.

12           THE COURT:  But the level of savings is determined by

13     these numbers, and the question that's being asked is how can

14     three days of partner time be at a cost of zero in this sample.

15     That doesn't make intuitive sense.  None of the other time is at

16     a cost of zero.

17           THE WITNESS:  I understand your question, but I think

18     I view the sample engagement as something slightly different

19     than maybe what we're proposing here.  The sample engagement

20     says, you know, on average, if we needed a partner for three

21     days, and in Humana's case, they either didn't have a partner or

22     didn't -- according to their structure, they actually didn't pay

23     for a partner level -- then what would it turn out to be.  So.

24     I don't know if that's a better explanation.

25           THE COURT:  Go ahead.

1    BY MR. ADLER:

2    Q.   Mr. Gokhale, cognizable efficiencies are merger-specific

3    efficiencies that have been verified and do not arise from

4    anticompetitive reductions in output or service?

5    A.   That's my understanding, yes.

6    Q.   And all of the cognizable efficiencies about which you have

7    testified, you have verified?

8    A.   In the ways I described.

9    Q.   Now, sir, let's discuss what you consider the verification

10   process to usually include.  The verification process usually

11   includes, among other things, an assessment of the parties'

12   analytical methods?

13   A.   That's in part what I did, yes.

14   Q.   And an assessment of the parties' analytical methods

15   contains three steps, the first being it includes assessing the

16   accuracy of data collection and measurement?

17   A.   That's correct.  If I recollect, that's what the guidelines

18   say.

19   Q.   And that's what you included in your expert report under

20   your section for the methodology you applied in this case?

21   A.   I believe that's the citation, yes.

22   Q.   And the second step is it includes evaluating the

23   reasonableness of assumptions?

24   A.   If I recollect correct, yes.

25   Q.   And the third step is, it includes scrutinizing robustness

1    of the parties' analysis?

2    A.    I'd rather not make it a memory test.  If you could point

3    me to some of this language.

4    Q.    Yeah.  Okay.  You should have a binder up there with your

5    expert report in it.  It's in your initial expert report at --

6    the internal Bates number pagination would be 21.  And that's DX

7    420 at 21.  Paragraph 52.

8    A.    I see it, yes.

9    Q.    After you've had a chance to look at it and refresh your

10   recollection, you can put it aside and then I'd like to ask you

11   my question again.

12        (Witness reviewing document.)

13   A.    I see it, yes.

14   Q.    And, sir, putting that aside, is it your testimony that the

15   third step in assessing the parties' analytical methods and

16   verification is scrutinizing the robustness of the parties'

17   analysis?

18   A.    That's what it says.  Correct.

19   Q.    Sir, I want to focus on the work you did assessing the

20   accuracy of the data collection and measurement as my first

21   step.  I'll direct your attention to your expert report, DX 420,

22   at internal page 22, paragraph 53.

23   A.    I see it.

24   Q.    Okay.  And tell me if I'm reading this correctly.  It's the

25   last sentence.  "We also reviewed the underlying data and

1   calculations used to estimate cost savings, in certain instances

2   spot-checked the data against underlying documents, and where

3   appropriate, made corrections or adjustments to the estimates."

4        Did I read that correctly?

5   A.   I do.

6   Q.   And then I want to turn your attention to the next

7   paragraph.  And can you tell me if I'm reading this correctly?

8   "Based on our understanding of the nature of the estimated

9   efficiencies and our ability to access and review the underlying

10  data, we evaluated whether the savings could likely be achieved

11  without the transaction, and which of the savings were

12  substantiated with data using reliable methods, i.e., which of

13  the estimated cost savings were merger-specific, verifiable, and

14  cognizable."  Did I read that correctly?

15  A.   Yes.

16  Q.   Now, sir, raw data, which is a term you used on your

17  direct, means -- does not include in your definition, terms of

18  contracts, rebates, and prices.  Is that correct?

19  A.   That's right.  What I discussed is I accepted that those

20  had been provided or gathered correctly.

21  Q.   And you and your team at Compass Lexecon did not check what

22  you termed raw data in your verification.

23  A.   We did not check it against the source documents.  That's

24  correct.

25  Q.   I'm sorry, sir.  You didn't check the raw data?

1    A.    Yes, in the way I described.

2    Q.    You didn't check the terms of contracts?

3    A.    We did not compare the raw data against the contracts.

4    Q.    Yeah.  You accepted what you were told.

5    A.    We did, yes.

6    Q.    And the same is true of rebates?

7    A.    That's also correct.

8    Q.    And the same is true of prices.

9    A.    Correct.

10   Q.    Now, as an example of what you did and didn't do in terms

11   of accessing the data and the data's accuracy, I want to turn to

12   your work on network medical cost savings.  In this matter,

13   Aetna retained PwC to conduct the clean-room analysis of the

14   expected savings related to network medical costs?

15   A.    That's right.

16   Q.    And the network medical cost savings derive from getting

17   the best contracted rate across Aetna's and Humana's networks?

18   A.    Well, you have to distinguish within the par to par and

19   non-par to par, but yes, that's generally true.

20   Q.    Now, you claim that you and your team reviewed the

21   underlying data and the metrics PwC used for what you call par

22   to par?

23   A.    That's correct.  In the source documents, we can see the

24   data for, as I described earlier, membership denial rates and so

25   on.

1  Q.   But the source documents don't include the actual

2  contracts.

3  A.   Like I said, we start with the data as was provided, i.e.,

4  that compiled the information.

5  Q.   So PwC would be the best party to speak to if we wanted to

6  know what was actually in those contracts.

7  A.   Or either of the companies.  Sorry.  Just to be clear, I

8  accept that the data collected are in fact -- I understand that

9  they're from the normal course of business records.  So, for

10  example, things like the current membership wouldn't come from

11  contracts, it would be data provided to PwC from the -- by the

12  companies.  Likewise, denial rates or admission rates would also

13  be something provided to PwC by the companies.

14  Q.   Yes.  But I think we were talking about the contracts.  And

15  for non-par to par, you think you simply discussed with PwC

16  whether it applied the par to par methodology?

17  A.   I'm sorry.  I don't follow your question.

18  Q.   Sure.  I'm sorry.  Let me rephrase it, then.

19      Sir, with respect to non-par to par contracts, you think

20  that you simply discussed with PwC whether it applied the par to

21  par methodology to that analysis?

22  A.   I'm still not sure I understand your question, but there is

23  a par to par analysis, and there is a non-par to par analysis.

24  They are done independently depending on which situation

25  applies.

1    Q.   Right.  And what I wanted to talk about was the latter, the

2    non-par to par.  You didn't do anything with the data; you just

3    asked PwC whether they used the same methodology as they had

4    used for par to par.

5    A.   I disagree with your characterization that -- or question

6    that I didn't do anything with the data.  What we did do with

7    the data is what I've explained in my reports.  Starting with

8    the mathematical opportunity, we understand that the analysis

9    was based on eliminating outliers and that the Aetna IM office

10   imposed some discounts on that.

11        So we followed through, starting with what I've called the

12   raw data, we followed through the analysis to estimate and

13   confirm whether PwC's math was right.  If it wasn't, we adjusted

14   it.

15   Q.   Let me be sure I understand your testimony.  Your testimony

16   today is that you did look at the numbers for non-par to par,

17   and you applied the methodology.

18   A.   I was describing par to par with -- let me shift to my

19   exhibit.

20   Q.   Could you share with us where you're looking?

21   A.   I'm looking at 6-1, it's Bates 067.

22   Q.   Okay.  Give me a moment, sir.

23             THE COURT:  This is again what is Defendants' Exhibit

24   577?

25             THE WITNESS:  Yes, Your Honor.  So if you look at the

1    first row, it's network discount, and then there's a third

2    category of non-par.  Is that what we're discussing?  Or are we

3    still in the first two rows?

4    BY MR. ADLER:

5    Q.   Well, hold on.

6            THE COURT:  I don't think he was asking a specific

7    question about this exhibit.

8            MR. ADLER:  Yes.

9    BY MR. ADLER:

10   Q.   I'm really trying to understand your verification, and

11   particularly all that you've told us about how you looked at

12   underlying data, metrics, how you spot-checked the data, all of

13   that.  I want to know simply about non-par to par, whether your

14   testimony today is that you -- you -- applied the same

15   methodology as PwC did and actually applied it to their numbers.

16   A.   We replicated their par to par analysis, and then the

17   reason I was looking at the 17.7, I don't doubt -- I did not

18   replicate that part.  So the discussion was it was the same

19   methodology which is comparing the cost under different

20   contracts, or in this case the cost of the hospital versus the

21   same provider under the contract.

22   Q.   So you took their word for that calculation.

23   A.   I wouldn't quite characterize it that way.  But given the

24   discussion we had with them about the other methodologies, given

25   that I had replicated the par to par, I took comfort that when

1    they told me that it was done the same way, I did not go back

2    and independently check that one area of their analysis.

3    Q.   And you accepted it and included it as a cognizable

4    efficiency that you had verified.

5    A.   Based on that fact, yes.

6    Q.   And so let's talk about what you did in par to par.  PwC

7    examined the provider contracts.

8    A.   Again, there's more information than just the contracts,

9    right?

10   Q.   I understand, but let's do it one step at a time.

11   A.   Okay.

12   Q.   PwC examined the provider contracts.

13   A.   Some combination of PwC examining the contracts and the

14   companies providing them information, yes.

15   Q.   And you and your team did not review the provider

16   contracts.

17   A.   We did not review the contracts ourselves.  That's correct.

18   Q.   And PwC examined the provider rates.

19   A.   Again, I think it would be some combination of PwC and the

20   companies, but we did not independently examine the rates

21   ourselves.

22   Q.   Okay.  So in order to kind of deal with whether the company

23   did or not, I'm going to ask you, did you tell me in your -- did

24   you write in your expert report that PwC examined the data and

25   not mention Aetna having examined it?

1    A.    Can you point me to where you --

2    Q.    Of course.  Could you look at your initial expert report?

3    A.    Yes.

4    Q.    Could you take a look at internal pagination 64, your

5    paragraph 196.

