2997

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4    UNITED STATES OF AMERICA,        :
     et al.,                          :
5                                     :
                  Plaintiffs,         :   CA No. 16-1494 (JDB)
6                                     :
        v.                            :
7                                     :   DAY 11
     AETNA, INC., et al.,             :   P.M. SESSION
8                                     :

9              Defendants.     :

10            TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE JOHN D. BATES
11            UNITED STATES DISTRICT JUDGE

12            Monday, December 19, 2016

13   APPEARANCES:

14     For Plaintiffs:        CRAIG W. CONRATH, ESQ.
                              RYAN M. KANTOR, ESQ.
15                            ERIC J. MAHR, ESQ.
                    JUSTIN HEIPP, ESQ.
16                            PETER MUCCHETTI, ESQ.
                              ERIC D. WELSH, ESQ.
17            U.S. Department of
                              Justice
18                            Antitrust Division
                              450 Fifth Street, NW
19                            Washington, D.C. 20530

20

21   State of Iowa:          LAYNE M. LINDEBAK, ESQ.

22

     State of Pennsylvania:   JAMES A. DONAHUE, III, ESQ.
23

24

25

```
                                                              2998
 1      For Defendants:

 2      AETNA, INC,:      JOHN M. MAJORAS, ESQ.
                          GEOFFREY S. IRWIN, ESQ.
 3              PAULA RENDER, ESQ.
                          CHRISTOPHER N. THATCH, ESQ.
 4                        Jones Day
                          51 Louisiana Ave., NW
 5                        Washington, D.C.  20001

 6       HUMANA, INC.,:   KENT A. GARDINER, ESQ.
                          SHARI ROSS LAHLOU, ESQ..
 7          DAVID M. SCHNORRENBERG, ESQ.
                          CROWELL & MORING, LLP
 8                        1001 Pennsylvania Avenue, NW
                          Washington, D.C. 2000

 9

10      Proceedings reported by machine shorthand, transcript

11      produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2999

1                    P R O C E E D I N G S

2

3          THE COURT:  All right.  Good afternoon.

4          MR. MAJORAS:  Good afternoon, Your Honor.

5          THE COURT:  Mr. Majoras.

6          MR. MAJORAS:  **The defendants call Mr. Jonathan**

7   **Orszag.**

8                *********************

9            J O N A T H A N    O R S Z A G,

10  Having been called as a witness on behalf of the Defense

11  and having been first duly sworn by the Deputy Clerk,

12  was examined and testified as follows:

13          THE COURT:  Good afternoon, Mr. Orszag.

14          THE WITNESS:  Good afternoon, Your Honor.

15          THE COURT:  Mr. Majoras?

16          MR. MAJORAS:  Thank you, Your Honor.

17                  DIRECT EXAMINATION

18  BY MR. MAJORAS:

19      Q.    Mr. Orszag, would you please introduce

20  yourself to the Court.

21      A.    My name is Jonathan Orszag.  I'm a senior

22  managing director at Compass Lexecon, an economic

23  consulting firm.  I also was a founder of the firm, and

24  on the firm's executive committee.

25      Q.    Would you describe your educational

3000

1   background.

2          A.     Sure.  I received my undergraduate degree

3   in economics from Princeton University, and then I

4   received a Marshall Scholarship to attend Oxford

5   University where I received a master's of science.

6          Q.     What is a Marshall Scholarship?

7          A.     After the World War II, as a thank you to

8   the American people, the British government said they'd

9   fund I believe it's 32 Americans to travel to England to

10  get their graduate education.

11         Q.     What was your degree from Princeton

12  focused on?

13         A.     Economics.

14         Q.     And how about your master's from Oxford?

15         A.     It was economics and history.

16         Q.     Could you share with us some of the

17  educational highlights, particularly of earning your

18  master's degree from Oxford relating to economics.

19         A.     Part of my studies -- I'd sort of take

20  the whole period because, when I was an undergraduate, I

21  took many graduate classes.  I actually served as a

22  teaching assistant for one of the leading

23  econometricians at Princeton as an undergraduate, which

24  is usually reserved for graduate students.

25         So I was a research assistant for Alan Krueger,

1    who is a leading labor economist, and I worked for him

2    for many years.  And so all of that was part of my

3    educational experience, both undergraduate and then in

4    graduate school.

5         Q.    And in terms of your economics work at

6    Oxford, did you have a focus?

7         A.    I studied a variety of things involving

8    labor economics.  Applied microeconomics was my focus.

9         Q.    What is applied microeconomics?

10        A.    It's the study of the firm.  Study of

11   industries is the area that I focused in on even more.

12   And so I take a pretty broad interest in economics.

13        When I went to Oxford, I was very focused on

14   policy issues in particular.  I had spent time in the

15   federal government prior to that, and I knew I was going

16   back to work in the federal government.  And so I like

17   the application of economics to real-world situations.

18   And so that was a focus of my research and my work when

19   I was in school.

20        Q.    Once you completed your work toward your

21   master's degree, did you then study for a Ph.D.?

22        A.    No, I did not.

23        Q.    What did you do instead?

24        A.    Well, I had previously been asked to come

25   back to serve at the White House on the president's

3002

1    National Economic Council.

2         Q.    What time was that?  What year?

3         A.    This was in 1996.

4         Q.    I'm sorry to interrupt.  Please go ahead.

5         A.    So I had this opportunity and, as a young

6    person, it was a very difficult choice for me.  I had

7    come from a family of academics.  My father was a

8    professor of mathematics.  So I grew up with a PDP-11 in

9    my basement, which is a big computer.  And my oldest

10   brother was an academic.

11        So my father was pushing me very much to stay in

12   academics, but my heart and my passion was policy.  And

13   so I really wanted to go back to Washington.  And I had

14   this terrific opportunity to return to the National

15   Economic Council and work with some absolutely brilliant

16   economists.

17        So had previously, when I was in government,

18   worked with Alan Krueger, who had brought me to the

19   government; Joe Stiglitz, who won the Nobel Prize in

20   economics, and Joe and I have written a number of papers

21   together; Larry Summers, who is absolutely brilliant,

22   has a very big brain; Janet Yellen, who's currently the

23   chair of the Federal Reserve.

24        They were all economists in the administration

25   at that time.  And as a young staff person, I could work

3003

1    directly with them and learn from them.  So it was an

2    amazing educational experience.

3         Q.    Could you give us just a bit of a

4    background.

5         What is the National Economic Council?

6         A.    Sure.  It was created in 1993 by

7    President Clinton to coordinate economic policy

8    throughout the government.  And so it sits on top of all

9    of the economic agencies.  So the Department of

10   Treasury, the Counsel of Economic Advisers, the

11   Department of Commerce, the Office of Management and

12   Budget.  And it was responsible for coordinating policy

13   and providing the president unbiased guidance about what

14   was the best course of action.

15        Q.    So once you joined the National Economic

16   Council, how long were you engaged with that?

17        A.    So I started at the National Economic

18   Council at the end of 1995.  I was there through 1996.

19   I then left.  I then came back in 1997, and I was in

20   government through 2000.

21        My last job in government was -- I was asked to

22   run the policy department at the Department of Commerce.

23   And so that was the last job I had in government was the

24   director of the Office of Strategic Planning, which is

25   the secretary's seniormost policy position.

3004

1        Q.      And how does that relate to your economic

2   studies and work?

3        A.      When you're in charge of the policy

4   unit -- the Commerce Department has all of the economic

5   statistics agencies except for the Bureau of Labor

6   Statistics.  So it's responsible for the decennial

7   census, for example, economic growth statistics,

8   et cetera.  I spent a lot of time involved in

9   telecommunications issues, innovation issues, et cetera.

10        Q.      What was the total amount of time you

11   spent with the government?

12        A.      Almost six years.

13        Q.      While you were with the government in

14   that six years of service, did you have any involvement

15   with Medicare issues?

16        A.      Yes, I did.

17        Q.      Could you tell us about that?

18        A.      When I started in government, when Alan

19   Krueger brought me to government, I was actually right

20   next door at the Department of Labor.  And the Secretary

21   of Labor -- I was in the Office of the Chief Economist

22   there.

23        The Secretary of Labor is a trustee of Medicare.

24   And unbeknownst to me, when I was a young staff person,

25   no one at the Department of Labor really had that much

3005

1    experience with Medicare.  And so it had been tasked to

2    me to prepare the secretary's testimony for Congress in

3    June of 1995.

4          So I spent a couple months learning everything I

5    could about Medicare, and it was a different program

6    somewhat back then.  And there were funding issues.  And

7    so I spent my time learning as much as I could, and I

8    was the principal author of the secretary's testimony.

9          Q.    The testimony related to Medicare?

10         A.    Related to Medicare before Congress.

11         Q.    So once you ended your government

12   service, have you remained involved in policy issues?

13         A.    Yes, I have.

14         Q.    In what way?

15         A.    In several ways.  I'd probably focus on

16   three.  First, I've been a fellow at -- or senior fellow

17   at a think tank here in Washington, D.C., at various

18   times over the last 15 years.

19         Second, Candidate Obama, then candidate Obama,

20   in 2008, asked me to serve on a very small, I think it

21   was, eight or nine people pretransition economic team

22   responsible for preparing the transition team, if he

23   were to win, on economic issues.  So I served in that

24   role.

25         I was actually responsible for auto-related

 1    issues.  So I handed off my work to that team that

 2    worked on the auto bailout issues when they assumed

 3    office.

 4          The third way is I've continued to advise

 5    President Clinton on development issues in particular in

 6    Africa.  And I've traveled with him to Africa, to East

 7    Africa, South Africa on those development-related

 8    issues.

 9          Q.    So backing up a bit to about 2000, is

10    that when you left your government service?

11          A.    That is correct, sir.

12          Q.    By that, I mean your government

13    employment.

14          A.    That is correct.

15          Q.    What did you do after that?

16          A.    I started the predecessor firm to Compass

17    Lexecon.

18          Q.    And that is -- currently, you're the

19    senior managing director of Compass Lexecon?

20          A.    That is correct.

21          Q.    Talk to us about your experience both

22    with the predecessor company and currently at Compass

23    Lexecon.

24          A.    I folded the -- the original firm my

25    brother and I started, I folded it into Compass Lexecon.

3007

1    So it's one and the same.  We have focused on what I'd

2    call interesting economic issues, applied

3    microeconomics.  And I've had a speciality in mergers

4    over that time period.

5              Q.    Give us a sense of how large Compass

6    Lexecon is today.

7              A.    We have about 420 employees.

8              Q.    And I'd like to focus just on your

9    consulting work now since you've been at Compass

10   Lexecon.

11             Could you please describe the types of matters

12   that you have found yourself involved in.

13             A.    As I said, I find myself involved in many

14   different economic issues.  My main focus has been

15   mergers.

16             So since I started this, I've probably have

17   worked on well more than 100 mergers.  I stopped

18   counting actually at 100.  We're probably at about 150

19   or more at this point.

20             Q.    Is that always in a litigation context?

21             A.    It's very rarely in the litigation

22   context.  It's mostly in -- an advisory role is --

23   probably takes the vast majority of those situations.

24             Q.    How would you describe the fields of work

25   that your consulting work has focused on?

1          A.       Applied microeconomics, industrial

2    organization.  And I would say antitrust economics is a

3    simpler way of saying industrial organization.  That's

4    the industrial organization's more technical term, I'd

5    say.

6          Q.       You described for us earlier a bit about

7    applied microeconomics.

8          What's your description of the latter two, the

9    industrial organization and antitrust economics?

10         A.       It's a subset of applied microeconomics.

11   It's the theory of the firm, the study of industries.

12   And so it's, in essence, what we're here to study today,

13   conduct of firms as they merge, conducts of firms as

14   they enter into contracts, et cetera.

15         Q.       Now, have you authored any publications

16   on these topics?

17         A.       Yes, I have.

18         Q.       I know they're in the exhibit -- I'm

19   sorry -- Appendix B to your report.  I was wrong.

20   Appendix A to your report.

21         But could you just describe generally the types

22   of publications you've authored.

23         A.       Given the variety of interest that I take

24   in economics, the publications I've had are various as

25   well.  I've done everything from the economics of

1    college sports to the consumer benefits of broadband to

2    issues related to patent settlements.

3            Q.    Are you involved in any professional

4    economic societies?

5            A.    Yes, I am.

6            Q.    Which ones?

7            A.    I'm a member of the American Economic

8    Association, the American Finance Association, and the

9    Econometric Society.

10           Q.    Have you received any rewards related to

11   your work?

12           THE COURT:  I'm assuming he's gotten some

13   rewards.

14           THE WITNESS:  Those are mouths that you have

15   to feed.

16   BY MR. MAJORAS:

17           Q.    Let me make sure we're clear.

18           Have you received any awards for your work,

19   sir?

20           A.    Yes, I have.

21           Q.    Please tell us about those.

22           A.    Can I have my mom testify?

23           So when I was in government, I received an award

24   for expanding economic opportunity in America for

25   efforts, for a bill that I helped design and then get

3010

1    passed helping to increase savings.  And it was a

2    specific policy related to savings.  So I won that

3    award.

4        In the late 1990s when I was younger than I am

5    today, I won various awards for being a top young

6    competition economist.  And the most -- this year, I was

7    named as one of the top ten most highly regarded

8    competition economists in a survey of lawyers and

9    economists.

10        Q.    Let's turn now to the work that you've

11   done on disputes and in litigation.

12        How many matters have you worked on that were

13   either in litigation or anticipated litigation?

14        A.    With the caveat that I'm not sure how I

15   answer anticipated litigation because, as an economist,

16   I don't necessarily have full insight, what I'd say is,

17   if you include testifying, I would say it's probably a

18   dozen to a dozen and a half matters that I've testified

19   in court.

20        Q.    And let's back up a little bit from

21   testifying.

22        Have you also been involved in matters where

23   you submitted expert reports but never ended up

24   testifying?

25        A.    For sure, because many cases end up

3011

1    settling.  So I'd probably double that number, but I've

2    never counted it that way.

3         Q.     And how many times have you been accepted

4    by a court or tribunal as an expert in economics.

5         A.     I've never been rejected as an expert in

6    economics or econometrics on that metric.

7         Q.     So that would take us back to the dozen

8    or so that ended up in litigation?

9         A.     That is correct.

10        Q.     Of those, when you have testified, how

11   often has the subject of your testimony related to

12   merger work and the types of issues you've addressed

13   here?

14        A.     If I take a broad view of antitrust

15   economics or applied microeconomics, basically every

16   single time.

17        Q.     Have you ever testified before Congress

18   or other governmental bodies?

19        A.     Yes, sir.

20        Q.     Which ones?

21        A.     In front of Congress, in front of the

22   Federal Communications Commission, in front of the

23   European Court of First Instance, which is always a very

24   interesting experience because there are 13 judges and

25   no real cross-examination except from the judges.  I've

3012

1   been in front of foreign tribunals and other regulatory

2   authorities.

3        Q.    Have you ever been barred in whole from

4   testifying before a court?

5        A.    Not in whole.

6        Q.    How about in part?

7        A.    One time.

8        Q.    Please describe that.

9        A.    Judge Cote, in the Apple matter, accepted

10  all of my econometric analyses, and then there were

11  analyses in another relevant market that she rejected,

12  as I understand it -- I'm not a lawyer -- as a matter of

13  law.  And then she criticized those analyses as well.

14       Q.    But you were accepted at least for what

15  part?

16       A.    For all my econometric work.

17       Q.    And even after that case, you have since

18  been accepted again as a qualified expert in economics?

19       A.    In this courthouse, yes, sir.

20       Q.    Please describe that for us.

21       A.    I testified last year in the

22  GE-Electrolux merger matter where the government had

23  sought to block that merger.  And I was the economic

24  expert for the merging parties.

25            MR. MAJORAS:  Your Honor, at this time, the

3013

1    defendants move that Mr. Orszag be qualified as an

2    expert in the field of an applied microeconomics,

3    industrial organization, and antitrust economics.

4           MR. CONRATH:  No objection.

5           THE COURT:  Without objection, we will admit

6    Mr. Orszag and receive his testimony in the field or

7    fields of applied microeconomics, industrial

8    organization, and antitrust economics.  I assume there's

9    some overlap, as he's described it, between those.  But

10   we welcome him and will receive the testimony.

11          MR. MAJORAS:  Thank you, Your Honor.

12   BY MR. MAJORAS:

13          Q.    And, Mr. Orszag, if there are particular

14   aspects about your opinions that one of those fields is

15   more relevant than another's, please explain that to us.

16          How did you first get involved in looking at

17   the Aetna-Humana merger?

18          A.    I received a phone call from counsel for

19   Aetna right around the time that the merger was either

20   signed or within a week or two either direction.

21          Q.    And let's draw a line between the period

22   you just described and when litigation was filed.

23          Would you briefly describe the work that you

24   did as a consultant.

25          A.    Well, the first thing, I do what I always

1    do.  I want to understand the rationale behind the

2    transaction.  I want to review the academic literature.

3    I want to review third-party reports, government

4    reports.  And then I want -- as an economist, I'd like

5    to get access to data.

6          And the applied part of the microeconomics is --

7    a real focus of mine is data analysis, what do the data

8    show.  So the first thing I did in the context of my

9    work is really seeking data to then go analyze that

10   data.

11         Q.    And as you moved forward in the work that

12   you had done, when it eventually turned into litigation,

13   you began working on the case?

14         A.    Well, I had previously been analyzing the

15   merger and presented those findings to the Department of

16   Justice in a series of, I think, two presentations --

17   maybe not a presentation, in a letter.  And then the

18   Department of Justice filed their complaint, and some of

19   that work then became part of what is now my expert

20   report.

21         Q.    When you say "made presentations to the

22   Department of Justice," were those in person?

23         A.    Some were in person, and some were over

24   the phone.

25         Q.    So if you look at the total of your

1    experience to date involved in the investigation and

2    ultimately the litigation, could you describe for the

3    Court the types of things you looked at, if anything,

4    beyond what you've already said?

5         A.    The only thing I probably didn't mention

6    is in addition, obviously, to the data work is -- I've

7    interviewed business executives.  For example, I went

8    out to meet with the Molina executives in Long Beach.

9    And then, obviously, I've reviewed Professor Nevo's

10   report in detail, and I have responded to that and

11   considered the various issues that he has raised.

12        Q.    Why do you do company interviews?

13        A.    Again, part of what I'm trying to do is

14   understand the context of how the business operates, the

15   rationale behind the transaction, how the data analysis

16   that we do as economists relate to the real-world

17   business decisions that they make.  Because oftentimes

18   economic analyses can be disconnected from the

19   real-world business decisions.  And it's our jobs to

20   make sure that they are consistent with the markets that

21   we are analyzing.

22        Q.    And in addition to the things you

23   described, I know you've been here in court watching the

24   trial to date; is that right?

25        A.    Some days, yes.  Some days, I've just

3016

1    read the transcript.

2          Q.    But what about deposition?

3          A.    I've reviewed a number of depositions,

4    and I had the opportunity to spend the day with

5    Mr. Conrath already.

6          Q.    When you refer to your reports, how many

7    reports did you file?

8          A.    Two reports.

9          Q.    Fair to say one was your initial report

10   and another was your reply?

11         A.    That is fair.  Yes, sir.

12         Q.    And approximately how many pages of

13   materials did you draft, leaving aside the appendices

14   for your reports?

15         A.    Hundreds.  I think it's 400-plus pages

16   worth of writing.

17         Q.    And just so it's on the record, do you

18   understand that your initial report is labeled as

19   Defense Exhibit 419, which has been admitted?

20         A.    Yes, sir.

21         Q.    And your reply report is identified as

22   Defense Exhibit 418, which has also been admitted?

23         A.    Yes, sir.

24         Q.    And I think I mentioned this earlier.

25         But in your initial report, in Defense

3017

1    Exhibit 419, what is contained in Appendix B?

2         A.    My materials relied upon.

3         Q.    And if you look at your reply report,

4    which is Defense Exhibit 418, what is in Appendix A?

5         A.    It looks like my materials relied upon.

6         Q.    Does that set forth all of the materials

7    you relied upon, at least at the time of the filing of

8    the reports?

9         A.    As of the time of the filing of the

10   reports, that is correct, sir.

11        Q.    Okay.  As you prepared for your testimony

12   today, did you prepare some slides?

13        A.    Yes, I did.

14        Q.    Why?

15        A.    I didn't think it would be helpful to the

16   Court, to Your Honor, if we went through each of the

17   pages obviously in my report.  So I've tried to

18   synthesize to a reasonable degree the work that's been

19   done and is embodied in these more than 400 pages.

20        Q.    How does -- I'll refer to it without

21   showing it yet -- Defense Exhibit DBM-900, how does the

22   material in the slides you prepared relate to your

23   reports?

24        A.    All of that information is in the report

25   or in the backup to my reports, except for two

3018

1    modifications that I made to Professor Nevo's merger

2    simulation model, which he included in his reply

3    reports.  So obviously it couldn't be in my reply report

4    because they were submitted on the same day.  And so it

5    was the first time that I saw that.

6           But Mr. Conrath and I talked about that, as part

