UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
et al.,                            .
                                   .   CA No. 16-1494
          Plaintiffs,              .
                                   .
     v.                            .
                                   .   Washington, D.C.
AETNA, INC., et al.,               .   Tuesday, December 20, 2016
                                   .   9:19 a.m.
          Defendants.              .
. . . . . . . . . . . . . . . . .      Pages 3151 through 3274


DAY 12, A.M. SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For Plaintiff United States:    CRAIG W. CONRATH, ESQ.
                                RYAN M. KANTOR, ESQ.
                                ERIC J. MAHR, ESQ.
                                JUSTIN T. HEIPP, ESQ.
                                PETER J. MUCCHETTI, ESQ.

                                U.S. Department of Justice
                                Antitrust Division
                                450 Fifth Street, NW
                                Washington, DC 20530

For Plaintiff State of Iowa:    LAYNE M. LINDEBAK, ESQ.
                                Office of the Attorney General
                                1305 East Walnut Street
                                2nd Floor
                                Des Moines, IA 50319


For Plaintiff                   JAMES A. DONAHUE, III, ESQ.
Commonwealth of Pennsylvania:   Office of the Attorney General
                                Public Protection Division
                                14th Floor
                                Strawberry Square
                                Harrisburg, PA 17011

For Defendant Aetna:                 JOHN M. MAJORAS, ESQ.
                                     GEOFFREY S. IRWIN, ESQ.
                                     PAULA RENDER, ESQ.
                                     CHRISTOPHER N. THATCH, ESQ.

                                     Jones Day
                                     51 Louisiana Avenue, NW
                                     Washington, DC 20001

For Defendant Humana:                KENT A. GARDINER, ESQ.
                                     SHARI R. LAHLOU, ESQ.
                                     DAVID M. SCHNORRENBERG, ESQ

                                     Crowell & Moring LLP
                                     1001 Pennsylvania Avenue, NW
                                     Washington, DC 20004


Court Reporter:                      BRYAN A. WAYNE, RPR, CRR
                                     U.S. Courthouse, Room 4704-A
                                     333 Constitution Avenue, NW
                                     Washington, DC 20001
                                     (202) 354-3186

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

WITNESS:                                              PAGE:


JONATHAN ORSZAG:      Direct Examination Continued........3154
                     Cross-Examination...................3203


\* \* \* \* \*


EXHIBITS RECEIVED

Government Exhibit No. 711 ............................ 3222
Orszag Deposition Page 157............................ 3229


\* \* \* \* \*

P R O C E E D I N G S

1    THE DEPUTY CLERK:  Your Honor, we have Civil Action

16-1494, United States of America versus Aetna, Inc. and Humana,

Inc.  And for the record, Your Honor, all counsel are present.

THE COURT:  My rough calculation for time, assuming

we're going to use about 12 and a quarter hours, which is about

what we're running now for two days, is that the plaintiffs have

about eight hours left and the defendants have about four and a

quarter hours left.

MR. MAJORAS:  That's consistent with ours, Your Honor.

THE COURT:  All right.  Good morning.

THE WITNESS:  Good morning to you.

THE COURT:  Nice to see you again.  I remind you

you're still under oath.

Mr. Majoras.

MR. MAJORAS:  Thank you, Your Honor.  Good morning.

**JONATHAN ORSZAG, WITNESS FOR THE DEFENDANTS, PREVIOUSLY SWORN**

DIRECT EXAMINATION CONTINUED

BY MR. MAJORAS:

Q.   Mr. Orszag, let's just set the table a bit as to where we

left off from yesterday.  One of the things that we've been

talking about is the demonstrative which is labeled as Defense

Exhibit DEM 900.  Is that right?

A.   With the caveat that I didn't memorize the exhibit number,

sure.

Q.   And this is your demonstrative exhibit to help inform the
Court and assist in your testimony.

A.   That is correct.

Q.   So yesterday, when we left off, we were on page 98 of the
demonstrative slides.  And that has now come up on your monitor
too?

A.   That is correct.

Q.   One of the things you mentioned yesterday is that you
described a difference in age between the different pieces of
economic literature you looked at?

A.   That is correct.

Q.   You mentioned that over that time period in which the
literature exists, there have been changes in the Medicare
program.

A.   That is correct.

Q.   So let's start from there, then.  You mentioned some of
those changes yesterday.  Did you actually test for how those
changes had some impact in the movement, the relative movement
between original Medicare and Medicare Advantage?

A.   So let me break that into two parts, if I may.  The first
part is there's this literature, and you can see it on the
screen here, that the older literature finds much higher nesting
parameters.  That's more distance between original Medicare and
Medicare Advantage.  And the newer literature, which studied
basically between 2006 and 2011, finds a lower nesting parameter

1    that's consistent with more competition between original

2    Medicare and Medicare Advantage.

3         So that's part one.

4    Q.   Just to clarify that, is there a trend line in the

5    literature overall?

6    A.   It's not something I plotted precisely, but I think you can

7    see that the older literature has higher, and the newer, the two

8    newspapers have a lower nesting parameter.

9    Q.   And the second element you were going to describe?

10   A.   As part of my research here, I looked at whether there had

11   been a decline in the nesting parameter from 2012 to 2016.  I

12   initially looked at it for my preferred specifications and I

13   found a downward trend as part of the natural back and forth in

14   this process.

15        Professor Nevo looked across all of my preferred

16   specifications and he noted that there were some versions that

17   showed a slight upward trend and some versions that had a less

18   significant downward trend.

19        If I take all those together, there is not a significant

20   downward trend over that four-year period from 2012 to 2016.  So

21   that's why I don't draw a conclusion that there's been a

22   movement downwards in that window from 2012 to 2016, because as

23   a matter of statistics, even though on average there's a slight

24   downward trend, it's not statistically significant.

25   Q.   And you have been describing what you think are the key

1    differences between your work and what you have seen from

2    Professor Nevo.  Right?

3    A.    That is correct.

4    Q.    Have you done anything else to test the validity of your

5    model in this regard?

6    A.    Yes, sir.

7    Q.    What did you do?

8    A.    Well, I really focused in on what the driving difference is

9    between our analysis, and it has to do with what's called

10   instrumental variables.  This is the issue of trying to solve

11   the issue of correlation and causation.

12        So if you think about what you could be trying to examine,

13   just giving a real world example, in areas where there is high

14   crime, there tend to be more police officers.  But we don't

15   think police officers actually cause crime.  Hopefully, they're

16   reducing crime.  And so if you want to test the effect that

17   police officers have on crime, you need to solve that

18   correlation problem by having something that would help solve

19   what's the effect of the number of police officers on crime.

20        And so the way you do that econometrically is doing

21   something called instrumental variables.  Both Professor Nevo

22   and I use instrumental variables, so we're both trying to solve

23   the same problem.  We do it differently.

24        So I think it will help the Court, hopefully, to understand

25   that this is literally driving the difference between our

1   results, our choice of instrumental variables, and so I dug in

2   to try to understand what's actually driving the difference.

3        So I do my instrumental variables looking in-county.  So if

4   I'm trying to estimate demand -- and I'm using Mecklenburg

5   County again because it was used by Professor Nevo, and this is

6   done over and over again within the econometric model -- what

7   I'm using as my instruments are counts of the number of

8   competitors and other factors in Mecklenburg.

9   Q.   Before you go on, is Mecklenburg an example of what you're

10  doing or is that only what you did?

11  A.   This is an example.  So it's done everywhere.  I'm just

12  using this as an example to highlight the point and the

13  difference between what Professor Nevo and I did.

14  Q.   So that's why we see Mecklenburg County on the map on the

15  screen?

16  A.   That is correct.

17  Q.   Please go ahead.

18  A.   So first of all, looking in-county is exactly what the

19  Curto paper does, the one that was cited by Professor Nevo and

20  myself.  Their instruments are based in-county.  So they're

21  doing the same instrumental variable structure that I'm doing.

22  So let's start with that.

23       Second, I test whether my instrumental variables pass

24  various statistical tests, whether they're valid.  And this

25  isn't -- I think I want to make sure that we put this in the

1  right box, because not every single version of my model passes

2  those statistical validity tests, but the ones that pass produce

3  similar results to the ones that do not pass.

4  Q.  What does that tell you?

5  A.  The test of statistical validity is -- I would put it in

6  the -- it's a check mark.  It's not the determinant about

7  whether instruments are good or bad.  It's a factor that should

8  be considered.  For example, Professor Nevo's instrumental

9  variables pass none of the statistical validity tests.  Just

10  based on that fact, I would not say that they're inappropriate,

11  but it is a piece of evidence to include in considering whether

12  they're appropriate or not.

13  Q.  So back to looking at your instrumental variables in

14  Mecklenburg County.

15  A.  Sure.  So -- and again, since I'm trying to focus really on

16  the differences between what Professor Nevo and I did, I include

17  in addition to the instruments -- and this is just highlighting

18  what matters and what doesn't for a second.  I include also

19  what's called cost instrumental variables.  If you go to the

20  literature, it's a standard instrumental variable that's used in

21  the broader nest of literature.  Professor Nevo raises questions

22  about whether that's appropriate in this case.

23      Whether I include it or not, it moves the nesting

24  parameter, the strength of original Medicare or Medicare

25  Advantage, by about .01, .02.  So it's really small as an

1    effect.  So whether I include that or not, that's not a

2    significant factor.

3         I also should note I tried a range of models and a range of

4    specifications in testing how to structure this model.  And I

5    just want to note this because I don't get a chance to come back

6    and explain these different things.  I included some versions

7    where I included what's called county fixed effects.  And when I

8    do that, my model becomes unstable.  It doesn't produce stable

9    results.  So I reject that approach.  The Curto paper, the

10   recent literature, also rejects including county fixed effects.

11   Professor Nevo doesn't include county fixed effects in his

12   approach.  So I think there's agreement about not including

13   county fixed effects.

14        And I just note this because in his reply report he

15   included a chart that compared his results to a full range of

16   mine, including the ones that I rejected with the county fixed

17   effects.  And since I don't get a chance to come back to explain

18   that point, if he does, I guess later today or tomorrow, explain

19   that, I just wanted to be clear that I had already rejected

20   that.

21        So I focus on in-county.  Now we should turn to what

22   Professor Nevo did.  Okay?  Which is --

23   Q.   I'm sorry.  Just remind us.  Why are you looking at what

24   Professor Nevo did?

25   A.   Because I'm trying to understand what drove the difference

1   between my estimate of around .3 for the nesting parameter, and

2   his estimate of around .65.

3   Q.   So on the slide we're now seeing on the monitor we have a

4   number of counties in blue surrounding Mecklenburg County.   What

5   is the significance?

6   A.   So he defines his instrumental variables based on the

7   entire service area.  He says that this is how they set prices.

8   So he says this is what we should use for our instrument set.

9   And so this is his argument.  So then I dug further.  And again,

10   his don't pass the statistical validity test.  I don't want to

11   put too much weight on that, but it is just a check mark to

12   note.

13   Q.   Even when he includes the pricing for the whole service

14   area?

15   A.   That is correct.  So now the difference between me and him

16   is I'm using in-county, he's using service area.  He raises a

17   technical econometric issue that you may not want to use in

18   county, and he uses it as the logic for why you should use the

19   service county.  So I split the service county into two

20   categories: counties that are adjacent and counties that are

21   nonadjacent.

22   Q.   Why?

23   A.   Because I wanted to test what was driving the difference

24   between our results.  If I use adjacent counties, I solve the

25   technical econometric issue that he raises.

1  Q.   Just so we can follow along, on the slide out of the

2  demonstrative, we're now seeing the original green in

3  Mecklenburg County.  What are the yellow counties?

4  A.   Those are the adjacent counties within the service area.  I

5  also tried it with all adjacent counties, so that would include,

6  say, the county that's right here and I guess right there.

7          THE COURT:  And by "yellow," you mean the dark yellow,

8  not the more beige yellow?

9          THE WITNESS:  That is correct.  Yes, sir.  And when I

10  rerun my econometrics with just -- using the instruments that

11  are just for the adjacent counties, the results barely change.

12  That means that my model is robust to now including adjacent

13  counties as the instrumental variable set, and consistent with

14  my conclusion, that the right way to think about this is either

15  county, or if you want to use adjacent counties, that's fine

16  with me because the results don't change significantly, they

17  change by a very small amount.

18      The entire difference in our results is being driven by his

19  inclusion of the nonadjacent counties.

20  BY MR. MAJORAS:

21  Q.   So now, so we could look at what you're talking about on

22  the slide, we see the slide which in the deck is No. 99 with

23  three colors, the ones you just described, the yellow and green.

24  What do we now see with the red?

25  A.   The reds are the nonadjacent counties, and that is

1    driving -- somewhere between 80 and 95 percent of the difference

2    between our results is his inclusion of those nonadjacent

3    counties.

4           THE COURT:  Which result are you talking about being

5    an 80 to 95 percent difference?

6           THE WITNESS:  Sure.  In the nesting parameter.  So if

7    you think about my nesting parameter is around .3, his nesting

8    parameter is about .65.

9           THE COURT:  What's the nesting parameter using the

10   adjacent counties?

11          THE WITNESS:  So I have to readjust because there's

12   differences in the data set.  So if I just do it, say, within

13   Professor Nevo's model, because you have to be consistent,

14   roughly speaking -- and it's in my reply report -- if you use

15   his instruments in-county, you get a nesting parameter of around

16   .4.  If you use the adjacent counties, it's .41.  And then you

17   get .65 if you add the nonadjacent counties.

18       So you have to do it on a consistent basis.  So it's

19   explaining the vast majority of the difference is the inclusion

20   of the nonadjacent counties.

21   BY MR. MAJORAS:

22   Q.   So what is your conclusion then as you compare what the two

23   of you did and your view of what should be done?

24   A.   I believe that using the in-county, the same thing that the

25   Curto paper did, is appropriate.  I believe the results -- it's

1    hard to understand how the results are being driven by the

2    nonadjacent counties, and I haven't heard an intuition for that.

3    So I believe that basing it on the most recent paper, Curto, or

4    doing it on adjacent counties is the most appropriate approach.

5    Q.    Remind the Court, please, why are you looking at demand

6    estimates to begin with?

7    A.    Because they go right into diversion, and diversion is

8    important for assessing the candidate market.  We talked about

9    this a lot yesterday.  So the diversion estimates then go to the

10   question of how close in the competitive space is Medicare

11   Advantage and original Medicare, or are they farther away in the

12   space?

13         Professor Nevo, even though we both find substantial

14   substitution to original Medicare, he says it's substantially

15   lower than the amount that I estimate.  This calculation is the

16   foundation of that.  So if he had had my nesting parameter, he

17   would have found a similar result, that there's higher

18   substitution, diversion to original Medicare, consistent with my

19   results.

20            THE COURT:  Let me ask one or two questions.  What

21   you're illustrating with Mecklenburg County, do you know that

22   that's true more universally?

23            THE WITNESS:  Yes.  So this is literally an

24   illustration, so it's in the model.  It's done for every single

25   county.  So if you -- what I'm doing is taking the entire data

set, and in my version I'm doing it in-county, or taking all the

adjacent counties everywhere in the country.  And then for his

version I'm adding the nonadjacency, and that's what's driving

the result.  So Mecklenburg is literally an example.

THE COURT:  Now, you're explaining the difference in

the results between .3, .41, and .65, based on whether

in-county, adjacent county, or service area is utilized.  Now

tell me why that should be an explanation for the difference in

results.  Okay, it tests out that way, but why does that make

sense?

THE WITNESS:  You ask a very good question, and that's

what I struggle with.  Why are the nonadjacent counties as a

matter of intuition driving the results in that way?  And there

isn't a good intuition.  That's in essence the problem.  There's

a very good intuition for using the in-county instrumental

variables, and it's consistent with the literature.  And it's

this idea that if you add a competitor -- say if you add a

competitor and the share of Medicare Advantage doesn't change,

then they're picking up share from other Medicare Advantage

providers.  That's saying original Medicare is a more distant

competitor.

If they're taking share from -- if you add a new competitor

and it takes share from both original Medicare and Medicare

Advantage, that tells you about the closeness of substitution

from the perspective of consumers.

1    So there's a very good intuition for looking right at

2  in-county.  There is -- it does raise a potential -- I don't

3  think it's appropriate statistical issue, and that has to do

4  with if there's a common cost or demand shock in the county, it

5  may affect all competitors.  So you can solve that by just

6  looking at the adjacent counties, and that's how the economics

7  literature has done this.  Professor Nevo actually cites to a

8  paper by Jerry Hausman that I would say innovated this idea of

9  looking at adjacent areas, and the results are similar.

10    The intuition of why the results change so much when you

11  add nonadjacent counties is not clear to me at all, and

12  Professor Nevo has not explained it yet.

13  BY MR. MAJORAS:

14  Q.   And if you haven't satisfied that question about why you're

15  using the surrounding versus the adjacent or just the county,

16  what is your conclusion?  What do you take from that?

17  A.   I think Professor Nevo and I agree on this.  You have to

18  have a good intuition for your instrumental variables and why

19  you're using certain instrumental variables.  And so I have a

20  sound intuition.  It's consistent with the most recent

21  literature.  And as a result, I believe my instrumental

22  variables, and as a result, my results are better.  They pass

23  certain statistical validity tests, they're consistent with the

24  literature, and I think they're more economically appropriate.

25  And as a result, my diversion estimates are better, in my

1    opinion.

2    Q.   So as you look to the significance of whether those

3    diversion estimates and whether the demand analysis is correct

4    or not, whether it's you or Professor Nevo, what is the

5    significance if that's wrong to the overall analysis?