6              THE COURT:  We need an exhibit number.

7              MR. ADLER:  Oh, I'm sorry.

8              THE COURT:  Just to control things.  It's not 577,

9    because that's the supplemental report.

10             MR. ADLER:  It is.  I'm terribly sorry.  It's DX 420.

11             THE COURT:  420.

12             THE WITNESS:  What page are you on?  196?

13             MR. ADLER:  Mm-hmm.

14             THE COURT:  What page number?

15             MR. ADLER:  It would be Bates No. 64.

16             THE COURT:  So it's paragraph 196, not page 196.

17             MR. ADLER:  Yes, Your Honor.  I'm sorry.

18   BY MR. ADLER:

19   Q.    Let me just read you the sentence, and you can tell me if

20   I've read it correctly:  "PwC examined provider contracts,

21   provider rates, contractual provisions, and other 'risk-sharing

22   or quality incentive arrangements,' determined which contract

23   provided a better overall outcome, and then 'aggregated all

24   those individual contract results to develop the estimate.'"

25   A.    I see that.

```
1    Q.   Is that correct?

2    A.   Yes.

3    Q.   So PwC examined the provider rates?

4    A.   In the analysis they did, yes.

5    Q.   And you and your team did not review provider rates?

6    A.   That is correct.  We did not independently review the

7    provider rates.

8    Q.   PwC examined the contractual provisions.

9    A.   That's correct.

10   Q.   And you and your team did not review contractual

11   provisions?

12   A.   That's also correct.

13   Q.   PwC examined other risk-sharing or quality incentive

14   arrangements with providers.

15   A.   That's right.

16   Q.   You and your team did not review other risk-sharing or

17   quality incentive arrangements with providers.

18   A.   We did not review the underlying documents.  I mean the

19   source documents I used, such as contracts.

20   Q.   And after examining and weighing all these factors, PwC

21   determined which contract provided a better overall outcome?

22   A.   Yes, but what it meant was there's a four-point analysis

23   they do where PwC compares the two -- the cost of the billings

24   under a particular provider under two different contracts.

25   Q.   So is the answer to my question yes?
```

1    A.    Can you repeat the question?

2    Q.    Sure.  After examining and weighing all these factors, PwC

3    determined which contract provided a better overall outcome.

4    A.    That's what I'm trying to explain, that now we're into the

5    part that is the mathematical part, which is, yes, based on the

6    particular terms of contracts and for a given provider, PwC

7    could run it through the different terms of the contracts and

8    ask which one is the lower cost.  So in that sense, they did.

9    Q.    And it, as we talked about, did not simply pick the

10   contract with the best rate.

11   A.    Now you're talking about rate as it would have in the par

12   to par analysis.  The point would be to ask -- and a par to par,

13   remember, is where both Aetna and Humana, or in the past Aetna

14   and Coventry, would have the same provider under contract.  So

15   the math would be we would say, whatever Aetna's book of

16   business, for lack of a better term, was with the same provider,

17   what was the cost to Aetna actually under its contract, and if

18   you adopted the terms of the Humana contract, what the cost

19   would be of Aetna's book of business, and vice versa.  What

20   would the cost of Humana under its contract, and Humana

21   performing under Aetna.

22        And if you compared which outcome is the better outcome,

23   that's how one determines which one of those contracts would be

24   better to adopt after the transaction.

25   Q.    Okay, sir.  You didn't answer my question, so let me try

again.  PwC, we talked about the things they've done, and they

picked the best contract after doing all of those things.  And

my question is simply, it did not simply pick the contract that

had the best rate.

A.   Well, that's what I don't follow about your question.  I

explained how the --

Q.   Let me rephrase.

A.   -- math was done.

Q.   Let me rephrase.  It looked at the risk-sharing

arrangements as well.  Correct?

A.   Well, presumably whatever the terms of the contract were

applicable in determining what it would cost one or the other

company under the contract, that's what I understand PW took

into account.

Q.   It looked at quality incentive arrangements.

A.   Again, if that was an applicable term of the contract, they

would have considered that, is my understanding.

Q.   And as you put it in your report, they aggregated all of

this together to pick the best contract.  They didn't simply

pick the one that had the lowest price.

A.   Well, they do what they call starting the mathematical

opportunity.  So to the extent they could do some math around

the contract terms, that's how they determine the respective

dollar amounts.

Q.   And then they gave the end product to you.

1    A.   Well, we start with sort of the data they use, and we

2    follow through the math on the mathematical opportunity as

3    they've calculated it, and from that point on, there were many

4    adjustments.  So PwC I think started with a mathematical

5    opportunity in the billions, and by the time they get down, it's

6    a couple hundred million.  So there's several adjustments along

7    the way.

8    Q.   You didn't start with the data they started with.

9    A.   We started with simply calculating the mathematical

10   opportunity, and then from that point on.  We did not start with

11   the contracts, yes.

12   Q.   Still staying with network medical savings, I wanted to

13   talk about the second step in verification, evaluation of the

14   reasonableness of the parties' assumptions.  Your expert opinion

15   on medical network synergies relies upon an assumption made by

16   PwC.  Correct?

17   A.   Specifically, which assumption are you discussing?

18   Q.   It relies on more than one assumption?

19   A.   Well, it was -- there are assumptions within the analysis.

20   But in places like how much to discount rate, I understand that

21   Aetna's IMO was part of that discussion.

22   Q.   Well, you mentioned one assumption in your report.  PwC

23   assumed that the combined company would get at least the better

24   of the two companies' rates.

25   A.   Again, based on the math I described, PwC assumed -- or the

1    assumption here is that I understand that post merger, on a par

2    to par for the same provider if there are two contracts, the

3    more cost-effective contract is the one that can be used.

4    Q.   And that assumption results from PwC's belief that larger

5    scale would lessen pushback from providers, all else being

6    equal?

7    A.   If you're going to point me to where it says, but I

8    remember that sentiment.

9    Q.   Sir, I'm asking you a question.  Can you not answer that

10   today?

11   A.   I don't recall the exact language, but if you show me what

12   you're referring to, I'd be happy to read it.

13   Q.   Okay.  Well, let me do it differently.  What I stated, was

14   that correct or not?

15   A.   Could you repeat that?

16   Q.   I beg your pardon?

17   A.   Would you mind repeating it?

18   Q.   That assumption results from PwC's belief that larger scale

19   would lessen pushback from providers, all else being equal?

20   A.   Again, I'd have to recollect exactly where that -- are you

21   asking me whether that's my opinion?

22   Q.   You can't tell me whether or not what I said is accurate

23   without recollecting what you yourself had said in the past?

24   A.   That sounds like the right language, but I'd really rather

25   not make it a memory test.

Q.   I'm not asking you if you said that before.  Right now I'm

just asking you whether what I said was correct.

A.   I think the gist of it might be, yes.  Can you repeat it?

Q.   That assumption results from PwC's belief that larger scale

would lessen pushback from providers, all else being equal?

A.   I think there are elements in a couple of different places

where -- there's two elements to the analysis.  One is whether

the larger scale actually reduces rates over and beyond what

either company has.  But there's an element of whether larger

scale can help you at least pick one of those two contracts.  I

think in a couple of different places that is an assumption that

the larger scale will help you at least assert one or the other

contract that exist.

Q.   So I can't tell, did you answer yes or no to my question?

A.   As I answered, I think the larger scale, the assumption is

in a couple of places that it will help you assert the more

favorable contract.

Q.   Okay.  Not really in a couple of places.  I want to know

specifically about network medical savings.

        THE COURT:  I think you're probably going to take a

few minutes, so let's take our morning break.  I know it's not a

perfect time, but I think we need to take a morning break.  So

we'll resume again at 11:10.

        (Recess from 10:55 a.m. to 11:15 a.m.)

        THE COURT:  All right.  Welcome back.  Mr. Adler.

1    BY MR. ADLER:

2    Q.   So, Mr. Gokhale, before the break we were discussing the

3    basis for PwC's assumption.  And so I wanted to ask you one more

4    time.  The basis of that assumption results from PwC's belief

5    that larger scale would lessen pushback from providers, all else

6    being equal.

7    A.   I think the best answer is to point you to a paragraph in

8    my report.  In paragraph 201 --

9    Q.   I'm sorry, sir.

10   A.   Sorry, it's on page 066 in Exhibit 420.  May I?

11   Q.   Please.

12   A.   "After the proposed transaction, the combined company will

13   be able to negotiate with networks with the knowledge of a

14   better current rate as well as the leverage of the combined

15   companies' volume increase."  So what I go on to explain is that

16   I understand that PwC assumed that the combined company, through

17   an applications of its newly acquired current rate knowledge and

18   the increased volume would be able to achieve at least the

19   better current rate.

20   Q.   So I'm going to return you to my question and ask you to

21   answer -- to tell me whether I have it right or not.

22           THE COURT:  This is the last time we're going to ask

23   this question, because it's at least the sixth time.

24           MR. ADLER:  Yes, Your Honor.

25   BY MR. ADLER:

1   Q.   That assumption results from PwC's belief that larger scale

2   would lessen pushback from providers, all else being equal.  Yes

3   or no?

4   A.   Can you remind me?  We've been going at it for some time.

5   "That assumption," what's the prelude to "that assumption"?

6   Q.   That the combined companies would get at least the better

7   of the two companies' rates.

8   A.   I think that's consistent with what I just read you from my

9   report, which is their combined volume after the transaction

10  will allow them to at least achieve the better current rate.

11        MR. ADLER:  Your Honor, can I treat that as he's

12  denying and impeach --

13        THE COURT:  You're just going to have to move forward

14  with other questions.  The record is what the record is.  I

15  can't give you permission to treat it as something.  Move

16  forward with your question.

17  BY MR. ADLER:

18  Q.   Now -- and why is it so important to focus on the "all else

19  being equal," which is something economists I know deal with.

20  The other efficiency claims you found cognizable here require

21  changes to other portions of provider contracts, or to

22  enforcement of other portions of provider contracts.