7    of my deposition, those additional opinions.  And then

8    I'd also say I include in some of my slides testimony

9    from the Court that -- from the hearing so far that

10   relate to certain of my opinions.

11          Q.    Do you have personal knowledge of the

12   information that is set forth in the demonstrative

13   slides?

14          A.    Yes.  Although obviously there's some

15   backup material that I didn't personally hit the return

16   button on the computer.  I had somebody working under my

17   direction do the data work to create the slide.

18          Q.    But in terms of the data work that was

19   done behind the slides, is that something you also

20   observed?

21          A.    Yes, sir.

22          Q.    And are familiar with?

23          A.    That is -- it was done under my

24   direction.

25          MR. MAJORAS:  Your Honor, at this point, we

3019

1    would like to put up for display DX-DEM-900 as a

2    demonstrative exhibit.

3                THE WITNESS:  Mr. Conrath?

4                MR. CONRATH:  No objection.

5                THE COURT:  All right.  I have a question.  Is

6    it in the materials somewhere?

7                MR. MAJORAS:  You should have a binder that

8    is -- magically, they appear, Your Honor.

9                THE COURT:  Now I will.

10               MR. MAJORAS:  Sorry about that.

11   BY MR. MAJORAS:

12        Q.    Okay.  Mr. Orszag, you understand that

13   there are two parts of the case that the government has

14   brought, one relating to exchanges, one relating to

15   Medicare?

16        A.    Yes, sir.

17        Q.    Have you offered opinions in both of

18   those areas?

19        A.    Yes, I do.

20        Q.    Before we dig into those, could you

21   summarize your opinions as they relate to the exchange

22   part of this case?

23        A.    Sure.  The first conclusion is that this

24   transaction will not harm competition on the public

25   exchanges.  Why is that?  Why do I reach that

3020

1    conclusion.

2         First, Aetna has already decided to exit the

3    complaint counties, and their decision was consistent

4    with the decision of many other insurers who have also

5    withdrawn from those counties.

6         The second part is Humana in those same

7    counties, the exchange complaint counties, has

8    significantly raised its prices, has raised its prices

9    so much that the reasonably predictable market share

10   that it will achieve in 2017 is so low that, even if

11   Aetna were in the market, there would be virtually no

12   change in concentration as measured that we use -- the

13   HHI, there would be virtually no change in the HHI.

14        These ongoing changes in the marketplace mean

15   that historic shares aren't particularly informative

16   about future competition.  And for those reasons, I've

17   reached the conclusion that this merger will not harm

18   competition on the public exchanges.

19        Q.    And would you please summarize your

20   opinions as they relate to the Medicare side of the

21   case.

22        A.    Sure.  Here I've reached the conclusions

23   that the transaction will not substantially lessen

24   competition for Medicare Advantage products.  Medicare

25   Advantage is not a relevant product market.  And I'll

3021

1    walk through a variety of analyses showing that.

2         Real-world data.  If you examine how Medicare

3    Advantage organizations, MAOs, price or their margins,

4    there is no relationship between those market outcomes

5    and Medicare Advantage competition or concentration.  If

6    necessary, entry will be timely, likely, and sufficient.

7    And I'll walk through detailed analyses on that issue.

8         Efficiencies will be passed through to

9    consumers.  I don't think there's a disagreement about

10   that fact.  Molina will be an effective competitor.

11        And one last area that's not on this slide, at

12   the end of this presentation, to hopefully help

13   Your Honor, I walk through the key differences between

14   my analysis and that of Professor Nevo's and what those

15   key differences are and why we are reaching different

16   conclusions.

17        In many respects, we have a lot of similarities

18   between our analysis.  We use the similar econometric

19   model, which is fortunate because we're talking on the

20   same playing field.  But there are some key differences

21   that are very consequential, and I try to just focus in

22   on those consequential differences so that all the

23   inconsequential differences aren't the focus of the

24   back-and-forth.

25        Q.    Before we dig into each of those

3022

1    opinions, as you look at the task -- as you looked at

2    the task before you, what about the transaction itself

3    was relevant to your analysis?

4         A.    Well, as I said, the first thing I like

5    to do is understand the rationale behind the

6    transaction.

7         Q.    Why?

8         A.    Because what is motivating the business

9    people to want to engage in the merger?  Is it a

10   pro-competitive reason, or is it an anti-competitive

11   reason?  Does it make economic sense what they are

12   proposing to do, or do their arguments not hold water?

13        And that matters to, in essence, the whole way

14   that the analysis will then be conducted.  And so I

15   start always with the question of what is the rationale

16   behind the transaction.

17        Q.    What were the observations you found

18   relevant to your analysis?

19        A.    I'd say there are two primary ones or

20   subsidiary ones that I focused on over a year and a half

21   ago.  These are complementary businesses.

22        Q.    What do you mean by that?

23        A.    Humana is very focused on Medicare

24   Advantage.  Well more than half of their business is in

25   Medicare Advantage.  They are weaker and smaller in

1    commercial products.

2         Aetna is the reverse.  They are stronger in

3    commercial products and weaker in Medicare Advantage

4    products.  That makes those complementary businesses

5    that they can then put together and be stronger in both.

6    That is, Aetna can help strengthen Humana's commercial

7    business, and Humana can help strengthen Aetna's

8    Medicare Advantage business.

9         Q.    And you had described that, when you're

10   looking at the rationale behind the business, that would

11   help inform you as to where -- or it might help guide

12   you on your opinions.

13        How did that guide you in this case?

14        A.    Well, it guided me next to efficiencies,

15   was the question of, could the merger achieve

16   efficiencies?  And the business people point to, I think

17   it's, $2.8 billion worth of efficiencies.  Mr. Gokhale

18   has found $2.3 billion in merger-specific efficiencies,

19   and they fall into these various categories.

20        Q.    As part of your work, did you do specific

21   work in terms of analyzing the efficiencies themselves?

22        A.    I did not do work with regard to the

23   level of efficiencies.  The only efficiencies-related

24   analysis that I conducted was the economic question of

25   pass-through, what efficiencies are passed through and

3024

1    at what rate.

2         Q.    So let's turn back now to your individual

3    or your -- the backup to your opinions.  Let's focus

4    first on public exchanges.

5         What did you do to start your analysis of the

6    public exchange economics?

7         A.    Merger analysis is inherently

8    forward-looking.  It's trying to predict the future

9    after the merger.  And so the first question I asked is:

10   Will there even be an overlap between the two parties in

11   2017?

12        Q.    The significance of an overlap is what?

13        A.    Well, if the firms do not overlap,

14   there's no substantial reduction in competition because

15   they are not competing with each other in 2017.  So

16   there can be no harm to competition in that

17   circumstance.

18        Q.    And what were your observations?

19        A.    Well, since -- as I've already mentioned,

20   since Aetna has withdrawn and -- it means that they do

21   not overlap with Humana in the exchange complaint

22   counties, the 17 counties that the Department of Justice

23   has alleged there would be a harm to competition.

24        Q.    And the fact there is no overlap now is

25   related to Aetna's decision to withdraw?

3025

1          A.      In part.  It's also -- given what I have

2     observed with Humana's decision to raise prices, even if

3     Aetna were there, there would be effectively no overlap

4     too.

5          Q.      So as you analyze that reasoning, what

6     did you do?

7          A.      Well, the first question I asked is --

8     the Department of Justice has said that it's possible

9     that maybe they left because of the transaction, because

10    of the complaint.  So my first question is:  Is their

11    decision consistent with other insurers who are not

12    undergoing a transaction?

13          So if Aetna's decision is like the decision of

14    other insurers who are not undergoing the transaction,

15    then their decision is consistent with rational business

16    conduct absent the transaction.  And what we observe is

17    that 36 other insurers -- 35 other insurers, 36 if you

18    include Aetna, have decided to either partially or

19    completely withdraw from the public exchanges in 2017.

20          And so the numbers on this chart show 23 have

21    decided to do it partially; 13 have completely

22    withdrawn.

23          Q.      Have you made any observations as to the

24    specific companies that have made those decisions?

25          A.      There are a range of big and small

3026

1    companies, and I think what's important for me as an

2    economist is what they're saying their reasons for exit

3    are very similar to the same reasons that Aetna has said

4    they are withdrawing from the exchanges.

5           Q.    Why is that important here?

6           A.    Because, again, it's this question of

7    those companies are not undergoing a transaction.  And

8    if they're having the same business conversation that

9    Aetna is having, then you can't justify Aetna's decision

10   because of the transaction.

11          Q.    What were your observations?

12          A.    If you read their words -- and of the 35

13   other insurers, most of them have indicated why they

14   have exited.  Those firms have said things that are very

15   similar to the words that Aetna has used in terms of the

16   instability of the marketplace and the risks of the

17   public exchanges.

18          Q.    How does that impact your opinion in this

19   case?

20          A.    It feeds directly to my opinion that we

21   observe other insurers behaving like Aetna.  And there

22   are insurers like Anthem that have indicated that, if

23   the marketplaces do not improve, if they don't see clear

24   evidence of improvement, they too will have to change

25   their strategy with regard to the exchanges on a

3027

1    going-forward basis.

2          So the fact that we observe all of these

3    insurers behaving and commenting and seeing the same

4    market conditions that Aetna is seeing is then

5    consistent with a decision that Aetna left for

6    unilateral reasons that had nothing to do with the

7    transaction.

8          Q.    So Aetna will be done or is gone from the

9    exchanges for 2017?

10         A.    Yes, sir.

11         Q.    At least in the overlapping counties and

12   beyond that as well?

13         A.    Yes, sir.

14         Q.    So did you look at Humana?

15         A.    Yes, sir.

16         Q.    Why?

17         A.    Because it's useful to see how Humana's

18   behaving as well.  They're a part of the transaction.

19   And so I wanted to see what Humana's reaction to the

20   marketplace or to the public exchanges has been.

21         Q.    What was your observation?

22         A.    Humana's dramatically raised prices.  So

23   if you look at 2016 in this chart, Humana's prices were

24   roughly equal to its competitors.  This is looking at

25   average prices.  So Humana and its competitors have

1    roughly similar prices.  This is focused on the Florida

2    complaint counties.

3              Q.    Okay.  So let's make sure we break this

4    down.  So the overall analysis in the chart on page 13

5    of DX-DEM-900 is the Florida complaint counties?

6              A.    That's correct.

7              Q.    Why?

8              A.    I was using it as an example.  Their

9    complaint counties in Georgia and Missouri, you'd see a

10   similar pattern if we focused on those as well.

11             Q.    So let's see what you have determined

12   here.

13             2016 represents what?

14             A.    The prices that Humana charged or the

15   price for the Humana Silver plan, the average price for

16   their Silver plan, the premiums, in 2016 on the public

17   exchanges in the Florida complaint counties.

18             Q.    Okay.  Compared to what?

19             A.    Compared to the average of its

20   competitors.

21             Q.    So currently, if someone has a Humana

22   exchange plan in Florida, they are paying on average

23   maybe $10 more than the competitors who offer those

24   plans?

25             A.    The reverse.

3029

1    Q.     I knew I got that backward when I said

2  it.

3    A.     Humana is $9 cheaper than its competitors

4  on average.

5    Q.     So then as you move to 2017, what was

6  your observation?

7    A.     Competitors have raised prices by about

8  10 percent in Florida, and Humana has raised prices by

9  more than 40 percent.  So now the Humana price -- the

10  average Humana price is dramatically higher than its

11  competitors' price, and so that's why we observe Humana

12  at $422 and its average competitors at $333.

13    Q.     What is the significance of that to your

14  analysis?

15    A.     If we turn to the next slide, you can see

16  directly why this matters.  So let me try to explain.

17  Hopefully I can do this clearly.

18    If you look over the last three years -- so

19  2014, 2015, 2016 -- there's a very direct relationship

20  between the price that an insurer charges on the

21  exchanges and its market share.  And what seems to

22  matter the most is the price relative to the lowest

23  priced Silver plan.

24    And you can predict with a very high degree of

25  accuracy the market share that a firm will achieve based

3030

1    on looking at the -- its price relative to the lowest

2    priced Silver plan.  So what this line -- the blue line

3    plots is that prediction based on the insurer's price

4    relative to the lowest priced Silver plan.

5            So if you think about this X axis along the

6    bottom, if you charge 10 percent more than the lowest

7    price Silver plan, you're going to get a market share

8    that's roughly 15 percent.

9            Q.    So let me make sure we're looking at the

10   same thing.  You say 10 percent more.

11           That will work out to a 1.1 ratio?

12           A.    Yes.  From last year in the GE-Electrolux

13   trial -- I think I can touch the screen.  So you'd be

14   right about there.

15           Q.    So what is that telling you?  If you have

16   a 10 percent higher than the average or than the average

17   Silver plan, what is that telling you about your ability

18   to compete in these markets?

19           A.    Well, that the maximum available share

20   that we observe in the data that you're likely to get is

21   something on the order of magnitude of 15 percent.  You

22   could end up getting less, but the maximum you're likely

23   to get is 15 percent in that circumstance.

24           Q.    So please continue with your observations

25   on this slide.

3031

1          A.       Well, if we go to all exchange counties,

2    Humana is going to be 58 percent above the lowest price

3    Silver plan.  According to that, their enrollment share

4    for 2017 will likely be less than 1 percent.

5          Q.       Okay.  Let me break that down.

6          All complaint counties in Florida or throughout

7    the case?

8          A.       This is now looking throughout the entire

9    case.  So this would be Missouri, Georgia, and Florida.

10         Q.       Seventeen counties?

11         A.       Seventeen counties.  Yes, sir.

12         Q.       And what is the implication of seeing the

13   implied enrollment share?

14         A.       Well, it suggests that their historic

15   share, when they had 20-plus percent market share, would

16   overstate their future competitive significance.  And we

17   can see this -- and this average holds if we look at the

18   other complaint counties, say, in Florida.

19         So, for example, in Broward, they're 51 percent

20   above.  In Volusia, they're 34 percent above.  In Palm

21   Beach, they're 32 percent above the lowest priced share.

22   So their maximum share is likely to be less than

23   2 percent.

24         Q.       But didn't other providers' prices go up

25   in 2017?

3032

1    A.    Yes, they did but not close as to as much

2    as Humana raised its prices.

3    Q.    So when you have the ratio that you're

4    looking at, are you comparing 2017 prices of Humana to

5    the 2017 Silver plan -- average Silver plan?

6    A.    Yes, sir.

7    Q.    If you were asked to assume that Aetna

8    had stayed in those 17 counties, what does this analysis

9    tell you about that pretend world.

10    A.    Well, it's critical.  If we go through

11    the merger guidelines, they tell us to use historical

12    market shares except when there are reasonably

13    predictable effects that we observe in the marketplace.

14         So the guidelines say, "Market concentration and

15    market share are normally based on historical evidence.

16    However, recent or ongoing changes in market conditions

17    may indicate that the current market share of a

18    particular firm either understates or overstates the

19    firm's future competitive significance.  The agencies

20    consider reasonably predictable effects of recent or

21    ongoing changes in market conditions when calculating

22    and interpreting market share data."

23         What that tells us is, given that we can

24    reasonably predict that Humana's market share is going

25    to be extremely low in 2017, even if we pretend or even

3033

1    if we assume that Aetna is in the marketplace, you have

2    to predict Humana's share because it's reasonably

3    predictable that it's going to be less than 1 percent.

4         Q.    You were here for Professor Nevo's

5    testimony?

6         A.    Yes, sir.

7         Q.    How does the analysis you just did

8    compare to what you understand Professor Nevo did?

9         A.    My understanding of Professor Nevo was he

10   was instructed to assume that the 2017 marketplace

11   looked like the 2016 marketplace.  So he just used 2016

12   market shares for both Humana and Aetna and made no

13   effort to forecast based on the available information

14   what Humana's market share would be or is reasonably

15   predicted to be in 2017.

16        Q.    So what are you showing in Slide 16 of

17   the demonstrative exhibit?

18        A.    It's, I think, hopefully quite simple,

19   which is that Professor Nevo used a 21 percent share in

20   his calculation -- this is for Humana -- in his

21   calculation of the HHI.  In his market share analysis,

22   he was assuming that Humana would have a 21 percent

23   share in 2017 based on the 2016 information.

24        And what he did not do was look at the prices

25   that Humana is going to charge in 2017 and adjust his

3034

1    market shares to take into account that information.

2         This is critically important because the

3    guidelines say that, if the change in the HHI is less

4    than 100, that there should be no competitive concerns.

5    If you add -- let's just pretend for a moment, for the

6    sake of argument, that Aetna were still in the market

7    and that Aetna still had the market share it had in 2016

8    in 2017.

9         Even if you combine the merger at that point,

10   the HHI -- the change in the HHI would be below 100 and

11   there would be no harm to competition, according to the

12   merger guidelines.

13        Q.    If you look at the slide on page 16, the

14   comparison graphs that we just saw, where do you come

15   out in terms of the predicted HHI -- sorry, the

16   predicted market share versus -- including the price

17   effects?

18        A.    It would be less than 1 percent.

19        Q.    So as you look back to the question you

20   started with, which is analyzing the decision process

21   that Aetna made, what are you learning from the analysis

22   you just showed us?

23        A.    Well, that businesses are struggling in

24   the exchanges, that many different insurers are

25   struggling.  Professor Nevo and I agree on a very basic

3035

1    economic concept, that firms operate in markets they

2    expect to be profitable.  And so that shouldn't be a

3    shocking economic revelation.  We are, I think, in

4    complete agreement on that point.

5         And at this point, given the losses that both

6    firms have suffered, they have made decisions in their

7    own way to change their business strategy.  Aetna

8    exiting, Humana raising its price.

9         Q.    So let's take a look at the losses that

10   you talked about.

11        What are you showing for us on Exhibit 19 --

12   I'm sorry -- page 19 of the demonstrative?

13        A.    These are the -- let's just focus for a

14   second on Aetna.  So Aetna lost $103 million in 2014 on

15   the exchanges, $131 million in 2015.  And they are

16   projected to lose $350 million in 2016.

17        But back up to the economics of you enter a

18   market expecting to be profitable.  In 2014 these firms

19   expected that they would turn a profit eventually, that

20   they were going to invest in the first year to hopefully

21   make money in future years.  However, it hasn't worked

22   out that way.  They have suffered losses.

23        Humana's situation is even worse.  They've lost

24   $74 million in the first year, close to $900 million in

25   the second year in 2015, and they're projected to lose

3036

1   $700 million in 2016.

2       Q.    So as you put together all the analysis

3   that you just described, what are your conclusions about

4   the exchange part of this case?

5       A.    That the transaction will not harm

6   competition on the public exchanges, that Aetna's

7   decision to exit is consistent with other insurers.

8   It's consistent with its economic interests absent the

9   transaction.  And Humana has responded to the challenges

10  of the exchange marketplace by raising its premiums

11  substantially, making it an ineffective competitor in

12  the complaint counties.

13      Q.    And do you have any other opinions that

14  you would like to offer with respect to the exchange

15  part of the case?

16      A.    I mean, I could get into more details

17  about some of the challenges they face, but these are

18  the high-level opinions.

19      Q.    Let's get into the Medicare part of the

20  case.

21      Tell us how you proceeded in your analysis

22  about the Medicare aspects of this litigation.

23      A.    Sure.  So the first thing I did was to

24  gather background.  And then even though I had done some

25  mergers and -- I had done a merger that involved special

3037

1     needs plans, it had been a number of years since I had

2     focused on the Medicare market.  So I wanted to get

3     background on the industry.  And this is a unique

4     industry.

5          The government is a competitor.  It's a

6     regulator, and it's a payor.  We often don't see this,

7     right.

8          Professor Nevo used an example of cell phones.

9     So imagine if the government ran a cell phone company,

10    regulated the plans that you got offered, then also

11    helped subsidize them.  That's unique.

12         It requires us to consider how the government's

13    intervention in the market affects the competition

14    analysis.  And so we have to consider those issues as

15    part of our work.

16         Q.    Let's start with the government as a

17    purchaser.

18         What are your observations?

19         A.    Well, the government's made a public

20    policy decision that it's going to subsidize healthcare

21    for senior, older Americans, for seniors.  And that's a

22    public policy decision that the government has made.

23         Originally that was done completely through the

24    original Medicare program in Parts A and B.  And then

25    subsequently they've added Medicare Advantage as another

3038

1    means for the government to be a payor to ensure that

2    seniors have health insurance.

3         And this is obviously an oversimplification of

4    what happens because there's consumers in the market

5    that are paying into the system.  There's Part D -- the

6    Part D program that would sit in here as well.

7         But we have remember the fundamentals here, that

8    fundamentally the government, as a public policy matter,

9    has decided to become the payor or a key payor for

10   healthcare for our seniors.

11        Q.    In that role as a payor -- you said

12   that's unique in the industry.

13        As you try to unpack this industry for your

14   analysis, did you see an impact from its role as a

15   payor?