6    A.   Remember how I started this section, which is both of these

7    calculations, aggregate diversion and margins are feeding in to

8    his critical loss analysis.  They also will feed into his merger

9    simulation model in a minute.  And so if you understate

10   diversion to original Medicare, all other things being equal,

11   you're prone to define too narrow of a market.

12   Q.   Let's turn now to the merger simulation.  That's another

13   area in which you found key differences with Professor Nevo?

14   A.   That is correct.

15   Q.   Why is that distinction important to you?

16   A.   Well, merger simulation is a standard task as part of a

17   merger analysis.  We analyze competitive effects.  I simulate

18   the merger by looking at the real world behavior of firms as

19   you've seen increases and decreases in the number of

20   competitors.  And I've talked about that, and I'll talk very

21   briefly about it shortly.

22        Professor Nevo goes to a model.  So he tries to simplify

23   the model and the world into this model.  But when he -- he

24   really has a contradiction between his demand model and his

25   merger simulation model in a way that doesn't make economic

1    sense.  In his demand model, he says I use those instruments

2    because they set prices at the plan service area.

3    Q.   So as you're speaking, we're looking on the screen at page

4    102 of demonstrative 900?

5    A.   That is correct.

6    Q.   So your first point that you're making is in which box?

7    A.   On the left-hand side.

8    Q.   The demand model.

9    A.   That is correct.

10   Q.   Okay.  Please go ahead.

11   A.   But when he actually goes to simulate how firms price, he

12   doesn't take his own guidance that they set prices to the plan

13   service area; he does his merger simulation model at the county

14   level.  He actually really does create 364 different merger

15   simulations, one for each of the complaint counties, that are

16   completely independent of each other.

17   Q.   On the screen again you show his merger simulation model on

18   the right side.  What's the significance of that distinction,

19   that he does one in one model, not in the other, or does it

20   differently in the other?

21   A.   Well, if you believe that firms set prices at the plan

22   service area, then you should simulate how they price, which is

23   at the plan service area.  So simplifying the world to the

24   county level, he basically oversimplifies, and that creates all

25   kinds of issues where his merger simulation model, as I will

1    explain, really contradicts with real-world evidence.  And if a

2    merger simulation model can't predict pre-merger behavior,

3    asking it to then predict what will happen post-merger is really

4    pushing hard on a model that is inappropriate.  Because if you

5    can't predict the pre-merger world, it's an awful lot to say

6    okay, let's forecast what the future world will look like.  And

7    I show that in a number of different ways.

8        We observe in the real world that firms do not set prices

9    on the county level in any kind of significant way.

10   Q.   How do the firms actually set prices?

11   A.   On average, there are eight counties in each plan service

12   area, 7.8 to be precise.  You see single-county plans in about 4

13   percent of counties.  That's the relevant statistic to look at.

14   Even if we take Professor Nevo's statistic, which isn't the

15   right way to think about it, it's about one out of six plans is

16   a single-county plan for Aetna and Humana, one out of five, one

17   out of six.  So the vast majority are multi-county plans, but

18   he's modeling it at the single-county basis.  In so doing, he's

19   ignoring all the costs associated with having a single-county

20   plan.

21   Q.   First, why are the costs important?

22   A.   Because there's a reason why we don't observe firms having

23   single-county plans today.  And they've made a decision that

24   it's too costly -- I mean, they reveal something about the costs

25   when they don't use single-county plans, when the vast majority

1    of their plans are multiple counties.

2    Q.   What kinds of costs?

3    A.   Well, there's the cost of the loss of scale with regard to

4    marketing.  And Ms. Cocozza and Mr. Wheatley talked about this

5    in their testimony.  They talked about the cost of multiple plan

6    review, the increased administrative cost.  There's also issues

7    with the CMS rules, that if you -- you have to have a certain

8    number of enrollees, so if you have single-county plans, it

9    becomes harder to meet those rules.

10         And then there's a cost of transition.  If we think about

11   the world today where we have a multiple-county plan, if you

12   wanted to issue a single-county plan, you would actually have to

13   terminate your multi-county plan, and people would disenroll and

14   then they would have to reenroll and then you would have risks

15   associated with people diverting to other companies or to

16   original Medicare.

17   Q.   When Professor Nevo's model looks at the individual

18   counties and the pricing of individual counties, what is the

19   impact that you see in your differences?

20   A.   Well, you see very significant results that don't comport

21   with what we actually see in the data pre-merger.  So I took two

22   examples from his model of two plans.

23   Q.   So the first we're going to turn to is on slide 104 of

24   Demonstrative Exhibit 900?

25   A.   Yes, sir.

1    Q.    Okay.  Please explain to us what we're seeing on that

2    slide.

3    A.    So this is a Humana plan in Georgia.  It has about 14,000

4    enrollees.  It's an HMO plan.  And what this shows is it covers

5    about eight counties, that's about average for your typical

6    plan.  The blue line is today's single price.  By regulation,

7    they have to offer a single price across all the counties.

8         The red dots represent the different prices that Professor

9    Nevo's model predicts for that plan post-merger.

10   Q.    Let me stop for a moment and make sure we're clear.  This

11   is an actual plan.  It's a Humana plan in existence today?

12   A.    Yes, sir.

13   Q.    And that plan number is H414-1.  Is that right?

14   A.    That is correct.  Yes, sir.

15   Q.    So tell us the significance of these dots.

16   A.    Well, even though today they have a single price across all

17   eight counties, Professor Nevo's model predicts that there will

18   be a differential price in each of those eight counties.  And

19   just so it's clear, along the X axis, the eight counties are

20   just sorted by what's called the FIPS code, which is a census

21   definition.  And so there's no particular meaning to the FIPS

22   code; it's just sorted by -- sorted some other way.  And then on

23   the left-hand side, this is rebate-adjusted premium.

24        So what Professor Nevo's model is saying is that you would

25   have a single plan today, and post merger there will be eight

1    different prices.

2    Q.   What does that mean to you in terms of the effects on the

3    analysis?

4    A.   Well, you have to go into the underlying economics, because

5    what the model does is it observes that single price and it

6    observes different market shares.  And what Professor Nevo's

7    model does is it then says, well, if I observe different market

8    shares and they have a single price, the variable that must

9    float, must be free, is cost.  And so this is going to be

10   important because as a result of his model, he mispredicts

11   pre-merger margins very significantly.

12        I give another example of what could happen in a more

13   county plan on the next page.

14   Q.   Before we do that, though, I want to make sure it's clear

15   on the record what the disparity and the results are across

16   these counties.  So if you look at the different eight counties

17   in this plan, what does Professor Nevo predict would be the

18   rebate-adjusted premium for the lowest increase?

19   A.   It would go from about $26 to about $38.

20   Q.   That's the plan we see labeled -- I'm sorry, the county

21   labeled as No. 2?

22   A.   Yes, sir.

23   Q.   What's the highest one he predicts?

24   A.   It will be about $40 or so.  This would be plan No. 6.

25   Q.   And as you look at how these dots that represent the

1    pricing he predicts, what, if anything, does that disparity tell

2    you about the differences within this single plan?

3    A.   Well, he's not taking into account the cost of splitting up

4    the plan into each of the individual counties in assessing what

5    would happen post merger.

6              THE COURT:  Let me ask, it sounds like you're saying

7    that the better -- using this particular analysis as reflected

8    on slide 104, that the better approach is to go with the service

9    area than the county level.

10             THE WITNESS:  That is correct.

11             THE COURT:  But you would agree that whether you go

12   with county or service area varies depending upon what test

13   you're doing in this overall economic analysis?  Because a

14   moment ago, with instrumental variables, you said focus county,

15   not service area.

16             THE WITNESS:  Right.  So let me explain, if I may?

17             THE COURT:  Which seems to be exactly the problem

18   you're accusing Professor Nevo of.

19             THE WITNESS:  I understand, and let me explain.

20   Demand is determined -- remember, we're doing a demand model in

21   the first one.  If Professor Nevo had actually flipped it and

22   done county on the demand side and then service area on

23   simulating prices, that's understandable as a matter of

24   economics, and let me get into more details about that.

25        Demand -- he and I agree that the county is the relevant

1    geographic market.  That is the county.  That is the level that

2    people are making decisions.  When you think about demand, it's

3    relevant to look at the county.  That's a demand model.

4        When we think about supply and demand, which is a merger

5    simulation, that will take into account both the demand side

6    considerations as well as supply-side considerations.  The

7    supply-side considerations will then take into account the cost

8    of, for example, having a single-county plan versus not.  And

9    that's why looking at plan service area for an analysis that

10   includes both demand and supply is more appropriate and why,

11   when you're simulating prices, which includes both demand and

12   supply considerations, you should do it on a broader basis.

13   BY MR. MAJORAS:

14   Q.   When you look at pricing and how prices are set on either a

15   service level or a county level, how does that comport to

16   present-day reality?

17   A.   In general, they're setting prices across plans that have

18   multiple counties.  So on average, across all of the Aetna and

19   Humana plans, there are 7.8 counties in each plan.

20   Q.   You were going to take us then to another plan with a bit

21   of a larger group of counties.  Is that right?

22   A.   Sure.  This is Humana plan H1716-1.

23   Q.   We're on page 105?

24   A.   Yes.  This is a plan in Kansas and Missouri.  It's a PPO

25   plan.  It covers actually 55 counties.  It has about 9,000

enrollees.  And what we see here is prices are -- a single price

today that's around $180, $190, and then each of the dots

represent the price increases that Professor Nevo predicts for

these counties.

So if I just highlight one, for example, right here,

Professor Nevo's predicting that the price will go from about

$190 to about $400.  I just want to highlight one point, which

is that there are rules about price increases, and according to

the CMS rules, you can only raise total beneficiary cost by $32

per member per month annually.  So it would take about six years

to be able to raise prices by $200.  And we have to remember

what these merger simulation models do.  They include no entry.

They don't factor in entry.  These are static models.

So during that period, what I've shown previously is if

there's that profit opportunity, if prices are actually going

up, there would be those opportunities for potential entrants to

come in.  The model doesn't take into account, in this version,

in the base version, any entry.  So it's not taking into account

those dynamics.

By definition, if the only part of the model is one change,

a merger, and you're not counting efficiencies, you're not

counting entry or any other factor, it has to show some price

increase.  It's set up to do that.  So we have to keep that in

mind that these models are, by definition, going in one

direction if you don't then factor -- include mitigating

1    factors.

2    Q.   As you look at the predictions from Professor Nevo's model

3    with all of the different counties and the various disparities

4    we've seen in the predicted pricing, what is your conclusion

5    about how he has structured his model versus the way you have

6    analyzed the market?

7    A.   That he's come up with a model, a very simplified model.

8    The way I've done my merger simulation, which is identical to

9    the way he's done it for the exchanges, is to use market

10   outcomes to look at what happens when there's a change in the

11   number of competitors and the impact that has on various

12   measures of price and margin.

13       Given the complexities of this market and the real-world

14   realities of this market, that's a much stronger way to simulate

15   the merger than to do it in basically a highly simplified way,

16   extracting too far from reality.

17       And there's an important implication.  As I described, his

18   model is allowing the cost variable to be the free variable.

19   That's how he's estimating his model, in essence.  And what

20   happens is, when you go into his model and you ask the question

21   of what's the implied margin from his model, he's implying a

22   margin of 24 percent.  That's his estimated margin that the

23   firms shall earn according to his model.  That doesn't comport

24   with what we observe their pre-merger margins to be.

25   Q.   So let's take a look again at your demonstrative Exhibit

1    900, page 105.  How does your testimony relate to this slide?

2    A.   As I just said, he estimated an economic margin --

3              THE COURT:  You said 105, but you're actually on 106?

4              MR. MAJORAS:  I am now, yes, Your Honor.  Thank you.

5              THE WITNESS:  So he estimated an average economic

6    margin of 24 percent.  Obviously, within his data there's a lot

7    of variation across that.  But let's focus on averages, because

8    that's relevant for simplification here.  If you look at their

9    average actual variable accounting margin, it's roughly 11

10   percent.  And again, across counties there's going to be

11   variation there.

12        So there's a very big difference, obviously, between the 11

13   percent margin that you see in the accounting data and the 24

14   percent margin that he observes, and obviously there's the

15   medical loss ratio regulation set at 85 percent which should cap

16   margins at 15 percent, and that's before you include

17   administrative costs.

18   BY MR. MAJORAS:

19   Q.   So as you look at the results he's predicting versus the

20   reality, what does that tell you about how he has modeled the

21   world?

22   A.   It raises a very significant issue.  The merger guidelines

23   actually tell us that your model has to be consistent with

24   pre-merger margins and consistent internally, and we should be

25   looking at those business records to consider those factors.

1          THE COURT:  Where did you get the 11 percent average

2    actual variable margin?  Because it seems slightly at odds with

3    some of the testimony that I've heard over the past two weeks

4    about a 4 to 5 percent profit margin.

5          THE WITNESS:  Hopefully I can enlighten the issue.

6    The difference is the 4 percent margin that the business people

7    talk about will include many fixed costs, as I'm focusing on

8    variable costs.  So there's, roughly speaking -- and I have more

9    details on this in my report, but roughly speaking about 85, 86

10   percent, 87 percent of overall revenue goes to medical costs.

11   Then if you think about the remainder, some of those

12   administrative costs are variable, and some are fixed.  I'm only

13   counting the variable cost.

14        So if you think about it as the medical costs get you down

15   to about a 13, 14 percent margin, if you include then the

16   variable elements of the administrative cost, like broker

17   commissions, you end up at about 11 percent.  If you then add

18   the fixed-cost elements, that takes you down to the 4 to 5

19   percent.

20   BY MR. MAJORAS:

21   Q.   You were starting to talk about the discussion of margins

22   and the guidelines.  What are the guidelines -- what do the

23   guidelines tell us about margins?

24   A.   There's a couple different places in the guidelines where

25   the issue of margins are discussed.  One of the points they

1    raise is that when we think about customer substitution, the

2    agencies want the estimate of customer substitution to be

3    consistent with the pre-merger margins.  That's number one.

4        Number two, they point to, in thinking about incremental

5    costs, the guidelines say to look at the business records and

6    look at the merging parties' documents or data to inform the

7    question of incremental cost.  And so it's both together helping

8    to inform that one should really look at what happens inside the

9    business to help inform whether one's model is accurate or not

10   in predicting margins.

11   Q.   So, as an antitrust economist, how should you and how did

12   you conduct that margin analysis here?

13   A.   Well, I have -- Professor Nevo and I agree that economic

14   margins and accounting margins are not necessarily the same

15   thing, because they are calculating a different concept.  In

16   part, based on the interaction we just had, economists are not

17   as focused on fixed costs as we are on variable costs.

18       And so I thought it would be helpful, because some of the

19   discussion earlier in the week about -- or last week about the

20   difference between accounting margins and economic margins

21   wasn't necessarily perfectly clear, to try to lay out what the

22   difference is, and then to walk through why in this case I can't

23   give an absolute certainty what the precise economic margin is

24   in this case, but I can tell you that it can't be higher than 15

25   percent given the nature of the costs that are at issue in this

1    case.

2        So I can't say if it's -- 9, 10, 11, or 12 percent is the

3    right economic margin, or 13 percent.  I know it can't be higher

4    than 15 percent given the nature of the costs that are in this

5    business.

6    Q.  So let's look at those differences again that you have with

7    Professor Nevo.  What does he use as his margin?

8    A.  So the model is -- his model is estimating economic

9    margins.  He's correct about that.  Just to help, we're on slide

10    109 now.

11        So let's just start with accounting margins.  The

12    accounting margins take revenue for all enrollees, it takes

13    medical costs and administrative costs for all enrollees, and it

14    takes revenues minus costs, and if you want to think about

15    profit margins, it's profit divided by revenue.  That's what an

16    accounting margin does.

17        Economic margins, we look at incremental revenue for

18    incremental enrollees.  So if we think about if we were to raise

19    price, or let's do it as a -- decrease price by 5 percent, what

20    is the revenue you get on the enrollees that you attract when

21    you change that price.  So we're looking at incremental revenue

22    for incremental enrollees.

23        The second part of that is cost.  What is the incremental

24    cost of those incremental enrollees.  And then the profit will

25    be the difference between those two.  So it's the incremental

1    revenue minus the incremental cost.  If you want to think about

2    the economic margin, it's then profits as a share of that

3    revenue.

4        So the economic margin is really focusing on incremental

5    enrollees, whereas you could think about the accounting margins

6    as focused on the average enrollees.

7    Q.   So if you look again to what Professor Nevo does and your

8    differences with him, where does he start with his margins?

9    A.   He's at 24 percent.  The accounting margins are at 11

10   percent.

11   Q.   Do you have any view as to whether his use of those -- not

12   necessarily number, but the way he looks at margins and how he

13   goes about it is the correct approach?

14   A.   Yes, I do have views.

15   Q.   What are those?

16   A.   So Professor Nevo raised two possible reasons, two

17   theoretical reasons why his economic margins may not be equal to

18   accounting margins.  The two reasons he gave here when he sat

19   right here were that the provider contracts may not scale with

20   the number of beneficiaries.

21       So if you thought about a provider contract that for some

22   reason -- I'm going to do a hypothetical -- the MAO paid a

23   hospital $100,000 and said you'll serve whatever number of

24   enrollees we have, that would be a case where the provider

25   contract is capped, and if you increase your number of

1    enrollees, it doesn't change the cost of being served by that

2    provider.  That was his first argument that he made that the

3    provider contracts may not scale with the number of

4    beneficiaries, number one.

5         Number two, he raised the theoretical argument that

6    marginal enrollees may have different costs than the average

7    enrollee in terms of medical cost.  He said, well, if they're

8    healthier, you pay into the system $100, or the revenue is $100

9    on a marginal enrollee and they're healthier than average, his

10   theory was that your profits could be larger.  And so the

11   marginal enrollee may look different than the average enrollee.