23  A.   You said changes to other portions of provider contracts.

24  Q.   Let me rephrase.  If the assumption rests on all else being

25  equal, your efficiencies that you have found cognizable -- other

```
 1   efficiencies -- will mean that all else will not be equal.  Is
 2   that correct?
 3   A.   I'm not sure I'm following you.  What -- you seem to be
 4   asking a hypothetical about all else being equal.  Can you tell
 5   me what you mean by all else being equal in this context?
 6   Q.   Well, sir, let me refresh your recollection.
 7            THE COURT:  I think all else being equal was in the
 8   question that he asked six times.  Did you not understand what
 9   it meant in that question?
10            THE WITNESS:  I'm trying to, but I think --
11   BY MR. ADLER:
12   Q.   Let me refresh your recollection then, sir, on all else
13   being equal and how it relates to the assumption.  Please turn
14   to your deposition.
15   A.   Sure.  Where is it?
16   Q.   On page 147.
17   A.   Where would I find it?  Okay.  It's on the screen.
18            THE COURT:  It's in one of the books.  One of the
19   books you have is a separate book with your deposition.
20            MR. ADLER:  We tried to make it easier, but
21   unfortunately...
22   BY MR. ADLER:
23   Q.   Now, sir, read to yourself quietly from lines 10 to 21, and
24   when you're done reading, please look up.
25        (Witness reviewing document.)
```

1    A.    I see it.

2    Q.    Well, now put it aside, sir, and let me ask you to testify

3    from the stand today.  Do you now understand what "all else

4    being equal" means in connection with PwC's assumption?

5    A.    Sure.  I understand what I was discussing in the

6    deposition.

7    Q.    Okay.  And so let me ask you, other of your -- well, let me

8    just ask you, what were you discussing in the deposition about

9    all else being equal and the assumption?

10   A.    Well, what I recollect is that in the context of the

11   network analysis, there is a discussion even in some of PwC's

12   documents that some providers -- it's either here or in the

13   context of the concurrent review analysis, maybe some of the

14   same providers, so the question is whether either the provider

15   contracts will contain a clause that resists this ability to go

16   back and assert some other term of the contract or some other

17   contract, and I know there is a discussion in PW's documents

18   that say Texas, for example, that several providers did have

19   some terms that would at least make it more difficult to take

20   the terms from some other contract.

21        And so what I was thinking, I think, when we were

22   discussing all else equal is PwC in its own analysis then does,

23   A, is aware of that in determining what the savings would be

24   from different contracts, but in different places, they do take

25   a discount also to account for the fact that to the extent some

1    providers can resist this change, that you won't expect the same

2    level of savings.

3              MR. ADLER:  If I may have a moment, Your Honor?

4              THE COURT:  Certainly.

5         (Pause)

6    BY MR. ADLER:

7    Q.   I want to pick up on that last line before I return to

8    where we were.  You did not have to factor into your analysis of

9    cognizable efficiencies from concurrent review these contractual

10   protections that you've just mentioned.

11   A.   In concurrent review, there are discounts taken in the

12   estimation of those savings.

13   Q.   Let me try again.  You, Mr. Gokhale, did not have to factor

14   this into your efficiency analysis.  Correct?

15   A.   By that you mean I did not impose any additional discounts

16   in the concurrent review analysis, that's correct.  I accepted

17   the level of discounts that were already embedded in the

18   analysis.

19   Q.   And your understanding is that PwC and Aetna took care of

20   this issue of contracts dealing with concurrent review?

21   A.   Well, it's clear from the documents that they were aware of

22   the issue when it happened.  It's also clear that in places that

23   they explicitly discuss this issue and point to discounts they

24   have taken.

25   Q.   Okay.  And it is your understanding that they took care of

1   this for purposes of the cognizability analysis.

2   A.   It is my understanding that the discounts are characterized

3   differently in different places, but one of the reasons is also

4   feasibility, and I understand that the discounts are meant to

5   impart -- at least account for certain pushbacks or whatever

6   else there may be.

7   Q.   But you don't know how they did it.

8   A.   How they did what?  Applied the discount?

9   Q.   Well, sir, you don't know whether they did it in the

10  underlying math?

11  A.   Well, the discount they take is part of the underlying

12  math.  So I don't follow your question.

13  Q.   So just so I understand, your testimony today is that you

14  do know whether they took care of this factor of concurrent

15  review exemptions in the underlying math?

16  A.   I'm aware of at least one presentation where they

17  explicitly discussed this within that presentation.  When they

18  said that certain provider contracts had clauses in them that

19  would prevent simply accepting another contract, they did take

20  some discount for it, yes.

21  Q.   Let me try it somewhat differently.  You have no idea how

22  they took this into account.

23  A.   Mathematically, I do, yes.

24  Q.   So your testimony today from the stand is that you know how

25  PwC and Aetna took account of these concurrent review

1    exemptions.

2    A.   I'm still not -- I'm not sure I'm following your question,

3    but I can explain to you the math, I can explain to you where

4    they take the discount and the reasons why they take the

5    discount.

6    Q.   I'm sorry.  Let me rephrase.  Let me try to make it, if I

7    can, more understandable.  You've talked about this issue with

8    cognizability for concurrent review.  The issue involves

9    contractual protections that providers have, and my question to

10   you simply is, you don't know how PwC and Aetna took this into

11   account.

12   A.   If your question is, for example, if they took a 40 percent

13   discount, exactly how they settled on the 40 percent, my

14   understanding is that's based on their experience, their

15   analysis, and generally what they learned from Coventry in their

16   business.

17   Q.   Sir, I'm going to read from your deposition, from page 134,

18   line 18.  No, I take that back.  I'm missing the question.

19           MR. ADLER:  I apologize, Your Honor.

20           THE COURT:  You're on page 134, line 18?

21           MR. ADLER:  Line 17.  I knew it didn't begin with

22   "answer."

23   BY MR. ADLER:

24   Q.   "Question:  Did they look at other states?

25       "Answer:  Well, I assume.  I don't recall if -- I think my

1    team may have spoken to them about this, but my understanding is

2    when it was worth noting or accounting for, they attempted to do

3    so.

4        "Question:  Okay.  And then how did they work that into the

5    analysis?

6        "Answer:  As I said, my understanding is it may be in

7    different places, but either the level of rate one could adopt

8    or, you know, whether the level of denials one could adopt

9    and/or a discount of some sort."

10       And now moving on to page -- well, let me offer that both

11   for impeachment and for its substance.

12            THE COURT:  Mr. Shumaker.

13            MR. SHUMAKER:  Objection, Your Honor.  I'm not even

14   sure which of the last three questions this is relating to,

15   quite honestly.

16            THE COURT:  Well, I'm not sure that's a problem in my

17   mind.  As I've done before, I will go ahead and allow it in for

18   both purposes, but I'll sort it out as I look at his testimony

19   here today and his testimony from his deposition to see whether

20   it is actually inconsistent.

21   BY MR. ADLER:

22   Q.   Let me further, on the same point of impeachment, direct

23   your attention to the deposition page 133, the question that

24   begins on line 23.

25       "And so how would -- how did you factor that into your

```
 1    analysis?

 2         "Answer:  Well, I didn't have to do it independently, but

 3    my understanding is, with this knowledge that both PwC and Aetna

 4    had, that their estimates had factored in when there were

 5    constraints.  Those constraints were accounted for in their

 6    underlying math, analysis or discount."

 7              THE COURT:  You offer this as well?

 8              MR. ADLER:  I do, Your Honor.

 9              THE COURT:  Same objection?

10              MR. SHUMAKER:  Objection, Your Honor.  I don't see the

11    inconsistency.

12              THE COURT:  I'm not sure it is inconsistent, although

13    technically this answer differentiates between underlying math,

14    analysis, or a discount, so I sense that that could be

15    inconsistent with something he said earlier.  I'll allow it in,

16    and I'll assess it for what it's worth.

17              MR. ADLER:  And finally, on page 136 --

18              THE COURT:  That's one of my favorite words, but it

19    rarely plays out that way.

20         (Laughter)

21    BY MR. ADLER:

22    Q.   On line 4.  "Question:  And but sitting here today" --

23    A.   I'm sorry, what page are you on?

24    Q.   136, line 4.

25    A.   Okay.
```

1   Q.   "Question:  And but sitting here today, you don't remember

2   exactly how they accounted for it?

3       "Answer:  I don't."

4           THE COURT:  And you're offering that as well?

5           MR. ADLER:  I am, Your Honor.

6           THE COURT:  Any objection to that?

7           MR. SHUMAKER:  Again, inconsistencies, Your Honor.  I

8   don't see it.

9           THE COURT:  This one I think is inconsistent with

10  something he testified to a few moments ago.  I will allow it

11  in.

12  BY MR. ADLER:

13  Q.   And sir, I wanted to talk about one aspect of the

14  provider-insurer relationship that you envision changing besides

15  the rate.  Humana has terms in its contracts which allow it to

16  penalize hospitals?

17  A.   I think my understanding is what I described earlier, is

18  that I don't think I used the word "penalized," but it has some

19  terms in its contracts that it may not be enforcing but that it

20  could in the context of some reimbursement.

21  Q.   Well, let me read -- let me ask you, is it true that Humana

22  has terms in its contracts which if enforced would allow it to

23  penalize hospitals for lack of compliance with certain

24  requirements such as timely notification?

25  A.   Yes.  In the sense that it would lead to lower

1    reimbursement.

2    Q.    And it does not enforce these provisions today.

3    A.    That's what I understand.   There are certain provisions it

4    does not enforce.

5    Q.    And you have concluded that the merger will lead Aetna to

6    change policy and culture at Humana?

7    A.    That's my understanding from speaking with the parties.

8    Q.    And the merger will result in Humana penalizing hospitals

9    for lack of compliance?

10   A.    In the sense that asserting those terms will reduce

11   payments to certain providers.

12   Q.    And that was your basis for finding reimbursement policy

13   savings merger-specific?

14   A.    That's correct.

15   Q.    And so when we talk about all else being equal, when the

16   combined company goes to providers, they may be at the same time

17   that they're asking them to give them the best Aetna rate, also

18   starting to enforce these penalty provisions for Humana.   Is

19   that correct?