16        A.    Well, it's not only just a payor, it's a

17   competitor in the market too and a regulator.  So the

18   way I like to think about this is it's setting the

19   contours of competition.

20        The government is directly setting the contours.

21   It has a number of different levers that it pulls.  This

22   is a slide that Mr. Paprocki used.  And so I've borrowed

23   it, let's say.  I thought it was a summary of the

24   different regulations.  So instead of trying to create

25   one myself, I saw something that was easier to just

3039

1   explain.

2        And there's just different elements of

3   regulatory intervention that the government uses.  And

4   so I think it's fair to say the government sets the

5   contours of competition through a number of different

6   levers.

7        We're going to talk a good amount about the

8   medical loss ratio because that flows directly into

9   certain analyses and various other forms of regulation.

10  But the way to think about this is it's setting the

11  boundaries or the contours that the firms then would

12  compete in.

13       Q.    The title of the slide -- your title is

14  "Contours of Competition."

15       What does that mean?

16       A.    By a -- I'm trying to use a word, by a

17  payor, by a competitor, and by a regulator, they're

18  setting the terms of how the private firms then compete

19  in the marketplace.

20       Q.    You said that this particular marketplace

21  has some unique features to it.

22       But looking simply at analyzing the contours of

23  competition, is that something that you would typically

24  analyze in a merger?

25       A.    You have to understand the contours of

3040

1  competition for any merger.

2          Q.      Why?

3          A.      Because if you ignore the contours of

4  competition, how the marketplace actually operates, then

5  your analysis can never be complete.  It could never

6  fully recognize what the businesses that are engaged in

7  the market, the players in the market are actually

8  having to experience and how they will interact with

9  each other.

10          Q.      As we look to the payments to Medicare

11  Advantage organizations and the government's role as the

12  payor, what is your observations?

13          A.      Well, the government, as part of the

14  ACA -- so we've heard a lot about the Affordable Care

15  Act -- made a policy decision to reduce the benchmark

16  payments to MAOs.  And so we've heard a good amount of

17  testimony about this, or at least I've heard it while I

18  sat in here.  So I don't want to repeat what's happened

19  already.

20          But basically the payments that Medicare

21  Advantage organizations receive are based on Medicare

22  costs.  And it used to be that you received about

23  110 percent of Medicare costs on average.  And those

24  numbers have lowered, depending upon if you're getting

25  quality bonuses or not, to between 99 and 102 percent.

3041

1      Q.      What are the consequences of that

2  benchmark shrinkage?

3      A.      If the payments that a Medicare Advantage

4  entity is receiving go down, that means that they have

5  to respond.  They have to either reduce the benefits

6  they're offering to consumers or become more efficient

7  or charge consumers more.  They have to respond to that

8  changing marketplace by changing their behavior.

9      Q.      And overall how have consumers responded

10 in terms of what their choices are?

11     A.      Well, consumers are buying original

12 Medicare overwhelmingly.  62 percent of consumers -- of

13 seniors buy original Medicare.  38 percent buy Medicare

14 Advantage.

15     And I just want to make sure that this is clear.

16 I'm doing the same exercise that Professor Nevo did,

17 excluding employer-sponsored coverage, group MA, MMP

18 plans, special needs plans -- so Medicare special needs

19 plans.  Same analysis to look at the universe that is in

20 either original Medicare or individual Medicare

21 Advantage plans.

22     There's one inconsequential difference in the

23 grand scheme of things between what Professor Nevo and I

24 did, which is just where the data come from.

25     The second is the share that go to

3042

1    employer-sponsored coverage.  He used a Kaiser Family

2    Foundation survey from 2011.  I used a survey from 2013.

3    And so I'm using more up-to-date data, and that's why

4    there's a slight difference.

5         I believe his numbers were 56 percent for

6    original Medicare and 44 percent for Medicare Advantage.

7    And the difference is the underlying data is slightly

8    different.  That's not driving the difference in the

9    treatment of the employer-sponsored coverage.

10        Q.    What about the percentage of purchasers

11   that have looked to -- I'm sorry -- the percentage of

12   members who have looked to original Medicare over time?

13   What are your observations on how that has changed?

14        A.    Well, they're both going up.  I mean,

15   Medicare Advantage is a growing population because,

16   guess what, there are more seniors.  So the number of

17   people on Medicare Advantage is increasing.  The number

18   of people in original Medicare is increasing.

19        And so the share over a long period of time has

20   shifted from -- somewhat from original Medicare to

21   Medicare Advantage.  But if we look more recently, once

22   you adjust for the employer-sponsored coverage, it

23   looks -- that gets more -- it's about flat.

24        Q.    So let's look at your charts on page 26

25   of Demonstrative 900.

3043

1          The chart on the left, that's the chart that we

2    saw that Professor Nevo used on this point?

3          A.     Yes, sir.

4          Q.     And your chart on the right is different.

5    Explain to us why.

6          A.     One simple change.  So Professor Nevo

7    used the 2011 employer survey from Kaiser Family

8    Foundation.  And he left it constant.  But we know that

9    employer-sponsored coverage is decreasing.  And if you

10   look at the change between the 2011 and 2013 survey, it

11   falls.

12         And so if you just continue that downward trend

13   and just simply make that change to adjust this chart,

14   you would get the numbers that are on the right-hand

15   panel.  So that's the only one change.

16         We don't have a newer survey than the 2013

17   survey, or I'm not aware of one.  But that is the

18   adjustment that you would make if you take into account

19   a downward trend in the employer-sponsored coverage.

20         Q.     Have you reached any conclusions as to

21   whether, in your opinion, Medicare Advantage

22   organizations actually compete with original Medicare?

23         A.     Yes, sir.

24         Q.     What is that?

25         A.     They compete every single day with

3044

1    original Medicare.  I mean, they have to go out and get

2    enrollees.  If they just competed against Medicare

3    Advantage providers, if that's all they focused on, they

4    would miss more than half of their potential base.

5         Q.    And how do you see that in Slide-27 of

6    your demonstrative?

7         A.    Sure.  So what Slide 27 shows is, if you

8    look at Aetna and Humana's enrollees for 2015 and you

9    ask where did they come from, where did their new

10   enrollees come from, and you divide it up into three

11   pies:  Other medicare Advantage from Medicare Advantage,

12   from original Medicare, or age-ins, what we've heard a

13   lot about, the 10,000 per day.

14        And so what you see is 45 percent of their

15   enrollees come from Medicare Advantage.  55 percent come

16   from other sources with 34 percent coming from original

17   Medicare and 21 percent coming from age-ins.  Again,

18   that's the 10,000 people a day that are becoming

19   eligible for either Medicare Advantage or original

20   Medicare option.

21        Q.    So as you look at these three different

22   pieces of the pie, what is the significance of that to

23   your conclusion on competition?

24        A.    A rational firm would not want to ignore

25   its opportunity to get age-ins and attract people from

1    original Medicare.  So this will feed directly into the

2    more sophisticated economic analyses that I do later in

3    this presentation.

4         Q.    So in terms of the analysis, let's turn

5    to some further analysis.

6         You take a look at the market definition in

7    this case?

8         A.    Yes, sir.

9         Q.    Let's talk about that.

10        First, what are the principles by which you are

11   guided in your analysis?

12        A.    I think we all turn to the merger

13   guidelines.  And the merger guidelines identify the

14   principles that we would use for market definition.

15   I've tried to simplify, in essence, the steps here.

16        And the first step is identify a candidate

17   market which must include at least one product offered

18   by a merging party.  Then you perform the hypothetical

19   monopolist test on the candidate market.

20        If the candidate market passes the hypothetical

21   monopolist test, you have a relevant market.  Then you

22   move to compress effects.

23        If the candidate market does not pass the

24   hypothetical monopolist test, that's not a relevant

25   market.  You start the process over, and you have to

3046

1    then consider alternative candidate markets.

2         Q.    So as you started the process here in

3    looking at Medicare Advantage and original Medicare,

4    what did you do?

5         A.    Well, getting data often takes a little

6    bit of time.  So the first thing I did is what would a

7    senior making a decision when they become Medicare

8    eligible do.

9         Q.    Why are you looking from the senior

10   standpoint?

11        A.    Because market definition is inherently a

12   demand-side question.  How do consumers, enrollees,

13   seniors in this case choose between the various options?

14   How does their behavior decide -- it feeds directly into

15   market definition.

16        Q.    What were your key observations?

17        A.    Well, the first thing I went to was to

18   Medicare.gov because it seemed like the most obvious

19   place to go.

20        Q.    First, what is Medicare.gov?

21        A.    It's the government's website that helps

22   provide information about Medicare and Medicare programs

23   to seniors.

24        And it says quite clearly that, if you're going

25   to age-in, say, or you're making a decision, there are

3047

1      two main ways to get your Medicare coverage.   And so one

2      way is original Medicare, and the other way is from

3      Medicare Advantage.

4              It then walks through steps and choices for

5      consumers.   And it says basically decide between these

6      two options:   Decide if you want prescription drug

7      coverage.   And then if you've chosen original Medicare,

8      you need to make the decision of whether you want to

9      have supplemental coverage as well.

10             And so these are the steps on the Medicare.gov

11     website.

12             Q.     Is that the end of the analysis?

13             A.     Unfortunately for many people, no.   But

14     fortunately for me, there's more quantitative work that

15     needs to be done.

16             THE COURT:   There will be more work.

17     BY MR. MAJORAS:

18             Q.     What were your next steps, sir?

19             A.     It's always useful to look at documents

20     from the company.   Although, as an economist, I'm not

21     the best able to weigh those documents versus other

22     pieces of information.

23             Q.     So why are you looking at them at all?

24             A.     Because if the quantitative information

25     says -- let's take an extreme view -- says -- the

3048

1    quantitative analysis says, okay, the two products are

2    competing but nowhere in the documents do you find that.

3    And in talking to the business people they don't

4    indicate that, I think probably your analysis has a

5    problem.

6         And so you want to marry the documents with the

7    data.  And it goes to the same concept of talking to the

8    business people to ensure that your economic analyses

9    match the market realities.

10        Q.    What did you observe?

11        A.    I think it's fair to say you observe two

12   things.  There's obviously lots of documents that show

13   competition between Medicare Advantage and traditional

14   Medicare or original Medicare.  They are -- you see

15   those documents, you see those discussions, and you see

16   also documents that are talking about the competition

17   with other MAOs.  So you see both.

18        And as an economist, you can't -- it's not like

19   you can take all the documents, put one stack here

20   saying competition with original Medicare and another

21   stack that says competition with Medicare Advantage.

22   That qualitative information isn't sufficient.  You then

23   need to go further into a quantitative analysis to help

24   inform market division.

25        Q.    You've put a couple of examples of these

3049

1    documents in your slides at 32 and 33.

2          Are those the only ones you observed?

3          A.    No, sir.  If you look at government

4    documents, if you look at business documents, you find

5    similar statements.  But to -- I don't think it's useful

6    for the economic analysis to just put loads of each one.

7    Because, again, as an economist, I can't -- qualitative

8    information, I can't just weight.  I need to go beyond

9    that to the quantitative information.

10         Q.    You have information about those

11   documents in your reports?

12         A.    Yes, sir.

13         Q.    Once you've taken a look at the

14   documents, then what's your next step in market

15   definition -- or once you've looked at how the parties

16   are talking about it?

17         A.    Well, I want to think about the products

18   at issue in the case.  And so are they functional in and

19   economic substitutes from the perspective of the

20   customers?

21         So this was a chart that Professor Nevo used in

22   his presentation and in his report.  The version in his

23   presentation was horizontal instead of vertical.  In his

24   report, it was like this.

25         And so if you look at this, it would suggest

3050

 1    that there's some real differences between Medicare

 2    Advantage and original Medicare.

 3           Now, of course, in differentiating product

 4    markets -- and that's what we're talking about here --

 5           Q.     Let me stop you there.

 6           Differentiating product markets?  What are you

 7    talking about?

 8           A.     When products have different

 9    characteristics.  So there's two types of -- you can

10    think about products that are homogenous.  If we're

11    selling screws that are all identical, brand doesn't

12    matter.  There's no particular characteristics of the

13    product that are different versus differentiating

14    products where there are different product

15    characteristics sold by each of the firms operating in

16    the market.

17           So if we think about airlines, for example,

18    Southwest offers a different product than United

19    Airlines.  Southwest doesn't have first class.  They

20    don't fly to Europe.  They don't have airline lounges.

21    They don't have TVs on board.  So Southwest is a

22    different product than, say, United Airlines.

23           And so the fact that the product may be

24    different doesn't mean that they don't compete

25    vigorously with each other.  You have to look at whether

3051

1    those are the types of different that drive competition

2    and are part of the nature of competition in the

3    marketplace.

4         Q.    So you looked at Professor Nevo's chart.

5         What were your observations about the

6    differentiated products?

7         A.    Well, my first observation was that this

8    was too simple, that there's much more complexity in

9    this market than just these four vertical lines.

10        Q.    Why does that matter?

11        A.    Because what this -- what it seemed to

12   suggest is that there's one Medicare Advantage product

13   and three different original Medicare products.  And

14   that's not at all what the market looks like.

15        There's a number of original Medicare options

16   and lots of Medicare Advantage options.  So it's

17   important to get a full flavor of the different products

18   that are offered in the marketplace.  And so I sought to

19   do that.

20        Q.    And tell us how you're doing that with

21   this slide.

22        A.    I'm just expanding the options that

23   consumers see to hopefully -- again, this is an

24   oversimplification as well.  Because with each of these,

25   there are almost an infinite number of combinations.

1        And so if I just stop on this one for a second,

2   what this shows is that there are different ways you can

3   get your original Medicare.  You can get original

4   Medicare with Part D, with prescription drugs.  You can

5   get it with Med Supp.  You can get it with both

6   together, which many people do.  You can go out and you

7   can get a hearing, vision, dental plan.

8        If you do that, there was testimony by, I

9   believe it was, Mr. Wheatley that you would have more

10  cards, more insurance cards.

11       We have to remember, consumers have made the

12  decision that they don't mind having multiple cards.

13  Two thirds of consumers, 62 percent, almost two thirds,

14  have chosen an original Medicare option.  So to them

15  having two cards can't be that big of a deal or having

16  three cards can't be that big of a deal because they've

17  made that decision in the marketplace.

18       I carry two cards in my wallet.  It's not that

19  big of a deal.  They're thin cards.

20       So the fact is that consumers are overwhelmingly

21  choosing original Medicare products versus Medicare

22  Advantage products, and so we have to remember that.

23       Q.    So you've added a column to Professor

24  Nevo's chart, perhaps two columns.

25       Once you've added the products at the top, what

3053

1    are you indicating with the green checks and the red

2    Xs?

3         A.    That you can get those same benefits with

4    those different products.

5         Q.    That's the same -- essentially the same

6    thing that Professor Nevo did with the narrower product

7    list that he had?

8         A.    That is correct, sir.

9         Q.    And then what did you do?

10        A.    Well, I added what is a new product

11   called Accountable Care Organizations.

12        Q.    What's that?

13        A.    As part of the ACA -- and I sat through

14   some testimony on this too, so I don't want to belabor

15   the point.

16        As part of the ACA, the government created

17   something called Accountable Care Organizations to help

18   improve the care coordination in original Medicare.  And

19   so doctors create these -- and providers create these

20   Accountable Care Organizations.  And the hope is that --

21   twofold.  One, consumers get care coordination, the same

22   types of care coordination they currently get in

23   Medicare Advantage.

24        And the second hope that the government has --

25   and this is highlighted very specifically in a MedPAC

3054

1    report, which is the congressional advisory committee on

2    Medicare issues, that ACOs were going to seek to lower

3    the cost of original Medicare.

4            And then remember what that does is, if you

5    lower the cost of original Medicare, that then feeds

6    directly into lower costs for Medicare Advantage.  And

7    MedPAC said their hope is that, if we do that, we're

8    going to see people moving from Medicare Advantage back

9    to original Medicare because of the nature of that

10   competition.

11           Q.    Why does that matter to you?

12           A.    Because it shows the inner connectedness

13   of these products.  You improve the efficiency of

14   original Medicare, it has a direct effect on the

15   incentives of Medicare Advantage providers.

16           Q.    When you include ACOs on your chart here,

17   you're only doing it with respect, though, to Medicare

18   Advantage offerings -- I'm sorry -- original Medicare

19   offerings?

20           A.    That is correct.

21           Q.    So take us back to your chart and what

22   you do next.

23           A.    What I did next was I expanded the

24   Medicare Advantage side, because Medicare Advantage is

25   not one product.  There's many flavors of Medicare

3055

1    Advantage out there.  You can get Medicare Advantage as

2    a PPO.  You can have it as an HMO.  You can have an MAPD

3    plan.  So that includes prescription drugs or without

4    prescription drugs.  You can get narrow networks or

5    broad networks.  You can get it with supplemental

6    benefits or without supplemental benefits.

7             So there's many different versions of Medicare

8    Advantage out there.  And what I did was I just took

9    four of those, obviously again a simplification.  And

10   many of the different boxes here, just so we're clear

11   all clear, are also simplifications because a senior can

12   go get wellness benefits seniors through a Silver

13   Sneakers program.

14             They also as part of the ACA get an annual

15   wellness visit as part of the legislation.  So I have

16   them as X boxes.  You could -- X marks -- I mean, red X

17   marks.  You could put checkmarks in there, and it would

18   perhaps be more complete.

19             But, again, I was just trying to highlight the

20   massive differences both between MA plans and between

21   different OM plans.

22             Q.    So once you've got these all together on

23   the same slide, what are your observations?

24             A.    Well, what I did was I said, okay, let's

25   just re-sort them based on additional benefits.  And

1    this is one way you could do it.

2          And you can see if you re-sort them just based

3    on additional benefits, you would have MA plans and OM

4    plans -- Medicare Advantage plans and original Medicare

5    plans interspersed with each other.

6          And if you're then a consumer or an enrollee

7    seeking options and if you're going to put a lot of

8    weight on, say, prescription drug coverage, you're going

9    to only look at the plans that have prescription drug

10   coverage.

11         If you're going to consider options about if

12   it's important you have a wide network, that's going to

13   drive your decision.  You're may consider a wide network

14   MA plan and original Medicare.

15         So each of those factors will then go into an

16   individual's decision about which plan to choose,

17   whether that's an OM option or a Medicare Advantage

18   option.

19         Q.    So once you separate them out or

20   reorganize them the way you did, what do the greenish

21   columns represent?  What types of plans are those?

22         A.    The greenish columns are all MA columns.

23         Q.    Okay.  So they're all Medicare Advantage.

24   How about the gray columns?

25         A.    Those are all different original Medicare

3057

1    options.

2          Q.    And as you see them now laid out in this

3    way based on the types of benefits available, what does

4    that inform your conclusions -- how does that inform

5    your conclusions in this case?

6          A.    There are lots of different options for

7    lots of different seniors and that they have choices

8    between the various products and will then observe those

9    choices later on in various other analyses.

10          Q.    Any other sorting in this chart, sir?

11          A.    No, sir.

12          Q.    Okay.  Where did you turn next in your

13    analysis?

14          A.    I went back to the merger guidelines.

15          Q.    Why is that?  What did you observe?

16          A.    Because I wanted to go to a quantitative

17    analysis of the hypothetical monopolist test in the

18    marketplace.

19          Q.    So if you were to describe what we just

20    went through versus what we're now going to do, how

21    would you differentiate that?

22          A.    What we just went through was

23    qualitative, and what we're about to go through is

24    quantitative.

25          Q.    I sort of invited that; didn't I?

3058

1          What are -- what do the guidelines tell you

2     about this?

3          A.    The guidelines say that you can turn to

4     direct evidence of what happens in markets for assessing

5     both competitive effects and also market definition.

6          So the guidelines say that we can turn to the

7     market evidence to help inform those questions.  And

8     here I'm going to use that direct market outcome

9     evidence for the purposes of applying the market

10    definition test.

11         Q.    So as you talk about statistical

12    evidence, how does that relate to econometrics?

13         A.    There are one in the same thing.

14         Q.    Is econometrics something that is

15    included in the background description you've provided

16    earlier?

17         A.    Yes, sir.

18         Q.    Is that something that you did in this

19    case?

20         A.    Yes, sir.

21         Q.    Okay.  Please take us through your

22    econometric work as it relates to market definition.

23         A.    Sure.  So what we can observe in the