12   Those are his two theories that he put forward when he sat here

13   I guess about a week ago.

14   Q.   And as you look at those theories and as you've heard or

15   reviewed the testimony about how the businesses operate, what

16   are your observations?

17   A.   They're not consistent with the data or with the facts.

18   Q.   Why?

19   A.   On the first one, contracts, medical costs scale with the

20   number of beneficiaries.  I'm not aware of -- and I've asked the

21   business people -- of any contract that doesn't scale with the

22   number of beneficiaries.  And Mr. Paprocki was here, and he gave

23   his testimony.  He said very clearly that medical costs are

24   variable costs.  He said a new member will more or less be the

25   same cost as an existing member.  Said if you have more members,

1   you'll pay more claims so it's variable by member.

2   Q.   And you're referring to his testimony which can be found at

3   trial transcript 1981, lines 9 through 21.  Is that right?

4   A.   I think it's 1949, sir.

5              THE COURT:  That's what the slide says.

6              MR. MAJORAS:  I wrote my notes on the wrong slide yet

7   again.  Thank you for the correction.

8   BY MR. MAJORAS:

9   Q.   Please go ahead.

10  A.   Ms. Buckingham said something very similar.  She was asked

11  whether medical costs are variable costs, and she said yes, they

12  were.  And then she was asked whether providers would for any

13  reason enter into a flat fee, and she said I'm not aware of any

14  contract like that.  I don't know why a provider would agree to

15  that.

16       So it's very clear, and also if you just look at the data,

17  that medical costs scale directly at a rate of 100 percent with

18  the number of enrollees, that this -- the argument that for some

19  reason medical costs aren't perfectly variable is incorrect as a

20  matter of both the factual pieces of evidence that I've seen as

21  well as the data.

22  Q.   Just so we're -- again for the record, where would we find

23  Ms. Buckingham's testimony that you just cited?

24  A.   Trial transcript 2518 at lines 19 through 24.

25  Q.   What about CMS?  What do they say on this issue?

1    A.    Now this goes to the second question of could the

2    incremental beneficiaries be healthier.  We don't have evidence

3    about whether they're healthier or sicker.  As a matter of

4    theory, they could be sicker, which would mean that the costs

5    would be higher and the margin would be even lower than the

6    average.  Professor Nevo hasn't put forward any evidence to

7    suggest that they're healthier, and so we don't see data that

8    says one way or the other that they're healthier than average

9    for sure.

10        But there's something that Professor Nevo didn't include in

11   his analysis, which is that CMS includes a risk adjustment.  So

12   if you get healthier patients or healthier enrollees, they

13   adjust down their payment.  So if you get sicker enrollees, they

14   proportionally adjust up your payment so that your margin does

15   not change on an individual patient.

16        So this whole concept that -- this isn't like a commercial

17   market.  In a commercial market, there is an insurance rate, and

18   if you get a healthier pool, you make more money; if you get a

19   sicker pool, you lose money.  In this market, CMS, because of

20   the structure of the market, is adjusting risk accordingly in

21   adjusting the payments, and this is directly in the CMS risk

22   adjustment rules.  You can see on the screen right here that

23   they adjust the payments based on the relative health of the

24   populations in the MAO plan.

25   Q.    So as you look at the significance of what you have on the

1    screen, would you please read into the record the part that you

2    were referring to?

3    A.   Sure.  It says, "For example, MA plans that

4    disproportionately enroll the healthy are paid less than they

5    would have been if they had enrolled beneficiaries with the

6    average risk profile, while MA plans that care for the sickest

7    patients are paid proportionately more than if they had enrolled

8    beneficiaries with the average risk profile."

9    Q.   What did you see from the witness testimony in this case on

10   this issue?

11   A.   Mr. Paprocki, the actuary for Aetna, said virtually the

12   same thing.  He said, "So if we enroll members with high risk

13   scores, we will get paid a higher amount to cover what is

14   predictably going to be more expensive services for the health

15   statuses they have.  And vice versa.  If we enroll healthier

16   members that are expected to have less utilization of services,

17   we will get paid less for those members."

18   Q.   And your citation to that is the trial transcript page

19   1981, lines 6 to 11?

20   A.   Yes, sir.

21   Q.   You had, on an earlier slide, you had talked about the 15

22   percent, which is the other side of the medical loss ratio

23   requirement?

24   A.   That is correct.

25   Q.   What is the significance of the 15 percent margin as you

1   look at the differences you have with Professor Nevo?

2   A.   In this case -- it's often challenging to measure economic

3   margins.  Professor Nevo was correct to note that.  But in this

4   case, we can bound them.  We know that they can be no higher

5   than 15 percent because there's no difference between the

6   incremental revenue and average revenue for enrollees.  There's

7   no difference between the incremental medical costs and the

8   average medical costs.  Given that there's a medical loss ratio

9   of 85 percent, we know that the economic margin cannot be higher

10  than 15 percent.

11       And we know that there are costs that are also incremental

12  that are counted in the administrative costs, like I described

13  earlier, like broker commissions.  So one would expect that the

14  true economic margin is even lower than 15 percent.  But yet

15  Professor Nevo's merger simulation model estimates that the

16  economic margin is 24 percent.

17  Q.   So if we look at your discussion overall of the issues

18  involving Professor Nevo's merger simulation model, what are the

19  implications of what you just described to us on the model

20  itself?

21  A.   They're very significant because Professor Nevo's merger

22  simulation model flows into effectively all of his analyses.

23  Q.   Let's break that down.  Which analyses does the merger

24  simulation model, what analyses does it flow into?

25  A.   So let me start first with market definition.  He does

market definition two ways.  One, he uses his merger simulation
to do market definition.  So obviously, if there's a flaw in the
merger simulation model, that version of his hypothetical
monopolist test is flawed.

The second is he uses those margins from his merger
simulation model in his critical loss analysis.  And it's
absolutely clear that if you use an overstated margin in a
critical loss analysis, you're more likely to find narrow
markets.  So the combination of him overstating the margin and
understating diversion makes both act together to make it more
likely that he defines an MA-only market, a Medicare
Advantage-only market.  That's been a very important part of his
critical loss.

It also implicates -- and we saw this as part of his
presentation.  He says if you use my demand estimates, it would
also suggest that it's a MA-only market, but he takes my demand
estimate and puts them through his merger simulation model.  The
merger simulation model is not an accurate depiction of what's
going on in the real world, so he's taking, in essence, one part
of my analysis where the aggregate diversion is correct, but
he's estimating margins through his merger simulation, so those
critical loss analyses where he's relying on me are also
invalid.

The next point I'd say is that he also does a critical loss
based on the Curto paper.  And if we recall, the Curto paper has

1    a nesting parameter of around .32.  My nesting parameter is

2    around .30.  If we just rely on the Curto paper, the candidate

3    market violates Example 6 of the guidelines because diversion to

4    original Medicare would be higher than the diversion from Aetna

5    to Humana, say, or Aetna to all MA products.

6         So this has very important implications for market

7    definition.  It also has important implications for competitive

8    effects, because this is his model for measuring competitive

9    effects.  This is what he's estimating the price effects off of.

10   And if the model is flawed, then the competitive effects

11   analysis is flawed.  The only other part of his competitive

12   effects analysis is his HHI analysis, which then is based on his

13   market definition, which was predicated on the critical loss in

14   the merger simulation.

15        So the merger simulation model that he has feeds into all

16   of the market definition and competitive effects analyses he has

17   except for his reliance on the Curto paper.

18   Q.   As you listed your key differences that you saw with

19   Professor Nevo, you also noted market outcome regressions was an

20   area of difference.  What were your observations there?

21   A.   Sure.  The guidelines say if there's -- if you get

22   different plausible candidate markets and they would lead to

23   different inferences about competitive effects, we should go

24   directly to look at effects.  And we should go directly to think

25   about what the market outcomes are.

1       I've already described these regressions a few times, so

2   I'll glance over them very quickly, which is I found that

3   there's no relationship between the market outcomes and level of

4   competition, and no evidence of head-to-head competition

5   affecting price.

6   Q.   And those conclusions, are those based on your analysis,

7   Professor Nevo's, or what are the differences?

8   A.   Those are based on my analyses.  Professor Nevo has made

9   three changes to my model, and let me describe them.  I'm going

10  to focus most of the attention on the first one because it's the

11  most significant.

12      He's removed what's called plan fixed effects from the

13  model which fundamentally changes how the model estimates what's

14  the effect of market outcomes on -- or competition on market

15  outcomes, and I'll describe why in a second.  He focuses the

16  regression at the county level.  I have versions where I look at

17  the plan county level, so those are very similar.  And all of

18  his analyses focus on the rebate-adjusted premium instead of the

19  fuller measure of price.

20      Let me just make sure I put, even with these modifications,

21  even with these modifications, he finds no relationship between

22  competition and profit margins.  So he's finding that if you

23  have one fewer competitors, the Medicare Advantage companies do

24  not earn more profits in those areas, in his own analysis.

25      The second thing is, if you look at his analysis and apply

1      it to total beneficiary costs, the fuller measure of price, it

2      would not pass the hypothetical monopolist test.  So using total

3      beneficiary costs, his model would conclude that MA is not its

4      own market.

5          The one I want to focus on is the plan fixed effects.

6      That's really driving the difference between his modification

7      and mine.  I think it's an entirely inappropriate change as a

8      matter of economics.  And hopefully this is one of the -- I'm

9      explaining one of the reasons what happens when you change --

10     you remove plan fixed effects --

11     Q.   Before you do that, if you could give us a definition or a

12     description, what are plan fixed effects?

13     A.   There are many variables that equal zero or 1 in a

14     regression, and it basically ensures that you're looking at the

15     same plan over time in the regression.  So in the statistical

16     analysis, by including plan fixed effects, it allows us to look

17     at the same plan over time in some sense.  I'm simplifying it,

18     but that's the concept.

19             THE COURT:  That sounds like more of why we look at

20     it.  What is a plan fixed effect?

21             THE WITNESS:  Plan fixed effects is literally if there

22     are -- I'm going to just -- 500 plans, it would be 500 variables

23     included into the regression that control for ensuring that you

24     look at the same plan over time, and you're not looking at, say,

25     average effects.  I'm actually going to describe it in this

1    chart.

2    BY MR. MAJORAS:

3    Q.   But to set that up, though, so we know where you're headed,

4    in your opinion, is the use of plan fixed effects important or

5    not?

6    A.   It's very important because it ensures that we're

7    identifying what we should be identifying, which is in response

8    to competition, do plans change prices.

9    Q.   Now I'll take you to where you've been trying to go, which

10   is slide No. 121 in demonstrative No. 900.  What are you

11   observing here?

12   A.   So what this slide describes is one of the problems if you

13   remove plan fixed effects.  So let me describe what this shows.

14   Q.   Please do.

15   A.   The blue bars are an MA plan, plan 1.  The red bars are

16   plan 2.  In year 1, plan 1 is $100 and plan 2 is $50.  In

17   year 2, plan 1 is $100 and plan 2 is $50.  So between year 1 and

18   year 2, there is absolutely no change in price; the price of the

19   plans has stayed constant.  If you include plan fixed effects,

20   you would observe that no change in price.

21       Now let's think what happens when you remove the plan fixed

22   effects.  If in year 1 half the people bought plan 1 and half

23   the people bought plan 2, the average price in the market would

24   be $75.  In year 2, if 60 percent of the people bought plan 1

25   and 40 percent of the people bought plan 2, the average price

1    goes up to $80, and you would predict in the model that prices

2    rose because of this change in mix.

3        And so the reason -- one of the reasons why you want to

4    include plan fixed effects is to examine what's happened to

5    actual plans instead of the average price in the market.

6    Q.   So as you apply that, the importance of the plan fixed

7    effects to the analysis that you did and that Professor Nevo

8    did, what are your conclusions on the differences?

9    A.   I think my analyses are more robust and more appropriate.

10   I focus more on total beneficiary cost.  I also do versions

11   based on rebate-adjusted premiums and the results are similar.

12   I do versions based on county and plan service area, but I think

13   plan service area is more appropriate in this case.

14       And lastly, and most importantly for sure, I'm including

15   plan fixed effects which control for this mix and other factors

16   that are important as a matter of econometrics.

17   Q.   How does that compare to what Professor Nevo did?

18   A.   The big difference between our results is he removes plan

19   fixed effects, and I don't believe that's appropriate because

20   now he's looking at what happens to average prices instead of

21   the price of actual individual plans.

22   Q.   You told us yesterday that another key difference that you

23   found with your analysis and Professor Nevo's was on entry.

24   What are your conclusions in terms of those differences?

25   A.   The single most important is I have an economic framework

1    to assess the timeliness and likeliness of entry.

2    Q.    Why do you do that?

3    A.    Because entry doesn't just occur always; it occurs in

4    response to profit opportunities.  If you think about the world

5    of -- if you just believe that there would be an -- I said this

6    yesterday.  If there would be an endless supply of 20 percent a

7    year of entrants, you would have an infinite number of MAOs in

8    each county, and that doesn't make economic sense.  So you have

9    to have a framework to assess when it would be profitable or not

10   for an entrant.  And Professor Nevo doesn't put forward one.  He

11   barely critiqued my analysis of that issue.

12        And this is important.  Because one of his analyses focuses

13   on, in the complaint counties, removing Aetna and Humana.  So I

14   look at entry that's occurred in the complaint counties over the

15   last five years, and obviously because they're complaint

16   counties, Aetna and Humana may have been entrants.  He removes

17   them but doesn't consider, well, if Aetna or Humana had not

18   entered one of the complaint counties, that would have opened up

19   an opportunity for someone else.  So, as a result in his work,

20   he shows a lower rate of entry in the complaint counties, but he

21   doesn't make any adjustment for the fact that there would have

22   been a profit opportunity for another MAO to come in if you

23   exclude or you assume that Aetna and Humana had not entered.

24   Q.    In looking at entry, you had shown us some statistics

25   earlier.  Do you make any differences for the size or the scope

1    of the entry as you analyze it?

2    A.    Yes, I do.

3    Q.    What do you do?

4    A.    I include a threshold of 5 percent.

5    Q.    By "threshold," what do you mean?

6    A.    That the firm must, in order to be counted as an entrant,

7    the firm must have reached a market share of 5 percent in my

8    preferred versions, because I'm focused on competitively

9    significant entry.

10   Q.    So how do you focus on that in terms of the specific

11   analysis you've done?

12   A.    So if somebody entered and received a 1 percent share and

13   then exited, I would count that neither as an entry nor as an

14   exit.  I'm focused on those that achieve a 5 percent share and

15   how often does that happen.  And the answer is it happens very

16   often.  I do a variety of sensitivity tests on this.

17        Professor Nevo worried in his reply report, for example --

18   and this goes to let's focus on what matters and what doesn't --

19   that you can imagine somebody is at 4 percent in year 1, 6

20   percent in year 2, 4 percent in year 3, 6 percent in year 4, and

21   I'd count them as an entrant twice.  He worried that that could

22   somehow bias my results.

23        I've gone back and looked at the data, and in an

24   appendix --

25   Q.    The appendix, though, is in the demonstrative exhibit.

1    Right?

2    A.    Yes, sir.

3    Q.    This is Defense Demonstrative Exhibit DEM 900.  You're

4    going to page 133.  Is that right?

5    A.    Yes, sir.

6    Q.    So 133, we have some more blue and red bars on entry.  What

7    are you depicting here?

8    A.    I just tried it every which way possible.

9    Q.    Tried what?

10   A.    On the left-hand side, it's what -- so this one is what I

11   first reported, no adjustments, you could have two entry events.

12   On the second bar in, I just looked at the first entry event and

13   recalculated the data.  And along the way I tried different

14   versions.  I'd exclude people who started between 1 and 5

15   percent and then reached 5 percent, so they would have to start

16   below 1 percent.

17        And as you can see, the results are very stable in terms of

18   the survival rate, which is the red bar, and the mean share

19   that's achieved, which is the blue bar.  So they're pretty

20   stable around 70 percent for the survival rate and about 30 to

21   35 percent for the average share achieved.

22        So this highlights that this critique is not a significant

23   critique to the analysis because, however you cut the data, you

24   get basically the same result.

25   Q.    What does this chart show you, the page 133, what does this

1    tell you about your decision to use the 5 percent as the

2    threshold?

3    A.   This doesn't go to the question of the 5 percent threshold.

4    This goes to the question of are there different ways to cut the

5    5 percent threshold, and the answer is, that's immaterial.  But

6    if I try other thresholds, it has virtually no effect on the

7    results.  And so I focus on that in slides 125 and 126.  You can

8    see --

9    Q.   Let's turn back to that then.  Let's start with slide 125.

10   We have another chart with some dots on it.  Please lay out what

11   we're looking at.

12           THE COURT:  That's a little highfalutin for me there.

13   Chart with some dots on it?

14           MR. MAJORAS:  Hopefully I can read my comments later

15   and understand it.

16       (Laughter)

17   BY MR. MAJORAS:

18   Q.   Mr. Orszag.

19   A.   So I've redone my analysis.  My original analysis was the 5

20   percent analysis.  Right there.

21   Q.   So now you've circled on the chart on page 125 the first

22   dot to the left.  What are you showing?

23   A.   That is the survival rate of entrants in year 4 using a 5

24   percent threshold in the analysis.  And you see a survival rate

25   of roughly 76 percent.  If I change that threshold instead of 5

1    percent to 2-1/2 percent, 1 percent, or even as low as 11

2    enrollees, that survival rate doesn't significantly change.

3    Q.   So let's just for the record, so we have it, if you look at

4    the dots that represent the threshold share when you go to 2.5

5    percent, you're still north of 70 percent in terms of survival

6    rate?