20   A.    It's possible.

21   Q.    Now, sir, you testified about savings that will flow direct

22   to customers and the government?

23   A.    I did.

24   Q.    And one of those savings you found cognizable was

25   self-insured network efficiencies?

1    A.   That's correct.

2    Q.   Another was additional gross pharmacy efficiencies?

3    A.   That's right.

4    Q.   Now, for network self-insured efficiencies, you verified

5    and found this cognizable.  You took that number from an Aetna

6    or Humana calculation.  Correct?

7    A.   Which one are you referring to now, just the part that

8    flows through directly?  I didn't follow your question.  Could

9    you repeat it?

10   Q.   Yes, sir.  Maybe it would be easier -- could we pull up his

11   Exhibit 1-1 from his rebuttal report, which was DX 577, and this

12   is at internal page 33.

13        So after you've found it --

14   A.   Okay.  I'm with you.

15   Q.   So do you see the box down at the bottom?

16   A.   I do.

17   Q.   The savings that directly flow to customers and/or

18   government?

19   A.   I see it, yes.

20   Q.   And you see self-insured network efficiencies?

21   A.   I do.

22   Q.   And you found those efficiencies cognizable?

23   A.   I did.

24   Q.   And you took that number from an Aetna or Humana

25   calculation.

1    A.    I think the 199.7 actually comes from an underlying

2    calculation that I get from PwC's estimate.

3    Q.    So your testimony here today is that you did not take that

4    number from an Aetna or Humana calculation?

5    A.    I think I can point you to --

6    Q.    Could you answer my question, sir?

7    A.    It's what I testified to.  There is a PwC -- one of the

8    documents that PwC estimates the savings.  In the same way that

9    it estimated the savings that would go to the fully insured

10   customers, PwC estimates on the commercial side what would be

11   generated for the self-insured customers.  That's the basis for

12   this number.

13   Q.    Okay.  I'm going to ask you to turn to your deposition at

14   page 18.  I'm going to read from line 19.

15        "I see.  So let me take self-insured network efficiencies

16   under the cognizable column.  The 199.7, does that come from an

17   Aetna or Humana calculation?

18        "Answer:  That's correct."

19             MR. ADLER:  Your Honor, I offer that for impeachment

20   and for its substantive value.

21             MR. SHUMAKER:  No objection, Your Honor.

22             THE COURT:  Without objection, it's admitted for both

23   purposes.

24             MR. ADLER:  Okay.  You can close your deposition now.

25        Could we pull back up Exhibit 1-1, please.

1  BY MR. ADLER:

2  Q.   Okay.  Now I'm going to ask you to look at the additional

3  gross pharmacy efficiencies in that lower box.

4  A.   Yes.

5  Q.   Does that number too come from an Aetna or Humana

6  calculation?

7  A.   In the sense that it's sourced from the underlying

8  documents.  But the way in which the 100.9 is calculated I think

9  is better articulated in one of the exhibits.  But it is based

10  partly on an Aetna sheet that summarizes what level of rebate

11  savings will be captured by Aetna versus what would flow through

12  directly.

13  Q.   Okay.  So let me try my question again.  Does that number

14  come from an Aetna or Humana calculation?

15  A.   I said there's two parts to that calculation.  Or three, in

16  fact, even in the earlier case and here, there are two sources

17  for some of these numbers.  The PwC number, or in this case it

18  would have been a starting point number from PSG, and Aetna also

19  imposed different levels of discounts.  And so it's not an

20  independent source for either.

21      But in that sense, yes, the numbers do come from -- in this

22  case the gross pharmacy we're discussing was an estimate that

23  starts with PSG, but for, as I described in my testimony,

24  there's a particular therapy class that I leave aside, and then

25  I do have to rely on the calculations of the flow-through that I

1    believe I do get from an Aetna document to estimate the number

2    we see here.

3    Q.   Let me try it again.  Did that number come from an Aetna or

4    Humana calculation?  Not PSG, but Aetna or Humana?

5    A.   In the sense that I described, it had inputs from Aetna and

6    Humana calculations.

7    Q.   So is that a yes?  I would like an unqualified yes or no?

8         THE COURT:  I don't think you can always demand an

9    unqualified yes or no.  You've got an answer.

10        MR. ADLER:  Fair enough.

11        THE COURT:  Do with it as you wish.

12   BY MR. ADLER:

13   Q.   May I have a yes or a no?

14   A.   I explained the calculation.

15        (Laughter)

16        THE COURT:  I think I just told you you may not.

17        MR. ADLER:  Well, I was requesting.

18        THE COURT:  Move along to the next question.

19        MR. ADLER:  Okay.

20   BY MR. ADLER:

21   Q.   Now, sir, you considered the amount of the efficiencies

22   that Aetna obtained from the Coventry transaction important for

23   your analysis?

24   A.   I did.

25   Q.   And it allowed you mathematically to compare the level of

1    efficiencies in the two transactions?

2    A.   It does, yes.

3         MR. ADLER:   Could we please put up Defense Exhibit

4    demonstrative 13.

5    BY MR. ADLER:

6    Q.   So in this -- I've put up DX Demonstrative 13.

7    A.   I see it.

8    Q.   So you compared the efficiencies for SG&A FTE from the

9    Coventry transaction and proposed for the Humana transaction?

10   Is that correct?

11   A.   Yes, generally.   The only comment I'll make is that what's

12   numbered column 3 is my estimate of the cognizable efficiencies

13   from the Humana transaction.

14   Q.   And you made a similar comparison for SG&A non-FTEs

15   excluding pharmacy?

16   A.   That's right.   That's the second row.

17   Q.   And you made a similar comparison for medical cost, network

18   and clinical services?

19   A.   That's the third row, yes.

20   Q.   You did not do this for any of the pharmacy savings.

21   A.   I did not.

22   Q.   And you did not do this for any of the rebate maximization

23   savings in pharmacy.

24   A.   That's part of pharmacy.   That's right.

25   Q.   Now, the amount of rebate maximization efficiencies you

1  found cognizable was dependent upon an assumption.  Correct?

2  A.   Like I said, there are, again, in -- my assumption, the one

3  I explained was there is in the market share movement, there is

4  an assumption that in most of the therapy classes, 80 percent

5  would shift over, and I think in one therapy class, it was 50

6  percent would shift over.

7  Q.   And that's the one I wanted to focus on.  And your opinion

8  is that that means that Aetna can shift 80 percent of the market

9  from one drug to another.

10  A.   That the post transaction company will be successful at

11  getting its customers to move their purchases to another drug.

12  That's correct.

13  Q.   And indeed, did you tell me at your deposition that this

14  was an Aetna estimate that it could shift 80 percent of the

15  market?

16  A.   Show me the deposition.  I don't recall exactly what I said

17  in this respect.

18  Q.   Sure.  Would you turn to your deposition, page 168, and

19  read to yourself from lines 14 through 20.

20  A.   14 to 20?

21  Q.   Yes.  And when you're done, please look up.

22  A.   I see it, yes.

23  Q.   And so is the -- are the pharmacy rebate savings based upon

24  Aetna's estimate that it can shift 80 percent of the market from

25  one drug to another?

1    A.   I think your question said Aetna.  My answer, I didn't say

2    Aetna, but to the best of my understanding, Aetna's pharmacy

3    team, while they may not have seen all the clean room

4    information, this likely started with a PSG estimate.

5    Q.   I see.  You're telling me that you ignored my use of Aetna

6    in the question and substituted PSG to answer it?

7    A.   No.  I'm saying that when I heard your question, I took it

8    to mean Aetna and/or the consultant.  But that's what I meant in

9    my answer.

10   Q.   Okay.  So your testimony today is that this consultant

11   who's not here estimated that Aetna could successfully shift 80

12   percent of the market from one drug to another.

13   A.   I think I should clarify.  Generally when in my deposition

14   we were talking about Aetna's estimates, the background is that

15   we were referring to Aetna's R4 or Aetna's Round 4 submission

16   estimates.  So that's where some of the confusion may come in,

17   because the latest estimate Aetna had on the record at the time,

18   and even now, is what they call the Round 4 submission estimate.

19   So that's why the terminology "Aetna's estimate" sometimes gets

20   confused with specifically whose estimate.  With that round four

21   submission estimate does incorporate all the clean room work by

22   all these different consultants.

23   Q.   And I believe you testified on direct you've done no

24   empirical work here on the market share movement?

25   A.   That's correct.  I accepted the 80 percent.

Q.    You've not done an empirical study of whether Aetna could

shift 80 percent of the market from one drug to another?

A.    I have not.  That's right.

Q.    And have you done any empirical study of the elasticity of

consumer demand for pharmaceuticals prescribed by their doctor?

A.    I did not do an independent study.

Q.    Now, on Friday you testified about a consultant with whom

Aetna had a disagreement on the work that needed to be done?

A.    That's right.

Q.    And that consultant was Deloitte?

A.    That's correct.

Q.    And you testified that Deloitte's work spanned a few rows.

What did you mean by that?

A.    I'm sorry.  Can you repeat that?

Q.    Yes.  You testified that Deloitte's work spanned a few

rows.  What did you mean by that?

A.    What I was referring to is --

         THE COURT:  Is it rows or roads?

         MR. ADLER:  Rows.  R-O-W-S.

         THE COURT:  Thank you.

         THE WITNESS:  What I mean by that is in a couple of my

exhibits you see references to Deloitte, as in Deloitte's

analysis being the basis of the estimate there.

BY MR. ADLER:

Q.    Can you tell us what areas of pharmaceutical savings

1   Deloitte worked on?

2   A.   I understand they did but that it was ultimately PSG's

3   analysis that the parties found more plausible.  But I don't --

4   knowing the disagreement between Deloitte and Aetna as to

5   whether they were finished or not, I really didn't examine

6   closer Deloitte's analysis.

7   Q.   It's true that you believe that it involved the whole area

8   of pharmacy, pharmacy medical savings.