24    marketplace is there's all kinds of different MA

25    markets.  We observed markets with one MAO, with two

1    MAOs, three MAOs competing in those marketplaces against

2    original Medicare.

3         So in this analysis, I'm starting with the

4    assumption that the candidate market proposed by the

5    government is correct.  I'm testing whether Medicare

6    Advantage is its own relevant product market.  And I'm

7    looking to the data to say, when we observe a market,

8    say, go from three competitors to two competitors or

9    from four competitors to three competitors, how do

10   prices change.

11        And I look at two measures:  the price, the

12   total beneficiary cost.  And I originally used a version

13   called adjusted premium.  Professor Nevo has proposed a

14   version of price called a rebate-adjusted premium.  So

15   I've adopted his use of "rebate-adjusted premium."

16        I look at those two measures and I look at the

17   behavior of firms.  In the real world, when you have a

18   reduction in competition or an increase in competition,

19   when there's a change in competition, how do they behave

20   in terms of their pricing behavior?

21        And I control for various market conditions.  So

22   it will take into account the demographics of the

23   county, the benefits offered, the costs, et cetera.  So

24   it will into account that information and the

25   econometrics, and it will really focus in on that

3060

1    question of when you observe a change in the number of

2    MAOs or the concentration of MAOs, what effects that has

3    on the price.

4          Q.    So that describes your model.  Let's be

5    clear.

6          What are you feeding into the model in terms of

7    data?  You mentioned data.

8          A.    So this is -- there's lots of data coming

9    from the marketplace.  It described in detail in my

10   appendix to my first report the various data sources

11   that I use.  And so that is all outlined there.

12         And it's econometric approach that I use here is

13   a standard econometric approach.  In fact, it's very

14   similar to the approach that Professor Nevo used with

15   regard to the public exchanges.

16         So he described an econometrics analysis he did

17   for the public exchanges, relating the number of

18   competitors in the public exchanges to price.  That's

19   the same analysis that I did for Medicare Advantage.

20         Q.    So you're constructing a model but you're

21   feeding real-world data to it?

22         A.    That's correct.

23         Q.    Where did that take you?

24         A.    That took me to results.  This is

25   obviously an oversimplification of the results.  There

3061

1    are very detailed data tables in my reports.  I thought

2    this would be a simpler way to present it because I'm

3    not sure that many people would like to stare at those

4    data tables.

5         And what I did was I asked the question of --

6    and I'm going to focus on this one right here for a

7    second.  When there is a change in the number of MAOs,

8    what's the relationship between the change in the number

9    of Medicare Advantage providers and price?  And the

10   measure of price I'm using here is total beneficiary

11   cost.

12        Q.    Why are you using that?

13        A.    Because that's -- the guidelines ask the

14   question of would the hypothetical monopolist test be

15   able to profitably impose a SNP -- SNP is a small but

16   significant nontransitory increase in price.  And a

17   standard measure to use is 5 percent.  So I asked the

18   question of would there be a 5 percent SNP.

19        And here what I'm asking is, if you extrapolate

20   the data, if you use the information from the analysis

21   and you had a hypothetical monopolist in a single

22   county, would they be able to charge 5 percent more than

23   current market prices?  And the answer is, based on the

24   analysis of the real-world data, no.

25        I then redid it based on the change in the HHI.

3062

1    I did it for rebate-adjusted premiums.  This is all

2    again analyzing it at the plan level.

3         I then redid it at the plan county level.  So

4    it's a slightly different analysis.  Instead of thinking

5    about it at the area that they've set prices, the plan

6    level, it's looking at the individual counties within

7    the plan.

8         Q.    Why did you decide to do that?

9         A.    I did it as a robustness check.  I did it

10   in my original report as a robustness check, and the

11   results were similar.  And so there are a whole series

12   of robustness checks that I include in that to ensure

13   that this result that I find over and over again is

14   consistent across a wide range of model specifications,

15   and it is.

16        Q.    So as you went through this analysis and

17   running this through, I assume, your computer, what are

18   your conclusions with respect to the question, does it

19   pass the hypothetical monopolist test?

20        A.    The answer is that the candidate market

21   proposed by the government does not pass the

22   hypothetical monopolist test when you use a real-world

23   test of the hypothetical monopolist test.

24        Q.    And do you recall, sir, just in case the

25   Court would want to reference it at some point, that the

3063

1    actual -- the longer tables that show the result of your

2    analytics are on page 233 of your initial report?

3    That's Defense Exhibit 419.

4         A.    That is correct.

5         Q.    So you started taking us through the

6    principles of market definition.  We've now done the

7    analytical approach.

8         What's next?

9         A.    The next step is, as we go back to those

10   principles, since the candidate market did not pass a

11   hypothetical monopolist test, we now need to consider an

12   alternative candidate market.  And so I now focus on did

13   the government and Professor Nevo follow the principles

14   of the merger guidelines with regard to the definition

15   of a candidate market.

16        And my answer and my conclusion is no, they did

17   not.  They ignored a very key principle in the merger

18   guidelines when they first chose that candidate market.

19        Q.    So let's break that down.  If you look at

20   Slide No. 39, which is on the screen, of the

21   demonstrative, we have an Example 5.  And I believe

22   Professor Nevo talked about this.

23        What is Example 5?  What is the purpose?

24        A.    Well, the guidelines provide various text

25   and then various examples.  Example 5 is the part of the

3064

1    guidelines that Professor Nevo points to as supporting

2    his choice of the candidate market of just MA.

3         And he points in particular, I think, during his

4    testimony, the last sentence that said that it's a

5    relevant market even though two thirds of the sales lost

6    by the product -- so this is Product A and B if we think

7    about it as, say, the MA product of Humana and the MA

8    product of Aetna.

9         It is true, even though two thirds of the sales

10   lost by one product when it raises its price are

11   diverted to products outside the relevant market,

12   outside of, say, MA.

13        And so he's saying that this is the governing

14   principle for why his candidate market is correct.

15        Q.     Do you agree?

16        A.     No, I do not.

17        Q.     Why not?

18        A.     Because it ignores the text that follows

19   directly after that in the merger guidelines, which --

20        Q.     We now see that on the screen in front of

21   us, page 40 of the demonstrative.

22        A.     Yes, sir.  So one of the authors of the

23   1992 merger guidelines has called this the circle

24   principle.  And he says -- or the guidelines say, sorry,

25   that when applying the hypothetical monopolist test to

3065

1    define a market around a product offered by one of the

2    merging firms -- so let's say an MA product -- if the

3    market includes a second product -- say the MA product

4    of Aetna -- the agencies will normally also include a

5    third product.

6         If that third product is a closer substitute for

7    the first product than is the second product -- that's

8    awfully confusing.  So let's now go to the example that

9    they give, which hopefully will enlighten us.  And then

10   I can try to explain it a little more.

11        They say in Example 5 suppose --

12        Q.    Just to be clear, we're now looking at

13   Example 6, which refers back to Example 5?

14        A.    That is correct, sir.

15        Q.    Please go ahead.

16        A.    In Example 5, suppose that half of the

17   units sales lost by Product A when it raises its price

18   are diverted to Product C, which also has a price of

19   $100.  While one third are diverted to Product B.

20   Product C is a closer substitute for Product A than is

21   Product B.  Thus, Product C will normally be included in

22   the relevant market even though Products A and B

23   together satisfy the hypothetical monopolist test.

24        What does this mean as a matter of economics?

25   Let me try to put some words on this.  If we think

3066

1    Product C is original Medicare.  Product A is, say,

2    Medicare Advantage from Aetna, and Product B is Medicare

3    Advantage from Humana.

4         If original Medicare is a closer substitute, if

5    there's more diverted sales to original Medicare options

6    than to the other MA product of the other merging party,

7    the guideline principles would say that you have to

8    include original Medicare options in the market before

9    you would include the other parties' MA plans.

10        And that's not -- that's before you get to the

11   hypothetical monopolist test.  This is a question of the

12   principles for determining the candidate market.  And

13   what this says is that, if you see diversion that is

14   greater to another product, you must include that or you

15   should include that before you include the product with

16   lower diversion.

17        Q.    Okay.  And that's called the circle

18   principle?

19        A.    It's what one of the authors of the 1992

20   guidelines has termed this section.  Yes, sir.

21        Q.    But what's the reason behind it?  Why are

22   you looking at that, why are the guidelines looking at

23   that?

24        A.    The guidelines are -- I would say there's

25   two reasons.  The first reason is because you don't want

3067

1    to define overly narrow markets.

2           Q.     Why not?

3           A.     Because it may not informative for

4    competitive effects to define overly narrow markets.   So

5    the goal should be to define the appropriate market.

6           It's wrong to define a market that's too broad

7    because then you're not informing the competitive

8    effects analysis appropriately.  And it's wrong to do it

9    when it's too narrow.  And so this helps to ensure that

10   the market is defined correctly.

11          The second thing it does is it helps to ensure

12   that markets aren't gerrymandered, that you don't just

13   pick pieces that help solve the problem of -- or help to

14   pass the hypothetical monopolist test.  It ensures that

15   there's a consistent framework for the analysis.

16          Q.     Now that we have Example 6 in front of

17   us, did you do any empirical work in analyzing how that

18   applies to this case?

19          A.     Yes, I did.

20          Q.     Please take us through that.

21          A.     So I did an analysis of diversion.   I'm

22   going to get into the statistical element of this.   But

23   this is the same nested logit framework that Professor

24   Nevo put forward.

25          In terms of the framework of analysis, it's very

3068

1    similar that we're using.  And so I'll discuss that

2    later when I talk about the differences between his work

3    and mine.  This is based on my preferred approach.

4         What this shows is, if we think about the red

5    bar as Product C, that's diversion to original Medicare.

6    So --

7         Q.    So there's two red bars.  Let's look

8    first at the Aetna --

9         A.    Sure.  So this is -- if we think about

10   this as -- maybe this would help.

11        So in the context of Aetna -- this makes it

12   easier.  This is Product A.  The diversion to original

13   Medicare would be Product C.  And you could think about

14   this as either diversion to Humana as Product B or

15   diversion to Medicare Advantage as a whole as Product B.

16        And in either case, diversion to original

17   Medicare, Product C, is greater than the diversion to

18   the product of the other merging party, Humana.  And

19   it's higher than diversion to Medicare Advantage

20   products as a whole.

21        What this tells us is diversion to Product C is

22   greater than Product B.  That means that the candidate

23   market must include original Medicare options prior to

24   the inclusion of Medicare Advantage options.

25        If you redo this for Humana, you would see the

3069

1   same concept.  So you think about diversion from Humana

2   to original Medicare is 56 percent.  Diversion from

3   Humana to Aetna Medicare Advantage products is

4   16 percent.

5           According to the principles of the guidelines,

6   you would have to include original Medicare options in

7   before Aetna's products.  Even if you look at Medicare

8   Advantage as a whole, you'd also have to include

9   original Medicare in the relevant candidate market prior

10  to including Medicare Advantage options.

11          Q.    In the analysis that you just took us

12  through with this data at least, that's specifically

13  Example 6; right?

14          A.    This has important implications for

15  Example 6 is what I'd say.  Obviously the analysis of

16  the data is based on a wealth of information that's all

17  described in a lot of detail in the report, but this is

18  absolutely critical for the application of Example 6.

19          Q.    Didn't Professor Nevo say you have to

20  break down original Medicare into the various products,

21  kind of like your chart we saw earlier?

22          A.    He has raised that critique, and he has

23  said that original Medicare isn't a unitary product.

24  It's many, many products.  And that is true.

25          Medicare Advantage is also not a single unitary

3070

1    product.  It's many products.

2           So if we're going to then apply Example 6 to

3    each of the individual products, we have to do it on a

4    consistent basis, and so -- the government has not done

5    that.  And so that is why -- one of the reasons why

6    their market definition is invalid.

7           Q.    Did you have data available to break down

8    all the different original Medicare products that

9    seniors may be buying?

10          A.    No, I did not.

11          Q.    Why not?

12          A.    We asked CMS for it, and they told us

13   that it would take them about a year to supply it.

14          Q.    So let's go to the next step as you're

15   applying Example 6.  And you're going to have explain

16   this one, sir.

17          A.    Sure.

18          Q.    Slide 42 of the demonstrative.

19          A.    So --

20          THE COURT:  Do you think he didn't have to

21   explain any of the others?

22          MR. MAJORAS:  It was perfectly clear to me,

23   Your Honor.

24          THE WITNESS:  I'd be more than happy to.

25          So let's start with MA Product 1 at the center

3071

1    of the circle.  And these products -- obviously, this is

2    an illustration of the issue.  The MA products are

3    sorted based on how close they are in the competitive

4    space to MA Product 1.

5    BY MR. MAJORAS:

6         Q.    How do you figure that out?

7         A.    Based on diversion.  Again, this is an

8    illustration.  So I'm just putting them on the page

9    however they fall to make -- to illustrate the point.

10        Q.    Okay.

11        A.    What the government has done is they've

12   included in their candidate market MA-1, MA-2, MA-3,

13   MA-4 and MA-5.  However, there are original Medicare

14   products, individual products that are closer in the

15   product space in terms of the diversion rate to those

16   products than others.

17        How do I know that without any data?  Well, we

18   can observe the diversion rate to, from say MA-1 to

19   MA-5.  We have that data to just look at MA products.

20   And we see that it's effectively zero, something

21   approaching the diversion of zero to MA Product 5.

22        We know that diversion to original Medicare as a

23   whole is 50-some odd percent.  So each of the component

24   parts have to sum up to 50-some odd percent.  Since we

25   know that each of those component parts have to be

3072

1    greater than something approaching zero, there must be

2    original Medicare products that are closer in the

3    product space that are the equivalent of Product C that

4    would fall before MA Product 5, which would be a

5    Product B.

6          So, by definition, there must be -- the original

7    Medicare products that are closer in the product space

8    to MA-1 than the -- certain of the Medicare Advantage

9    options.

10         Q.    And if you look back to, then, Example 6,

11   what are you doing in terms of applying the conclusion

12   you just reached?

13         A.    Again, I'm testing the candidate market.

14   So what I'm saying here is that, if we treat this

15   product as Medicare -- as Product C -- I'm sorry.

16         If this is Product B out here and this is

17   Product A, you must include these versions of product --

18   I don't know how to clear just one thing.  So I won't

19   try to do that.  I feel like I'm John Madden on

20   Thanksgiving Day.

21         You would have to include those various

22   Product Cs first prior to including that Product B.  And

23   so that's, in essence, the heart of Example 6 that

24   Professor Nevo and the government do ignore.

25         Q.    You said that this is an illustration.

3073

1          Did you do any -- did you observe any empirical

2    evidence about this principle?

3          A.    Yes, sir.  Again --

4          THE COURT:  Let's wait and do that empirical

5    evidence after our afternoon break.  It seems to be a

6    logical time to take a break.

7          Let's take that 15-minute break, and I'll see

8    everyone back here at 3:40.

9          (Recess)

10         THE COURT:  Welcome back, Mr. Orszag.

11         And, Mr. Majoras, please?

12   BY MR. MAJORAS:

13         Q.    Will you just turn to Slide 34 of Defense

14   Exhibit DEM-900.  Are you on that page?

15         A.    Yes, sir.

16         Q.    First, tell us what this slide is doing.

17   What are you trying to represent with this slide?

18         A.    Sure.  So what this shows is the total

19   beneficiary cost measured on a per-member per-month

20   basis.  This is data that comes from CMS.  This shows

21   for each of the original Medicare and Medicare options

22   in Shawnee County, Kansas.

23         Q.    Why Shawnee County?

24         A.    It was one of the three counties that

25   Professor Nevo included in his presentation.  And I

3074

1    could show them for the other two.  It just -- at some

2    point, it just becomes -- it defeats the purpose to keep

3    using other examples.

4            What this shows is -- the green bars are the

5    Humana MA plans.  The purple bars are the Aetna MA

6    plans.  And the blue bars are all of the original

7    Medicare options that you observe in Shawnee County,

8    Kansas.

9            Q.     Okay.  So let's break this down just to

10   be sure what we're looking at.

11           If you talk about the Aetna and Humana plans

12   being offered, those are being offered when?

13           A.     This would be data for 2015, I believe.

14           Q.     You have -- the blue bars are OM options.

15           Explain to us a little more what you mean by OM

16   options.

17           A.     Think about it as the various -- you

18   know, when we saw the chart about the economic and

19   functional substitutes, there are various choices that

20   people could make in terms of the purchasing of original

21   Medicare with a PD plan.  These would represent

22   different prescription drug plans or different Medigap

23   Med Supp plans.

24           So the point is that they can bundle the base

25   program, Part A and Part B, with one of the options out

1    there in terms of prescription drugs or Med Supp or, by

2    the way, choose not to purchase either of those.

3           And I think it's about the sixth or seventh bar

4    in from the right represents original Medicare without

5    any of the add-on products.

6           Q.     So that would be just to the left of the

7    two Humana plans?

8           A.     That is correct.

9           Q.     And the reason they would be left of that

10   is that the total beneficiary costs are less than those

11   plans to the right?

12          A.     Yeah.  So perhaps I should explain how

13   this is done.

14          So the government, CMS, goes in and calculates

15   the expected total beneficiary costs for different

16   groups of consumers, enrollees based upon their health

17   status.  So they do it for folks with excellent health,

18   very good health, good health, fair health, and poor

19   health.  So five different categories.

20          This represents the middle category, good.  I

21   have other analyses in my report based on the good

22   health status too.  The chart looks largely the same if

23   you change the health status.  Obviously, each bar will

24   move because the total beneficiary cost will depend upon

25   the health of the enrollee.

3076

1          And this type of information, the total

2   beneficiary cost, is presented on Plan Finder for

3   seniors to use in making decisions of which option to

4   choose.

5          Q.     Okay.  And we haven't heard about Plan

6   Finder in a while.

7          Tell us just briefly what Plan Finder is and

8   how you get that information.

9          A.     It's a service run by the government to

10  inform seniors about the various options that they have

11  in their area given their health status.  So they can

12  type in their ZIP code, and then it will provide

13  information on -- the original Medicare option will be

14  first, and then the Medicare Advantage options will be

15  below that.

16         Q.     The user of Plan Finder can pull up the

17  total beneficiary costs for each plan?

18         A.     It's reported right there in Plan Finder.

19         Q.     Okay.

20         THE COURT:  Before you move off of this, which

21  I can see by your hand you're about to --

22         MR. MAJORAS:  No, sir, I wasn't going to.

23         THE COURT:  I have a question, but I'll wait

24  until after you finish with this.

25         MR. MAJORAS:  Okay.  I just have a few here.

3077

1  BY MR. MAJORAS:

2       Q.     Mr. Orszag, if you were to look at the

3  purple and the green, the Humana plans that are being

4  offered in Shawnee and the Aetna Medicare Advantage

5  plans, do you know what the market share is of those

6  plans combined?

7       A.     In Shawnee, the Medicare Advantage plans

8  have about an 11 percent market share and -- maybe it's

9  12 percent.  And the original Medicare options have

10  about an 88 percent market share.

11       And one thing -- so why is this useful for -- if

12  you recall, we had just finished Example 6.  If we don't

13  have data from CMS on enrollment by each of their

14  original Medicare options, so as a result, because we

15  don't have that data from original Medicare on

16  enrollment, we can't measure diversion in the type of

17  statistical model that Professor Nevo and I used to each

18  of the individual original Medicare options.

19       But if diversion is directly proportional to

20  total beneficiary costs -- so if you were to raise, say,

21  the price of the three or one of the MA plans on the

22  left-hand side here, say, the green Humana plan, people

23  would divert if it's proportional to total beneficiary

24  cost, to the blue and the colored bars to the right.

25       And you would add the original Medicare options,

3078

1    all of these blue bars, before you would add, say, those

2    Medicare Advantage options or this Medicare Advantage

3    option.

4         So if diversion is proportional with total

5    beneficiary costs, this chart tells us that the

6    government's candidate market excludes many, many

7    different original Medicare options, Product Cs, from

8    the relevant market even though they are closer

9    substitutes for Product A than, say, the Product B that

10   is represented by that bar.  And that's particularly

11   relevant.

12        The second thing I'd note about this chart, if I

13   may, just to provide more detail, is when Professor

14   Frank was here, he showed a chart with the average

15   premiums for Medicare Advantage and original Medicare.

16   And he showed that the average premium for original

17   Medicare was significantly above the average premium for

18   Medicare Advantage once you include a Med Supp plan.

19        That average hides a lot of diversity.  And so

20   this type of chart shows the diversity of options and

21   the diversity of prices that are out there that an

22   average number does not reveal.

23        And so this type of information is directly

24   relevant to the application of Example 6 of the

25   guidelines.

3079