7    A.   That is correct.

8    Q.   When you go to a 1 percent share, you're approximately 68

9    percent in terms of survival rate?

10   A.   That is correct.

11   Q.   And if you use just an absolute number of 11 enrollees in

12   terms of an entry, what is your survival share of that grouping?

13   A.   Roughly 70 percent.

14   Q.   So those are just the different threshold types you could

15   have used.  Right?

16   A.   That is correct.

17   Q.   So what do you report then with the final dot labeled "Nevo

18   report"?

19   A.   In his original report, he did not include any threshold.

20   So what you observe often is that plans are available in a

21   county, but they're not marketed in a county.  So sometimes

22   they'll get a few enrollees, and then they may leave -- they may

23   have zero a couple years later.  They'll treat that as an exit

24   even though it wasn't a competitively significant entry.  So

25   that's why his survival rate is significantly lower.

1      He does do versions.  And we're trying to narrow the

2   differences here.  He does do versions where he includes a

3   threshold, but he doesn't do them for all his analyses.  He only

4   did that for some analyses.  And that's going to be important

5   when we get to, I think it's the next slide or the slide after,

6   because it actually feeds into his merger simulation model a

7   version where he does not include a threshold.

8           THE COURT:  Just out of curiosity, why did you pick 11

9   enrollees as a threshold?

10          THE WITNESS:  Because, according to CMS data, they

11   will have -- if it's below 11, they basically mask it.  So it's

12   a threshold that's in the CMS data.

13   BY MR. MAJORAS:

14   Q.   It's the lowest level of new enrollees that you could

15   actually analyze from the data?

16   A.   That's a fair way of describing it.

17   Q.   I feel like I deserve a point for that.

18        (Laughter)

19          THE COURT:  Maybe two.

20        (Laughter)

21   BY MR. MAJORAS:

22   Q.   So let's look to slide 126, which looks to be a similar

23   chart.  What are you demonstrating on this chart?

24   A.   I redid this for the average share that a surviving entrant

25   achieves and it's the same -- you can see the same pattern, that

1   regardless of the threshold you use, you get about a 30 percent

2   average share, and if you use Professor Nevo's report, you get a

3   much lower estimate.

4   Q.   As you look at the differences you see in these two charts

5   with the different thresholds, what are your conclusions about

6   the appropriateness of the threshold?

7   A.   The threshold is entirely appropriate.  It's actually

8   ironic that I was criticized in part for not -- for having a

9   threshold given that I've been before the Department of Justice

10  many times as part of merger analyses, and they will often tell

11  me, oh, you should impose some kind of threshold to focus on

12  competitively significant market participants.

13       In fact, in this case, in a June conference call, we were

14  told by the staff economist that they were focused on

15  competitively significant market participants.  And we submitted

16  a letter a few weeks after that, or maybe it was a shorter time

17  period, that redid our analyses to include a threshold.  And we

18  noted that we do that.

19       If you look at airline cases, the Department of Justice

20  will exclude airlines that don't fly a certain number of round

21  trips on routes.  They won't count them as market participants.

22  They also will do that on one-ways in -- if you think about

23  one-way competition, they're focused on people if you're flying

24  from Washington, D.C. to L.A., a lot of people may go

25  Washington, D.C.-Dallas, Dallas-L.A. because Dallas is a hub, or

1    through Chicago, because it will be cheaper flights.  Every once

2    in a while in the data you'll see someone who flew Washington,

3    D.C. to London, had a business meeting, presumably, and then

4    flew London to Los Angeles.  And they exclude those

5    not-competitively-significant events as part of the analysis in

6    the airlines.

7         So this is a pretty standard technique to exclude -- to

8    create a threshold in the data to examine market participants.

9    Q.   So you've explained why you would have a threshold.  Let's

10   look back to what Professor Nevo did without a threshold.  Have

11   you reached a conclusion as to whether he should have done that

12   or not?

13   A.   He has versions with thresholds.  He does various of his

14   analyses with thresholds.  In certain ones he does not, and in

15   some of the ones that are most critical for his merger

16   simulation model and his modification merger simulation model,

17   he does not include those.

18   Q.   And what is the significance of that to you?

19   A.   It means that the share that he puts in for the entrant, if

20   you recall he used a 2 percent average share for the entrant,

21   that's a version where he is counting a lot of these very small

22   players.  So obviously that compresses the average.  If he just

23   focused on the competitively significant ones, the average would

24   be higher, and then you would include a higher number in the

25   merger simulation estimate, that would put downward pressure on

1    price.

2    Q.   So if you look at the slide --

3         MR. MAJORAS:  And Your Honor, in the booklet these

4    slides get condensed into one on page 127, which is why this may

5    look a little bit different.

6    BY MR. MAJORAS:

7    Q.   But now we're seeing a slide which shows about whether or

8    not entrants are achieving sufficient share.  What is the reason

9    for this analysis?

10   A.   Well, one of the arguments -- one of the analyses he does

11   is he says, well, would the smallest -- would the entrant

12   achieve the share of the smaller of the two merging parties?  So

13   if Humana's 10 percent today and Aetna's 20 percent, would the

14   entrant reach that 10 percent share?  And he uses that as a

15   relevant benchmark.  And he, as part of his analysis in that

16   case, he's not including a threshold.  And so he's including a

17   lot of these in essence little guys, and so that means that the

18   distribution that you observe on this chart has shifted way to

19   the left.

20        And so he has in essence more examples where they don't

21   reach that share, so it suggests that they're less likely to

22   reach the small share.  But even that standard's not the correct

23   standard according to the guidelines.

24   Q.   What do the guidelines say?

25   A.   The guidelines say, look, if a single firm can replicate

the size and strength of one of the merging parties, that's

sufficient, period.  It then goes on, and this is the last

sentence here, it says, "Entry by one or more firms operating at

a smaller scale may be sufficient if such firms are not at a

significant competitive disadvantage."

Q.   When we talked yesterday about, I believe it's timeliness,

likelihood and sufficiency of entry, what does this analysis go

to of those three prongs?

A.   This goes to sufficiency.

Q.   What are your conclusions concerning your analysis of the

sufficiency of likely entry?

A.   I show that surviving entrants reach shares of roughly 30

percent, and so that is clearly sufficient.

Q.   Yesterday you provided us your analysis and your

conclusions relating to the exchange part of this case.  Taking

everything now that you have talked about, would you please

summarize what your conclusions are on the Medicare part of this

case.

A.   Sure.  First, the transaction will not substantially lessen

competition in Medicare Advantage or Medicare products.  My

analyses show that Medicare Advantage is not a relevant product

market.  If you go to the actual data about how firms have

behaved in the marketplace when there's been a reduction in the

number of competitors, it shows no relationship between that and

an effect on different measures of price; that entry will be

1    timely, likely, and sufficient if it's necessary to counteract

2    an exercise in market power; the efficiencies will be passed

3    through to consumers; and Molina, given that it's starting off

4    with 290,000 members, I would expect to be an effective

5    competitor.

6          MR. MAJORAS:  Thank you, Mr. Orszag.  I pass the

7    witness, Your Honor.

8          THE COURT:  All right.  Mr. Conrath.  We'll go for

9    about 15, 20 minutes before we take our morning break.

10                     CROSS-EXAMINATION

11   BY MR. CONRATH:

12   Q.   Good morning, Mr. Orszag.

13   A.   Good morning, Mr. Conrath.  How are you?

14   Q.   Very well.  Good to see you again.

15   A.   Nice to see you too.

16          THE COURT:  All right.  Now that the niceties are

17   over --

18       (Laughter)

19          THE COURT:  -- let's get down to business.

20       (Laughter)

21          THE WITNESS:  We've only had very pleasant

22   interactions, so I couldn't expect anything different.

23   BY MR. CONRATH:

24   Q.   You told us yesterday, Mr. Orszag, about a situation when

25   your testimony was excluded in Southern District of New York in

1    the Apple case.  Right?

2    A.   That is correct.

3    Q.   What you told us was that all your econometric work was

4    accepted?

5    A.   That is correct.

6    Q.   In fact, just to be exact about what you said, was,

7    "Question:  Please describe that.

8        "Answer:  Judge Cote in the Apple matter accepted all of my

9    econometric analyses, and then there were analyses in another

10   relevant market that she rejected, as I understand it -- I'm not

11   a lawyer -- as a matter of law.  And then she criticized those

12   analyses as well.

13       "Question:  But you were accepted for at least what part?

14       "Answer:  For all my econometric work."

15       Do you remember you telling us that yesterday?

16   A.   Yes.  Yes, sir.

17   Q.   In fact, isn't it right that what Judge Cote said was that

18   you did not conduct your own econometric or statistical

19   analysis?

20   A.   In the part that she excluded, that is correct.  In the

21   part that she included, I had done my econometrics and she

22   accepted those as being reliable.  So one of her reasons for

23   excluding the analysis that was done in the separate relevant

24   market is precisely because I had not done econometrics of that

25   issue.

1    Q.   All right.  We'll get to that.  Can we have a copy of the

2    opinion?

3              MR. CONRATH:  May I approach, Your Honor?

4              THE COURT:  Yes, you may.

5    BY MR. CONRATH:

6    Q.   I've handed up Exhibit 710.  Do you recognize PX 710,

7    Mr. Orszag?

8    A.   Yes, sir.

9    Q.   And this is Judge Cote's opinion with respect to your

10   testimony?

11   A.   That is correct.

12             MR. CONRATH:  Your Honor, I'd like to ask him about

13   it.  Can I move the admission of PX 710?

14             THE COURT:  It depends how you're going to utilize it.

15   Go ahead with your questioning.

16             MR. CONRATH:  All right.  And I'm going to propose to

17   read some things at some time --

18             THE COURT:  It's only for impeachment, isn't it?

19             MR. CONRATH:  It is for impeachment.

20             THE COURT:  You can proceed on that basis with it

21   being only for impeachment.

22             MR. CONRATH:  Very well.

23   BY MR. CONRATH:

24   Q.   Could you turn, Mr. Orszag, to page 9 of PX 710.

25   A.   Yes, sir.

1    Q.    Looking in the first paragraph -- so that we can understand

2    this, you were appearing on behalf of the defendant, Apple?

3    A.    That is correct.

4    Q.    And there was another economist named Joseph Kalt who was

5    also there.  Right?

6    A.    That is correct.

7    Q.    And the expert for the plaintiffs was Professor Noll.

8    Right?

9    A.    That is correct.

10   Q.    Looking at the first paragraph, the third sentence, it

11   says, "Neither Orszag nor Kalt, however, conducted their own

12   econometric or statistical analysis of damages.  Orszag did,

13   however, rerun Noll's regression analysis using a modified

14   control group and date range."  Did I read that correctly?

15   A.    Yes, sir.

16   Q.    And then if you look in the next paragraph, the second

17   sentence, it says, "Orszag will be permitted to testify

18   regarding his rerunning of Noll's regression analysis."  Right?

19   A.    That is correct.

20   Q.    So what you told me a moment ago was that you did your own

21   econometric work that was admitted.  In fact, what Judge Cote

22   allowed to be entered was just your rerunning of Noll's

23   regression analysis, which is what she said above was not your

24   own econometric work.  Right?

25   A.    They were my own econometric analyses taking into account

1    Professor Ashenfelter's analyses that were part of part 1, and

2    by rerunning them incorporating Professor Ashenfelter, the

3    different control groups, they were my own analyses rerunning

4    Professor Noll's damages estimate.  So they were my econometric

5    analyses.  I was relying on my expertise about what to use as a

6    control group for the purpose of that analysis.

7    Q.   You told us yesterday that what was admitted was all my

8    econometric work, and what Judge Cote said was you did not

9    conduct your own econometric analysis.  Right?

10   A.   Well, I did by rerunning Professor Noll's with modified

11   control groups, date ranges, and there were other changes beyond

12   this that are not reflected in this one sentence.  And so I

13   would consider those very much my own because they were my own

14   modifications of that.  So that's my own analysis.

15   Q.   Okay.  One other thing you told us yesterday was that there

16   were analyses in another relevant market that she rejected.

17   A.   That is correct.

18   Q.   You say the opinions that were rejected were in a different

19   relevant market than the one at issue in the case?

20   A.   That is correct.

21   Q.   And that's the market for e-readers as opposed to e-books?

22   A.   That is correct.

23   Q.   Let's check that.  Would you turn to page 41 of Exhibit

24   PX 710.  Do you have that?

25   A.   Yes, sir.

1              MR. CONRATH:  May we put this on the screen, Your

2     Honor?

3              THE COURT:  Sure.  There's no confidentiality to it.

4              MR. CONRATH:  Correct.

5              THE WITNESS:  No.  It's very public.

6     BY MR. CONRATH:

7     Q.   I'd like to direct your attention to footnote 21.  Footnote

8     21 says, "Orszag also speculates that Amazon may even have

9     raised e-book prices but for the conspiracy.  This is so

10    far-fetched, given the record at trial, that it would have been

11    particularly incumbent upon Orszag to point to reliable evidence

12    supporting such speculation.  He has not."

13         So this is one of the places where she criticized your

14    proffered testimony.  Correct?

15    A.   That is correct.

16    Q.   And this is about e-books prices, not about e-readers.

17    Right?

18    A.   Right.  But the whole discussion here is about the e-reader

19    analysis, and what I had said is, given the increased

20    competition in e-readers, that would -- given the

21    complementarities in the market, that would have put pressure on

22    e-book prices that Amazon charged.  So this whole discussion was

23    predicated on the competition in the e-readers part of the

24    market, the other relevant market, that then she's criticizing.

25    Q.   So when you told us yesterday that your rejected analyses

1    were in another relevant market, that wasn't entirely true, was

2    it?

3    A.    I had forgotten this footnote, but the whole discussion of

4    this section is about the discussions in the other relevant

5    market.   The predicate to this analysis is the increased

6    competition in the e-reader market that she rejected.

7    Q.    Would you look while we're on page 42 at the paragraph

8    under the heading B.   "Orszag's offset opinions are unreliable."

9         It says there, doesn't it, "Moreover, even if they weren't

10   irrelevant as a matter of law, Orszag's opinions regarding the

11   amounts of any offset from a damages figure would be

12   independently excluded as unmoored from record facts and

13   unsupported by any rigorous analysis."

14        Do you see that?

15   A.    Yes, I do.

16   Q.    So when you told us yesterday that your opinions were

17   criticized, they weren't just criticized; they were excluded.

18   Correct?

19   A.    That is correct.   But they were -- I think I said they were

20   excluded as a matter of law and criticized.   And so that's

21   what -- I think I read this here.

22   Q.    So it says they're excluded as a matter of law, irrelevant

23   as a matter of law.   Right?   And then what we just read said

24   they would be independently excluded as unmoored from record

25   facts.

1    A.    That is correct.  You read that correctly.

2    Q.    So they are both excluded as a matter of law and excluded

3    as a matter of evidence?

4    A.    I'm not a lawyer, but I don't disagree with your

5    interpretation, because you are one.

6    Q.    So when you told us yesterday that they were criticized,

7    you meant to add "and excluded."  Right?

8    A.    I think I prefaced the whole are by saying I wasn't a

9    lawyer.  If that's the legal interpretation, yes, that's what

10   the words seem to suggest.  I did not commit the entire decision

11   to memory.

12   Q.    All right.  Could we direct your attention to page 44,

13   please.  Can you see that here Judge Cote is talking about your

14   opinions?  Right?

15   A.    That is correct.

16   Q.    And it says, "There are many problems with this analysis,

17   but it is only necessary to list a few of them to explain why

18   this entire theory of offset is inadmissible at trial and why

19   Orszag's opinion must be stricken.  First, Orszag's hypothesis

20   rests on layers of assumptions, many of which are untethered to

21   the real world or at odds with the facts.  In addition, the

22   sheer length of Orszag's chain of shaky inferences, without any

23   modeling or analysis, invites the jury to speculate about any

24   potential impact on a damages calculation."

25         That was one of the criticisms that Judge Cote made.  Is

1  that right?

2  A.   That is correct.

3  Q.   She also at one point called your analysis a

4  back-of-the-napkin calculation?

5  A.   Again, I haven't committed it to memory, but I remember

6  some words to that effect.

7  Q.   Okay.  That would be at the top of page 45.  Is that right?

8  A.   That is correct.

9  Q.   And at the bottom of page 45, she says "this calculation is

10  also jerry-rigged."

11  A.   She did write that.  Yes, sir.

12  Q.   On page 47, first full paragraph, second sentence, it says,

13  "An economist who wished to measure the effect of competition

14  within the e-reader market on e-reader prices would undertake an

15  examination of that market and perform a study.  Orszag did

16  not."

17       Is that another criticism she made?

18  A.   Yes, sir.

19  Q.   Focusing your attention on page 49, if we could,

20       The last sentence in the first full paragraph there says,

21  "For the absence of the same level of intellectual rigor that

22  characterizes the practice of an expert economist," citation to

23  Kumho Tire, "for its flawed assumptions and for its invitation

24  to engage in guesswork, Orszag's opinion is barred by both Rules

25  702 and 403."

1     And that's another confirmation that your work was not only

2   criticized but excluded.  Right?

3   A.   That is correct.

4   Q.   All right.  You can put aside PX 710.  You were hired in

5   this case after this opinion came out.  Is that right?

6   A.   That is correct.

7   Q.   So I'd like to look, if we can, just to talk a little bit

8   back where we started in the beginning of your testimony,

9   looking a little bit at your background.  And you have a CV

10  that's in your report.  Right?  Is that Exhibit A?

11  A.   Yes, sir.

12  Q.   That's in DX 149?

13        THE COURT:  No.  419.

14        MR. CONRATH:  419.  I was relying on what I got here.

15  I'm shocked.  419.

16        THE COURT:  My copy says 419.

17        MR. CONRATH:  Yeah.  Look at the -- the index might

18  get it wrong.