9   A.   As I said, I really didn't examine it in great detail.

10  Q.   It involved rebate maximization savings.  Correct?

11  A.   To the best of my knowledge, there may have been some

12  element, but again, I did not examine that very closely at all.

13  Q.   The disagreement between Aetna and Deloitte applied

14  generally to the overall pharmacy analysis?

15  A.   I don't believe so.  That's why I specifically looked at

16  the areas in which Deloitte, like the pharmacy network, those

17  are two rows under 5-1 -- if I may point to the exhibit.

18  Q.   Well, no.  I'm fine.  I just wanted to ask you my question.

19  A.   Where specifically in my tables you find a reference to

20  Deloitte and the explanation.  That's where I set it aside.

21  Q.   Did Deloitte's concerns relate to rebate maximization?

22  A.   I don't recall seeing any document specifically about that,

23  but their general concern was that they thought they needed to

24  do more work, and Aetna thought that additional work by Deloitte

25  wouldn't have added any clarity or reliability to what they had

1    done.

2    Q.   But Deloitte's concerns generally related to their whole

3    analysis.  Correct?

4    A.   For the most part, I looked at the -- or I understand that

5    to be the difference of opinion.  Overall, they wanted to do

6    more work or thought they wanted done.

7    Q.   Including rebate maximization?

8    A.   Again, I didn't really examine that part of their analysis

9    in great detail, but I'll take your word for it.

10   Q.   Well, I'm asking you.

11   A.   I understand in general Deloitte thought they needed to do

12   more work, and Aetna thought it wouldn't add much value to do

13   so.

14   Q.   And you found cognizable the pharmacy medical cost savings?

15   A.   You're combining a couple of terms from my answer.  I have

16   a pharmacy bucket and a medical cost bucket.

17   Q.   I don't think so.  Let me direct your attention to your

18   exhibit -- this will be in your rebuttal report.  Although I

19   think this is marked confidential.

20   A.   It is.

21   Q.   We can't put it on the public monitors.

22   A.   I see what you're referring to.

23            THE COURT:  We're in Exhibit 1-1, but we're in the

24   line that's blacked out to the public.  I don't think the public

25   is seeing the line that you're going to be referring to.

1          MR. ADLER:  Okay.  Yes.

2     BY MR. ADLER:

3     Q.    So you see under there pharmacy medical cost?

4     A.    Yes.  I was thinking it was 5-1, which is confidential, but

5     if you look at 1-1, that's correct.  Under medical costs, a

6     subset of those medical costs is the rebate.

7     Q.    And what percentage?  What percentage, roughly?

8     A.    From the rebate maximization?

9     Q.    Yeah.

10    A.    What percent of what number?  The total number we're seeing

11    here?

12    Q.    No.  I thought you just said for the pharmacy medical cost,

13    rebate maximization was a part of that.  I'm just asking you

14    what percentage of it is?

15    A.    Applied to what?  I'm not following your question.

16    Q.    Let me move on.  And you found cognizable rebate

17    maximization efficiencies in pharmaceuticals.  Right?

18    A.    I did.

19    Q.    Now, sir, did you try and find out from Deloitte what their

20    concerns were?

21    A.    I did not personally speak with Deloitte, but I know my

22    team had at least a conversation with Deloitte where they

23    explained that they thought they needed to do more work.

24    Q.    Right.  Because they did not think that enough had been

25    done to verify the rebate maximization savings.

```
1    A.    As I said, you keep specifying the rebate maximization.  My
2    understanding is Deloitte in general thought they needed to do
3    more work, because notice under pharmacy, there's also a
4    category of network which would be the pharmaceutical delivery
5    side of the network, and that's what primarily Deloitte was
6    responsible for, and there too they thought they needed to do
7    more work.
8    Q.    Okay.  What did Deloitte tell your team were its concerns?
9    A.    I think one of the things they said -- there's just a
10   general category of more work.  One of the concerns they
11   expressed, we would like to do a more longitudinal analysis,
12   whatever that meant.  I interpreted that and I think the team
13   interpreted that to mean some kind of analysis over time.
14   Q.    Your team interpreted that?  Did they consider asking
15   Deloitte what they meant by that?
16   A.    They asked, and this is my -- based on my conversation with
17   my team, that's my understanding of what longitudinal means.
18   Q.    Okay.  And despite Deloitte's concerns, you have verified
19   and found cognizable the savings.  Did you not think it would be
20   important to really understand what their concerns were before
21   telling this Court that they were verified and cognizable?
22   A.    Well, apart from these couple of terms I just related, it
23   wasn't clear exactly what they were planning to do, at least
24   based on my conversation with the team.  And when I spoke with
25   Aetna's personnel from -- some of them from IMO finance or the
```

1    relevant functional teams, it's not clear that -- I don't

2    remember specifically discussing with them their understanding

3    of what Deloitte wanted to do, but what I do recall discussing

4    with them is they didn't think that Deloitte extending its

5    analysis would add any clarity or reliability to what they'd

6    already proposed.

7        And the bulk of my discussion would have focused on this

8    network part which Deloitte was primarily responsible for.  I'm

9    aware they did do some work around the rebates, but PSG was the

10   clean room consultant whose analysis was adopted whose analysis

11   I tested.

12   Q.   So I just want to make sure, you then are aware that

13   Deloitte did work on the rebate maximization pharmacy savings.

14   A.   I think I said that earlier.  If not, I should clarify it.

15   Yes, I am aware they did do some work, but what I said earlier

16   is I didn't examine any of that in great detail.

17   Q.   So let me ask you, and I just want to understand what you

18   did.  Your team is reporting to you that, what, Deloitte was

19   unclear on what they wanted to do?

20   A.   Okay.  It would have been a fairly iterative process.  But

21   the team had a conversation with Deloitte.  Like I said, the

22   mitigating factor would have been to better understand some of

23   this network maximization analysis.  As part of that

24   conversation or more than one conversation, when the team and I

25   spoke next or a couple of times, my understanding is Deloitte

generally thought they needed to do more work.  And the team

independently, and I when we spoke to Aetna said they thought

Deloitte was done, that more work wouldn't necessarily add

anything, as I said, to the clarity or the reliability of the

analysis.

Q.   So just so I have the characters straight, Deloitte thought

more work was needed, Aetna said, no, it's not.  And you went

with Aetna?

A.   That's not a fair characterization.  What I said was I set

aside, therefore, any analysis based solely on Deloitte's

estimates because I did not parse through whether and how they

needed to do more work, and I in some cases, Aetna had

alternative estimates, and I simply didn't get comfortable

enough to know which of those two estimates should be used here,

or whether it should be a portion of either of those two

estimates.  So in the interest of caution, I set aside the whole

category in this area as not cognizable.

Q.   But it's not true that you set aside the whole area as not

cognizable.  You found the rebate maximization savings to be

cognizable.

A.   Because I had independent analysis by PSG with input from

Aetna.

Q.   Now, I know you're an economist, so they talk about

incentives.  But do you think it's a good way to judge to say

Aetna and Deloitte have a disagreement, as long as Aetna can

1    find another consultant, that will be sufficient?

2    A.   Depends on the quality of this other consultant's work.  I

3    got the underlying data.  As I described, I was able to

4    understand and confirm to myself that what they were estimating

5    was merger-specific, and I was able to verify it.  So to me,

6    that seemed a reliable analysis.

7    Q.   Okay.  So Deloitte is a large, well-respected consulting

8    firm.  Aren't they?

9    A.   As are PSG, as is BCG, yes.

10   Q.   Is it your testimony that they could not convey to your

11   team what it is they wanted to do, they were just saying we want

12   to do more?

13   A.   I've told you my understanding of their concern.  If there

14   were other concerns they could or could not convey, I couldn't

15   testify to that.

16   Q.   Well, if you understood their concern was to do a

17   longitudinal study, did you do one?

18   A.   I did not do a longitudinal study.

19   Q.   And can you explain why you didn't?

20   A.   Well, I can speak in the context of what we did analyze.

21   So, for example, going back to the rebate area that you wanted

22   to discuss, the basis or the baseline was set on the quarter for

23   2015 spend, and the structure of the formularies as they were in

24   2015 at that time.

25        The question becomes, is that an appropriate enough

baseline going forward.  So in that context, when we looked at

the quarterly financial information for the companies, and when

we discussed and I looked for information about whether there

is, say, seasonality in the usage of the therapy classes that

were being analyzed here -- and not all the therapy classes are

analyzed, the top 10 or so -- is there any seasonality?  Is

there any reason to think that fourth quarter numbers come in

higher or lower than the rest of the year such that scaling of

the fourth quarter would be an inappropriate baseline.  I didn't

find any evidence to contradict or not be comfortable with using

a fourth quarter 2015 as a starting point.

Q.    Sir, you were retained to work upon this matter a few

months ago?

A.    I think around June or July of this year, 2016.

Q.    And -- well, this case was filed towards the end of July.

Do you recall whether it had been filed before you were

retained?

A.    I think we discussed this in my deposition, and I didn't

recall the exact dates then, my retention versus when the case

was filed, and I frankly didn't go back and check the dates

again.

Q.    And you learned that another financial economist had been

retained earlier to study the efficiencies from the proposed

transaction?

A.    I was aware that Professor Zmijewski had previously done

1    some work, and I believe written a white paper.

2    Q.   And Professor Zmijewski has testified about efficiencies in

3    several antitrust merger cases?

4    A.   I haven't counted it, so I'll take your word for it.  But I

5    believe he has testified in similar cases.

6    Q.   And he's on the faculty of the University of Chicago?

7    A.   He is, yes.

8    Q.   He's well regarded in the profession?

9    A.   He is.

10   Q.   And do you think that your analysis could have benefitted

11   from speaking with him?

12   A.   We did ask for and receive all the data that were provided

13   to Professor Zmijewski, and I really did my independent analysis

14   here, relying on data that we would have received that he also

15   had received.

16   Q.   So you, to sum it up, then, you didn't think your analysis

17   would benefit from speaking to him.