```
1          THE COURT:  My question is a factual question

2   that may be irrelevant to the use that you're making of

3   this chart.

4          The total beneficiary cost, I think I heard

5   you mention a moment ago that that's determined in part

6   by the health of the beneficiary?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  What else determines it?  The

9   richness of benefits in the plan?

10         THE WITNESS:  So you could think -- there's a

11  very detailed process that CMS goes through.

12         What they basically do is they take a sample

13  of people and they run it through, in essence, a

14  calculator based on the benefits offered by each plan.

15         So if the deductible is $500 and they expect

16  the person will end up having healthcare costs of 5,000,

17  they'll put $500 into the total beneficiary cost.  Based

18  on the copays, the coinsurance, et cetera, they will

19  then add those to the total beneficiary cost.

20         So they're literally running hypothetical

21  people through each of the plans to estimate what their

22  costs would be if they chose one of these plans based on

23  their health.  And it's a process that CMS does to then

24  hopefully inform consumers accurately about what their

25  costs would be with various plans.
```

3080

1    BY MR. MAJORAS:

2        Q.    So if I wanted to compare, for example,

3    an original Medicare plan with a Part D option to a

4    Medicare Advantage plan, I could get that total

5    beneficiary cost information directly from the

6    government on the Plan Finder?

7        A.    That is correct.

8        Q.    You had mentioned a couple of terms.   I

9    want to make sure we're clear on the definition.   They

10   actually sound a fair amount alike.   The first is

11   "diversity."  You were talking about diversity of

12   products.

13       Is that the differentiation that you spoke of

14   earlier?

15       A.    Yes, sir.

16       Q.    The other one is "diversion," and it came

17   up a little bit earlier in your testimony.

18       Why, as an economist, are you caring about

19   diversion when you're defining the markets?

20       A.    I could say simply because the guidelines

21   focus on diversion, but the right economic issue is

22   because that's what matters for firms' pricing behavior.

23       If you think about a firm's pricing behavior, if

24   a firm were a stand-alone and it sought to raise price,

25   it will lose customers.   And the question is, who does

3081

1   it lose customers to?

2       If it loses customers to the party that it is

3   merging with, it now can internalize that.  It receives

4   those customer.  That changes its incentives with regard

5   to pricing.

6       So diversion is precisely the measure that

7   economists focus on.  Professor Nevo and I agree on that

8   fact.  We focus on diversion in our analyses.  Even if

9   there is switching data that enters in every once in a

10  while to the discussion, we really do use diversion as

11  part of our work.

12      Q.    And without going back to the slides, the

13  circle principle you talked about at Example 6, what are

14  your observations as that relates to diversion in this

15  market?

16      A.    That diversion to original Medicare is

17  higher than diversion to the -- so if you look at Aetna,

18  if Aetna were to raise its price today, diversion would

19  be higher to original Medicare than it would be to

20  Humana or all other Medicare Advantage products

21  combined.

22      Q.    So as you look at all of the analyses --

23  the circle principle, the other information that we just

24  went through -- what are your conclusions about market

25  definition in this case?

3082

1          A.      I have two primary conclusions.  First

2     that the sale of Medicare Advantage plans to individuals

3     does not pass the most appropriate hypothetical

4     monopolist test for this transaction, which is looking

5     at real-world data about how firms behave when they

6     change the number of competitors.

7          And, second, the sale of Medicare Advantage

8     plans to individuals.  The market that's been proposed

9     by the government, by Professor Nevo, does not satisfy

10    the guidelines principles, in particular Example 6.

11         Q.      As you did your analysis of these

12    issues -- we just looked at Shawnee, Kansas -- how does

13    your analysis that you did overall apply in all of the

14    complaint counties here?

15         A.      The numbers that I showed in terms of

16    diversion apply on average across the exchange -- I

17    mean, the MA complaint counties.

18         Q.      Once you look at the market definition,

19    where do you turn next as an antitrust economist?

20         A.      Once you've defined a market, you then go

21    to competitive effects.  And the first step in thinking

22    about competitive effects is often to use market shares.

23         Q.      Why do you do that?

24         A.      Because looking at market shares is often

25    an informative screen to assess whether a merger

3083

1   requires further investigation or whether, given the

2   market shares, it doesn't require that next step of

3   analysis.

4        Q.     In terms of analyzing market shares, this

5   is where we get to the Herfindahl Index, the HHI?

6        A.     Yes, sir.

7        Q.     What are your observations related to how

8   HHI applies in this market?

9        A.     Well, if we're going to focus on a market

10  that includes Medicare Advantage and original Medicare,

11  the HHIs become odd, let's just say.  They go against

12  the underlying economics of the Herfindahl Index.

13       Q.     You'll have to explain that to me,

14  please.

15       A.     Sure.  If you think about the underlying

16  economics of the HHI, of the index, what it's saying is

17  that in markets that are more concentrated, there is

18  more risk for harm to consumers, holding all else

19  constant, for a merger of, let's say, smaller players.

20       If you have a big player in the market and two

21  smaller players want to merge, you have more risk of

22  harm in that market.

23       The problem in this market -- and it's something

24  that I highlighted earlier -- is the big player in that

25  combined Medicare Advantage-original Medicare market is

3084

 1    the government.  And they don't have a profit motive

 2    like a private firm.

 3         In the traditional model undergirding the HHI,

 4    that large player would have a profit motive.  And that

 5    profit motive really makes the HHIs, when you include

 6    original Medicare in the market, not make economic

 7    sense.

 8         And so the way I highlight that is by showing an

 9    example.

10         Q.    And we start with that on Slide No. 47;

11    is that right?

12         A.    Yes, sir.

13         Q.    Please explain what you did.

14         A.    So maybe if we can back up one so that we

15    can actually have the context.

16         Two scenarios here.  You have -- the first

17    scenario is let's just assume you have five equally

18    sized MA players.  If we're an MA-only market, you would

19    have -- there's no issue about the treatment of the

20    government payor in that case, and you have a postmerger

21    HHI, if you had a merger of MA-1 and MA-2, of 2,800 and

22    a change in HHI of 800.

23         But now let's introduce original Medicare into

24    this conversation.  In Scenario 1, let's have it equal

25    25 percent.  And in Scenario 2, let's have it equal

1    50 percent.  Scenario 2, original Medicare is bigger.

2         Let's assume that it takes share proportionately

3    from each of the MA players, and now let's rerun the

4    merger through the HHI.

5         Q.    And what do you observe?

6         A.    What you observe is that in Scenario 1

7    the change in the HHI or the delta Herf, as we often

8    will call it or the delta HHI, is bigger.  It's 450.

9    The postmerger HHI is 2,200.  The 2,200 is below the

10   2,500 threshold in the guidelines of presumption that

11   would raise competitive concerns.  That's when original

12   Medicare is small.

13        When original Medicare is bigger, at 50 percent,

14   it would trigger the presumptions that the change in the

15   HHI is 200 and the postmerger HHI is 3,200, above 2,500.

16   So the bigger is original Medicare, the more likely you

17   are to create a presumption which runs directly counter

18   to, in essence, the economics that would make sense in a

19   private market if original Medicare were a profit-making

20   organization.

21        But when original Medicare is the federal

22   government that's not seeking to maximize profits, that

23   makes the HHI calculation here really meaningless.  Or

24   it doesn't provide sound guidance, I would say, about

25   where to focus one's efforts in terms of potential

1    competitive effects.

2         Q.    So if we could advance -- you used a lot

3    of numbers there.  If we could advance our slide to 48,

4    please.  Thank you.

5         So, Mr. Orszag, in terms of the numbers you

6    went through, is that what we're seeing now In

7    Slide 48?

8         A.    Yes, sir.  So one should be, in

9    essence -- in a combined OM, original Medicare-Medicare

10   Advantage market, one should be less concerned about the

11   merger in Scenario 2 because original Medicare is a more

12   significant force in that merger.

13        But that is the one that, according to the HHI

14   statistics and the delta HHI, would trigger a

15   presumption.  Whereas, in Scenario 1, you would not

16   trigger the presumption because you're below the 2,500

17   threshold in the guidelines.

18        Q.    So what's your conclusion about using

19   HHIs when the government is a payor in an industry such

20   as this?

21        A.    It does not provide sound guidance for

22   measuring competitive effects or even as a screen of

23   assessing competitive effects.

24        Q.    Now let's go back to the guidelines.

25        After you've done the review of the HHIs,

3087

1  what's your next step?

2        A.      To look at competitive effects.  And the

3  guidelines --

4        Q.      This is Section 2.1.2?

5        A.      Yes, sir.  The guidelines give

6  guidelines, hopefully.  No, they do provide very good

7  guidelines about what type of evidence to look for.  And

8  direct evidence of market outcomes is one of the things

9  that it focuses practitioners' attention on.

10       So right here it's telling us to examine the

11 impact of entry and exit on the relevant market.  If we

12 look at the last sentence, "The agencies also may

13 examine how prices in similar markets vary with the

14 number of significant competitors in those markets."

15       Q.      So with that as your guidance, what did

16 you do?

17       A.      Go back to that analysis that I described

18 earlier in looking at the relationship between market

19 outcomes in competition.  And I analyzed that precise

20 question and with lots of different sensitivity tests.

21 And in each version, it's showing no reliable

22 statistical relationship between market outcomes and

23 total beneficiary costs, revenue, rebate-adjusted

24 premium, or the gain-loss margin.

25       What it's telling us is that this merger, if you

3088

1    were to reduce the number of competitors by one, is not

2    going to have a statistically significant effect on,

3    say, rebate-adjusted premium or total beneficiary costs

4    that seniors pay in the county -- in the complaint

5    counties.

6           Q.    So this relates to the econometric work

7    that you did?

8           A.    This is, again, a simplification of that

9    detailed econometric work that was done.

10          Q.    The slide that we saw earlier?

11          A.    Yes, sir.

12          Q.    Maybe just a couple slides.

13          You mentioned reliability testing.  What is

14    that?

15          A.    Well, I'd call it sensitivity testing.

16    You want to know how robust your results are to changes

17    in the model specification.

18          So if you change a variable very slightly, you

19    include another what's called a control variable and the

20    model produces different results, that raises

21    significant concerns.  And so I tried all kinds of

22    sensitivity tests that are detailed in the appendix to

23    my report, and these results hold up across a wide range

24    of tests.

25          Q.    So you look at market outcomes.

3089

1        What about pricing?

2        A.      Well, total beneficiary costs and

3   rebate-adjusted premium are two measures of price.   I

4   think total beneficiary cost is a better measure of

5   price because it's more complete and more full.  So I

6   focus most of my attention on total beneficiary costs,

7   although I do in my analyses consider rebate-adjusted

8   premiums as well even though I have a preference for the

9   fuller measure of price because it includes more

10  measures of cost to an enrollee than just a

11  rebate-adjusted premium.

12       Q.      Why are you looking at relative pricing

13  of Humana versus Aetna and vice versa?

14       A.      Well, I did do that too.

15       Q.      Where does that take us?

16       A.      To the next slide.

17          THE COURT:  Amazing.

18          THE WITNESS:  It's a really shocking finding.

19          MR. MAJORAS:  Let me get that part of the

20  transcript, Your Honor.

21  BY MR. MAJORAS:

22       Q.      Okay.  Mr. Orszag.  Let's go back to --

23  so now we're on Slide 51.  This slide looks similar.

24       What is it telling you that's different from

25  the last?

3090

1          A.      I did a different statistical test here.

2     So I asked the question of does the presence of Aetna in

3     a market affect Humana's pricing or Humana's margins or

4     vice versa?  Does the presence of Humana affect Aetna's

5     pricing or Aetna's margins?  Is there something special

6     about that head-to-head competition that would show up

7     in the data?

8          And you do not find that the presence of, say,

9     Aetna or the presence of Humana has an effect on the

10    other one's total beneficiary costs, rebate-adjusted

11    premium, or gain-loss margin.  So in terms of their

12    pricing, there's no effect statistically on the presence

13    of one on the other.

14         I should note, on the previous analyses it

15    perhaps won't be surprising to the Court, that Professor

16    Nevo has various critiques which I'll describe later in

17    the presentation of these -- of that work.  He has not

18    presented any analyses that suggests that the presence

19    of Aetna has an effect on Humana's pricing or vice

20    versa.

21         Q.      And as you look at your overall analysis

22    of competitive effects, what were your findings?

23         A.      That if we look at the real-world data,

24    the behavior of these firms and the history and the

25    geographies in which they compete, that the number of

1   MAOs or the concentration rates doesn't have an effect

2   on prices and so that the merger will not substantially

3   lessen competition.

4          I reached that conclusion because I think

5   there's three factors that are driving that, that are

6   constraining them today that won't change postmerger.

7          One is the competition with original Medicare.

8   That remains postmerger.  The second is -- and we'll

9   talk about entry shortly -- the potentially entry by

10  other MAOs.

11         We see very significant entry, and that is a

12  constraining force.  There's a whole theory and a whole

13  area of economics that talks about contestable markets.

14  And that acts as a constraint because a firm knows that,

15  if it raised price, it may induce somebody to come into

16  the market.  So that potential entry is a threat

17  constraining their price.

18         And the last is that there's the regulatory

19  framework shaping the contours of competition, and

20  that's present throughout these counties.

21         Q.    But doesn't that imply -- if you look at

22  your analysis on the MAOs, doesn't that imply that, if

23  all MAOs merged, your conclusion would be that that's

24  not anticompetitive?

25         A.    That would be taking it much too far.

3092

1    Because think of it.  If you merged all 140 MAOs, you

2    would have no potential entrants.  And so you're taking

3    out a competitive constraint from this calculation.  So

4    one can't do that.

5         One can't just take a leap beyond what the

6    analysis can do, which is looking at the evidence that

7    we have today based on the market conditions we observe

8    today and the fact of the relationship that we observe

9    as you move from, say, three MAOs to two MAOs in a

10   market and what effect that has on prices.

11        Q.    So let's move on to entries, as you had

12   brought up.  And let's start again with the guidelines.

13        What are you doing with respect to the

14   guidelines guidance on entry?

15        A.    I follow the guidelines.  They say that

16   entry deters the exercise of market power if it's

17   timely, likely, and sufficient.  That's the standard

18   that economists who focus on competition economics use.

19   So the question is timely, likely, and sufficiency.  So

20   my analyses focus on that question.

21        I first look exactly where the guidelines tell

22   us to look, the actual history of entry into the

23   relevant market.  And the guidelines say that they give

24   that substantial weight.  What's the actual history of

25   entry in the complaint counties?  So that's the very

3093

1    first analysis of entry that I conducted.

2         Q.    So let's take a look at the slide you

3    prepared on that, which is No. 56 of the demonstrative.

4         Mr. Orszag, please tell us what you are trying

5    to show with Slide 56.

6         A.    I'm trying to show the fact that

7    80 percent, roughly, of the complaint counties have had

8    entry in the last six years, including 2017.  So

9    80 percent of the counties have had entry, and some of

10   that entry is cumulative.  So there's some counties that

11   have had, say, two entrants or three entrants or four

12   entrants.

13        So if one observes the red bar, that's the entry

14   that occurred in 2012.  So about 16, 17 percent of the

15   counties had entry in 2012.  Then you had more counties

16   that had entry in 2013, more counties in 2014, more in

17   2015, more in 2016.  And then in 2017, we had 89

18   counties.  89 counties, roughly 25 percent of the

19   complaint counties, had entry.

20        And so that's important evidence about the

21   likeliness and timelines of entry, and it's important

22   for consideration as part of the overall entry analysis.

23        Q.    Let's be clear on what we're seeing in

24   this slide.

25        As the bars build each year, does that mean

3094

1   there are that many more competitors in the market in

2   2017 versus 2012?

3        A.     This is based on counties with an entry.

4   So if -- let's just take a simple example.  If you think

5   about two counties, County A and County B, if County A

6   had had entry in 2012, even if there's another entry in

7   2017, it doesn't move this chart up one unit.  It's only

8   if -- when County B gets entry, that would move the

9   chart up a unit.

10       So this is only counting new counties that have

11  entry.  And the end conclusion is 80 percent of the

12  complaint counties have had some form of entry since

13  2012.

14       Q.     And as the guidelines instruct you to

15  look at whether it's entered timely, likely, and

16  sufficient, what prong of that does this inform you of?

17       A.     This helps on likeliness.

18       Q.     Let's look to what you do next in terms

19  of entry.

20       A.     This just is a -- hopefully, providing

21  some more excitement to economics -- a graphical

22  presentation of the entry that's occurred in the

23  complaint counties and provides some color to what is

24  usually a dry presentation from an economist.

25       Q.     So this is another way to present the bar

1     chart information we just saw?

2           A.     Yes, sir.

3           Q.     Okay.  Just talk us through, if you would

4     please, what these -- how these different colors

5     interrelate to each other.

6           A.     Perhaps it's just easy -- I guess we have

7     2017 up on the screen.  You can see the point that I was

8     making that there are counties with multiple entrants.

9           So, for example, in Illinois right here, there

10    was a county that had five entrants at some point.  And

11    so what this shows is that 80 percent of counties have

12    had some form of entry.  And many of the counties -- any

13    that are yellow, orange, red, or purple -- have had more

14    than one entrant since 2012.

15          Q.     And so we're clear, the only thing you're

16    looking at on the map are the counties that are part of

17    the Medicare Advantage complaint?

18          A.     That is correct.  So this would be the

19    364 complaint counties.

20          Q.     I'll ask my question again in terms of

21    the timeliness, likelihood, and sufficiency of entry.

22          What do these -- what do these charts show you?

23          A.     They're consistent with this evidence of

24    an ease of entry.  And this is, you know, consistent

25    with the other analyses that I conduct that entry would

3096

1    be timely, likely, and sufficient, if necessary, to

2    defeat any putative or increase in market power or

3    attempt to raise price by the merging parties.

4         Q.    Why did you emphasize "if necessary"?

5         A.    Because entry responds to profit

6    opportunities.  If there's no increase in price, it may

7    not be appropriate or profitable for a firm to enter.

8    It may be profitable if it can gain market share, say,

9    because remember profits, in some sense, are products of

10   price times quantity.

11        So a firm may not have that market opportunity.

12   So one has to think about the optimal number of MAOs in

13   a market.  We have to have an intellectual economic

14   framework for considering entry.

15        If we just said, Oh, 20 percent entry every

16   year, you would end up with -- is what's necessary, you

17   could end up with 50 MAOs in the market.  And that would

18   obviously not make any economic sense.

19        Market can only support a certain number of