19        THE WITNESS:  It's page 270, I think.

20        MR. CONRATH:  270.  Right.

21  BY MR. CONRATH:

22  Q.   So I think you explained to us that you don't happen to

23  have a Ph.D., and I think you said you set out to pursue a

24  doctorate but then you left to work in the White House?  Is that

25  right?

1    A.    You summarized it roughly correctly.

2    Q.    So basically you went right from grad school to a position

3    in the White House.  Is that right?

4    A.    That is correct.

5    Q.    So it's sometimes said, isn't it, that one can qualify as a

6    professional economist either by getting a Ph.D. or by getting a

7    master's and doing a lot of publications.  Have you heard that?

8    A.    No, I have not.

9    Q.    In any event, you have quite a few publications listed in

10   your CV.  So I would like to focus your attention on the part

11   that begins on page 419-272, the reports, papers, and notes.

12   And there you have about 56 publications listed.  Is that right?

13   A.    I have not ever counted them, but if you've counted them, I

14   will agree to the number.  Sure.

15   Q.    And after this you list some other kinds of things like

16   speeches and op-ed pieces and other kinds of publications.

17   Right?

18   A.    That is correct.

19   Q.    So just focusing on the 56 reports, papers, and notes,

20   they're kind of in chronological order from the bottom up.  Is

21   that correct?

22   A.    Roughly speaking, yes.  There are a couple of papers, I

23   believe, if I recall, that were republished, and I may have used

24   the newer date and then said that it was previously published,

25   something -- at an earlier date.

1    Q.   So if you -- starting from the bottom and look up, it looks

2    like out of the first 25 publications, which is about five

3    years, 21 of them were coauthored with your brother.  Is that

4    right?

5    A.   I haven't counted them, but that wouldn't shock me given

6    that my brother and I started a business together and we co-ran

7    the business together and we're very close personally.

8    Obviously.

9    Q.   Obviously.  And you're to be commended for that.  Many of

10   these publications list Sebago Associates as a sponsor or

11   something.  That's the business you founded with your brother?

12   A.   That is correct.

13   Q.   So of these 56 reports, papers, and notes, I think if I

14   look at them, two of them are peer-reviewed publications.  Is

15   that right?

16   A.   It's not something I've ever totaled up, so I can't give

17   you an answer to that one way or the other.

18   Q.   Well, you would agree that Economic Letters, 1994, which is

19   at the top of page 275, that I think was peer-reviewed.  Right?

20   A.   That is correct.  When I was a junior in college, I got a

21   paper published in an economics journal that was based on

22   econometrics.

23   Q.   And that was, I think you told us at your deposition, you

24   found by trying to replicate someone's work, you found an error

25   that an older economist had done and published this paper.  Is

1   that right?

2   A.    That is correct.  Actually, to be more precise, I set out

3   to study a different question, but I then found an error in that

4   previous paper.

5   Q.    And the other peer-reviewed article is in the Review of

6   Network Economics.  That's right?  That's the next to last one

7   on page ending in 272?

8   A.    I'm not sure if that's correct, because there's a number of

9   other papers that were published in various journals.  I don't

10  have a recollection one way or the other whether they are

11  peer-reviewed or not.

12  Q.    Okay.  You told us, I think, you were retained in this case

13  in May or June or July.  Is that right?

14  A.    Of 2015.  That is correct.  I think more precise is

15  probably June or July.  But the precise date I don't have fresh

16  in my recollection.

17  Q.    In the time since you were retained in June or July of

18  2015, you have testified either at trial or in deposition in

19  nine other cases.  Is that correct?  Nine other matters?

20  A.    I don't know one way or the other.  If you say that's

21  correct, I'm not going to disagree with you.

22  Q.    Well, we can just look at it.  It's DX 419-279.  They're I

23  think chronological.  Does that look right?  Nine other matters?

24  A.    I'm assuming you've counted up correctly, but yes, sure.

25  Q.    Okay.  One of the things I thought you heard you mention

1    yesterday was that you're a member of the Econometrics Society.

2    Is that right?

3    A.    Yes, I am.

4    Q.    I just want to make sure I heard you correctly.  You didn't

5    mean to suggest that you are a fellow of the Econometrics

6    Society?

7    A.    I am not a fellow, no.

8    Q.    A member is something that you can go to the website and

9    pay 200 bucks and sign up.  Right?

10   A.    I don't know what the price is, but sounds about right.

11   Yes, sir.

12   Q.    And that's how you get the publication?

13   A.    What was that?

14   Q.    That's how you get the --

15   A.    You get Econometric with that.  Yes, sir.

16   Q.    Okay.  You can put aside for the moment your expert report,

17   if you want, or -- yes.

18            THE COURT:  Why don't we take our morning break.

19            MR. CONRATH:  Sure.  I'm about to change topics.

20            THE COURT:  Fifteen minutes, so we'll be back at

21   11:10.  Thank you.

22       (Recess from 10:55 a.m. to 11:12 a.m.)

23            THE COURT:  All right.  Welcome back to you all.

24   Mr. Conrath.

25            MR. CONRATH:  Thank you, Your Honor.

1   BY MR. CONRATH:

2   Q.   Let's turn first to individual commercial if we can,

3   Mr. Orszag.  I'd like to first direct your attention to your

4   slide 7.  If you want to have your slides, I'm probably going to

5   go through them approximately in order.

6        So your slide 9 --

7             THE COURT:  I thought you were going to examine him on

8   slide 7.  I was waiting for it.

9        (Laughter)

10            THE WITNESS:  And I was getting very excited for that.

11            MR. CONRATH:  That would be one of the more creative

12   ones I've done in my life, Your Honor.  9, slide 9, please.

13            THE WITNESS:  It's on slide 10 right now.

14   BY MR. CONRATH:

15   Q.   You can look at slide 9 and I'll ask you the question and

16   if we get it up on the screen it'll work.  You say here that 13

17   firms withdrew completely.  Is that right?

18   A.   Based on the analysis that I conducted.  Yes, sir.

19   Q.   Your initial report said 18 firms had a full withdrawal in

20   2017.

21   A.   I believe that's correct, and that some of them, ultimately

22   there were some that remained in certain counties.

23   Q.   So you're correcting that now.  Right?

24   A.   That is correct.  If I may, firms that had indicated

25   publicly that they were completely withdrawing, when we then saw

1    the data, there was not complete withdrawal.  So, obviously, as

2    Keynes said, when I get new information, I update my opinions.

3    Q.   Your opinion, if I heard you yesterday correctly about the

4    exits -- Aetna's exits from the 17 counties, was that you

5    thought the behavior of other firms, either exits or reductions,

6    were consistent with Aetna's actions.  That was the substance of

7    your testimony?

8    A.   That's a fair characterization.  Yes, sir.

9    Q.   And you yourself, you did not look at the profitability of

10   Aetna in the 17 counties.

11   A.   No, I did not.

12   Q.   And you didn't make any comparison between the results of

13   other firms whose behavior was consistent with the results that

14   Aetna was achieving.

15   A.   I did not conduct that analysis.  That is correct.

16   Q.   You say that, if we look at slide 16, your opinion is that

17   Aetna will not be a significant -- will not be an effective

18   competitor.

19   A.   I think you mean Humana, sir.

20   Q.   Humana will not be an effective competitor.  Let me start

21   from rephrasing.  Your opinion is -- I'm looking at slide 16 --

22   Humana will not be an effective competitor on the public

23   exchanges in the 17 markets in 2017.  Is that right?

24   A.   That is correct.

25   Q.   Do you know that in a substantial number of the 17

1   counties, in six of them, Humana will be one of only two

2   competitors?

3   A.   I'm not aware of that precise fact.  I believe that in five

4   of those their price is dramatically different than the lowest

5   priced silver plan.

6            THE COURT:  When you use the term "competitors,"

7   you're talking about --

8            MR. CONRATH:  Firms.

9            THE COURT:  -- Medicare Advantage plans?

10           MR. CONRATH:  Medicare Advantage plans.

11           THE WITNESS:  No, we're in the public exchange market.

12           THE COURT:  I'm sorry.  We're in the public exchange.

13   I'm sorry.  We're talking about firms.

14           MR. CONRATH:  I should reframe the question, and maybe

15   I can do it by showing something, we'll see if you recognize it.

16       Could I have the...

17           THE COURT:  Look at all the problems I've caused by my

18   confusion.

19           MR. CONRATH:  I wish I could blame it on someone other

20   than myself.  But there are a lot of questions that might

21   involve -- during this examination, that might involve some

22   handing documents, and there might be a little delay now and

23   then, and I apologize in advance if I can.  So may I hand up

24   Government Exhibit 711, Your Honor.

25   BY MR. CONRATH:

1    Q.   So, do you see that this is a printout of firms in counties

2    that shows the state and then the county and the third -- the

3    fourth column shows metal level and the issuer name?  You see

4    that in Bibb County, Georgia, there will be a Blue Cross Blue

5    Shield, I think that's an Anthem plan, and a Humana plan?

6    A.   I think there will be six --

7    Q.   Six plans through insurers?

8    A.   Six plans from Blue Cross and one from Humana, and in

9    Georgia, the Humana plan will not be either the lowest or the

10   second lowest silver priced plan, and the evidence then shows

11   that its market share will be low.

12   Q.   You will agree, if you take my representation, that these

13   are the filings that in these six counties Humana will be one of

14   two firms offering plans on the public exchange.  Right?

15   A.   I have no reason to disagree with you.  Yes, sir.

16              MR. CONRATH:  Your Honor, I move the admission of

17   PX 711.

18              THE COURT:  I don't know what it is.  I mean, I know

19   what it says, but where does it come from?  He's saying he has

20   no reason to disagree with it, but where does it come from?

21              MR. CONRATH:  It comes from the records of who has

22   submitted plans for the --

23              THE COURT:  CMS records?

24              MR. CONRATH:  It would be the public exchange, HHS

25   public exchange, not CMS.  CMS is Medicare, once again.

THE COURT:  All right.  But from HHS's records?

MR. CONRATH:  HHS's records, yes.

THE COURT:  Any objection?

MR. MAJORAS:  I'll object that there's no foundation for this.  I'm not sure what it is still even after the explanation.

THE COURT:  Can you give a little better explanation of what it is?  Basically, it's a piece of paper from HHS.

MR. CONRATH:  Yes.  That's right.

(Laughter)

THE COURT:  Your representation is that it depicts what?

MR. CONRATH:  That it depicts the insurers who have submitted to indicate their participation in the public exchanges in the listed counties.

MR. MAJORAS:  I'm staying with the objection, Your Honor.

THE COURT:  All right.  Unless there can be some further clarification -- and you can do it, I suppose, in a rebuttal case by having put on a witness -- I will conditionally admit it since we don't have a jury here, but it's subject to either an agreement if you can convince Mr. Majoras by talking to him, or your having to lay the foundation through a further witness.

MR. CONRATH:  Fair enough, Your Honor.

```
 1            THE COURT:  So it's conditionally admitted.

 2                            (Government Exhibit No. 711

 3                            conditionally received.)

 4   BY MR. CONRATH:

 5   Q.   Mr. Orszag, are you aware that Humana says they expect that

 6   with their new strategy in the public exchanges, they expect to

 7   do reasonably well?

 8   A.   They had an early forecast that projected that they would

 9   lose about 75 percent of their enrollees, I believe.  But that

10   was focused overall not across, just looking at the exchange

11   counties, which is obviously a more narrow base.

12   Q.   Could we look at PX 407.  Can we call that up?  We'll call

13   it up on the screen, if that's all right.

14        I'd like to look at the 12th page of PX 407.  Do you see

15   the third bullet there?  Did you see on the first page that this

16   is a Humana press release?  We can go back.  I'm sorry.

17            THE COURT:  We have to go back to the first page.

18            MR. CONRATH:  Yeah, I think we better go back.

19   BY MR. CONRATH:

20   Q.   Do you see that this is a Humana news release?

21   A.   Yes, sir.

22   Q.   And it's reporting their third quarter financial results?

23   A.   That is correct.

24   Q.   And reporting your financial results is something that

25   firms pay particular attention to accuracy on?
```

```
 1    A.    I sure hope so.

 2    Q.    All right.  Could we look at now -- and it's third quarter

 3    of 2016.  I'm sorry.  Right?

 4    A.    That is correct.

 5    Q.    And this is admitted, Your Honor.  Could we look at page

 6    12.  Would you look at the third bullet, the first sentence?  It

 7    says, "Humana seeks to maintain individual commercial

 8    on-exchange coverage options in markets where it expects to be

 9    able to offer high-quality and ultimately stable individual

10    commercial health plan."  Right?

11    A.    That is correct.

12    Q.    And to be stable they'll have to achieve some measure of

13    success in the market.  Isn't that right?

14    A.    That's a fair proposition, or they could be talking about

15    stability in terms of the risk pool.  But either one would

16    ultimately achieve some stability for Humana.

17    Q.    And did you hear Mr. Broussard, the CEO of Humana,

18    reference the public exchange and their changes in

19    participation?

20    A.    His precise words on that I do not recall.

21    Q.    So could we turn to your slide 19, please.  So this is your

22    reporting of results in overall individual commercial products.

23    Right?

24    A.    That is correct.

25    Q.    Not focused on the 17 counties.
```

1    A.    That is correct.

2    Q.    So in 2014, both Humana and Aetna experienced losses on the

3    ACA exchanges?

4    A.    That is correct.

5    Q.    And in 2015, again, both experienced losses?

6    A.    That is correct.

7    Q.    And in 2015, Humana's losses on the exchanges were greater

8    than Aetna's?

9    A.    Significantly greater.  Yes, sir.

10   Q.    Five or six times greater?

11   A.    Yes, sir.

12   Q.    And based on projections, both Humana and Aetna will

13   experience losses in the exchanges for 2016.  Right?

14   A.    That is correct.

15   Q.    And Humana's losses for 2016 are projected to be greater

16   than Aetna's?

17   A.    Yes, sir.

18   Q.    About twice as much?

19   A.    That is correct.

20   Q.    And for 2017, Humana decided to remain on the exchanges in

21   11 of the 15 states where it was present in 2016.  Is that

22   right?

23   A.    That is correct, but remember there's also the price

24   component, that they dramatically raised their prices as well,

25   which is part of their business strategy.

1    Q.    And Humana remained on-exchange in those 11 states while

2    taking a number of corrective actions.  Right?

3    A.    That is correct.

4    Q.    And that's with a goal of getting to being able to be in a

5    stable situation.  Right?

6    A.    In part, yes, sir.

7    Q.    And Humana's statement to its shareholders that we looked

8    at a moment ago in the press release is consistent with your

9    statement on slide 18 that economics experts agree that firms

10   operate where they expect to be profitable.  Right?

11   A.    Generally speaking, yes, sir.

12   Q.    And your chart on slide 19 does not distinguish between

13   Aetna's and Humana's on-exchange offerings and their

14   off-exchange offerings.  Right?

15   A.    That is correct.

16   Q.    Now, in the three states named in the complaint's exchange

17   claims, Aetna completely exited -- it withdrew its on-exchange

18   business for 2017.  Isn't that right?

19   A.    That is correct.

20   Q.    And in each of those three states Aetna remains a

21   participant in the off-exchange business?

22   A.    I believe that to be true.  Yes, sir.

23   Q.    Are you aware that Aetna experienced greater losses in its

24   off-exchange business than its on-exchange business?

25   A.    I saw one of the experts for the Department of Justice make

1    that claim, but I have not analyzed that individually.

2    Q.   Did you look at -- hear the testimony concerning DX 9,

3    which was an exhibit concerning the profitability in Florida, on

4    the -- Aetna's profitability in Florida concerning the

5    exchanges?  Do you recall that?

6    A.   I don't know what DX 9 is.  I didn't memorize what every

7    document is.

8    Q.   Well, you said you either listened to the testimony or read

9    the transcript of the trial.  Right?

10   A.   I tried to read the transcripts.  Yes, sir.

11   Q.   Are you aware that according to the testimony of Aetna's

12   CFO, Mr. Guertin, Aetna's ACA business in Florida in total was

13   profitable?

14   A.   I'm aware of such testimony on a historic basis.

15   Q.   And that was because the profitable on-exchange business

16   brought up the unprofitable off-exchange business?

17   A.   I don't know that one way or the other.

18   Q.   And Aetna's exiting the on-exchange business in Florida.

19   Right?

20   A.   That is correct.  Remember what economists focus on is

21   "expect to be profitable."

22   Q.   And Aetna is staying in the off-exchange business in

23   Florida.  Right?

24   A.   I believe that to be true, but I have not studied that

25   question.

1   Q.   All right.  Let's turn to Medicare Advantage.  Is it your

2   opinion today that a merger to monopoly among Medicare Advantage

3   firms on average would not cause an effect on consumers?

4   A.   If you merged -- I think I said in my direct testimony, I

5   have not reached a conclusion that if you merged all 140 MAOs

6   together, that that would not cause a harm to competition

7   because then you would lose that potential entry opportunities

8   which helps to constrain competition.

9   Q.   Are you saying that your testimony is not that a merger to

10  monopoly among Medicare Advantage firms on average would not

11  cause an effect on consumers?

12  A.   What I'm saying is I have not analyzed the question of

13  merging all 140 MAOs together because that would lose one of the

14  competitive constraints that is in the marketplace, the concept

15  of entry.

16  Q.   All right.  Let's look at your deposition testimony.  I'd

17  like to direct you to page 157.  Are you there?

18  A.   Yes, sir.

19  Q.   I'd direct your attention to line 24.

20       "Question:  And did you do a projection of whether even a

21  merger to monopoly among Medicare Advantage firms would be --

22  would under your view, would have no effect on consumers --

23       "Answer:  According to --

24       "Question:  -- is that correct?