18   A.   I did my own independent analysis.

19              MR. ADLER:  Could I ask that his Exhibit 1-1 to his

20   rebuttal report be brought up again.  So this will be his --

21   Mr. Gokhale's rebuttal report, defendants' trial exhibit DX 577,

22   and it's Exhibit 1 -1, which is found at the internal page 33.

23              THE COURT:  And this version is being displayed

24   publicly?

25              MR. ADLER:  Thank you, Your Honor.

1            THE COURT:  Thank you.

2    BY MR. ADLER:

3    Q.   Now, sir, I want to direct your attention again to

4    pharmacy, to the second line, insourcing and consolidation?

5    A.   That's what I described as sourcing in general, yes.

6    Q.   And these savings depend upon a termination of a

7    contractual relationship?

8    A.   As explicitly modeled, for the run rate purpose issue, that

9    if the relationship is terminated, then that's when they will

10   achieve a run rate.

11   Q.   And that termination can't occur before 2019?

12   A.   That's my understanding as to the term of the contract.

13   Whether it can be terminated before and at what cost, I didn't

14   examine.

15   Q.   So 2020 would be the first year that the insourcing and

16   consolidation synergies could be realized?

17   A.   2020 is the year in which the company projected and the

18   analysis projects the full run rate.  So whether you could have

19   achieved a higher run rate with that contract or not before, I

20   didn't examine.  I focused on the run rate.

21   Q.   And sir, have you -- that's several years in the future.

22   Have you analyzed whether, without regard to the Humana

23   transaction, it would be in Aetna's interest to insource?

24   A.   That gets -- it's four years out.  Without knowing a

25   projection, a reliable projection of how much the additional

1   base would be relative to when they decided to outsource in the

2   first place, my understanding is when I discussed this with the

3   IMO finance team, that at least currently they weren't

4   anticipating anything would be different enough that they would

5   suddenly insource that part of the business.

6   Q.   Did you look at any data to see whether or not it would be

7   profitable for them regardless of the merger to insource

8   starting in 2020?

9   A.   There was an analysis when they outsourced it originally.

10  This is the net present value analysis that I described.  I

11  asked if there were similar analysis of whether or not to

12  insource anywhere else, and they hadn't prepared one, according

13  to the folks I spoke with at Aetna.

14  Q.   It's several years in the future, and they haven't even

15  looked into this?

16  A.   They hadn't looked into it.

17  Q.   And you're not in a position to say whether or not it would

18  be profitable for Aetna to do it with or without the transaction

19  in 2020?

20  A.   I'm sure -- I didn't follow your question.  I'm sorry.  Do

21  what with or without a transaction?

22  Q.   I'm sorry.  We're talking about insourcing.

23  A.   Okay.

24  Q.   And you yourself have not studied whether it would be

25  profitable for Aetna to insource even if the Humana transaction

1    does not go through.

2    A.    As I said, I looked back at the time when they outsourced

3    it, and to the best of my knowledge, the company hasn't

4    anticipated anything that would change that dynamic.

5    Q.    When did they outsource?

6    A.    I say in my report.  I think it was around 2010, if I

7    recall correctly.

8    Q.    And a lot of things can change in an industry in 10 years.

9    A.    Sure.

10   Q.    Now, sir, I wanted to direct your attention to your

11   rebuttal report, which is DX 577, to the internal page 9,

12   paragraph 15.

13   A.    I'm sorry.  I'm on the wrong page.

14   Q.    Oh, I'm sorry.  Paragraph 15.

15   A.    I think you're on page 6.

16   Q.    Yes.  Thank you.  So looking at paragraph 15, tell me if

17   I'm reading this right.  "Importantly, the instructions given by

18   Aetna for measuring efficiencies were the same in both

19   transactions."

20   A.    I see that.

21   Q.    And "both transactions" meaning Coventry and the proposed

22   transaction with Humana?

23   A.    Right.

24   Q.    And could you explain why it was important to you that they

25   be the same?

1  A.    Coventry is important in two respects.  One is not just

2  that it provides a benchmark to judge the level of savings.  But

3  some of the same people, the same playbook, and some of the same

4  actions that were used by Aetna in estimating and actually

5  implementing the transaction, coordinating it, and then

6  measuring the efficiencies actually achieved from the

7  transaction, in many cases some of the same people worked on the

8  Humana transaction, some of the same methodologies and actions

9  are being used to estimate the efficiencies from the Humana

10  transaction.

11  Q.    So my question was unclear, then.  I was asking why it was

12  important to you that the instructions be the same in both

13  transactions.

14  A.    That's one leg of the stool of how the estimation process

15  works, what actions were undertaken.  And as we're looking at

16  this, it's useful to know that on the right-hand side that's

17  titled "What is not a valid synergy hypothesis," it says, the

18  first bullet, savings that would occur regardless of the merger.

19  So that's how I interpret how to estimate the merger-specific

20  savings, and seems consistent that's the instruction they gave

21  both in the estimation of expected efficiencies and calculation

22  of actual efficiencies.

23  Q.    And you don't -- looking at the criteria that are in your

24  report, you think that there's not really any significant

25  difference between these instructions and your approach?

1    A.   I don't know how to characterize "significant."  But in

2    this same rebuttal report, a little later I do offer some

3    examples of the methodology and the actions that were undertaken

4    at the time of the Coventry transaction and how similar

5    methodologies and actions are being used in estimating the

6    efficiencies from the Humana transaction.

7    Q.   So is it fair to say -- let me rephrase that.  You don't

8    think that there are differences between these instructions in

9    your approach.

10   A.   Well, I'm reading what's in front of me, and this was a

11   slide included in presentations at the time of the Coventry

12   transaction, and this was a slide included at the time of the

13   Humana transaction.  So that's what I'm going by.  And in my

14   various conversations and the team's conversations, we can

15   follow through some of the methodologies, including looking at

16   the underlying data.

17   Q.   Sir, would it be -- is it fair to say that though these

18   rules may be phrased differently, you don't think there's any

19   difference in principle from your approach?

20   A.   It's a broad, hypothetical question.  As I took the time to

21   understand the methodologies being used, I only included in

22   cognizable what I thought was being estimated that would

23   actually be a merger-specific efficiency.  To that end, it's

24   when I agreed with the methodologies that I included it as

25   merger-specific.

1    Q.    I'm just trying to understand whether these instructions

2    are equivalent to your approach.

3    A.    I think you trailed off at the end there.  Can you repeat

4    your question again?

5    Q.    Yeah.  Let me try again.  Are these instructions similar to

6    your approach here?

7    A.    It's not just these instructions, but when I look at the

8    methodologies actually employed, that's where I take comfort

9    that my approach to how one would think of for estimating

10   merger-specific efficiency, the language seems consistent, and

11   when I can actually look at the math as I did and offer some

12   instances in my report, the methodologies seem consistent.

13   Q.    I guess I'm not sure, so let me try one more time.  These

14   instructions, do these comport with the approach you are taking

15   in this case?

16   A.    Maybe I can try a different answer.  What they said in

17   terms of how they thought about merger-specific efficiencies,

18   the instructions they gave to the functional teams, what they

19   did I think is quite consistent with how I approached estimation

20   of or verification of a merger-specific efficiency.

21   Q.    Okay.  Then let me ask you to turn to the fifth bullet

22   under "What is not a valid synergy hypothesis."

23   A.    Yes.

24   Q.    "Savings in non-cash items, e.g., depreciation or

25   amortization."  Did I read that correctly?

1    A.    You did.

2    Q.    And, sir, in this case did you attempt to exclude non-cash

3    savings including amortization?

4    A.    This refers to the 122 million I discussed earlier,

5    especially in that case when I read the word "amortization."

6    This is one part of the SG&E non-FTE savings which comes from

7    platform consolidation.  When I read the word "amortization,"

8    that's exactly when we went back to the company and asked, what

9    is this amortization?  And this is what I discussed in my direct

10   testimony is, it turns out it's more like an economic

11   depreciation in this case, which is, but for the merger, the

12   company would have to incur $120 million of additional expense

13   going forward that the companies will not as a result of the

14   transaction.  So, yes, the word "amortization" in this instance

15   at least was misleading.

16   Q.    Okay.  We'll break it into two parts, then, if we may.  Did

17   you tell me at your deposition that to the best of your

18   knowledge you did not include in your estimate of cognizable

19   efficiencies from the proposed transaction non-cash savings?

20   Did you tell me that or not?

21   A.    That would be consistent with what I'm testifying to now.

22   This is an estimate of what would be a cash expense, even though

23   it's termed amortization.

24   Q.    So this is to take into account future, unbudgeted costs?

25   A.    It's not unbudgeted.  If it's been recognized as

1   amortization or as I call it, economic depreciation, it's not an

2   unbudgeted cost.

3   Q.   Is it non-cash then if it's already been incurred?

4   A.   Not true.  What it could be, as I said, is sometimes you

5   can get bulky investments that are capitalized.  And if

6   amortization simply reflects spreading out that bulky investment

7   smoothly over time, then it is a cash item simply being spread

8   out over a few years, which would be the life of that

9   investment.  So in that sense, from a run rate perspective

10  especially, it's a useful number to use an annual rate instead

11  of whatever the total investment would be every so often.

12  Q.   And you did, sir, include $122 million marked as IT

13  amortization?

14  A.   For the reasons I explained, yes.

15  Q.   One of the things I wanted to briefly touch upon was what

16  you mean when you use the term "understanding," which I think

17  you've -- well, the record will reflect whether you've used it

18  and where you've used it.

19       But an understanding is not an opinion.  Right?

20  A.   You're asking me a very broad question, but in this

21  instance, the opinion I've reached is what I've expressed.

22  Q.   When you state that something is your understanding, you

23  are simply repeating what you have been told?

24  A.   Well, it depends on the context.  In at least one place in

25  my report, I know I repeat something that, as I understand,

1   without necessarily being my opinion or without relying on an

2   understanding in any way to inform my opinion.  But it depends

3   on the context.

4   Q.   Well, so, how would someone who's listened to your

5   testimony or reads your materials know, when you say

6   understanding, whether you are simply repeating what you've been

7   told or whether you are reaching an opinion, if everything

8   depends on context?