20   players.  And so there has to be an intellectual

21   framework, an economic framework undergirding that

22   analysis of entry.  And I conduct that as part of my

23   entry work.

24        Q.    And what you just discussed, does that go

25   to the sufficiency prong of the guidelines?

3097

1      A.      Really the next analysis does.  And so if

2  you look at Medicare Advantage entrants and you look at

3  those that survive -- and, on average, roughly speaking,

4  70 percent survive -- the ones that survive achieve very

5  high market shares.

6      And so after, say, three years, the surviving

7  entrants, on average, have a market share of close to

8  30 percent.  So among those who survive, the 70 percent

9  that survive, there's a -- they succeed -- they're

10  successful, that tests the sufficiency prong of the

11  entry analysis.

12      Q.      So if you look at Slide 63 and the bar

13  charts that you see there, you're looking at entrants

14  over a time period?

15      A.      Yes.  So this is -- I will take --

16  they're cohorts of entrants.  So you think about the

17  2013 cohort of entrants.  And ask you how do they

18  perform in 2013, 2014, 2015, 2016.  And so I take the

19  average across the last three years of cohorts, I

20  believe.

21      Q.      What is the significance of the data you

22  show in chart -- on page 63?

23      A.      It shows the sufficiency of entry among

24  those surviving entrants.

25      Q.      What did you do next on entry?

3098

1          A.      I went to the question of timely and

2     likeliness.

3          Q.      Okay.  How did you do that?

4          A.      I went to that economic framework that I

5     just discussed.

6          So there's a long literature in economics about

7     entry.  And it started 30 years ago, I guess, with two

8     professors out at Stanford who, in fact, drove around

9     Nevada counting the number of dentists in various

10    markets.

11         And what they analyzed -- they did it for other

12    products as well.  They analyzed how many, say, dentists

13    or other companies in different industries can a local

14    area support.  How much -- what's the optimal number of,

15    say, dentists in a market?

16         They couldn't have done it with lawyers because,

17    in small towns, it would cause all kinds of problems.

18         So they did it with dentists, and they then went

19    to do it with all other kinds of products.  What you do

20    is you estimate what the optimal number of players in

21    the market is.  And then you ask the question of does

22    the market adjust to that optimal number and how quickly

23    does it do it.

24         So Chart 64 is, in essence, a graphical

25    illustration of what the econometric analysis is seeking

3099

1    to do.  And the adjustment rate is a rate at which the

2    actual number of MAOs converges to the optimal number.

3          So the way to think about this is, if the

4    optimal number of MAOs in an area is five and we observe

5    that there are four today, how quickly does the market

6    respond.  How quickly do you see a fifth player entering

7    the market?

8          And the model estimates that, and it shows that

9    the adjustment rate is relatively quick.  And so it

10   shows the timeliness and likeliness of entry, and it

11   shows it econometrically.  It provides an intellectual

12   framework, an economic framework to gauge how likely and

13   timely entry will be.

14        Q.    So I think we're back to the big computer

15   again.

16        What do you mean by the econometric analysis?

17   What did you do here?

18        A.    So, again, it's all done within a model.

19   So this is taking, as you said, a big computer.  And

20   it's measuring the adjustment rate, the rate at which

21   you go along that line, that you converge the optimal

22   number.  And simultaneously it's measuring the optimal

23   number of MAOs for a market, which will be a function of

24   a variety of factors:  How many Medicare-eligibles, say,

25   there are in the market; their preferences for Medicare

3100

1    Advantage versus original Medicare; their demographics.

2        So there will be a whole set of factors that

3    define the optimal number of MAOs per market, and then

4    it asks the question of how quickly do we observe that

5    convergence.  And what you see in Slide 66 is that

6    you -- the probability of convergence is quite high

7    within two to three years.

8        Q.    Please explain how we see that in

9    Slide 66.

10       A.    So the way to think about this is, if you

11   had four MAOs in a market today and the optimal number

12   is five, what's the probability that there will be an

13   entrant within one year, two years, and three years?

14   And what this says is the probability is 47 percent that

15   there will be an entrant within one year, 72 percent

16   that there will be an entrant within two years, and

17   85 percent there would be an entrant within three years.

18       In the appendix, I include a version of this

19   where you treat movements down differently than the

20   movements up.  But this is the average between the two,

21   and it basically shows the same trend in roughly the

22   same numbers.

23       Q.    So if you look at all of the analytical

24   work that you did -- I'm sorry -- if you look at that

25   analysis, including what might be in your appendix, what

3101

1    were your conclusions?

2         A.    That MA entry occurs in response to

3    market opportunities and that is both timely, within two

4    to three years; and likely, it's well more than

5    50 percent probability of an entrant correcting that

6    difference between the optimal number and the actual

7    number.

8         Q.    And in Slide 66, it uses the phrase

9    "adjustment rate."

10        I think I have it clear, but could you explain

11   just what that is?

12        A.    It's precisely that factor of the gap

13   between the optimal number and the actual number and how

14   quickly does it adjust.

15        Q.    Did you look at the -- as you looked at

16   the complaint counties in this case, did you do further

17   analysis of how actual entry in those counties might

18   look?

19        A.    Yes, I did.

20        Q.    And what did you observe?

21        A.    There are many potential entrants in the

22   complaint counties.

23        Q.    Okay.  Let's look at Slide 67.

24        A.    So who are the potential entrants?  How

25   do I do this analysis?

3102

1            If you look at history, who -- of the firms that

2     enter counties -- so this is going back, in essence, to

3     the candy-striped chart of showing the entry in the

4     complaint counties, say.

5            You observe that firms offer individual Medicare

6     in an adjacent county are very likely to be potential

7     entrants.  Firms that offer commercial insurance in the

8     relevant county, firms that offer group MA in the

9     relevant county, and firms that are offering various

10    other insurance products are potentially -- are

11    potentially entrants for the complaint counties.

12           So what this counts up is those various

13    potential entrants.  It doesn't include, say, de novo

14    entrants, so a brand-new entrant to the Medicare market.

15    Obviously, that's a possibility.  But that happens

16    relatively infrequently.

17           We observe it in the data that there are de novo

18    entrants, people who have never provided individual

19    Medicare Advantage previously, offering service in

20    counties.  But I do not include that as part of this

21    analysis.  This is really focused on the geographic

22    expanders, those who are offering individual MA in a

23    state and move into a new county or ones that are

24    offering in adjacent counties.

25           And I total up the number of potential entrants

3103

1   for each of the complaint counties.  And as you can see,

2   there are many potential entrants for the 364 counties.

3          Q.      Could you give us a bit more explanation

4   in terms of the process?  How did you look at each

5   county?  How did that work?  How did you manage that?

6          A.      Well, there's rich data in Medicare

7   Advantage about the players in each market and players

8   in other counties.  And so I did a statistical analysis

9   of the -- of entry.  How often do you, say, see an

10  individual MA provider in an adjacent county acting as

11  the entrant in the focal county, the county of interest?

12  And you see that that happens more frequently than

13  others.

14         And so I took each of the categories that I

15  found statistically significant results, and I totaled

16  them up and only counted those that had all

17  statistically significant results in, I believe it was,

18  four different regressions.

19         There was one category that didn't come in

20  statistically significant.  And one regression, I

21  excluded them from this analysis.

22         Q.      So if you were to add up the totals

23  across these six bars, does that get you to the 364

24  counties?

25         A.      Yes, it does.

3104

1      Q.     When you looked at the potential

2   entrants, did you exclude Humana and Aetna?

3      A.     Yes, I did.

4      Q.     Why?

5      A.     Because they're already in the complaint

6   counties.

7      Q.     So you've also, then, looked at a couple

8   of specific examples of counties; didn't you, sir?

9      A.     Yes, sir.  These were the three examples

10   that Professor Nevo had in his presentation.

11      Q.     Why don't you take us through them?

12      A.     So what this shows is -- this is Shawnee

13   Kansas; Polk, Iowa; and Mecklenburg, North Carolina.

14   Let's focus on Shawnee first.

15      Shawnee has a Medicare penetration rate of

16   11 percent.  So that's well below the average of 38

17   percent across the whole country.

18      If I focus on UnitedHealth, UnitedHealth is

19   offering commercial service in Shawnee.  They are also

20   offering individual Medicare Advantage in Kansas.  And

21   so for those reasons, they are a potential entrant.

22      They have the resources -- obviously they're a

23   big company -- and the potential to enter if there's an

24   opportunity for them in Shawnee.

25      Mecklenburg, for example, has an MA penetration

3105

1    that's slightly above the national average, 41 percent.

2    That's relative to the 38 percent national average.  It

3    has three potential entrants.  Cigna for example, which

4    is first on the list, is a -- offers commercial in that

5    market, and it also offers individual Medicare Advantage

6    in an adjacent county.  So that's why it's considered a

7    potential entrant.

8          And then similarly for Polk, Iowa -- Polk

9    County, there are four potential entrants for that, and

10   it has a Medicare Advantage penetration rate that is

11   below the national average.

12         Q.    This analysis you did where you looked at

13   each county and then tried to determine the potential

14   entrants, is that the same analysis you did for all 364

15   counties in your previous slide?

16         A.    Yes, sir.  So this is just highlighting

17   three anecdotes from that previous analysis.

18         Q.    So what happens if the entrants are

19   successful?

20         A.    If the entrants are successful, then they

21   will presumably get market share.  What I've done is --

22   and I'm going to discuss this at great length --

23         Q.    Not at great length, sir, I'm sure.

24         A.    Or at length.  It depends on the interest

25   level from various folks.

1        Professor Nevo's merger simulation model, he

2   presented that when he was here.  And it has a number of

3   very significant flaws.  But he included a modification

4   where he assumed that an entrant had a 2.7 percent share

5   in all of the 364 counties.  And he found that prices in

6   that model would go up by 15.3 percent.

7        If all I do is go into his code, switch that

8   2.7 percent to a higher number, more consistent with the

9   market evidence that we actually see on entrants, his

10  model would show price decreases.

11       So let me give a little bit more color on that.

12       Q.     Please do.  And if you could refer

13  specifically to the chart on page 69 of the

14  demonstrative.

15       A.     Sure.  So if the entrant achieves a

16  30 percent market share, then prices would fall by close

17  to 50 percent inside of his own model.  And I will

18  discuss the issues with it.  So let's hold that caveat.

19       But that's too extreme of an assumption, because

20  30 percent, remember, was only among the surviving

21  entrants.  And not every single county has had entry.

22       So if you multiply the 30 percent by the

23  probability of survival and then you look at the entry

24  that's occurred, which has been in the vast majority of

25  counties, we end up that the entrant, on a conditional

1    basis, has a share somewhere between 10 and 20 percent

2    across all the counties.

3         That would suggest that the price effect,

4    according to his model, is somewhere between falling

5    3 percent and falling 27 percent.  And so if you input

6    those more realistic assumptions, that something between

7    10 and 20 percent, his model would produce price

8    decreases.

9         Q.    What does that tell you about entry?

10        A.    Well, I would say I would rather focus on

11   my analysis.  My analysis tell me that entry is timely,

12   likely, and sufficient; that if it's necessary, firms

13   will respond to the profit opportunities.  They will

14   move into those markets.

15        They can do that.  There's a history of doing

16   that.  There's history going back to 2012.  There's a

17   2017 entry.  There's the evidence that they've succeeded

18   when they've entered.  There's evidence that there's

19   many potential entrants for these counties.

20        And so it's the combination of all of that that

21   tells me that entry will be timely, likely, and

22   sufficient, if necessary.

23        Q.    And in terms of that conclusion, how does

24   that then fit into your overall analysis of this market?

25        A.    Well, it reflects the dynamism of the

3108

1    market.  We have to remember that ignoring the

2    possibility of entry in an analysis will be ignoring a

3    key market reality that we observe.  And so that's

4    something that's important to consider, and it's

5    something that would defeat a putative price increase.

6         Q.    Did you look at exits at all of firms

7    that were selling Medicare Advantage products and then

8    exited at some point?

9         A.    Yes, I did.

10         Q.    What does that tell you about the

11    barriers to entry?

12         A.    It's another data point showing that

13    there are low barriers to entry in this market, that

14    firms have moved in and out of markets.  And so the fact

15    that it exits is another data point on the entry

16    analysis.

17         Q.    Now, you mentioned earlier that you had

18    done some, you had reached some conclusions about the

19    efficiencies in this case that the defendants have

20    presented some evidence on.  As you know, we just heard

21    from Mr. Gokhale about that.

22         What is it that you looked at regarding

23    efficiencies?

24         A.    I focused on the question of

25    pass-through.

1      Q.      So in terms of the number, you simply

2   take the number from Mr. Gokhale?

3      A.      I did not independently verify that

4   number, no.

5      Q.      Okay.  So what did you look at, then, in

6   terms of pass-through?

7      A.      The question I asked is:  Is there

8   evidence for this industry about pass-through, and what

9   does that tell us about the efficiencies?

10      And I think there's a general agreement among

11   the experts on this, I don't think this is

12   controversial, that marginal costs will be passed

13   through to consumers at a rate of something in the order

14   of magnitude of around 50 percent.

15      Professor Frank, when he sat in this chair, used

16   the estimate of 50 percent from the literature.  My

17   estimate from my work is 42 percent, lower than

18   Professor Frank's.  And Professor Nevo, when he

19   testified, agreed with the general conclusion of

20   Professor Nevo -- of Professor Frank that there would be

21   pass-through of marginal cost savings.

22      Q.      As an antitrust economist, why do you

23   care about pass-through?

24      A.      Because in the end we're not focused on

25   profits of firms.  We're focused on the effects on

3110

1    consumers.

2        And so the question we want to ask is:  What

3    effect does the merger have on consumers?  And so the

4    question is:  What share of the savings flows through to

5    them?  And so that's what we really care about.

6        Q.    Are your observations on pass-through

7    related specifically to the amount of the efficiencies?

8        A.    No, they are not.

9        Q.    Why not?

10       A.    Because all I'm estimating is the

11   probability that they're passed through to end

12   consumers, not the question of the magnitude.  That's an

13   analysis that was done by somebody else.

14       Q.    So regardless of the amount of the

15   efficiencies, what are your conclusions on pass-through?

16       A.    That marginal cost savings that the firm

17   achieves will be passed through to consumers.

18       Q.    You understand -- or you heard Professor

19   Nevo talk about the Aetna-Coventry transaction and

20   suggested that that had an impact on how one should look

21   at efficiencies.

22            What are your observations?

23       A.    My general observation is that his

24   analysis was incomplete.

25       Q.    Why?

3111

1          A.     He focused on what happened to

2    rebate-adjusted prices.  And rebate-adjusted prices

3    include some elements of quality but not all elements of

4    quality.

5          Now, let's imagine a situation where prices go

6    up, say, by $5 but quality goes up by $10.  In that

7    situation, the consumer is better off.  Their

8    quality-adjusted price has fallen.

9          What happens when quality-adjusted prices fall?

10   Enrollment output would go up.  That's a very simplified

11   version of the economics of the situation.

12         If prices had risen with no quality improvement,

13   then enrollment should go down.  That would then be a

14   concern about competition.

15         What we observed with the Aetna-Coventry deal is

16   that the quality of the Aetna-Coventry products

17   increased.  As measured by star ratings, you can see

18   they went from roughly 3.4 to 4.1 from the 2012-2013

19   period.

20         Q.     You're referring now to Slide 74?

21         A.     Yes, sir.  And the other insurers in

22   those markets saw their star ratings go up but not by as

23   much.  So Aetna-Coventry raised the quality of their

24   products, as measured by star ratings, faster than their

25   competitors did.

3112

1           Now, what happens to their enrollment?  As the

2   next slide shows, their enrollment goes up.

3           I guess it's not on the screen.

4           Q.    Just so we have the record here, you're

5   on page 75?

6           A.    Yes, sir.  And so the enrollment after

7   the Aetna-Coventry merger increases and increases

8   significantly.  And remember that's consistent with

9   pro-competitive outcomes.

10          So increases in output are consistent with

11  competition, benefits the competition.  Following that

12  in the Aetna-Coventry merger, we observed that increase

13  in enrollment for the Aetna-Coventry plans as reflected

14  in this chart.

15          Q.    What conclusions does this analysis bring

16  you to?

17          A.    This conclusion suggests that the

18  Aetna-Coventry merger, if anything, it was able to

19  increase their quality and enrollment with

20  pro-competitive outcomes, and also it's consistent with

21  pass-through to consumers of improvements in the quality

22  of products to the benefit of consumer welfare.

23          Q.    And how does that impact, then, your

24  overall competitive analysis?

25          A.    Again, if there's an improvement in the

3113

1  efficiency of the firms that merge and consumers'

2  benefit, that puts a downward pressure on price or an

3  improvement in quality to the benefit of consumers.

4         Q.     You had mentioned Molina Healthcare in

5  your early description of your testimony.

6         Did you take a look at the potential impact of

7  the proposed divestiture from Aetna and Humana to

8  Molina Healthcare?

9         A.     Yes, I did.

10        Q.     What did you do?

11        A.     I did a variety of economic analyses with

12 regard to the Molina transaction.  My focus was largely

13 on what I could do as an economist, and my focus here is

14 there were claims made by Professor Burns that the

15 provider rates that Molina would get would be much

16 worse -- or the provider terms would be much worse than

17 what Aetna and Humana receive in the marketplace.

18        Q.     So these are the terms that the MAO

19 negotiates with the various providers in its network?

20        A.     Yes.  The terms they have with doctors,

21 hospitals, et cetera, in their network.

22        Q.     And what did you observe?

23        A.     Original Medicare acts as like a magnet

24 for provider rates, and the economics literature shows

25 this.  The testimony that I've observed confirm this,

3114

1    and the data show this as well.

2         If you look at the provider rate, say, that

3    Humana gets at, say, Hospital A versus the rate that

4    original Medicare has at that same hospital, they are

5    roughly equal.

6         Q.    So that's what we're looking at, the

7    first bar on the left on page 78?

8         A.    Yes, sir.

9         Q.    Okay.  So roughly equal.

10        Here you have 98 percent?

11        A.    Yes, sir.

12        Q.    What does that tell you?

13        A.    It's consistent with this -- this is not

14   like a commercial market.  In commercial markets, you

15   often see a relationship between the scale of the entity

16   and the rate that they get at a hospital or at various

17   providers.

18        In Medicare Advantage markets -- in Medicare

19   markets you don't observe a difference in the provider

20   rates that the various players receive relative to

21   original Medicare.