25       "Answer:  Based on where we are today, being -- moving to

monopoly on average would not cause an effect, but that --

that's, you know, not where we may be at some point in the

future."

Let me continue.  "The point is that based on the data,

historical data that we have today, that's what the analysis and

the data show, including Dr. Nevo's, when you include, say,

total beneficiary cost.  If you just put total beneficiary cost

into his analysis instead of using premiums, it shows that

moving -- his price concentration analysis, which he used,

obviously, in exchanges and now uses in Medicare Advantage,

shows the -- the same result that I show, is there would not be

a -- a SSNIP from moving to current market conditions to a

monopoly.  By the way, that is the right way to do the analysis.

Just as an aside, I had a footnote where I said, oh, even if you

go from perfect competition to monopoly, this is the magnitude

of the effect, magnitude of the effect, although it's not

statistically significant from zero."

THE COURT:  It says "statistically different."  You

said "significant."

MR. CONRATH:  Statistically significant -- different

from zero.  Thank you, Your Honor.

"Professor Nevo, in implementing his hypothetical

monopolist test, implements it the same way, but that's not

consistent with the guidelines.  I forgot that point about --

earlier I should -- should have raised that but it's not the

1   right way to do it.  The right way is to do it from current

2   market conditions and the guidelines are explicit about that."

3        Your Honor, I move the admission of this.  It obviously

4   went on a while, but the focus is on the first paragraph, which

5   I offer as impeachment and as a substantive statement of the

6   witness.

7             THE COURT:  Any objection?

8             MR. MAJORAS:  I object that it's not impeachment, that

9   it's not inconsistent with what he testified.

10             THE COURT:  I'll sort that out.  I'll admit it for

11   both purposes.

12             MR. CONRATH:  Thank you, Your Honor.

13                          (Orszag Deposition Page 157

14                           received into evidence.)

15   BY MR. CONRATH:

16   Q.   And your opinion about merger to monopoly, however

17   expressed, is an outgrowth of your price concentration analysis.

18   Right?

19   A.   That is correct.  There is a different question of a merger

20   to monopoly in a single county, which is what you asked me about

21   in the context of my deposition, and the context that we've just

22   discussed, which is a merger of all 140 MAOs.  Those are

23   different concepts as a matter of economics.

24   Q.   So your opinion is that a merger to monopoly in a single

25   county would not cause harm to consumers.  Is that right?

1    A.    If you look at the actual real-world data, when we've seen

2    a movement from three MAOs to two MAOs to one MAO, you can

3    observe what's happened to prices in those markets, and prices

4    have not increased significantly.  So my opinion is based on

5    completely the analysis of the data of what we actually observe

6    in the marketplace.  And as I said in my direct, there's a

7    number of factors that are constraining that single MAO from

8    raising prices, and those are the factors outlined, original

9    Medicare, potential entry and the regulatory environment.

10   Q.    All right.  Could we bring up, please, PX 154.

11         Sir, do you see that this is an e-mail with material

12   attached.  It's from Nancy Cocozza.  It's dated 26th of March

13   2015?

14   A.    I do see that.  Yes, sir.

15   Q.    And if we could go to the page that is PX 154-004.  Do you

16   see this is part of the attached materials?

17   A.    I assume so.  I haven't seen the whole document because it

18   just flashed up on my screen quickly.

19   Q.    Right.  Well, let's just focus -- the headline here is IVL.

20   That's individual Medicare.  Right?

21   A.    Yes, sir.

22   Q.    And AEP, what's that?

23   A.    Annual enrollment period.

24   Q.    Right.  And competitive analysis?

25   A.    That's presumably their analysis of competition?

1    Q.   All right.  And it lists here Humana, United, Cigna,

2    Anthem.  Is it your opinion under your analysis a merger of the

3    Medicare Advantage businesses of Humana, United, Cigna, Anthem

4    and Aetna would not harm consumers?  Is that your opinion?

5    A.   I have not reached that opinion, because if that were to

6    happen, you're losing potential entrants which act as a

7    constraining force.  And so I would not go so far as to draw

8    that opinion because you'd have to look at each merger on its

9    own because you could have counties, once, say, the merger --

10   say this merger were consummated and you looked at the next

11   merger, there could be counties where there are no potential

12   entrants and they both have high share, and original Medicare,

13   say, has a small presence, and then you would have a potential

14   for a competitive concern.

15        In addition, one of the analyses that I conduct looked at

16   the head-to-head competition between Aetna and Humana and its

17   effect on price.  And I find no evidence of that.  If I were to

18   analyze the head-to-head competition, say, of Humana and United

19   and had found a significant effect on price, one could come up

20   with a different conclusion.

21        So I do not draw the conclusion that you questioned based

22   on the analyses that I conduct, because you have to look at each

23   individual transaction on its own two legs.

24   Q.   All right.  If I understood you correctly a moment ago,

25   what you said is that in any particular county, your view, based

1   on the reasons that you've explained to us, a merger to monopoly

2   in a particular county would not trouble you.

3   A.    Based on where we are today, looking at the historical

4   evidence, if there's a single MAO in a county, they do not price

5   significantly higher than counties with more MAO competitors.

6   And I should note that Professor Nevo's analyses show that the

7   margins aren't higher in those counties and that total

8   beneficiary costs are only slightly higher in his model, which I

9   have problems with because it drops plan fixed effects.

10  Q.    Do you agree that the county is the relevant geographic

11  market when we're looking at the Medicare Advantage part of the

12  case?

13  A.    Yes, sir.

14  Q.    Could we look at your slide 26, please.  So in looking at

15  the chart on the right, that's yours?

16  A.    I did not -- this is a correction of his chart to

17  incorporate the downward trend.

18  Q.    You say that as of 2016, the correct proportion of people

19  going into Medicare Advantage is 35.8 percent.  Right?

20  A.    As a share of the eligible population, if I use Professor

21  Nevo's data.  So there are a couple of different pieces here.

22  This is, as I think I described, when he did his pie chart and I

23  did mine, we used slightly different data sets.  They account

24  for a couple percentage-point difference.  A big chunk of it is

25  the difference between our treatment of employer-sponsored

1    coverage.  And so this is within his data set.

2    Q.   And you use this to suggest a downward trend.  Is that

3    right?

4    A.   No.  I was actually quite precise about my title, I think,

5    which is it's just not increasing in the way that Professor Nevo

6    presented.  So I adjusted for the downward trend generally in

7    employer-sponsored coverage.  That's a phenomena that's been

8    written about quite extensively in the literature, and I

9    adjusted his figures for that downward trend in

10   employer-sponsored coverage.  But my critique was just he shows

11   a very strong growth rate in the Medicare Advantage share of

12   seniors that are eligible, and my point is that that was not

13   correct because he fixed in time, in 2011 time, the employers'

14   share of coverage.

15   Q.   Could we bring up, please, PX 348.  This is admitted, Your

16   Honor.

17       Do you recognize PX 348 as a Kaiser Family Foundation issue

18   brief, "Medicare Advantage 2016 Spotlight:  Enrollment Market

19   Update"?

20   A.   Yes, sir.

21   Q.   That's a document on which you relied in your initial

22   report?

23   A.   I'm almost positive that that is in fact the case.  Yes,

24   sir.

25   Q.   It's listed at page B16 in your report if you or anyone

1    would like to check.

2    A.    I'm going to trust you.

3    Q.    I think that's efficient at this point.  I'd like to direct

4    your attention to the first paragraph.  All right?  It says,

5    "The number and share of Medicare beneficiaries enrolled in

6    Medicare Advantage has steadily climbed over the past decade,

7    and the trend in enrollment growth is continuing in 2016.  The

8    growth in enrollment has occurred despite reductions in payments

9    to plans enacted by the Affordable Care Act of 2010 (ACA)."

10        Did I read that correctly?

11   A.    Yes, you did.

12   Q.    Could we turn to your slide 27, please.  You don't know

13   whether -- focusing on the switching-in part, you don't know

14   whether any of this switching-in is in response to price.  Is

15   that correct?

16   A.    That is correct.  That's why it's in the background

17   section, not in my competitive effects analysis section.

18   Q.    And you know that Professor Ford presented evidence from

19   Humana's own survey about switching for related -- for reasons

20   related to price?

21   A.    I believe he had a disenrollment survey of about 250

22   seniors that looked at the question of -- that surveyed people

23   based on their reasons for exit.  Yes, sir.

24   Q.    You're not presenting any opinions in this slide deck about

25   Professor Ford's analysis?

1    A.   Yes, I did.  In the slide in this first section of the

2    demand section where he talked about you should be doing

3    diversion, which includes switch-ins, age-ins and switch-outs

4    based on price, that's the right way to do it.  That switch-out

5    analysis that -- just looking at switch-out data is not an

6    appropriate economic method for analyzing this market.  So I

7    thought I was clear about that.  I'm more than happy to explain

8    in more detail if you'd like me to.

9    Q.   You're not offering any critique of Professor Ford's

10   analysis of the survey and how it was done.  Is that right?

11   A.   I am not offering a critique of the survey itself; I'm

12   offering a critique as a matter of economics about the

13   usefulness of that survey for the competitive effects analysis.

14   Q.   I say this because, if I read your report, there was a

15   suggestion that you were going to offer opinions as a survey

16   expert.  And if I understand how you're qualified, you're not

17   trying to do that in this trial.  Is that right?

18   A.   I made the observation that it had 250 enrollees as part

19   of -- or disenrollees as part of the survey, and what it was

20   focused on was switch-out, and that what we should be focusing

21   on is diversion, which takes into account both switch-ins,

22   age-ins, and switch-outs, in response to price, and that's the

23   right measure to focus on.

24   Q.   Of those who switch in from original Medicare, you do not

25   know, do you, how many are switching in from original Medicare

1    with a Med Supp plan versus without?

2    A.   That is correct.  If it's proportional to the rough shares,

3    it would be about two-thirds are switching in from original

4    Medicare with Med Supp and about one-third from original

5    Medicare without Med Supp.  But I don't have evidence one way or

6    the other to say whether the average is the marginal.

7    Q.   In your initial report, you relied on a working paper by a

8    researcher called Sinaiko, S-I-N-A-I-K-O.  Is that right?

9    A.   I believe that's the case.  Yes, sir.

10   Q.   If we could, can we pull up the Sinaiko paper?

11           MR. CONRATH:  May I hand up PX 712?

12           THE COURT:  You may.

13   BY MR. CONRATH:

14   Q.   So PX 712 is a paper entitled "Persistent Preferences and

15   Status Quo Bias Versus Default Power:  The Choices of Terminated

16   Medicare Advantage Clients," March 2015, by Anna Sinaiko, Ph.D.?

17   A.   And Richard Zeckhauser.

18   Q.   And Richard Zeckhauser.  Correct.  So you recognize PX 712?

19   A.   Yes.  I'm not sure this is the precise version that I

20   cited, but if you say it is, then I'm not going to disagree with

21   you.

22   Q.   Well, let's look at the top.  It says "Draft not for

23   citation or circulation."  You used it and cited it?

24   A.   Whether this is the precise version sitting here today, I

25   can't tell you one way or the other.

```
1    Q.   Let's look at your initial report, page 101, if we could.

2              THE COURT:  The original report being Exhibit 419?

3              MR. CONRATH:  Yes.  Thank you, Your Honor.

4    BY MR. CONRATH:

5    Q.   I direct your attention to --

6    A.   Footnote 253?

7    Q.   -- footnote 253, and that cites a 2015 version?

8    A.   That is correct.  I just don't know if --

9              THE COURT:  I'm sorry, I'm lost.  I thought we were on

10   page 101.

11             THE WITNESS:  We are.  Footnote 253.

12             THE COURT:  Not DX number, but the actual page number.

13   All right.

14             MR. CONRATH:  For clarity, I will say DX 419-110.

15             THE COURT:  All right.  Go ahead.

16   BY MR. CONRATH:

17   Q.   And the title there is the title of PX 712.  Right?

18   A.   That is correct.

19   Q.   And you describe it in your footnote as a working paper?

20   A.   That is correct.

21   Q.   And you can't tell if it's the same?

22   A.   No, because in the footnote it says 2015, Harvard

23   University, and nothing on the front cover of what you've given

24   me says Harvard University.  So I can't tell you one way or the

25   other.
```

1    Q.    This paper studied choices by seniors between MA and

2    original Medicare after a Medicare Advantage plan was canceled.

3    Is that right?

4    A.    That is correct.

5    Q.    In that situation, the seniors are defaulted to original

6    Medicare.  Is that right?

7    A.    That is correct.

8    Q.    And could we turn to the abstract, the second page of the

9    working paper, PX 712?  I'd like to direct your attention to the

10   third paragraph, about the middle.  It says, "However, the rates

11   of transition to traditional Medicare among TCs" -- that's

12   terminated choosers, right? -- "were still relatively low."

13   A.    I'm sorry.  I'm not sure where you are.

14         (Counsel indicates.)

15   A.    That's pretty far away.

16         THE COURT:  Middle of the third paragraph.

17   BY MR. CONRATH:

18   Q.    The middle of the third paragraph.

19   A.    Okay.  I can see where it's easier to see where they've

20   highlighted it on the screen.  Thank you very much.

21   Q.    It reads, "However, the rates of transition to traditional

22   Medicare among TCs" -- that's terminated choosers -- "were still

23   relatively low.  This result suggests that, for the majority of

24   enrollees, preference effects which favor staying in MA

25   overpowered the default effect of a nudge toward enrollment in

1    traditional Medicare."

2         Did I read that correctly?

3    A.   Yes, you did.

4    Q.   So after being defaulted to original Medicare, Sinaiko

5    found that seniors still preferred Medicare Advantage and

6    switched back.  Right?

7    A.   That is correct.

8    Q.   And that would be a switch-in?

9    A.   That would count -- well, I don't know precisely in terms

10   of the timing of this whether it would be counted as a switch-in

11   or not because it depends on if they ever actually enrolled in

12   original Medicare.

13   Q.   So you're not sure.

14   A.   Sitting here today, I'm not sure of that issue.

15   Q.   Okay.  So could we turn to slide 33, please.  So slide 33

16   you include as a party's ordinary course document.  Is that

17   right?

18   A.   That is correct.

19   Q.   You went back to February 2012 to find a document where

20   they talk about competing with traditional Medicare.  Is that

21   right?

22   A.   I took it -- I mean, I didn't look at the date for this one

23   for the presentation.  In my reports I cite a number of the

24   different documents.  I stand by what I said, which is you can

25   find documents saying both competition with original Medicare

1   and competition within MA, and that's why I go to the

2   quantitative analysis.

3   Q.   Sure.  But let's -- since you brought it up, let's go to

4   page 35 of DX 515, which is the document on slide 33.  I'd like

5   to turn to page 35, which is DX 0515-255.  Do you see that this

6   section of the document is called "Competitor/Market Analysis"?

7   You see that?

8   A.   Yes, sir.

9   Q.   And if we go to the next page, this lists competitor

10  capabilities.  Right?

11  A.   Yes, it does.

12  Q.   And the competitors it lists are itself, Humana, and then

13  United, WellPoint/Anthem, Kaiser, and small regional plans.

14  Right?

15  A.   On this page, yes, sir.

16  Q.   And the next page, let's go ahead to slide deck page 37,

17  but the DX number is DX 0515-257.  So this was when Aetna was

18  just starting to make its big expansion into Medicare Advantage.

19  Is that right?

20  A.   As you said, this document is from 2012, so this represents

21  where the various MAOs were in two thousand -- it looks like

22  '11.

23  Q.   Right.  So all of these are Medicare Advantage competitors.

24  Isn't that correct?

25  A.   That's what the title of the chart says, yes.

1    Q.   And Aetna here was fifth and growing, as you can see by the

2    bars for 2006 and 2011?

3    A.   It looks like just about everyone was growing, sir.

4    Q.   Right.  And that's because there was growth in Medicare

5    Advantage?

6    A.   Medicare Advantage, as a share of all Medicare eligibles,

7    that's a different question than the share that is at issue in

8    this case.  So there's a discrepancy between those two figures,

9    because as employer-sponsored coverage falls, you can --

10   Medicare Advantage share will increase.  But the relevant

11   question for this case is excluding those other elements.  So

12   that's why there's a little bit of confusion in how the

13   different reports cite to the data.

14   Q.   So at this point, my question was, Aetna was fifth.  Is

15   that right?

16   A.   In terms of MA membership, that appears to be the case if

17   you include group.  It says both group and individual, and as

18   you know in this case, we're looking at individual.  If you look

19   at just individual, I can't figure out what number they'd be.

20   Q.   All right.  And this is just before Aetna acquired

21   Coventry, which you can also see listed on this chart.  Is that

22   correct?

23   A.   That is correct.

24   Q.   You showed us a series of slides, or I think it's slide 34,

25   but you moved some things around that showed the characteristics

1    of Medicare Advantage and other Medicare options.  Do you

2    remember that slide?

3    A.   Yes, sir, as examples of the different types of plans that

4    are out there.

5    Q.   And one thing that is always different between Medicare

6    Advantage and the various flavors of original Medicare is the

7    network question.  Right?  Original Medicare, you always have

8    the option to visit any provider, and Medicare Advantage plans

9    limit provider choice to a network?

10   A.   To some degree.  You have wide networks and narrow networks

11   within MA, and you have a wide network with original Medicare.

12   So there's differences in both.  I mean, there's singularity in

13   terms of in original Medicare, the network question.  In MA,

14   there's diversity in terms of the network question.

15   Q.   Could we pull up DX 490, please.  So page 1, can you see

16   this is a Humana document from 2015?  And do you see that the

17   attachment is called "Medicare product decision tree final

18   6-26-15"?  Do you see that?