9   A.   For the most part, in -- when I'm saying I understand

10  something in the context of reaching my opinion about the

11  cognizable efficiencies, it's based on my analysis and review of

12  the documents or interviews.

13  Q.   When you say "for the most part," are you talking about all

14  the time?

15  A.   Generally in that context, "I understand" means it's based

16  on something.

17  Q.   Well, you used it in your report on the question of

18  efficiencies pass-through, did you not?

19  A.   That's true.

20  Q.   I'd like to turn to your -- Defense Exhibit 420, which is

21  your initial report, page 3 of that report, paragraph 4.

22             THE COURT:  The initial report.

23             MR. ADLER:  Yes.  I'm sorry.

24             THE WITNESS:  Paragraph 4?

25             MR. ADLER:  Yes, sir.

1      THE WITNESS:  I'm in the wrong report.  Sorry.

2      MR. ADLER:  I'm sorry.  It's up on the screen if it

3  makes it any easier for you, sir.

4      THE WITNESS:  I think I have the right one.  I can

5  just flip quickly.  Okay.  I'm with you.

6  BY MR. ADLER:

7  Q.   And tell me if I'm reading this right.  "In addition to the

8  efficiencies that are expected to accrue to Aetna (e.g., cost

9  savings and incremental revenues) -- much of which I understand

10  will be passed through to consumers in the form of pricing and

11  reinvestment, there are significant efficiencies that will flow

12  directly and in full to consumers."  Did I read that correctly?

13  A.   You did.

14  Q.   And that understanding is based on conversations with the

15  Aetna functional teams and the Integration Management Office?

16  A.   I'm trying to look.  I think I cited -- there is some

17  either deposition testimony or in the record, I'll be happy to

18  find it, that said they would pass through or -- I forget the

19  exact language.  But this is what we discussed in my deposition.

20  I wasn't offering that as an opinion.

21  Q.   Right.  That's what I'm trying to get, to flesh out so that

22  anyone who reads your material or listens to you will understand

23  how to distinguish between repeating something and offering an

24  opinion.

25  A.   Actually, the footnote's right here.  So I'm merely citing

1    to Mr. Bertolini's deposition.  "Aetna plans to invest half of

2    the achieved synergy back in the business and the other half to

3    improve affordability to Aetna's customers."  So that was the

4    basis of the statement "I understand."  As I said then, I didn't

5    analyze it independently, and I wasn't offering that as an

6    opinion.

7    Q.   Okay.  Let's turn to your deposition at 272, please, line

8    24.  And we'll see if -- what you said about Mr. Bertolini's

9    deposition.

10        "Question:  Okay.  Now, you state -- and this is what I

11   want to direct your attention specifically to -- that, quote,

12   much of the efficiencies you understand will be passed through

13   to consumers in the form of pricing and reinvestment.

14        "Answer:  I see that.

15        "Question:  What is your basis for that understanding?

16        "Answer:  I think my team's and my conversations with the

17   Aetna functional teams, the IMO, but I think we -- I am trying

18   to recall what public discussion there has been of this topic.

19   I will have to go back and look at our files, but also I am

20   thinking whether there are any internal presentations that

21   discuss the -- that there would be reinvestment and/or some of

22   it would flow directly.  But I would say for the most part it's

23   my understanding based on my conversations and on my team's

24   conversations."

25        Did I read that correctly?

1    A.    You did.

2    Q.    Is that accurate?

3    A.    Well, it's consistent with what I was saying today, I

4    think --

5              THE COURT:  The question is only whether it's

6    accurate.

7              THE WITNESS:  That is accurate, yes.

8    BY MR. ADLER:

9    Q.    And then turning to page 274, line 11.  I want to ask you

10   if this question and answer are accurate.

11        "In stating your understanding, are you just -- are you

12   simply repeating what you have been told?

13        "Answer:  Yes.  My understanding that the company may do

14   this is based on conversations with the company.  I haven't

15   independently analyzed that point or done an independent

16   analysis of."

17        And then you go on to say.  "Question:  Okay.  Okay.

18        "Answer:  So that it is different from my opinion.  This

19   is -- I am simply stating what I understand it to be."

20        So sometimes an understanding is what you repeat, and

21   sometimes it's an opinion.

22   A.    I don't agree.  I think it was, as we discussed here, it

23   was pretty clear what my understanding meant in this particular

24   context, and as I said elsewhere, I describe what my

25   understanding is based on and how it's different from this fact.

1   Q.   And, sir, you have not examined whether Aetna passed

2   through any efficiencies in the form of pricing and reinvestment

3   after its acquisition of Coventry?

4   A.   I did not.

5   Q.   I want to discuss with you the estimates you've received

6   about what was realized in Coventry.  The estimates Aetna

7   provided you for the actual efficiencies from Coventry were an

8   output from a larger calculation or data set?

9   A.   You're talking the earlier estimates, or at what point are

10  you asking me?  I generally believe that's part of their -- by

11  "larger data set," it would be part of their business records,

12  yes.

13  Q.   Okay.  Let me try that again.

14          THE COURT:  Yes, because, otherwise, we're sort of

15  reversing what's happening.  He's asking you a question that you

16  don't understand.

17      (Laughter)

18  BY MR. ADLER:

19  Q.   The estimates that Aetna provided you for actual

20  efficiencies from Coventry were an output from a larger

21  calculation or data set?

22  A.   I think that's generally fair.

23  Q.   I'm sorry?

24  A.   I think that's generally true, yes.

25  Q.   And the math by which Aetna came up with these actual

1    estimates was not obvious to you.

2    A.   Now I want to pause and see what you're reading because --

3         THE COURT:  He's reading his questions.

4    (Laughter)

5         THE WITNESS:  Maybe I don't follow your question,

6    because you're asking "actual estimates."

7    BY MR. ADLER:

8    Q.   Yes.

9    A.   They're estimates, and at least out of context, I'm not

10   following what you mean by "actual estimates."

11   Q.   So they estimated the actual efficiencies they got from the

12   Coventry transaction, and it came as part of, as I think you've

13   testified, an output from a larger calculation or data set.  And

14   now I'm asking about the math by which those estimates were

15   produced.

16   A.   So just to clarify, you're asking me after the transaction,

17   when Aetna has, for example, the $1 billion number we discussed,

18   whether that's part of output from a larger data set?

19   Q.   I'm really only asking you about what you were provided by

20   Aetna on actual efficiencies.

21        THE COURT:  From the Coventry transaction?

22        MR. ADLER:  Yes.

23        THE WITNESS:  Now that you've dropped the "actual

24   estimates," yes.  My understanding is the document I rely on is

25   indeed output from some larger data set, because what I have is

1   a simpler spreadsheet, which by category and functional team

2   tells me the billion dollars and where they come from.

3   BY MR. ADLER:

4   Q.   Right.  And the math by which these numbers were derived

5   for you, it just was not obvious to you.

6   A.   I told you I didn't verify it, and I discussed with the

7   company whether it was their estimate -- I've fallen into trap

8   now -- whether it was their calculation of the actual

9   efficiencies realized.

10  Q.   Okay.  Sir, was the math by which they derived these

11  numbers for you obvious to you or not obvious to you?

12  A.   Obvious isn't a technical term, but I did not ask for or

13  see the actual detail behind that calculation.  So in that

14  sense, I didn't follow it back.

15  Q.   Did you tell me at your deposition that the math was not

16  obvious to you?

17  A.   In the sense I am describing now, yeah.

18  Q.   And your expert opinion about those numbers they provided

19  you is that you have no basis to disagree with them.

20  A.   Given the rest of my analysis and understanding about the

21  methodologies they used, I have no disagreement with those

22  numbers.

23  Q.   But that's where you are.  It's not that you have told us

24  that you think they're right; you just have no basis to disagree

25  with them.

1   A.    As in I believe this is their best estimate as they've

2   explained it to me.

3   Q.    Would this be an understanding, then?

4   A.    In the sense that there's some basis to it, yes, that I

5   have specifically asked questions about whether the 1 billion is

6   a reflection of the actual efficiencies they are recognizing,

7   and as I said earlier, I take comfort from the fact that they've

8   discussed this internally at their, I think at a national

9   meeting, and that they actually attached to it an SEC document,

10  so there's some external message at least based on that 1.1

11  billion.

12  Q.    And, sir, is it fair to say you just took at face value

13  Aetna's estimate of the amount of savings from the Coventry

14  acquisition?

15  A.    I accepted their 1.1 billion for what I'm doing with it,

16  yes.

17  Q.    And you just accepted the number at face value?

18  A.    That's fair.

19          MR. ADLER:  Your Honor, may I have a moment to confer

20  with my colleagues?

21          THE COURT:  Certainly.

22      (Counsel conferring.)

23          MR. ADLER:  Your Honor, we would pass the witness to

24  defendants.

25          THE COURT:  All right.  Mr. Shumaker.

REDIRECT EXAMINATION

BY MR. SHUMAKER:

Q.   Mr. Gokhale, what records did you rely upon in conducting your efficiencies analysis in this case?

A.   Pretty much the entire documentation we received.

Q.   And where did they come from?

A.   Well, a lot of it we received through the attorneys, but the sources of those are various.  Aetna, Humana, the third-party consultants and so on.

Q.   Why did you rely upon those documents?

A.   Because they were generated from the normal business course information that would be saved by either company.

Q.   And why does that give you comfort that they're reliable?

A.   Because this is the information that would be used in other contexts, whether it's management, financial reports, whether ultimately it feeds up to the audited financial statements of the company.  So it's the same information going different places.

Q.   The consultants that you relied upon, why did you place reliance in them?

A.   They're generally subject matter experts in their field, they have experience.  In the case of PSG, they've actually examined and successfully achieved similar calculations and savings before.

Q.   Did you just accept their judgment?

1   A.   No.   In each case I started with asking whether the

2   efficiency as estimated is consistent with how I would approach

3   the calculation of a merger-specific efficiency and/or whether

4   it would be cognizable.

5   Q.   Did you test the information you received from them in any

6   way?