22        The other way to say this is, in Medicare

23   Advantage, scale is not that important.  It doesn't show

24   up in the data as a determining factor of rate that you

25   get from a hospital or a doctor.

3115

1      I include in my appendix a bunch of charts that

2  show all the different contract and the different data

3  points, and you see no relationship between scale and

4  the rates that people receive.  These are averages, and

5  they confirm the more detailed analysis that's in the

6  appendix.

7      Q.    So it's clear on the record what you did,

8  take us through the remainder of the chart on page 78.

9      A.    Sure.  So, again, for Humana they have

10  data on physicians.  So you can look at -- compare the

11  physician rate that the physician gives to original

12  Medicare -- let's just say it's $100 for a particular

13  service -- and what's the price that Humana gets for

14  that particular service.  And it would also be $100.

15  And so they're the same rate for physicians as original

16  Medicare if you go through Humana.

17      Aetna doesn't have hospital data that allows us

18  to do the same analysis.  So we can only do it for

19  physicians.

20      Q.    This is your purple bar?

21      A.    This is the purple bar.  It also shows

22  100 percent.  Molina does it, yet their data allows us

23  to do it overall, and they report 101 percent.

24      Q.    And that's shown in the Molina blue bar?

25      A.    Yes, sir.

3116

1        Q.      Doesn't Molina have a brand problem?

2        A.      Well, they are better known in certain

3   areas than in other areas.  And it's certainly the case

4   that, if you look at the history, they are not as well

5   known in individual Medicare Advantage.

6        Q.      So did you analyze that at all?

7        A.      Well, I asked the question:

8   Historically, have non-top-five MAOs survived in the

9   marketplace?  How have they done in the marketplace?

10  And you see two trends.

11       The first is that they survive at a lower rate

12  than, say, top five MAOs.  But it's still significant.

13  It's not like they enter the market and they exit when

14  they have no brand.

15       So they survive at a rate of about 50 percent

16  after three years.  This is looking at the 2013 cohort.

17  If you look at the next chart --

18       Q.      Just so we're, again, clear on what we're

19  looking at.

20       So the first chart you described is on page 79?

21       A.      Yes, sir.

22       Q.      And this is -- so this chart is only

23  relating to the non-top five MAOs?

24       A.      Yes, sir.  So what I did was I asked the

25  question of:  Within the 2013 cohort, what was the

3117

1    probability that they still existed in the markets that

2    they entered by 2016 if they were not a top-five MAO?

3            And what the data show is that they still

4    survived at a rate of 52 percent.  That's lower than the

5    survival rate of the top five, but it's still above

6    50 percent.  But when they do survive, when the

7    non-top-five MAOs survive, they tend to have a much

8    higher market share than the top five MAOs.

9            THE COURT:  What do you compare the

10   52.1 percent in 2016 to for top five MAOs?

11           THE WITNESS:  It's in my report.  If I can

12   have one second, I can get it for you.

13           THE COURT:  You say it's lower.  If it's 52

14   versus 55, okay.

15           THE WITNESS:  No.

16           THE COURT:  If it's 52 versus 98, then maybe

17   it's significant.

18           THE WITNESS:  It's going to be roughly -- I'm

19   going to get the actual number in a second, but I think

20   the number is about 75 percent for the top five.  So it

21   is lower than the top five.  But if you look at the

22   average share, it's higher than the top five.

23           Previously, I showed the average across all

24   cohorts that the -- across all cohorts, the average

25   share is about 30 percent.  If you look at the next

3118

1    chart on Slide 80, it shows that, after three years, you

2    get to 38.1 percent, which is higher than that

3    30 percent.  So they have a higher risk of failing.  But

4    when they succeed, they succeed at a higher rate than

5    the top five.

6    BY MR. MAJORAS:

7         Q.    How do you look at Molina?  You're now

8    talking about top fives and non-top fives.  How does

9    Molina fit in your analysis?

10        A.    Well, I wanted to look at this about the

11   importance of brand.  But Molina is not your typical

12   entrant.  Remember, your typical entrant starts with

13   zero.  They start with -- they have to design plans that

14   attract consumers.  They have to attract enrollees.

15   They have to build a provider network.  They have to do

16   all these different steps.

17        And so an entrant -- a typical entrant starts at

18   a much lower base, in some sense, than Molina, which is

19   getting supercharged.  It's starting off with 290,000

20   members.  So what does that do?  That gives them

21   immediate revenue.  You're taking out revenue risk as

22   one of the calculations that would go into your typical

23   entrant's determination.

24        They are starting out without plan risk.  If

25   you're a new entrant and you don't quite know the plan

3119

1    design, that may attract demand from enrollees.  They

2    are starting off with plan designs that they know those

3    290,000 consumers have purchased.  So they're starting

4    off with certain advantages over your typical entrant in

5    the market.

6         Q.    When you talk about "typical entrant in

7    the market," even a top-five MAO that moves into a new

8    county that it hasn't been before, where does it fit

9    relative to Molina about whether it has existing members

10   or how it has to go about getting them?

11        A.    Well, the top five would have to go out

12   and build its membership.  They would have to have plan

13   designs that attract consumers or enrollees.

14        So in those situations, they have certain risks.

15   They have revenue risks.  They have plan-design risk,

16   that Molina is starting off with advantages that those

17   entrants would not have.

18        Q.    So as you look at the advantages that you

19   see Molina having, how do those stack up relative to top

20   five, non-top five, or the combination?

21        A.    I haven't done that precise analysis, but

22   all I can say is they're starting off with a leg up.

23   They're starting off -- one of the most important things

24   is having -- attracting enrollees, attracting members.

25   And they are starting off with the 290,000.  That gives

3120

1   them, in essence, a leg up relative to the typical

2   situation where you actually have to go out and build

3   membership.

4          Q.    What else --

5              THE COURT:  What about if a typical entrant

6   were a top-five company that had plans in an adjacent

7   county?  Wouldn't that eliminate any advantage that

8   Molina would have from an administrative services

9   agreement and from a benefit design?  This top-five

10  entrant would have a plan or plans that were successful

11  in that general area and actually would have

12  relationships with providers in that general area.

13             THE WITNESS:  In that case, yes.  It would

14  take off that part of the risk.  But they still have to

15  attract members, and they have to build-up their

16  membership.  But they have insights into plan design.

17  But that's precisely why it's easier for a MAO to move,

18  say, to an adjacent county than it is to try to enter

19  from elsewhere or de novo.

20  BY MR. MAJORAS:

21         Q.    And even though another party might have

22  its own set of advantages, does that in any way diminish

23  the ones you observed for Molina?

24         A.    What this shows is that there are -- they

25  have advantages relative to the typical entrant and

3121

1    they're taking off -- they're checking certain boxes

2    that your typical entrant may have to work at depending

3    upon the entrant.

4         Q.    And as you observed -- let me ask first,

5    were you here for the testimony of the witnesses from

6    Molina Healthcare?

7         A.    I read their transcripts.  I was not

8    here.

9         Q.    As you considered the specifics of how

10   they've developed over time, does that have any impact

11   on your analysis?

12        A.    It's, again, a data point.  It's

13   something that I considered, and they've been -- I

14   visited -- they have a beautiful center in Long Beach.

15   I went to go see them, and they've succeeded in various

16   marketplaces.  They've succeeded in Medicaid.  They are

17   one of the biggest providers of Medicaid in the country.

18        Q.    So let's take a look at that

19   specifically -- sorry to interrupt you -- that

20   specifically on Slide 82.

21        What are you observing about their Medicaid

22   business?

23        A.    They've been able to effectively double

24   their Medicaid membership since the 2013.  So they've

25   added 1.6 million members.  And Medicaid is a tough

3122

1   market to serve.  This is not an easy market.  It's hard

2   to get good provider contracts because you're

3   lowering -- you're trying to get significant discounts

4   from providers.  And they've succeeded at serving that

5   market.

6           Q.     And as you look at that growth, which has

7   essentially doubled in members over a four-year period,

8   what are your observations as you assess the potential

9   of the divestiture on the competitive impact?

10          A.     Within Medicaid, they've been able to

11  attract new members and bring them onto their platform

12  successfully.

13          Q.     And I'm sorry.  I think I interrupted you

14  earlier.

15          What other observations did you make beyond

16  Medicaid in terms of Molina's existing business?

17          A.     They've -- unlike many other players,

18  they've succeeded on the exchanges.  They've been able

19  to grow their membership sharply on the exchanges.  And

20  they now serve -- in 2016, they serve about 568,000

21  members.  They've been -- they've added those members to

22  their system as well.

23          Q.     How does that impact your analysis?

24          A.     Again, this has been a focus of their

25  attention and they've succeeded on that.  So it's an

3123

1    area where they've been able to grow their membership.

2    They are trying to serve in both Medicaid and the

3    marketplace's target populations that they think they

4    can serve well.

5          Q.    What other observations did you make

6    about Molina's growth over time?

7          A.    They've grown in MMP plans,

8    Medicare-Medicaid plans, and special needs plans.  So

9    D-SNPS, dual-eligible plans.  They had 39,000 members in

10   2013, and now they have 96,000, roughly speaking, in

11   2016.

12         So they've been able to grow in Medicare

13   Advantage, the special category involving

14   dual-eligibles, and MMP plans as well.

15         Q.    So as you look at the last three charts

16   we saw of the growth in the different types of products

17   in Slides 84, 83, and 82, does it matter that they are

18   in different products in terms of seeing that growth?

19         A.    It shows that they can successfully serve

20   members, especially low-income members.  And that's what

21   they've focused their attention on over the years, and

22   they've successfully served those markets.

23         Q.    So as you look at the implications of

24   what you've seen from Molina, what impact does that

25   have, if any, with respect to Professor Nevo's analysis

3124

1    if Molina is, in fact, successful?

2         A.    So, again, going back to his merger

3    simulation model, he assumed that Molina will lose two

4    thirds of its members postdivestiture.  He puts into the

5    model that they will have 33 percent of the members that

6    they had -- that Aetna and Humana had when they divested

7    it.

8         I have two primary observations.  One is

9    that's -- that conclusion is inconsistent with the type

10   of status quo bias that Professor Frank talked about.

11   People have chosen these plans.  These plan designs are

12   the ones that they like.  They are -- that's what

13   they've picked.

14        There's a bias in the data and in sort of

15   enrollees from switching.  They don't like the sort of

16   figuring out if their doctor is covered or those kind of

17   situations.  So that's why you observe not that much

18   switching.  And so there is a status quo bias.

19        And so the 33 percent, based on Molina's own

20   projections, appears to be too low.  If you use

21   alternative assumptions about what will happen

22   postdivestiture -- for example, if they can maintain

23   just 80 percent of the current members, the merger

24   simulation model will show price decreases.

25        If they do 90 percent, which was the

3125

1    conservative estimate that Mr. Molina discussed, prices

2    would fall by 5.3 percent.  And if it's according to

3    Molina's plan, which is that there would be a 3 percent

4    drop and then increases, prices would fall even more.

5         Q.    So let's take a look at how you are

6    representing that in Slide 85.  Let's break this down.

7         What is the green -- what does the green bar

8    represent?

9         A.    That represents the analysis of Professor

10   Nevo, where he showed that using, in essence, an

11   attrition rate or a disenrollment rate of 67 percent,

12   prices would go up 15 percent.

13        Q.    So his analysis assumes that two thirds

14   of people that would be in the Molina plans once the

15   divestiture closed, they would then be gone from those

16   plans?

17        A.    Effectively, he's proposing that they go

18   from about 290,000 members to about 100,000 members.

19        Q.    And that relates to your testimony in

20   terms of what you viewed or what you saw in real market

21   data?

22        A.    He's using what I believe is a flawed

23   analysis that I'll talk about in a second to come up

24   with that calculation, but he's -- it's not consistent

25   with Molina's projections or the types of status quo

3126

1    bias that Professor Frank talked about.

2          Q.      So then if you look at the four

3    additional bars below the line on Slide 85, what

4    assumption did you plug in to Professor Nevo's model in

5    the first bar.

6          A.      Well, if you take the 80 percent bar,

7    they would lose 20 percent of their subscribers.  So

8    they go from about 290,000 to about 230,000.

9          Q.      And using Professor Nevo's merger

10   simulation model with that one change, what does that

11   show the price -- the Aetna-Humana prices would be?

12         A.      They would fall by 1.7 percent.

13         Q.      And then if we go through the successive

14   bars, the next one, you're using an assumption of a

15   10 percent dropout from the new Molina plans; is that

16   right?

17         A.      That is correct.

18         Q.      Did you hear testimony that that was the

19   assumption built into at least the financial model as

20   Molina looked at the potential transaction?

21         A.      Yes, sir.

22         Q.      And the result when you plugged in the

23   10 percent attrition brings you to what effect on

24   pricing if you used Professor Nevo's merger simulation

25   model?

3127

1    A.    About a 5 percent price decreases.  So

2  this is going from about 290,000 to 260,000 members.

3    Q.    So the next bar is -- essentially the

4  membership stays the same.  Molina is able to come in,

5  work with the members, and it stays the same in terms of

6  membership; right?

7    A.    That is correct.

8    Q.    And what does Professor Nevo's model show

9  when you use that assumption?

10    A.    A 9 percent fall in price.

11    Q.    And then finally, the last bar, you show

12  a 110 percent.

13    So that's actually an increase?

14    A.    Yes.  So that would be consistent with a

15  3 percent drop and then 6 percent annual growth after

16  that, which is one of their plans.  And in that case,

17  you would have a 12 percent drop in price.

18    Q.    And when you say "one of their plans,"

19  that's Molina's plans?

20    A.    Yes, sir.

21    Q.    One of the other things that Professor

22  Nevo did was compared the Molina divestiture to what

23  happened after the Humana-Arcadian merger.

24    Do you recall that?

25    A.    Yes, sir.

3128

1      Q.      How did he do that?  What was his

2  observation, before we get to yours?

3      A.      He made an observation that -- he did a

4  statistical analysis of looking at what happened to

5  rebate-adjusted premiums relative to control groups.  He

6  used two different control groups or two different -- he

7  did two different analyses.  And so he concluded that,

8  following the Humana-Arcadian transaction, which

9  included divestitures, that prices rose.  The

10  rebate-adjusted premiums rose.  And he only looked at

11  rebate-adjusted premiums.

12      Q.      Okay.  And you took a look at the same

13  issue, whether the Arcadian-Humana merger was

14  informative to what might happen with Molina; right?

15      A.      Well, I first start with the question of:

16  Is that a similar merger?  Is that something that we

17  should use as a benchmark?

18      I think there's one very important thing to

19  highlight.  Arcadian was struggling mightily

20  financially.  It was having a really hard time

21  financially.  And so that tells us something about the

22  markets it's operating in.  And those markets that it's

23  operating in were very different than the markets at

24  issue in this proposed divestiture.

25      First, it involved 51 counties versus the

3129

 1    divestiture here.  There were 13 divested members --

 2    13,000 divested members instead of 290,000 divested

 3    members.  And the divested member per county, the 250,

 4    is very different than the 800 per county here.

 5          So we're talking about a different transaction.

 6    And there's a long literature about using merger

 7    retrospectives to inform one's guidance.  Merger

 8    retrospectives are important.  They're very useful to do

 9    for analytical purposes, but the merger must be similar.

10    It has to be analogous in order to provide information.

11          And this merger is not analogous because it's

12    not that Humana and Aetna are struggling; Arcadian was

13    struggling for a reason.  And that reason Professor Nevo

14    did not include any, in essence, economic framework for

15    assessing the optimal number of MAOs for those counties

16    at issue.

17          So he observes exit, but that exit may have been

18    precisely because Arcadian was struggling prior to that

19    merger.

20          Q.    When you looked at the Arcadian-Humana

21    merger, how did you perform your analysis?

22          A.    Well, I take Professor Nevo's model.  And

23    instead of just looking at rebate-adjusted premiums, I

24    now add the question of:  What happened to margins?

25    What happened to enrollment?

3130

1       And under his theory that there was an adverse

2  price effect, you would expect margins to go up and

3  you'd expect enrollment to go down.  You'd also expect,

4  potentially, Medicare Advantage penetration to go down.

5       So I tested his model, the two different ways

6  that he proposed, which is outlined here.  And, again,

7  there's more detailed statistical analysis that's in the

8  backup to the reports.

9       And I looked at what effect that merger had on

10  gain-loss margins, what effect it had on Medicare

11  penetration rate, and what effect it had on enrollment.

12  And there's no adverse effects.  So to the extent that

13  he observes rebate-adjusted premiums going up, if we

14  observe no effect on margins, that would suggest to us

15  that costs went up as well.  If we observe no effect on

16  enrollment, that's telling us that quality-adjusted

17  prices were unchanged.

18       He did not look at any of these other elements.

19  He solely looked at the one measure, rebate-adjusted

20  premium.  That's not a sufficiently complete analysis to

21  draw any conclusions.

22       Q.   So, again, looking a little bit at nuts

23  and bolts here, how did you go about looking at those

24  elements?

25       A.   I literally took his model, and I took

3131

1    his model where he is trying to estimate what happened

2    to rebate-adjusted premiums.  I then basically look at

3    it the same way he does.  And instead of looking at

4    rebate-adjusted premiums, I asked what happens to the

5    gain-loss margin, what happens to enrollment.

6         And what one observes is that you find no

7    effects when you do that analysis.

8         Q.    When you look at Slide 87, this is

9    similar to some other slides that you showed us on

10   econometric analysis.

11        Here, though, you're just simply taking

12   Professor Nevo's model and making adjustments?

13        A.    That is correct.

14        Q.    And if you look at the question that's

15   being asked, you're trying to find out after this

16   analysis what?  What are you asking?

17        A.    I want to know whether the

18   Humana-Arcadian merger, which included the divestitures

19   showed harm to consumers.  This analysis, when one looks

20   at margins and enrollment, showed that there was no

21   harm.

22        The point is that, if there's no adverse effect

23   on output, then the one measure of price that he looked

24   at must have been associated with also improvements in

25   quality associated in increases in quality that then are

 1   reflected in the fact that there was no change in

 2   output.

 3          Q.    And I want to ask you something about the

 4   slide on page 87.  And I know we'll talk a bit more

 5   about this.

 6          But in the two right-hand columns that -- in

 7   which you answer "no" for each of those, there's

 8   overlap/non-divestiture counties and

 9   overlap/divestiture counties.

10          What are you measuring with those two?

11          A.    Sure.  There's two different ways that

12   Professor Nevo did his analysis.  He did the divestiture

13   counties relative to the non-divestiture counties, and

14   then he did divestiture counties versus counties that

15   would have met the presumption.  I think I may have

16   twisted that slightly.  But, roughly speaking, he did it