19   A.   Yes, sir.

20   Q.   And could we move to the page DX 490-36.  This is in the

21   section of the attachment, "Consumer Medicare Purchase Decision

22   Process."  Do you see that?

23   A.   I assume that's the case.  I haven't seen this whole

24   document so I can't -- I don't know precisely what else is in

25   here.

1    Q.   All right.  Could we turn to the page DX 490-045.  This is

2    entitled "Decision tree -- brand, network, and costs are key

3    considerations."  Is that the title of this page?

4    A.   That is correct.

5    Q.   And it portrays the first decision is "what brands will I

6    consider?"  Right?

7    A.   That's what it says.

8    Q.   And then it says, "Am I willing to accept network

9    restrictions?"  That's portrayed as the second choice.  Right?

10   A.   That is correct.

11   Q.   And then below that, the decision tree splits to original

12   Medicare and Medicare Advantage.  Is that right?

13   A.   Effectively, yes, sir.

14   Q.   You agree that price is a reason why some seniors choose

15   Medicare Advantage?

16   A.   For sure.

17   Q.   Could we turn to your slide 36, please.  You use the phrase

18   here, "real-world market outcomes."  I just want to be clear

19   here that the nested logit model that Professor Nevo used -- you

20   use a version as well -- is based on actual market choices of

21   millions of seniors.  Is that right?

22   A.   That's correct.

23   Q.   And that's real-world data.  Right?

24   A.   That is correct.

25   Q.   You said, I believe, yesterday that market definition is an

1    inherently demand side question.  Correct?

2    A.   You're looking at consumers' behavior in response to price

3    changes.

4    Q.   Right.  So what you're describing on slide 36, your

5    regression analysis, is about how MAOs behave.  Is that right?

6    A.   It involves the question -- remember, MAOs are responsive

7    to consumer preferences and consumers' willingness to pay for

8    products.  And so the MAO behavior will reflect directly the

9    consumer behavior.

10   Q.   But just to be clear, the regression analysis that is your

11   form of analyzing market definition includes not just demand

12   side but supply side, that is MAO behavior, in the analysis that

13   you did.

14   A.   It's reflecting the market as it is, and we're observing

15   what's happening.  The identical analysis that Professor Nevo

16   conducts for public exchanges.  An identical statistical

17   analysis.  So -- in terms of the structure of the model.  And so

18   it seeks to look at what happens when you move from three

19   players to two players to one player or vice versa, and what

20   happens to price.  And the ability of a firm to raise price will

21   be directly related to their consumers' willingness to pay.

22   Q.   Let's see if I can go back and ask my question again.  You

23   agree that market definition is inherently a demand side

24   question?

25   A.   It's inherently a demand side -- it's looking at the

1    factors that consumers consider, that's a demand-side factor.

2    Q.   Right.  And the merger guidelines say market definition is

3    focused on consumer behavior.  Right?

4    A.   Correct.  And they also talk about how the fact that how

5    markets behave when you have a change in the number of

6    competitors is directly informative of market definition, as

7    evidenced by the previous slide in this presentation.  The

8    guidelines themselves dictate that this is an approach that is

9    entirely appropriate.

10    Q.   Market definition is an inherently demand-side question,

11    and your test included also supply-side behavior by the market

12    participants.  Correct?

13    A.   It includes what's happening in the real world, how firms

14    behave in terms of pricing when they have fewer competitors.

15    And if we go to the previous slide, if I may, it is directly --

16    that evidence that the guidelines say, "Evidence of competitive

17    effects can inform market definition... for example, evidence

18    that a reduction in the number of significant rivals offering a

19    group of products causes prices for those products to rise

20    significantly can itself establish that those products form a

21    relevant market.  Such evidence also may more directly predict

22    the competitive effects of a merger, reducing the role of

23    inferences from market definition and market shares."

24    Q.   So that last sentence says that the kind of evidence that

25    involves market behavior is more directly relevant to

1    competitive effects.  Right?

2    A.   It says it also may -- such evidence also may more directly

3    predict.  It doesn't say it's more relevant for it.  It says it

4    may also more directly, and that's why I look at that, because

5    it is a better prediction -- that data and that analysis is a

6    better predictor of competitive effects than trying to simulate

7    the merger through a model that requires a significant

8    simplification of what happens in the real world.

9    Q.   In the work that you did in this case, you did look at

10   consumer demand.  Isn't that right?

11   A.   That's correct.

12   Q.   And you did an estimate logit model?

13   A.   That is correct.

14   Q.   And you estimated with that how consumers choose among

15   Medicare options?

16   A.   That is correct.

17   Q.   And that is to say you did demand estimates?

18   A.   I did demand estimates, yes, sir.

19   Q.   And you did not use those demand estimates to do a

20   hypothetical monopolist test, correct?

21   A.   That is correct, because I have a more powerful test, which

22   is looking at what actually happens in the real world when we

23   have a single MAO.

24   Q.   You did not --

25   A.   We have a more powerful and direct test, if I may.  Sorry

```
 1    to interrupt you.

 2    Q.   Do you have a copy of the merger guidelines?

 3              MR. CONRATH:  Can I hand it up?  Your Honor, may I

 4    hand up a copy of the merger guidelines?

 5              THE COURT:  Sure.

 6    BY MR. CONRATH:

 7    Q.   I'd like to direct your attention -- so we've marked these

 8    as PX 7 --

 9              THE COURT:  You're going to mark it as an exhibit?

10              MR. CONRATH:  Well, for identification only.

11              THE COURT:  It's okay.  Everyone's using them.  I'm

12    sure there's no problem with --

13              MR. CONRATH:  That's my thought.  All right.  All

14    right.

15              THE WITNESS:  Mr. Conrath, I thought you would have

16    them memorized.

17              THE COURT:  He does, but he's concerned you don't.

18        (Laughter)

19              THE COURT:  And he knows I don't.

20        (Laughter)

21    BY MR. CONRATH:

22    Q.   All right.  I'd like to direct your attention to section

23    4.1.1, the hypothetical monopolist test.  I'd like to look at

24    the second paragraph, beginning "the hypothetical monopolist."

25    And look at the second sentence.  Do you see that?  It says,
```

1    "Specifically, the test requires that a hypothetical

2    profit-maximizing firm, not subject to price regulation, and

3    that was the only present and future seller of those products

4    (hypothetical monopolist) likely would impose at least a small

5    but significant and nontransitory increase in price (SSNIP) on

6    at least one product in the market."  Do you see that?

7    A.   Yes, sir.

8    Q.   And that's the fundamental definition of hypothetical

9    monopolist in the guidelines?

10   A.   Yes, sir.

11   Q.   And one of the conditions --

12   A.   It's technically also involving the SSNIP test, but I think

13   broadly speaking, yes, sir.

14   Q.   And one of the conditions is the hypothetical monopolist

15   was the only present and future seller of those products.

16   Right?

17   A.   In the relevant geographic market, yes, sir.

18   Q.   And that means that neither entry nor potential entry are

19   to be considered.  Right?

20   A.   It doesn't actually say precisely those words.

21   Q.   Well, the meaning of "only present and future seller"

22   surely means there's not going to be any entry.  Right?

23   A.   It has the threat of potential entry that sits there, but

24   your words are "the only present and future seller" sitting

25   there today.

1    Q.    Well, future seller is talking about future entry, right?

2    You're not quibbling with that part of the guidelines, are you?

3    A.    I'm not quibbling with that; that is correct.

4    Q.    And your version of the hypothetical monopolist test, which

5    is your regression, takes into account potential entry.  Right?

6    A.    It takes into account all the competitive forces that exist

7    today when we have a monopolist, a single MAO provider, in the

8    relevant geographic market.

9    Q.    And so -- and your view is that entry is a powerful force.

10   Right?

11   A.    It's one of the forces that protects competitors.  It's --

12   the regulation as well as the presence of original Medicare in

13   the marketplace.

14   Q.    All right.  So your --

15   A.    Just for clarity, I don't disaggregate those three effects.

16   They are present in the real world as a protector of

17   competition.

18   Q.    So your, what you call the regression, what your regression

19   is as a hypothetical monopolist test includes an element that

20   the guidelines tell us is not appropriately a part of the

21   hypothetical monopolist test?

22   A.    The test goes directly to a previous part of the guidelines

23   that say you can look at market definition as informative to

24   competitive effects, and competitive effects is informative to

25   market definition.  Looking directly at what happens when you

1    have a reduction in competition by one, the guidelines tell us

2    that that's directly informative about market definition.

3    Q.   But in answer to my question, your regression, which you

4    use as a hypothetical monopolist test, incorporates an element

5    that the guidelines tell us is not properly part of the

6    hypothetical monopolist test.

7    A.   My regression incorporates the full panoply of competitive

8    forces that exist to -- remember, what it's doing is it's

9    testing whether the candidate market proposed by the government

10   is correctly specified, and the answer is, based on that

11   analysis, it is not.  And just as a reminder, it's the same

12   hypothetical monopolist test that Professor Nevo uses in the

13   context of the exchange markets.

14   Q.   So the answer to my question is yes?

15   A.   The answer to your question is that it's looking at the

16   market as it is, and it's taking all of those competitive

17   forces.  If original Medicare is in part of the market today and

18   imposing that constraint, that would mean that the candidate

19   market proposed by the government is not correctly specified and

20   is not correctly identified in the data, and that's why we're

21   observing no relationship between price and the number of

22   competitors.

23   Q.   So among the panoply of competitive forces that's included

24   in your regression, which is what you use as a hypothetical

25   monopolist test, is what you've described as price regulation as

1    well.  Right?

2    A.   I didn't say price regulation.  It's the full range that

3    CMS sets the contours for competition.

4    Q.   All right.  If I heard you correctly, you have the view

5    that CMS is a price regulator.  Is that right?

6    A.   They regulate elements of price, but they also regulate

7    margins and benefit design and all these other elements.  The

8    combination determines the contours of competition.

9    Q.   That's another way in which your hypothetical monopolist

10   test, your regression, does not follow the principles set forth

11   in the guideline.  Right?  Where it says "not subject to price

12   regulation"?

13   A.   I disagree with you, because the concept here was really

14   focused on could you implement, as I understand it, and I've had

15   a long conversation about those four words with one of the

16   authors of the 1992 guidelines, which the 2010 guidelines, at

17   least for this section, are based on -- really were focused on

18   if you had a rate-regulated industry, where it's literally rate

19   regulation, not any room to change prices, how should you

20   implement the hypothetical monopolist test.

21        As I noted, there is flexibility to raise, change prices by

22   say $32 a month, per member per month in the TBC calculation,

23   and there's obviously other constraining effects within all the

24   other regulations.  And so this is -- my understanding of this

25   based on discussions over the years has been that that is based

1   on a rate-regulated type industry and how you might implement

2   the SSNIP in the circumstances.

3   Q.   So you agree that this industry, the Medicare Advantage

4   industry, is not a rate-regulated industry in the traditional

5   sense?

6   A.   What I would say is this is a unique industry.  In the

7   traditional sense of a utility, it is not.  Remember, as I

8   described it, the government's setting terms of competition,

9   determining the contours of competition is the way I'd like to

10  think about it; they are not telling an MAO that you have to set

11  a price of $26 instead of $27 unless it violates some other

12  regulatory regulation that CMS has.

13  Q.   While we're on this page, would you look at the beginning

14  of the next paragraph of the guidelines, the third paragraph in

15  section 4.1.1?  The first sentence there says that "Groups of

16  products may satisfy the hypothetical monopolist test without

17  including the full range of substitutes from which consumers

18  choose."  Do you agree with that?

19  A.   Yes, I do.

20  Q.   Could we look at your slide 42, please.  Do you have it

21  there?

22  A.   Yes, sir.

23  Q.   So I just want to be clear.  The boxes on this diagram do

24  not represent any specific real-world data.  Is that right?

25  A.   This is an illustration -- I think I said it right when I

1    put it up, that this is an illustration of the Example 6

2    principles.

3    Q.   And you did not use any estimated data in this example,

4    this illustration.

5    A.   No, I did not.

6    Q.   And you have not identified any particular flavor of

7    original Medicare that belongs in what you would say is the

8    right relevant market?

9    A.   As I said during my direct testimony, and we talked about

10   at my deposition, in an ideal world, we would have granular data

11   from CMS on enrollment for each flavor of original Medicare.  In

12   the absence of that data, we can look at original Medicare as a

13   block.  We know two facts:  Diversion to a number of Medicare

14   Advantage plans is effectively zero.  We know that because we

15   see that in the data that both Professor Nevo and I used for

16   measuring diversion.

17        So we know, for example, diversion from MA 1 to MA 5 is

18   close to zero.  We see that on the data.  We also know that

19   there are a number of flavors of original Medicare, and we know

20   that on average, roughly one-third to 40 percent of enrollees

21   take original Medicare without a Med Supp or a PDP plan.

22        Third fact is we observe high diversion to all original

23   Medicare.  Those combined tell me there must be versions of

24   original Medicare, original Medicare probably without Med Supp

25   and PDP, that there's higher diversion to than these MA plans

1    that have virtually no diversion.

2    Q.   So let's unpack the various parts of that.  The first is

3    you don't know of any such plan to which there would be higher

4    diversion.  You assume that there must be some.

5    A.   Logically, it must be the case that there is higher

6    diversion to OM options than some MA options because we observe

7    the full range of MA options -- OM options and diversion is

8    high.  In either Professor Nevo's it's 30 percent, in mine it's

9    51 percent.  And we know diversion to MA options, products in

10   both Professor Nevo's data and in my data, versus individual

11   products, approaches zero.  So it has to be the case that there

12   are OM options that come before the MA options.

13   Q.   All right.  You say that you needed, if I heard you right,

14   individual-level enrollment data in order to seek -- actually

15   try to find real diversion and not hypothetical diversion?

16   A.   Yes.  So what you would do with the nested logit model is

17   instead of just treating original Medicare as a block, you would

18   allow for each individual product from all of the various

19   players that offer original Medicare options to be in the

20   analysis.  But CMS would not provide that data on a timely

21   basis.

22   Q.   Well, just to be clear, you asked for -- your request for

23   data was what was forwarded to us.  I think you told me that at

24   your deposition?

25   A.   How that precisely works is beyond my knowledge, but I

1    assume that it goes to you or goes directly to CMS.

2    Q.   And that was your request that would have produced tens of

3    millions of records that included the individual information

4    about every specific senior who's eligible for Medicare?

5    A.   All we needed were the individual decisions that they made,

6    not obviously their personal information.

7    Q.   And you understood that you know that to mask the personal

8    information would have taken months?

9    A.   I doubt that that's the case, given that the Curto paper

10   actually uses much more disaggregated data as part of its

11   analysis that they got directly from CMS.

12   Q.   So you know better than CMS whether it would take time to

13   mask the data?

14   A.   I know that they made more disaggregated data available to

15   Curto and their co-authors than were made available to us.

16   Q.   And you know that once faced with the choice to get the

17   time to get the data that you said you wanted, or keep the

18   schedule that they said they wanted, they decided not to get the

19   data for you.  Is that right?

20            THE COURT:  "They"?

21            MR. CONRATH:  "They" being the defendants.  Sorry,

22   Your Honor.

23            THE WITNESS:  That's beyond my knowledge set.  Sorry.

24   BY MR. CONRATH:

25   Q.   You know that request was dropped in discovery?

1    A.    I was under the impression at some point, I was told that

2    it would not be able to be supplied in a timely basis.  Whether

3    it's dropped or what happens to it, I don't know.

4    Q.    Aetna and Humana are themselves two of the largest sellers

5    of Med Supp plans.  Is that right?

6    A.    I haven't done the precise analysis to know their relative

7    size, but they are sellers of Med Supp plans for sure.

8    Q.    And they're also substantial sellers of Part D plans?

9    A.    They are sellers of Part D plans, yes, sir.

10   Q.    And Aetna and Humana have individual level data for

11   consumer enrollment in Part D and Med Supp plans.  Right?

12   A.    That is correct.

13   Q.    And you did not use in your analysis any enrollment data

14   from either of the defendants in an attempt to identify specific

15   flavors of OM to which there might be more diversion.  Is that

16   correct?

17   A.    That is correct.  And I'm more than happy to explain why,

18   if you would let me.  Which is that in the model, you can't just

19   introduce the products of two players without knowledge about

20   the other players, because there's just so much information in

21   those other players.  So if you don't have the other competitors

22   that they're competing against, you're really -- the model won't

23   be specified correctly, and it won't be -- I'm not sure how you

24   introduce just those two players into this analysis.  I haven't

25   thought of a way to do that.

1    Q.    You're familiar with third-party discovery?  You know that

2    Aetna and Humana sought information from third parties in this

3    lawsuit?  You know that in general in lawsuits that's possible?

4    A.    In general, I do know that because in the GE-Electrolux

5    trial, there was a massive amount of third-party data, but the

6    details of how that works is beyond my knowledge.

7    Q.    You didn't ask for third-party data for this purpose?

8    A.    I don't see how you could do that, because you would have

9    to go to each of the Med Supp and PDP players in every market,

10   and there are many, many players offering those products,

11   especially Med Supp is effectively a commodity product.  And so

12   you would need a massive amount of information, all information

13   that, Mr. Conrath, the government or CMS has in its possession.

14   So this is beyond the scope for my knowledge because I'm not a

15   lawyer.

16   Q.    Could we look at your chart that is on slide 44.  This is

17   part of your illustration of why there must be some examples of

18   some flavor of original Medicare that is closer to Medicare

19   Advantage than some others as part of this same topic we've been

20   discussing?

21   A.    What I said was, if diversion is proportional to total

22   beneficiary cost, there must be ones that come first.  But given

23   that I don't have data on enrollment, I can't draw a firm

24   conclusion.  But given the fact that -- if it's proportional,

25   there must be versions of original Medicare that come before

1    versions of Medicare Advantage.