7   A.   In the ways I described, and we turned over some of this as

8   backup to my report, but we took the starting points, we --

9   having understood their methodologies, we replicated them.  Like

10  I said, first point was to ask whether their methodology was

11  designed to estimate merger-specific efficiencies, and second

12  point was to make sure that they actually -- the math that they

13  did and we did, did what the methodology was supposed to do.

14  Q.   Is the approach that you took in this case any different

15  from the prior efficiencies work you have done?

16  A.   No.   It's the same approach.

17  Q.   Same approach as you used with respect to the FTC

18  representation that you had?

19  A.   That's correct.

20  Q.   As you look back on what you relied upon, and the reliance

21  on the clean room consultants, what concerns do you have about

22  the basis for your conclusions?

23  A.   The whole point of my analysis and interviewing people and

24  replicating their analysis was to allay my concerns.  So my

25  opinion, as I express it, is my opinion.  I don't have concerns

1    about the way I've expressed my opinion.

2    Q.    Okay.  Counsel asked you about prior work by a

3    Dr. Zmijewski.  Do you recall that?

4    A.    I do.

5    Q.    Why did you do your own independent analysis?

6    A.    Because it was different from relying on the subject matter

7    experts in the clean room analyses.  This way, using the same

8    data, I really wanted to do an independent analysis.

9    Q.    Okay.  Can I direct you, sir, to your binder, Exhibit 256.

10   A.    I see it.

11   Q.    Can you explain what we're looking at here, sir?  It's been

12   preadmitted.

13   A.    This is a printout of one of the Excel spreadsheets that

14   was in the record that we analyzed.  And in particular, this is

15   the concurrent review analysis, and it's on the -- I guess the

16   second page, that's at 002, it lays out a description of the

17   general methodology.  But importantly, in the rest of this

18   presentation on a state-by-state basis, and you see on all three

19   there's a summary of the build-up, but each of those numbers

20   flows from something underneath, which is a calculation, and a

21   calculation that we can and one can take a calculator and follow

22   through to understand exactly what's being estimated.

23            MR. ADLER:  Your Honor, I'm going to object.  This

24   doesn't seem appropriate redirect.

25            THE COURT:  I'm a little bit concerned, Mr. Shumaker.

1    At a minimum, I'm going to let them examine on this document

2    since this seems to be going beyond what would appropriately be

3    redirect examination.

4              MR. SHUMAKER:  I understand.

5              THE COURT:  And indeed, I don't want you to go beyond

6    it.

7              MR. SHUMAKER:  Understood, Your Honor.  I think you'll

8    see where I'm going here.

9    BY MR. SHUMAKER:

10   Q.   There's a lot of numbers and data here in this report,

11   Mr. Gokhale.  Did you undertake any effort to check these

12   numbers?

13   A.   We did, in the way I described earlier.  We started with

14   the opportunity and worked our way up to the final

15   determination.

16   Q.   Why did you not simply accept the numbers?

17   A.   Because I wanted to do my independent analysis, and in

18   offering an opinion, be comfortable that indeed what I was

19   offering was merger-specific, verified, and cognizable

20   efficiencies.

21   Q.   We had some testimony about the run rate synergies,

22   Mr. Gokhale.  Why were run rate synergies calculated as of 2020?

23   A.   There are in many instances actions that would already be

24   undertaken, but simply to get the full effect of those actions,

25   it would be until 2020.  There was, for example, IT platform.

1    It takes a couple of years to sometimes actually consolidate

2    platforms and realize the efficiencies.

3    Q.   What about the prior years?

4    A.   There is a template again that shows -- it's in the back of

5    documents I've referred to -- that shows the ramp-up, or they

6    have some other term for it.  I think they call it slope.  But

7    it does show on an annual basis after the transaction closes

8    what that actual dollar amount will be in each year until 2020.

9    Q.   Do you know the basis for the number for the year being

10   2020?

11   A.   It's the year by which the companies expect they'll achieve

12   that full run rate.

13   Q.   Mr. Gokhale, you heard a number of questions from counsel.

14   Do any of those questions change your opinion in this case?

15   A.   They do not.

16   Q.   And do you still stand by the amount that you have

17   calculated for the amount of cognizable efficiencies that will

18   flow from this transaction?

19   A.   I do.

20           MR. SHUMAKER:  I have nothing further, Your Honor.

21           THE COURT:  All right.  I have a couple questions.

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  Let's turn to DX 577, the Exhibit 1-1,

24   which is on page 33.  And if we put it up, you can redact out --

25   make sure it's the version that has that column redacted out.

1      What's the first numerical column on this, the total there

2  that winds up being $3,120,000,000 approximately?  What does

3  that represent?

4              THE WITNESS:  That, as I described earlier, Your

5  Honor, the -- Aetna's submission 4, this is their estimate --

6              THE COURT:  That's their estimate of the efficiencies?

7              THE WITNESS:  It's an accumulation of all the work.

8  So it's simply a reporting.

9              THE COURT:  It's their estimate of the efficiencies?

10              THE WITNESS:  "Their" as in Aetna, and yes, the

11  collective work of their consultants.  But that's the starting

12  point, and that's before any adjustments --

13              THE COURT:  That's what they estimated using the

14  criteria that you've referred to and that we've seen were the

15  same as with Coventry.  That's what they came up with as an

16  estimate of the efficiencies.  Correct?  Over $3 billion?

17              THE WITNESS:  Yes.  That's what you would see in their

18  latest submission.

19              THE COURT:  And your calculation, once you looked at

20  it, is, in the cognizable column, of a little over $2 billion.

21              THE WITNESS:  That's correct, Your Honor.

22              THE COURT:  Reduced by about one third.  Correct?

23              THE WITNESS:  That's correct.

24              THE COURT:  Now, they used the same criteria for

25  coming up with these estimates as they used for coming up with

1    the actual estimate for Coventry.  Correct?

2              THE WITNESS:  Where applicable, yes.  I want to make a

3    caveat.

4              THE COURT:  I think we already referred to the chart

5    and your testimony with respect to that chart, and I think there

6    was an initial sentence that said it was the same criteria.

7              THE WITNESS:  I apologize.  I think I was anticipating

8    the next question, but --

9              THE COURT:  That's dangerous.  But let's now turn to

10   your Demonstrative Exhibit 13, which is a comparison of

11   efficiencies with respect to Coventry and Humana.

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  So what you're comparing there is, with

14   Humana, your calculation of the efficiencies, which is only

15   two-thirds of what Aetna calculated it to be, with Aetna's

16   calculation of the Coventry efficiencies.  Correct?

17             THE WITNESS:  That's correct, Your Honor.

18             THE COURT:  So if you reduced the Coventry

19   efficiencies by that same one third, since they used the same

20   criteria, this chart would be much different, wouldn't it?

21             THE WITNESS:  Literally, if you reduced it by one

22   third, the 1.2 would go down to .8 percent --

23             THE COURT:  And the percentages would be much less in

24   terms of the efficiencies of baseline.  Right?

25             THE WITNESS:  That's what I was trying to do some

1    mental math, Your Honor.

2              THE COURT:  I don't want to know what they are

3    exactly.  But they'd be much less, wouldn't they?

4              THE WITNESS:  They would be lower than what's reported

5    under the Coventry column, but nevertheless still comparable, I

6    think, to my estimate of what's cognizable.

7              THE COURT:  Well, if you used a reduced by a third,

8    they'd be comparable, but they'd be much less.

9              THE WITNESS:  Much less than what's reported here.

10   That's correct.

11             THE COURT:  And you also testified that you did the

12   comparison based on these three items, SG&A, FTE, et cetera, but

13   you didn't do a comparison with respect to any of the pharmacy

14   items.  Correct?

15             THE WITNESS:  That's what I was going to try out

16   earlier, Your Honor.  But that's correct.

17             THE COURT:  Why did you not do that comparison?

18             THE WITNESS:  It turns out in Coventry, they didn't

19   really forecast or extract any meaningful amount of efficiencies

20   in that area.  That's why it would be a little bit of an unfair

21   comparison, because the cognizable number on the right, the 2

22   billion, does include about 340 million from the pharmacy

23   bucket.

24        In Coventry, they didn't focus on that, and they didn't

25   really achieve much of cognizable efficiencies in that pharmacy

1    area.

2              THE COURT:  So it wouldn't have been a very accurate

3    or favorable comparison in terms of percentage.

4              THE WITNESS:  Well, actually, if you went back and

5    assumed there's some same degree of pharmacy that was actually

6    available in Coventry, then the number would be bigger in

7    Coventry.

8              THE COURT:  But that would be an assumption that isn't

9    borne out by --

10             THE WITNESS:  Yes.  That's why I didn't make one.

11   You're right.

12             THE COURT:  All right.  Both sides can follow up on my

13   questioning.  When I do questioning, I give you the opportunity

14   to follow up on it.  Mr. Shumaker?

15             MR. SHUMAKER:  One question, Your Honor.

16             THE COURT:  Go ahead.

17   BY MR. SHUMAKER:

18   Q.   Mr. Gokhale, the figures that you're looking at on

19   Demonstrative 13, what significance is it that you're comparing

20   the estimate as compared to the actuals in Coventry?

21   A.   It's a benchmark that gives me some comfort that if I

22   thought about the level of efficiencies I find cognizable here,

23   whether you simply compare the levels here or if you reduced

24   them as Your Honor suggested, I get comfort that in this

25   transaction the levels aren't being overstated.

1          MR. SHUMAKER:  Thank you.

2          THE COURT:  Mr. Adler?

3          MR. ADLER:  No questions, Your Honor.

4          THE COURT:  All right.  Thank you very much,

5     Mr. Gokhale.  We appreciate your coming and your work in this

6     case.  You may step down.

7          THE WITNESS:  Thank you, Your Honor.

8        (The witness steps down.)

9          THE COURT:  All right.  We should take our lunch break

10    before we begin with the next witness.  So we'll be back at

11    1:47.  See you then.

12        (Lunch recess taken at 12:47 p.m.)

*  *  *  *  *  *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.


_Bryan A Wayne_
BRYAN A. WAYNE