17   two different ways.  And so I implemented the same two

18   ways that he had done.

19          Q.    What are your conclusions as you look at

20   the potential Molina divestiture and the impact it would

21   have on the competitive analysis here?

22          A.    To just summarize, original Medicare

23   creates a magnet for the providers.  So I expect that

24   their provider rates would be very similar to the rates

25   that Aetna and Humana get today.  I expect that brand

3133

1    will not be an impediment to their success.  I would

2    expect that they will launch with certain advantages,

3    they start with 290,000 members; and that their success

4    in Medicaid public exchanges, MMP D-SNP Medicare is a

5    relevant factor to consider because it shows that, when

6    they focus on certain markets, they can succeed.

7              We have to remember that Molina -- they have

8    been serving lower-income markets.  And Professor Nevo

9    and I agree, Medicare Advantage enrollees, individual

10   Medicare enrollees tend to be lower-income as well.

11             So this is an area, a segment of the market that

12   they are accustomed to serving.  And one would expect

13   that, if they put focus to this, that they would then

14   succeed.

15             Q.    You've given a bit of a preview, I think,

16   from time to time that you have done some direct

17   analysis of where you've seen differences between -- or

18   key differences between your analysis and Professor

19   Nevo's.  Let's turn to that.

20             We don't have an opportunity to put you up here

21   side by side, so I'm going to need you to take me

22   through what those key differences are.

23             A.    You know, in certain foreign countries,

24   they do do this.

25             Q.    I understand that.  We're not going to do

3134

1    that.

2          A.     The economists would very much enjoy

3    that.

4          THE COURT:  Well, I haven't been asked to

5    allow that.

6          THE WITNESS:  Maybe we'd both agree.

7          There's a lot that Professor Nevo and I agree

8    on.  And so in some sense, what I really am trying to do

9    here is hopefully help you understand the differences

10   between analyses and why we're coming out to different

11   conclusions.  So I'm going to walk through, in essence,

12   the five areas that we differ.

13         There are obviously much of the main areas

14   that we've already covered, but I'm going to focus in on

15   the things that are important.

16         We have little disagreements like:  Is the

17   share 38 percent or 44 percent based on the

18   employer-sponsored coverage survey?

19         That doesn't, in the end, change the

20   conclusions that we reach doing the quantitative work.

21   So I want to really focus in on all the things that

22   matter because I've run and he's run the models many

23   different ways.

24         So, for example, I used a measure of adjusted

25   premium.  He recommended that we use a different measure

1     of premium.  If you put that into my model, that

2     lowers -- actually decreases the diversion of individual

3     Medicare by a very small amount.  I'm not going focus on

4     that.  I'm going to focus on the things that really

5     drive the difference between our conclusions.

6     BY MR. MAJORAS:

7          Q.     Let's do that then.  What are the five

8     reasons that you found -- the five differences?

9          A.     The first is the implementation of the

10    hypothetical monopolist test.

11         The second is -- and unfortunately for everyone

12    in the room -- I apologize in advance -- a very

13    technical issue with regard to our demand model.

14         The third, we have a very significant difference

15    of opinion with regard to the merger simulation.

16         The fourth is there are technical issues with

17    regard to our difference in market outcome regressions.

18         And then fifth, there are differences in our

19    entry analyses.  And so I'm going to walk through each

20    of those.

21         Q.     Okay.  Let's jump in then.  I believe you

22    started with the differences in the hypothetical

23    monopolist test.

24         A.     Yes.  So hopefully this clarifies how

25    we've done the hypothetical monopolist test.

3136

1          Q.      So by "this," you're talking about

2     Slide 92?

3          A.      Ninety-two.  Yes, sir.

4          So I use direct evidence for market outcomes.  I

5     use the model about the relationship, as I talked about,

6     between the number of MAOs and pricing to do my

7     hypothetical monopolist test.

8          For Medicare Advantage, Professor Nevo used

9     something called critical loss analysis in merger

10    simulation.  I'll come back to this in one second.

11         For public exchanges, he uses the same type of

12    approach that I used for Medicare Advantage, direct

13    evidence for market outcomes.  And then he used critical

14    loss as part of that.

15         Q.      So if you look at the two columns under

16    Professor Nevo, broken down by the two issues -- main

17    issues in this case, direct evidence from market

18    outcomes is not used by him in Medicare Advantage?

19         A.      It was not used in his initial report.

20    In response to my report, he included certain

21    sensitivity tests, which I will talk about in the market

22    outcome regression part of the differences.

23         Q.      We all love to move to regressions.

24         Let's move to our next topic in your analysis,

25    sir.

1      A.      This is -- we can move on pretty quickly.

2 This is, again, the same analyses I've talked about

3 multiple times about the relationship between price and

4 the number of competitors.  And what I find is that it

5 does not pass the hypothetical monopolist test.

6      What this uses, again, is real-world data about

7 market outcomes that we observe, taking into account

8 original Medicare, the potential entrants, the

9 regulatory environment that we observe.

10     So all of that is being factored into what we

11 observe happening in the market when there's a change in

12 the number of MAOs and the effect that has on price.  I

13 implement that.  In every way that I implement it,

14 there's no version of this that passes the hypothetical

15 monopolist test, which says that Medicare Advantage is

16 not a relevant market.

17     Q.      So your conclusions are different.

18     What is it about the analysis that drives that

19 as the key difference to you?

20     A.      Well, the primary analysis he does -- and

21 he does two, and I'll get to both.  So in the

22 guidelines -- the merger guidelines, it talks about two

23 different ways to implement the hypothetical monopolist

24 test.  You can think about the hypothetical monopolist

25 increasing a single product price or increasing all

3138

1    products.

2          For the single product price he uses what's

3    called critical loss.  When you increase all price, he

4    uses his merger simulation model.

5          So let me start with critical loss.

6          Q.    Maybe define that for us, if you would.

7          A.    What critical loss is is it asks the

8    question of what is the -- it sets a threshold.  And it

9    says could you profitably raise prices by 5 percent.

10   And so it, in essence, sets a mechanism for determining

11   whether a hypothetical monopolist would profitably

12   impose a SNP.  And so it uses two values to determine

13   this, and it's embodied in the equation that's right

14   here.

15         Q.    That's Slide 94.

16         A.    So the first thing -- I'm going to start

17   actually on the right.  I'm going to go backwards.  It

18   asks the question of -- you have to start with what SNP

19   target you're going to use.  I'm fine with using

20   5 percent.  He uses versions that are 5 and 10 percent,

21   but it's assumed to be 5 to 10 percent in most models.

22         He then uses two measures:  Its aggregate

23   diversion that comes from his demand model, so that's

24   the diversion within Medicare Advantage; and then a

25   profit margin, which he simulates from his merger

1    simulation model.  He estimates that from his merger

2    simulation model.

3         Critical loss is in the guidelines.  It's a

4    standard approach that practitioners use.  I have used

5    it.  I often will use it -- I think it should be used,

6    as the guideline says it should be used, as

7    corroborating evidence, not as necessarily a stand-alone

8    piece of evidence because it is a simplification.

9         It's trying to condense the complexities of the

10   market down to two variables:  aggregate diversion and

11   profit margins.  And then it assumes that those remain

12   constant as you move towards monopoly.

13        So it's a simplification of the real world.  So

14   it's -- and in this case, I believe, it's an

15   oversimplification, which I can explain as we get there.

16   But let's focus first on the two elements of the

17   equation.

18        Q.    Okay.  So you mean the aggregate

19   diversion ratio and the profit margin?

20        A.    Yes, sir.

21        Q.    What do you want to discuss first?

22        A.    Let's do demand first.  And so this is at

23   the heart of the difference between what we do on the

24   demand side.

25        Q.    So just to remind the Court, I'd asked

3140

1    you before about diversions and you related it to

2    demand.

3              Is that the same reason we're looking at demand

4    now?

5              A.     Yes, sir.

6              Q.     Okay.  I'm sorry to interrupt.  Go ahead.

7              A.     I just want to start off, to put us in

8    the right spot here, there has been a whole bunch of

9    testimony as I've sat here about switch-out data.  And

10   some of it has been related to price; that's the

11   Professor Ford survey.  And some of it has not been

12   related to price; that involves -- I sat here for the

13   opening -- the work -- the presentation of Mr. Conrath

14   and Professor Frank.

15             Switch-out data ignores age-ins and ignores

16   switch-ins.

17             Q.     Okay.  Define "switch-out data" for us so

18   we're clear.

19             A.     So it's only looking at the people who

20   leave a Medicare Advantage provider.  It's not looking

21   at that other half of that circle that I showed earlier,

22   the age-ins at 10,000 per day, or the people switching

23   from original Medicare or other Medicare Advantage

24   providers.  It's only looking at the switch-out

25   information.  So it's only telling half the story.

3141

1          And if it's not in response to price, it's not

2     the right measure of switching for the purpose of the

3     economic analysis.

4          So Professor Nevo and I conducted what's called

5     a nested logit model.  And the good news is, because we

6     agree on it, I actually don't have to spend that much

7     time explaining it because it's a point of agreement.

8     We both use the same type of model, and we both have

9     very similar parameters in terms of the control -- I

10    mean, we both have very similar control variables in the

11    model.

12         So we both structure the model quite similarly.

13    And that model produces estimates of diversion, which

14    will take into account both switch-outs, age-ins, and

15    switch-ins in response to price.

16         And so that's what we should focus on.  That's

17    the right piece of information for the competitive

18    effects analysis is the diversion analysis.

19         Q.     When you talk about measuring

20    substitution, how do you go about doing that as you look

21    at these diversion issues?

22         A.     We use this nested logit model.  And what

23    that tells us is both diversion to Medicare Advantage

24    and diversion to original Medicare.  And so I think it's

25    a similar -- again, this is a place where there's

3142

1    probably agreement.

2          We both agree there's substantial substitution

3    from Medicare Advantage to original Medicare.  His

4    calculation is that the diversion rate is 30 percent to

5    original Medicare.  My calculation is it's 51 percent to

6    original Medicare.

7          Q.    This is the information you show in

8    Slide 97?

9          A.    That is correct.  Sir, yes.

10         Q.    So on the right-hand side is his nested

11   logit model and what he predicts in terms of

12   substitution -- I'm sorry -- in terms of diversion?

13         A.    That is correct.

14         Q.    And on the left is your model?

15         A.    That is correct.

16         Q.    But it's still the same model, the nested

17   logit model?

18         A.    We have one very significant technical

19   difference, but it's the same model framework.  Yes,

20   sir.

21         Q.    So I think I interrupted you when you

22   were talking about what your model predicted in terms of

23   diversion.

24         A.    So my model shows diversion to original

25   Medicare of 51 percent and to Medicare Advantage of

3143

1     49 percent.  His model shows 70 percent diversion to

2     Medicare Advantage and 30 percent to original Medicare.

3          So we both agree that there's significant

4     diversion to Medicare Advantage, and we both agree

5     there's significant diversion to original Medicare.

6     It's an area of agreement for both of us.

7          We also both agree on the academic literature

8     that we both cite.  We both literally cite the same

9     papers.  And I focus on the most recent literature,

10    and --

11         Q.    So we're looking at the slide on 98.

12         This is the same academic literature slide that

13    Professor Nevo used; is that right?

14         A.    That is correct.

15         Q.    Okay.  So I'm sorry to interrupt.

16         What is it that you're looking at, and how does

17    it relate to the differences between the models?

18         A.    Okay.  Let me try to explain what the

19    nesting parameter estimates mean because it's not

20    necessarily intuitive for anyone who hasn't studied

21    econometrics, and I'll try to put the intuition here.

22         The way I like to think about it is, imagine two

23    boxers -- a 150-pound boxer, a lightweight boxer, and a

24    heavyweight boxer -- which one would you rather be

25    punched by?  I would always rather be punched by the

3144

1   lightweight.

2        But the question is -- what this -- what the

3   model assumes is, if the nesting parameter equals zero,

4   the lightweight is average, and the heavyweight is of

5   average strength.  And so you always want to be punched

6   by the lightweight.

7        In this example, original Medicare is a bigger

8   player.  It has bigger market share.  So it's the

9   heavyweight.  Medicare Advantage has a 38 percent share.

10  It's the lightweight.  If you have a nesting parameter

11  equal to zero, they're both average punchers.

12       Q.    And by "puncher," competitor?

13       A.    Yes.  And so in that case, Medicare

14  Advantage would be a weaker puncher because you have to

15  take into account the weight class than the heavyweight.

16       Now you increase the nesting parameter from

17  above zero, and I'll stop at roughly the estimates that

18  are here.  What this tells us is that the lightweight is

19  stronger than average; Medicare Advantage is stronger

20  than average.  The heavyweight, original Medicare, is

21  weaker than average.  And at the estimates that I find,

22  you would much rather be punched by the lightweight

23  that's above average than the heavyweight that is below

24  average.

25       That's the diversion ratio that we're observing.

1  I'm finding more diversion to original Medicare than to

2  Medicare Advantage.

3        If you move the estimate all the way to one,

4  that's saying that the heavyweight is very far away and

5  their punch can't even reach you.  In that case,

6  original Medicare would be very far away, and enrollees

7  would not view Medicare Advantage -- original Medicare

8  as a substitute for Medicare Advantage.

9        So the way to think about this conceptually is,

10  as the nesting parameter gets higher, original Medicare

11  is a weaker and weaker substitute for Medicare

12  Advantage.

13        Q.    And when you talk about the nesting

14  parameters that you reach versus what Professor Nevo,

15  what are they in terms of actual --

16        A.    I have a range of estimates from .23 to

17  .35.  My midpoint is right around .30.  That's

18  consistent with the two most recent papers and the

19  literature.

20        Q.    The ones we see on the slide and the

21  pull-up?

22        A.    That is correct.  So that's .32 from the

23  Curto paper, which Professor Nevo talked about

24  extensively, and .41 with, from Ms. Guglielmo.  Those

25  papers use the most recent literature.

3146

1        I don't know if we can slide this back out so we

2    can see the underneath part.  But Professor Nevo has an

3    estimate of .65.  That's more consistent with the older

4    literature.  So that older literature that's up on the

5    screen, he's finding estimates that are consistent with

6    that older literature.

7        So the difference really is my estimate is

8    consistent with the recent literature.  His is

9    consistent with the older literature.  If we look at

10   that older literature, it's based on your studies that

11   are actually quite old now.  The most recent study in

12   that older literature ended in 2007, and there have been

13   very significant changes in the Medicare market in the

14   last ten years.

15       Q.    So let's talk about that in terms of why

16   the age of the literature matters.

17       What are the changes that you think are

18   significant since the -- previous to the two most

19   recent pieces of literature?

20       A.    Well, the Medicare Advantage program

21   wasn't called Medicare Advantage in the 1990s when I

22   served in the government.  It was called Medicare Plus

23   Choice.  So the program has gone through various

24   iterations in changes.

25       In 2003, President Bush added a prescription

1    drug plan which was implemented in 2006.  In 2010,

2    President Obama signed into law the ACA, which included

3    various changes to the benchmark payments, the creation

4    of ACOs, et cetera.  So there have been various changes

5    to the Medicare program over the last 15 to 20 years.

6         Q.    And as you observe those changes, what

7    does that tell you about the nesting parameter of what

8    you would expect?

9         A.    All other things being equal, I would

10   expect the nesting parameter to fall.  It's not easy to

11   go back to the studies and reestimate them using the

12   newer data, using the precise same techniques.  So

13   neither of us have done that.

14        But what I'd say is that my estimate is very

15   consistent with the last two papers and the literature,

16   especially the one that was cited extensively by

17   Professor Nevo.  His estimate is very consistent with

18   the much older literature, and that older literature

19   shows less substitution between original Medicare and

20   Medicare Advantage.

21        The newer literature from Ms. Guglielmo and the

22   Curto paper shows a much more significant substitution

23   between Medicare Advantage and original Medicare.  And,

24   again, that's really important because that goes right

25   into that aggregate diversion calculation in the

3148

1    critical loss analysis.

2         But, more importantly, it goes to the principles

3    of -- more importantly to me, it goes to the principles

4    of the circle principle, Example 6, because it shows

5    that diversion.  And so we have to sort of keep that in

6    mind about the difference between our estimates.

7         THE COURT:  Mr. Majoras, is this a good place

8    to end for the day?

9         MR. MAJORAS:  Yes, it is, sir.

10        THE COURT:  Well, why don't we do so.  We'll

11   resume tomorrow morning at 9:15.  I thank you all and

12   wish you a pleasant evening.

13        Tomorrow morning, once I get the estimates

14   from both sides or the actual raw data from both sides

15   as to the time that you each utilized, I'll tell you

16   what my assessment is for the last two days in terms of

17   how much time each side has.  Because I think that's

18   useful for you to know as you embark upon the last two

19   days of examination.

20        MR. MAJORAS:  Mr. Conrath and I spoke at lunch

21   about this issue too, Your Honor.  And perhaps it would

22   be helpful for us to share at least our thoughts.  We

23   are still of the view that Mr. Orszag will be on direct

24   for about an hour or so tomorrow morning, perhaps less

25   than that.

1          But our expectation is that, if the complete

2     amount of testimony, including the rebuttal case, does

3     not come in all day -- by the end of the day tomorrow,

4     it would likely be in sometime on Wednesday morning.

5          THE COURT:  I'm sorry to keep everybody, but

6     I'll ask the question.

7          How many rebuttal witnesses are we expecting?

8          MR. CONRATH:  I think we expect two,

9     Your Honor.

10          THE COURT:  Two experts?

11          MR. CONRATH:  Two experts, yes.

12          MR. MAJORAS:  And in that regard, Your Honor,

13     counsel both have an interest in this question.  And

14     that is, if we were to conclude with the testimony at

15     some point tomorrow afternoon, probably late --

16          THE COURT:  Tomorrow afternoon?

17          MR. MAJORAS:  Yes, sir.  If that were to

18     happen, would it be your preference to have our closing

19     arguments the end of testimony -- closing arguments

20     immediately after that or carried over to Wednesday?

21          THE COURT:  We'll see where we are, but I

22     would be flexible enough to give you the overnight if

23     you both would like the overnight.

24          MR. MAJORAS:  We would both like that, sir.

25          MR. CONRATH:  I will confirm.

3150

1     THE COURT:  See you in the morning.

2              (Proceedings adjourned at 5:19 p.m.)

3                   * * * * * * * * * * * * * *

4          CERTIFICATE OF OFFICIAL COURT REPORTER

5

6   I, Barbara DeVico, certify that the foregoing is a

7   correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11

12

13

14   _____        12-19-16

15   SIGNATURE OF COURT REPORTER                 DATE

16

17

18

19

20

21

22

23

24

25