2    Q.   All right.  Let's take both parts of that.  You said if

3    diversion is according to total beneficiary cost.  You didn't

4    cite any evidence that it is proportional to total beneficiary

5    cost, did you?

6    A.   That is correct.

7    Q.   That would be an assumption.

8    A.   That is correct.

9    Q.   And plans vary on a lot of characteristics.  Right?

10   A.   For sure, they do.

11   Q.   Two plans that might be very close together on total

12   beneficiary cost could be very different in terms of the

13   features and characteristics.  Correct?

14   A.   For sure.

15   Q.   And those features and characteristics are important to

16   many seniors.

17   A.   Some -- depends on the senior.  It may or it may not

18   depending upon the individual circumstances.

19   Q.   So that means that two bars that we see next to each other

20   here on your chart on slide 44 could be very different plans

21   that are very, very poor substitutes for each other.  Right?

22   A.   It's possible that that's the case.  If you look at the

23   chart, the plans on the left tend to be -- I think the first two

24   are HMO plans and the other MA options are all PPO plans.  I may

25   be slightly off on that, but roughly speaking, the two green

1    lines I think are HMO plans and the purple line's a PPO plan, so

2    those would have some differences.

3         And obviously, sir, just to make sure the record's

4    complete, this is looking just for good health.  The chart looks

5    slightly different if you used excellent health or very good

6    health or fair or poor, with shifting bars based on the various

7    co-pays, deductibles, et cetera, that each plan offers.

8    Q.   So you show about 30 options on this chart.  Is that right?

9    A.   I haven't counted them up.  If you have, I'll agree with

10   30.

11   Q.   Loosely.

12   A.   Sure.

13           THE COURT:  It looks like a lot more than 30 lines to

14   me.

15           MR. CONRATH:  I would say 45 maybe.

16           THE COURT:  That's a lot more than 30.

17           MR. CONRATH:  Yeah.  I agree.  Statistically

18   significantly different, I believe.

19           THE WITNESS:  Your Honor's pretty damn close.  It's

20   about 45.

21   BY MR. CONRATH:

22   Q.   All right.  So you understand that Med Supp policies come

23   in different types?

24   A.   Yes.

25   Q.   And there are 11 plan types, A, B, C, and so on, on offer

1   for Medigap in Kansas?

2   A.   Yeah.  For some reason I never figured out, they actually

3   skipped certain letters along the way.  But Med Supp Part F is

4   the most popular of those options.

5   Q.   And these plan types are offered by a wide range of

6   insurers, right?

7   A.   That is correct.

8   Q.   In 2015, do you know that there were 27 Part D plans

9   offered in Shawnee County, Kansas?

10  A.   Sitting here today, that wouldn't surprise me given this

11  chart.

12  Q.   All right.  So if any modest number of Medigap, Med Supp

13  plan offerers offer more than one type, there are -- there would

14  be scores, perhaps a couple hundred actual different types of

15  original Medicare flavors available in Shawnee, Kansas?

16  A.   Could you repeat the question?  I was a little confused by

17  it.

18  Q.   I'll break it up.  So Aetna offers Med Supp plans.  Right?

19  A.   That is correct.

20  Q.   If Aetna offers Med Supp plans A, B, C, D, F, F high

21  deductible -- those are two different plans, right? -- G and

22  others.  If Humana offers five or as many as 11, and Medical

23  Mutual of Omaha and so on, other insurers, there are actually

24  going to be a lot more than 45 plans on offer in Shawnee,

25  Kansas.  Right?

A.   That is correct.  But we have to remember that the vast

majority of people who buy Med Supp buy a Part F plan.

Q.   So your chart does not actually include all the options.

Correct?

A.   This is focused -- the analysis is focused on the most

prevalent version of Med Supp, which is the Part F.

Q.   And are you sure that it's Part F and not the

high-deductible Part F?

A.   Sitting here today, I'd have to go back to the backup to

this to see if it's the high-deductible or just the Part F.

Q.   You haven't presented to us any ordinary course of business

documents that use the same information you used to calculate

the prices, the total beneficiary costs shown on this chart.  Is

that right?

A.   That's correct.  I haven't also seen any ordinary course of

business documents that use the nested logit model.

Q.   I think we can stipulate to that.

A.   Although there are HHS documents that use nested logit

models.  So maybe there's some evidence out there that the

parties use that.

Q.   Have you seen Aetna or Humana documents that use Herfindahl

indexes?

A.   Not that I'm aware of.

Q.   Yesterday you testified that the sixth or seventh bar to

the right is original Medicare without any options.  Do you

1    remember that?

2    A.    I do.  I've looked at all the Shawnee ones, so I thought --

3    I think I said "I think" if I look at -- I may not have been

4    accurate, but if you look at the very good or the excellent, I

5    know it shifts to the right.  So if you look at the excellent

6    one, it would be somewhere in the middle among excellent health.

7    Very good, it's sort of three quarters.  I thought for good it's

8    six or seventh.  So -- I assume you're going to ask me.  And

9    then as you get to fair and poor, it shifts all the way to the

10   right as the last bar.

11   Q.    Well, let's start.  This chart that's shown on this slide

12   44 is not contained in any of your reports.  Correct?

13   A.    The data are because I analyzed the question in my first

14   report of the distance in total beneficiary cost between MA

15   plans.  So if you take the lowest priced MA plan and the highest

16   priced MA plan, how did that distance compare to the distance

17   between an MA plan and an OM plan, original Medicare option.

18   And so I did various analyses related to that question about the

19   diversity of total beneficiary costs, and obviously, to do that

20   analysis, it's -- each of these bars is the foundation for then

21   an analysis that looks at every county.

22   Q.    So my question was narrower.  You didn't produce in either

23   of your reports the chart that's set forth in your slide 44.

24   A.    That is correct.  This chart was not in the report; it was

25   a backup to an analysis that was at the first part of my initial

1    report that looked at every single county.  And obviously,

2    producing 364 of these charts would be quite voluminous.

3    Q.   The backup to this chart was not produced when we got it in

4    your demonstratives on Sunday noon?

5    A.   That question I do not know.  If you look at Table 2-1 --

6    Q.   Do you have a page number?

7    A.   Page 59.  And for Your Honor it would be Defense DX

8    0419-68.  And so what that analysis does, it's a comparison to

9    total beneficiary cost for Medicare Advantage and original

10   Medicare options in the complaint counties.  So it looks at each

11   of the -- this data in each complaint county.

12   Q.   And you cite on slide 44 as a source "September 2015 OOPC."

13   The OOPC is what?

14   A.   Out-of-pocket cost.

15   Q.   Could I have...

16   A.   And just for clarity, that's the same source as in Table

17   2-1.

18           MR. CONRATH:  One moment of a little production,

19   Your Honor?

20           THE COURT:  All right.

21           MR. CONRATH:  I'm handing up, Your Honor, what has

22   been marked as PX 716.

23           THE COURT:  716.  You decided to skip 4 and 5?  714

24   and 715?

25           MR. CONRATH:  Well, I was confident that 6 was not

1    taken, Your Honor.

2              THE COURT:  Okay.

3    BY MR. CONRATH:

4    Q.   Do you recognize PX 716?

5    A.   As presented, no.

6    Q.   So this is an extract from the document, the September 2015

7    out-of-pocket cost, OOPC, which is a large Excel spreadsheet,

8    and this is a printout of the relevant columns from the

9    spreadsheet that contains the out-of-pocket cost for Medicare

10   fee-for-service and Medigap plans?  Do you recognize the

11   columns?  So this is what you meant as the backup for your

12   report?  Is that right?

13   A.   I haven't seen it in printed-out form, so I can't tell you

14   one way or the other.

15   Q.   Did you see it in Excel spreadsheet form?

16   A.   At some point along the line, yes, sir.

17   Q.   So if we look on the left-hand box on the first page of

18   PX 716, do you see the first column is "H plan"?

19   A.   Yes, sir.

20   Q.   That would be the plan?

21   A.   Yes, sir.

22   Q.   And then there's a state.  Then there's the categories of

23   different health statuses.  Right?

24   A.   Yes, sir.

25   Q.   There's a list -- there's a place for Medigap premium where

1    there is a Medigap policy.  Right?

2    A.    Yes.  In the version you printed, it's the same column.

3    Q.    Same column as the health status.  Right?

4    A.    I just don't know if it's printed that way or not, but

5    sure.

6    Q.    And then a total cost.  Right?

7    A.    That is correct.

8    Q.    Total cost, that's what you used to show the height of the

9    bars in your slide 44?

10   A.    That is correct.

11   Q.    All right.  So if we look at the top -- the very first

12   entries in this before we get to the states are several entries

13   for FFS.  That's fee-for-service.  Is that right?

14   A.    That is correct.

15   Q.    If we look at those first ones where there's no premium

16   listed, that would mean fee-for-service without a Medigap plan.

17   Is that right?

18   A.    That is correct.

19   Q.    And if we look at fee-for-service for good health, that

20   would be $549 total beneficiary cost?

21   A.    That is correct.

22   Q.    So if we look at your slide 44, just eyeballing it, the

23   $549, original Medicare without a supplement, would now be six

24   or seventh in -- looks like it would be the far right one.  Is

25   that right?

1    A.    Conditional on -- sitting here today I didn't memorize all

2    the backup data, whether the fee-for-service is, it's not

3    allocated to a state, so to the extent that it had, as you run

4    through the program, there's different health costs that would

5    then be estimated and would be different by state, then you're

6    showing me what looks like a national average.

7    Q.    But you can't point to what is the source for what you told

8    us yesterday, that original Medicare with no add-ons is the

9    seventh or eighth in on your slide 44.

10   A.    As I said, if you go -- I think I just said when you asked

11   me a few minutes ago, if you look at that table that you had for

12   me, when you have excellent health, the price is about $352 --

13   obviously, all the other bars are going to change as well.  In

14   that case, again, conditional on this being for Kansas, that

15   would be much more in the middle is my recollection of the

16   chart.  If you look at very good, it moves to the right.  As it

17   goes to good it moves to the right, and as you get to fair or

18   poor, it moves all the way to the right.

19         Which -- showing, in essence, that -- let's think about

20   what the economics is here.  Original Medicare is a good deal

21   for some folks and for other folks it doesn't make as much

22   sense, and this is partially why we see diverse choices out

23   there.

24   Q.    Does original Medicare vary by state in terms of benefits?

25   A.    No, it does not.

1    Q.    Could we look at your slide 56, please.  You know what,

2    let's look at your slide 44.  I appear to have gotten ahead of

3    myself.  Forty-seven.  I'm sorry.  47.

4              THE COURT:  Forty-seven.

5              MR. CONRATH:  Forty-seven.

6    BY MR. CONRATH:

7    Q.    One of your points in talking about this slide yesterday

8    was the question of treating original Medicare as a monolith.

9    Right?

10   A.    That is correct.

11   Q.    And you said one of the things that affects it is that it

12   doesn't have a product profit motive.  Right?

13   A.    That's correct.

14   Q.    It's correct, however, that all the flavors of original

15   Medicare, other than original Medicare with no supplements,

16   involve private insurers selling Medigap or Part D plans.

17   That's right, isn't it?

18   A.    That is correct.

19   Q.    And those, of course, do have a profit motive.  Right?

20   A.    Yes, sir.

21   Q.    So the backup to your reports treated original Medicare in

22   this way, right, as a monolith, using a single market share for

23   all original Medicare?

24   A.    That is correct.

25   Q.    And the result you got when you made that calculation was a

1  presumption of anticompetitive effect in 101 counties?

2  A.   I disagree with that.

3  Q.   You -- let's put it this way.  You calculated HHIs in a way

4  that showed that they met the tests and the guidelines for a

5  presumption of anticompetitive effect in 101 counties.  Isn't

6  that right?

7  A.   I don't think that's actually accurate the way you've

8  described it.  If you treat original Medicare as a monolith,

9  which let's abstract from reality and just assume that it is a

10  profit-making entity, I believe it's the case that it's a lower

11  number than that, but I may be misguided, because you have to

12  meet both prongs:  a change in the Herf of 200, and a

13  post-merger HHI of over 2,500.

14      Then the question is obviously what's the economic meaning

15  of that.  And as I described, it runs directly counter to

16  actually the original paper undergirding the

17  Herfindahl-Hirschman index; that you worry about concentration

18  in markets where there's more concentration in a merger because

19  of the potential welfare effects when you have that larger

20  profit-making organization.

21  Q.   And your calculations showed that there was -- the standard

22  set forth in the guidelines -- we've heard your explanation --

23  the standards set forth in the guidelines were met according to

24  the calculations you did in your backup in some number of

25  counties.

1     A.    If you blindly apply the question, treat original Medicare

2     as a monolith, and ignore that it's run by the government, you

3     do get numbers that are above 2,500 for the post merger HHI, and

4     200 in certain counties.  That is a statement of fact.  The

5     question is the economic meaning behind that, and as I've

6     described, it doesn't have much economic content given that the

7     big player in that situation is the government, and the bigger

8     is the government, the more likely it is that you trigger those

9     levels in the guidelines.

10    Q.    All right.  Now let's go to -- see your slide 56.  So this

11    is a chart of the percentage of complaint counties with some

12    entry that you've described to us previously.  It includes entry

13    by Aetna and Humana.  Is that right?

14    A.    That is correct.  Except I think the 2017, because by

15    definition they were already in the market.  So those are all

16    new players in the complaint counties.

17    Q.    Now, you do not, in counting something as entry on the

18    chart on slide 56, apply the 5 percent threshold that you used

19    to this entry information?

20    A.    Well, I couldn't for 2017 because we don't have enrollment

21    data.

22    Q.    So you didn't for the other years as well.  Is that right?

23    A.    I need to go back and look.  There are versions that I had

24    with and without the threshold.  The numbers I thought were

25    roughly 70 percent with the threshold through 2016, so it

1    matches up roughly to that.  But you could go to the report if

2    you'd like to.

3    Q.   Well, let's be clear.  Sometimes you use the 5 percent

4    threshold, and sometimes you don't.  Is that right?

5    A.   I think this -- I think I had one analysis where I did not

6    include the 5 percent threshold.  Well, I had a number of

7    versions where I compared my threshold with and without

8    Professor Nevo, so that's the first instance.  We just need to

9    ensure.

10    Second, if I recall, there was only one analysis in my

11    initial report where I did not include a threshold and the

12    remainder of them did.

13    Q.   So the information contained in slide 56 does not reflect

14    exit data.  Right?

15    A.   That is correct.  This is just looking at entry.  So, for

16    example, in 2017, if you look at gross entry, you had 89

17    counties with entry.  If you look at -- if you net out exits, it

18    would be 78 counties with net entry.  So this is looking at the

19    entry side.  If you take exit into account for, say, 2017, there

20    were some exits, so you would lower that number from 89 to 78 I

21    believe it is.

22    Q.   You know that it is a matter of fact a substantial number

23    of entrants fail.  Right?  And exit?

24    A.   My analysis shows that the survival rate on average is

25    about 70 percent.  That would suggest that roughly -- almost a

1    third do not make it.

2    Q.   All right.  And then that's your analysis applying the 5

3    percent threshold.  Right?

4    A.   That is correct.  And if you use Professor Nevo's where you

5    don't include the 5 percent threshold, I think it's just below

6    60 percent for survival rate.

7    Q.   So your survival rate is, if you survived and succeeded

8    enough to get to 5 percent, then we're going to ask whether you

9    survive beyond that.  That's your definition of surviving.

10   A.   I'm focused on competitively significant entry as the

11   Department of Justice has historically looked at, so I have

12   applied that analysis here, and I have showed that as long as

13   you include some threshold, 11 enrollees or more, the analyses

14   are consistent that the survival rate is roughly 70 percent, and

15   the average share achieved by the surviving entrant -- so

16   ignoring the exits -- is roughly 30 percent after three or four

17   years.  We could go to the precise time period if you'd like.

18   Q.   I'll take that as a yes.

19   A.   Sure.

20   Q.   So when you -- this chart on slide 56 counts as an entry

21   event entrants that you know as a matter of fact have failed,

22   right?  It shows them.

23   A.   This is looking at the question of gross entry, how many

24   complaint counties have included entry.  I have lots of analyses

25   in my report that also look at exits.

1    Q.   So, for example, on the chart on slide 56, the red bar that

2    represents 2012, you show it here as flat all the way across.

3    As a matter of fact, any firms that entered in 2012 would not

4    still be there in 2017, at least not based on any analysis you

5    did for this chart.

6    A.   Not all of those would be present.  That is true.  There's

7    a question of survival, and as I said, on average after about

8    four years, you see survival rates -- I believe it's a few

9    slides later -- of about 70 percent.  So that would be not every

10   firm that enters actually makes it.

11   Q.   Okay.  So, for example, a firm like Molina that entered

12   counties to offer individual Medicare Advantage and then failed

13   and exited, would just show up on your chart on slide 56 as a

14   series of entry events with no reflection of the eventual exit.

15   A.   Depends if they reached a threshold or not, or they've

16   entered into a county that had already had an entrant, whether

17   they show up or not in the data.

18   Q.   Do you know whether Molina, according to your test, in the

19   time that it was entering individual Medicare Advantage

20   counties, ever met your test of entry?

21   A.   Sitting here today, one way or the other, I do not know

22   that question.

23          THE COURT:  And that's a good place to stop for lunch.

24          MR. CONRATH:  It is a good place to stop for lunch,

25   Your Honor.

1             THE COURT:  So we'll resume at 1:45.  See you all

2    then.

3         (Lunch recess taken at 12:44 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A Wayne*
_____
BRYAN A. WAYNE