3275

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          :
Et al..                            :
                                   :
                 Plaintiffs,       CA No. 16-1494 (JDB)
                                   :
    v.                             :
                                   :  DAY 12
AETNA, INC., et al.,               :  P.M. SESSION
                                   :

                 Defendants.    :

           TRANSCRIPT OF BENCH TRIAL
      BEFORE THE HONORABLE JOHN D. BATES
         UNITED STATES DISTRICT JUDGE

           Tuesday, December 20, 2016

APPEARANCES:

   For Plaintiffs:        CRAIG W. CONRATH, ESQ.
                          RYAN M. KANTOR, ESQ.
                          ERIC J. MAHR, ESQ.
                  JUSTIN HEIPP, ESQ.
                          PETER MUCCHETTI, ESQ.
                          ERIC D. WELSH, ESQ.
                  U.S. Department of
                          Justice
                          Antitrust Division
                          450 Fifth Street, NW
                          Washington, D.C. 20530

   State of Iowa:         LAYNE M. LINDEBAK, ESQ.


   State of Pennsylvania:   JAMES A. DONAHUE, III, ESQ.

3276

1    For Defendants:

2    AETNA, INC,:      JOHN M. MAJORAS, ESQ.
                       GEOFFREY S. IRWIN, ESQ.
3           PAULA RENDER, ESQ.
                       CHRISTOPHER N. THATCH, ESQ.

4

5     HUMANA, INC.,:   KENT A. GARDINER, ESQ.
                       SHARI ROSS LAHLOU, ESQ..
6        DAVID M. SCHNORRENBERG, ESQ.
                       CROWELL & MORING, LLP
7                      1001 Pennsylvania Avenue, NW
                       Washington, D.C. 2000

8

9    Proceedings reported by machine shorthand, transcript

10   produced by computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3277

1      <u>PROCEEDINGS</u>

2          J O N A T H A N   O R S Z A G, previously sworn.

3                      CROSS-EXAMINATION

4      BY MR. CONRATH: (Continued)

5              THE COURT:  We're ready to resume.

6              Mr. Conrath?

7              MR. CONRATH:  All right.  If I may, I'd like

8      to begin by moving again for the admission of

9      Plaintiff's Exhibit 711, and I believe I might meet with

10     an agreeable response this time.

11             MR. MAJORAS:  No objection, Your Honor.

12             THE COURT:  No objection.  All right.  711 is

13     admitted.  I take the conditional admission.

14     BY MR. CONRATH:

15         Q.    All right.  Mr. Orszag, we were talking

16     shortly before we quit about calculations you did in

17     your initial report.  You calculated some postmerger

18     HHIs based on a relevant product market that includes

19     original Medicare products; right?

20         A.    It was included in the batch of material,

21     yes, that is correct.

22         Q.    And you were presented at your deposition

23     with an exhibit showing the file which your backup data

24     performed the HHI calculations?

25         A.    That is correct.  You did share that with

3278

1    me.

2         Q.    And also the backup -- the HHI figure is

3    actually taken out of your backup; right?

4         A.    Well, I think technically you calculated

5    it, but it was from the code that was a part of my

6    backup.

7         Q.    Well, your code directed the program to

8    calculate the Herfindahls; right?

9         A.    That is correct.

10         MR. CONRATH:  May I approach, Your Honor?

11         THE COURT:  Certainly.

12    BY MR. CONRATH:

13         Q.    Do you have PX-714 in front of you,

14    Mr. Orszag?

15         A.    Yes, I do.

16         Q.    And do you recognize PX-714 as the

17    exhibit you saw at your deposition?

18         A.    Yes, I do.

19         Q.    And so that reflects the HHI calculations

20    that were contained in your backup material; is that

21    right?

22         A.    That is correct.

23         Q.    And if you turn to page 108 of your

24    initial report.

25         A.    (Witness complies with request.)

3279

1          Q.     That is DX-419-117.

2               THE COURT:  I'm sorry.  I didn't hear that

3     last question.

4                    (Discussion held off the record.)

5     BY MR. CONRATH:

6          Q.     My reference is to page 108 of

7     Mr. Orszag's initial report, which is the page numbered

8     DX-419-117.  And I'd direct your attention to Footnote

9     266.

10          And do you say there that considering a market

11     that includes individual non-SNP Medicare Advantage as

12     well as all original Medicare options and ignoring, for

13     the sake of the argument, the implications of the

14     divestiture transaction, the transaction causes the HHI

15     to increase by more than 200 in only 28 counties.

16          That's what you said in your report; right?

17          A.     That is correct.

18          Q.     And then you said, "Even if I adjust

19     original Medicare shares to exclude those beneficiaries

20     eligible for Medicaid or who receive health insurance

21     coverage from an employer" -- skipping a little -- "only

22     101 of the 364 MA complaint counties have a delta HHI

23     greater than 200"; right?

24          A.     That is correct.

25          Q.     And it is, in fact, consistent with the

3280

1    market definitions we've been looking at -- talking

2    about in this case to exclude those that are dually

3    eligible for Medicaid or who receive their health

4    insurance coverage through an employer?

5          A.    That is correct.

6          Q.    So if it's relevant -- I understand your

7    argument is it's not -- but the number is 101 counties;

8    right?

9          A.    That have a delta HHI of greater than

10    200; yes, sir.

11          Q.    And the numbers -- the HHI calculations

12    that your backup report -- your backup materials did are

13    those set forth in PX-714; is that right?

14          A.    I think technically no.  But I'll agree

15    generally that this is the program.  I just focused on

16    the delta HHI because that's the relevant statistic.

17    And for all the reasons I've already articulated, I

18    didn't focus on squaring the original Medicare share

19    because I didn't think it was relevant.

20          Obviously, to calculate postmerger HHIs in the

21    delta, one way to do it is to look at the postmerger HHI

22    minus the premerger HHI.

23          MR. CONRATH:  Your Honor, I move the admission

24    of PX-714, which is the material taken from Mr. Orszag's

25    backup.

3281

1          THE COURT:  Any objection?

2          MR. MAJORAS:  No objection.

3          THE COURT:  Without objection, Plaintiff's 714

4     is admitted.

5                    (Plaintiffs' Exhibit Number 714

6     admitted into evidence.)

7          MR. CONRATH:  Thank you, Your Honor.

8     BY MR. CONRATH:

9          Q.     All right.  If we could return to your

10    slide -- your slides.  I'd like to direct your attention

11    to your Slide 57.

12         So do I understand first correctly that the

13    chart on Slide 57 and the subsequent slides that are

14    similar in appearance -- so we'll talk about 57 through

15    62 -- these include entry by Aetna and Humana; is that

16    right?

17         A.     That is correct.

18         Q.     And you include in the last -- for 2017,

19    just by definition, there can't be any entry that has

20    already achieved a 5 percent threshold; is that right?

21         A.     Right.  So the way to view the chart and

22    the chart prior to this, the one with multiple colors

23    that look like a candy cane, is that for each year prior

24    to 2017, there's a 5 percent threshold.  For 2017,

25    because we do not yet have enrollment data, it just

3282

1    counts the number of entrants, because CMS has made that

2    part of the data available.  They haven't made the

3    enrollment information available because we're obviously

4    not into 2017 yet.

5            Q.    All right.  So if we could look at

6    Slide 62 for example, do you recognize which one of

7    those is Shawnee County, Kansas?  Is that one of the

8    white counties?  That's where Topeka is?  You don't

9    know?

10           A.    Precisely -- I've actually spent a good

11   amount of time around Wichita, which I know where that

12   is, but Shawnee I do not know.

13           Q.    All right.  Do you know that there's been

14   no entry in the five years in Shawnee?

15           A.    I do know that, yes sir.

16           Q.    And that's a county where Aetna and

17   Humana are the only two providers of Medicare Advantage?

18           A.    That is correct.

19           Q.    And the maps that are Slides 57 through

20   62, they do not include exit information?

21           A.    That is correct.

22           Q.    And you have exit information?

23           A.    That is correct.

24           Q.    And in some years, there was more exit

25   than there was entry; is that right?

3283

1          A.      For the complaint counties, I don't know

2    if that's correct or not.

3          Q.      Overall it's correct; right?

4          A.      We can go to my report.  It has the

5    year-by-year.  It's not a way that I've -- the way

6    you've articulated it is not a way that I've analyzed

7    it.

8          Q.      We might get there in a couple minutes.

9          So your initial report says that both entry and

10   exit are widespread; isn't that right?

11         A.      That is correct.

12         Q.      So if we were looking at the maps on your

13   Slides 57 through 62, if you had shown net entry -- net

14   entry, entry minus exit, it would look quite a bit

15   different; wouldn't it?

16         A.      That is correct.

17         Q.      Slide 63, if you could turn to that,

18   please.

19         A.      (Witness complies with request.)

20         Q.      So this includes entry by Aetna?

21         A.      That is correct.

22         Q.      And Humana?

23         A.      That is correct.

24         Q.      What this does not include is entrants

25   who entered in 2012; is that right?

3284

1        A.      Yes.    I looked at the most recent data of

2   2013 to 2016.

3        Q.      And you have the data for 2012; is that

4   right?

5        A.      I have the data going even, I think,

6   farther back than that.  But I was focused on the

7   success or failure of the most recent entrants.

8        Q.      Well, there was data back to 2011; right?

9        A.      There may have been data back even

10  further than that.  Sitting here today, I don't know if

11  it goes back to '11 or even further.

12       Q.      But you had 2011, which you needed to

13  know whether there was entry in 2012; right?

14       A.      We definitely had data for 2011.  I just,

15  sitting here today, don't know how far even further back

16  it goes than that.

17       Q.      So would you turn to DX-419, your first

18  report.  And I'm going to direct you to Table 2-10,

19  which is at the page number DX-419-126.

20                  (Discussion held off the record.)

21           THE COURT:  All right.  Mr. Conrath?

22  BY MR. CONRATH:

23       Q.      So on the page marked 117 of your report,

24  the sentence at the beginning of paragraph 128 says,

25  "Table 2-10 demonstrates that both entry and exit are

3285

1    widespread."

2            Do you see that?

3            A.      Yes, sir.

4            Q.      And Table 2-10 is on the following page,

5    DX-419-127.

6            Do you see that shows that the source is

7    enrollment data 2011 to 2016?

8            A.      That's correct.

9            Q.      And you report here entry data for the

10   year 2012; right?

11           A.      That is correct.

12           Q.      Now could we look at page number

13   DX-419-131.  And if we look at paragraph 135 and pull

14   that out.

15           You used -- this is referencing Table 2-12, and

16   you use Table 2-12 to show that the majority of

17   entrants survive; correct?

18           A.      That is correct.

19           Q.      And you say that -- in the next sentence

20   Table 2-12 shows that, since 2013, 87.9 percent of

21   entrants into a county remain present in year 2.

22   83.6 percent remain present in year 3, and 74.3 percent

23   remain in year 4; right?

24           A.      That is correct.

25           Q.      And in Table 2-12, you do not report data

3286

1    of those who entered in 2012; is that right?

2          A.     That is correct.  If you look at the

3    table, it has 2013, 2014, 2015, and then the 2016

4    cohort.

5          Q.     So in Table 2-12, you're using it to

6    establish the point that the majority of entrants

7    survive, and you did not include the 2012 data; correct?

8          A.     In 2-12, I'm talking about the survival

9    rates of the '13, '14, '15, and '16 cohorts.

10         Q.     You didn't report anywhere in your

11   reports any analysis of whether 2012 entrants survive?

12         A.     I believe that is correct.  Yes, sir.

13         Q.     But you did look at Professor Nevo's

14   analysis?

15         A.     I did see his analysis.  Yes, sir.

16         Q.     Okay.  Could we bring up, please,

17   Table 18 of Professor Nevo's reply report, PX-552 at the

18   page number PX-552-064.

19         You can see here that the source is the backup

20   to one of the entry tables to your report?

21         A.     That is correct.

22         Q.     And it says in the note that he's

23   calculating survival rates using your definition of

24   entry.

25         A.     Yes.

3287

1      Q.     That is -- so it's looking -- this would

2   include the 5 percent threshold that you established;

3   right?

4      A.     That is correct.

5      Q.     And can we see on this that, after the

6   first year of entry, the 2012 cohort survival rate is

7   much worse than that for 2013 or 2014?

8      A.     So you're comparing the 79.8 percent

9   versus the 93.5 percent and the 90 percent; is that

10  correct?

11     Q.     Yes.

12     A.     Yes, the survival rate is lower for the

13  2012 cohort.

14     Q.     The numbers you just gave were for the

15  top five survivors among the top five entry events.  If

16  we look at non-top five, the comparison is, for the 2012

17  cohort, 42.3 percent.

18         That's the year you didn't report; right?

19     A.     I focused on the last four years worth of

20  data, and so I did not report five years ago.  That is

21  correct.

22     Q.     All right.  And 2012 was 71.9 percent,

23  and 2014 was 80.9 percent?

24     A.     Yes.  It would appear from this that the

25  non-top five are doing a better job more recently of

3288

1    surviving in the marketplace.

2         Q.    And in the year that you didn't report,

3    the survival rate was much worse; is that right?

4         A.    Five years ago, the survival rate was

5    definitely lower.  Yes, I agree.

6         Q.    And that continues.  I won't go through

7    the numbers.

8         But if you look at all the years after entry,

9    two years, three years, you can see that the 2012 data

10   cohort had a much higher failure rate than the cohorts

11   that you reported; is that correct?

12        A.    That is correct.  I reported the last

13   four years worth of cohorts, and those have survived at

14   a higher rate than the previous cohorts.

15        Q.    But back when we looked at your exhibit,

16   your Table 2-10, when your point was that entry is

17   widespread, you did report the 2012 cohort; right?

18        A.    Well, I was focused on -- obviously, the

19   nature of the fact that there's been significant entry

20   in the last several years is what I've always focused

21   on, and that's been the focus of my attention.

22        Because the question of timeliness, likeliness,

23   and sufficiency of entry really should reflect current

24   market conditions rather than the conditions that were

25   in place at around the time that the ACA was

3289

1    implemented.

2         So I overall have always focused on the most

3    recent data as being the most relevant both in my demand

4    estimations and in my entry analysis.

5         So did I include 2012?  Yes, it's here.

6         Q.    All right.  So just to be clear, when

7    your point is that entry is widespread, you included the

8    2012 data?  When your point is that entrants survive,

9    you excluded the 2012 data; right?

10        A.    If you excluded 2012 from Table 2-10, the

11   point would be completely unchanged.  In fact, it looks

12   like 2010 doesn't have a very significant effect on the

13   results -- I mean, 2012.  I'm sorry.  So it wouldn't

14   change the conclusion whether it's there or not.

15        Q.    But you made a conscious decision from

16   one table to another which cohorts to include; right?

17        A.    I wouldn't say it was conscious.  The

18   conscious decision was to focus on the most recent

19   entrants, and the most recent entrant cohorts are

20   obviously the '16, '15, '14, '13.  We could go back

21   further too and look, but the most relevant for

22   analyzing competitive effects are the most recent

23   cohorts.  And that's why I focused on them.

24        Q.    And when I asked you about this at your

25   deposition, you said, I don't really have a good

3290

1    explanation about that?

2         A.    That's consistent with it wasn't a

3    conscious decision.  It was more because I was focused

4    on the most recent cohorts, and that's what matters

5    most.

6         Q.    Could we turn to Slide 68, please.

7         So that is your attempt to identify potential

8    entrants; right?

9         A.    This is correct.

10        Q.    So one of the three examples you

11   referenced here is Mecklenburg County, North Carolina?

12        A.    That is correct.

13        Q.    And you list here three potential

14   entrants there?

15        A.    That is correct.

16        Q.    Now, Cigna is the first one.

17        And you're aware that Cigna is under sanction

18   from CMS?

19        A.    Yes, I am.

20        Q.    And they can't market?

21        A.    They can't currently market; that is

22   correct.

23        Q.    Right.  And you're aware that Cigna, of

24   course, is not now in Mecklenburg County?

25        A.    Yes.  By definition, they wouldn't be a

3291

1    potential entrant then.

2        Q.    And you know that there are two principal

3    hospital systems in Mecklenburg County?

4        A.    I haven't studied the details of the

5    hospital systems in Mecklenburg County, so I can't give

6    you a complete answer to that question.

7        Q.    All right.  Well, you have an opinion

8    about who is the potential entrant; right?

9        A.    That is correct.

10       Q.    You have to be able to sign up an

11   adequate network of hospitals in order to be an entrant;

12   right?

13       A.    Yes.  And they're providing commercial

14   service in Mecklenburg already.  So presumably, to

15   provide commercial service in Mecklenburg, they have

16   access to at least a provider network sufficient to

17   compete in the commercial market.

18       Q.    And that's your assumption?

19       A.    Well, it's consistent with the empirical

20   analysis.  If you look at history of potential entrants,

21   the probability of entry is related to whether you have

22   the presence of a commercial offering in that county.

23   And that's an empirical analysis.  That's in my initial

24   report.

25       Q.    All right.  Other than what you've just

3292

1    said, did you do any other study to conclude that Cigna

2    is a potential entrant into Mecklenburg County and

3    present it in this report?

4         A.    So what I did was the -- an empirical

5    analysis.  If you look across potential entrants, what's

6    the probability of entering or the frequency of entering

7    that we observe in the data?

8         So I categorize potential entrants into

9    different categories.  Do they have individual MA in an

10   adjacent county?  Do they offer individual MA in the

11   state?  Do they offer an individual special needs plan

12   in the county?  Do they offer group MA in the county?

13   And do they offer commercial in the county?  And I may

14   be missing a category.

15        And I look at that and I ask the question of:

16   Do you see statistically significant evidence of entry

17   from those different players?  And what I found is, in

18   one of the regressions that -- having individual special

19   needs plan in the county was not statistically

20   significant.  So I did not count those as potential

21   entrants given that the other results were statistically

22   significant, that is you see them entering with a

23   statistically significant probability.

24        I then counted each of those as potential

25   entrants.  And so obviously that's done on average.  And

3293

1    so each of the ones that's reflected on this chart is

2    one of those entities that meets that empirical

3    analysis.

4              MR. CONRATH:  May I approach, Your Honor?

5              THE COURT:  Sure.

6    BY MR. CONRATH:

7         Q.    So, Mr. Orszag, I'm handing you what's

8    been marked and is admitted as PX-534.  It is a document

9    that is under seal.  It's not from either Aetna or

10   Humana and so no screen.  And I'm going to ask you --

11             THE COURT:  But it's in evidence?

12             MR. CONRATH:  It's in evidence, yes.

13   BY MR. CONRATH:

14        Q.    I'm not going to give details in this.

15   And so if my questions seem a little circumspect, that's

16   why.

17        But I guess my first question is if you have

18   seen this document.

19        A.    I do not recall seeing this document.

20        Q.    This is a document from Cigna.

21        Do you see that it's dated May 2014?

22        A.    Yes, sir.

23        Q.    And I'd like to direct your attention to

24   the second page of the document.  Can you look at the

25   second paragraph.

3294

1      Do you see what that says about the hospitals

2   available in Mecklenburg County?

3      A.    Yes, I do.

4      Q.    And do you see that you didn't consider

5   the information here about the two hospital systems

6   because you didn't know it?

7      A.    I did not go through every single --

8   remember, there's 364 counties and I think something on

9   the order of magnitude of 1,400 or 1,500 potential

10  entrants.  I did not go through every single one to

11  determine the degree of probability.

12      I used averages based on history about the

13  probability that MAOs meeting those kind of

14  characteristics would be potential entrants.

15      Q.    All right.  But there are only three

16  counties on your Slide 68; isn't that right?

17      A.    Yes, because I was taking them from

18  Professor Nevo's presentation.  But I did this across

19  all 364 counties.  So that would average across all of

20  those different -- that would be an average across all

21  the different entities.

22      Q.    Okay.  So you don't know -- if you look

23  at -- can you look at the third paragraph.  Just read it

24  to yourself.

25      A.    (Witness complies with request.)

3295

1    Q.    So you didn't consider this information

2    about Cigna's consideration of entry into Mecklenburg

3    County?

4    A.    This dates from a discussion that looks

5    like -- can I say the date?  Am I allowed to?

6    THE COURT:  Sure.

7    THE WITNESS:  From September 11, 2012, which

8    is four-plus years ago, and then a letter, it looks

9    like, that followed from 2013.  So whether this is still

10   relevant, I do not know one way or the other.

11   BY MR. CONRATH:

12   Q.    Well, as far as you know, there are still

13   only two principal networks in Mecklenburg County; is

14   that right?

15   A.    I don't have any information one way or

16   the other about that.

17   Q.    Well, except what we just read in the

18   second paragraph; right?

19   A.    But this is a several-year-old document.

20   So I don't know if it's current.  But as of that time, I

21   agree with you.

22   Q.    And you understand that CMS would

23   require, before someone could offer an MA plan in a

24   county, that they have adequate coverage in the

25   hospitals in the county; right?

3296

1      A.      I understand that that is one of the CMS

2  regulations.   Yes, sir.

3      Q.      You didn't consider how long they had

4  been trying to sign a contract with this particular

5  system, how long Cigna had been trying to sign a

6  contract with this particular system?

7      A.      As I said, I didn't go through all --

8  every potential entrant.   There are literally -- I think

9  it's 1,500, give or take.   I could get the precise

10 number from my report.

11     So I did not go through every single one to test

12 each one that way.   What I did was I did a statistical

13 model to see whether it was statistically significant

14 that, given the market position, you would observe that

15 they would enter at some point within a reasonable

16 period of time.   And the answer is you do.

17     Q.      Okay.   You can put aside PX-534.

18     The next potential entrant that you mentioned

19 in Mecklenburg County, North Carolina, is Moses Cone;

20 right?   Do you see that?

21     A.      Yes, sir.

22     Q.      That's on Slide 68.

23     And you acknowledge Patrick Farley's testimony

24 earlier in this trial that Moses Cone is a hospital

25 system located in Greensboro?

3297

1        A.      I remember reading that testimony.  Yes,

2   sir.

3        Q.      And so with their hospital system, Moses

4   Cone is a provider-based plan?

5        A.      Yes, sir.

6        Q.      And Greensboro is about an hour and a

7   half from Mecklenburg?

8        A.      I had never driven that route, so I can't

9   tell you one way or the other.

10        Q.      All right.  I think we heard that from

11   Mr. Farley.

12        You recall that Mr. Farley said that Moses Cone

13   entered in four counties?

14        A.      I recall that testimony.  Yes, sir.

15        Q.      All right.  And remains in the same four

16   counties?

17        A.      I don't remember that, but -- I'm not

18   disagreeing with you.  I just don't remember that.

19        Q.      Okay.  And do you know that Moses Cone is

20   not in any contiguous counties to Mecklenburg County?

21        A.      That is correct.

22        Q.      Okay.  And, of course, it's Defendants'

23   position that entry is more likely if you're in a

24   contiguous county?

25        A.      The statistical analysis shows that

3298

1    you're about ten times more likely to be an entrant if

2    you're in a contiguous county than if you just offer

3    individual MA within the state.

4         Q.    Okay.  The third potential entrant you

5    mentioned is FirstHealth.

6         And do you understand that FirstHealth is based

7    in Pinehurst?

8         A.    I haven't studied where they're actually

9    based, so I do not know that.

10        Q.    Pinehurst is famous for a golf course?

11        A.    Yes, it is.

12        Q.    There's a lot of retirement communities

13   around there, and FirstHealth is focused on that; is

14   that right?

15        A.    I don't know that one way or the other.

16        Q.    Do you know if they have -- FirstHealth

17   has a relationship with a hospital called Mission

18   Hospital in Asheville, North Carolina?

19        A.    I don't know that one way or the other,

20   although I believe Asheville is quite far away from

21   Pinehurst, if I recall.

22        Q.    Unless I missed my guess, based on what I

23   read in the popular press, you've probably visited

24   Pinehurst?

25        A.    I have visited Pinehurst, and I've

3299

1    visited Asheville.

2         Q.     And is that in your tour of the 100 top

3    golf courses in the world?

4         A.     I was there for one day.  Yes, sir.

5         Q.     All right.  Well, we won't go into that,

6    but we congratulate you.

7         Asheville is in the other direction, farther

8    from Mecklenburg than Pinehurst; right?

9         A.     Sitting here today, I don't -- I'm not

10   that much of an expert in the North Carolina geography.

11        Q.     FirstHealth would be another

12   provider-based plan?

13        A.     Sitting here today, I don't have that one

14   way or the other.

15        Q.     Okay.  And you'd agree that entry into

16   Charlotte would require signing a deal with one or both

17   hospitals in Mecklenburg County?

18        A.     Presumably, yeah.  You need to have an

19   adequate provider network.

20        Q.     And you don't have any information about

21   whether FirstHealth is in a position to do that?

22        A.     Sitting here today, I didn't look at --

23   again, I looked it up.  There's 1,684 potential entrants

24   to the complaint counties.  I didn't go through each and

25   every one.  I did an average statistical analysis to see

3300

1    if it's statistically significant, and it is.

2         So the fact that there are examples, obviously,

3    that may or may not be better entrants, that's why we

4    don't see all 1,684 enter at once.

5         Q.    Thinking about North Carolina more

6    broadly and not just Mecklenburg County, your general

7    opinion is that you could treat entrants with less than

8    a 5 percent share as not competitively significant;

9    right?

10        A.    That's the analysis that I conduct.  I'm

11   focused on competitively significant entrants, entrants

12   that achieve a 5 percent or higher share.

13        Q.    All right.  Do you recall Mr. Farley of

14   Humana testifying about Gateway, a Medicare Advantage

15   insurance company that's in certain parts of North

16   Carolina?

17        A.    Sitting here today, I do not recall that

18   testimony.

19        Q.    Do you recall whether he described

20   Gateway as an entrant?

21        A.    I don't recall that part of his

22   testimony.

23        Q.    Could we look at DX-DEMO-002, Slide 11,

24   002-11.

25        Do you remember this series of slides?

3301

1      A.     I wasn't sitting in the courtroom during

2  that testimony, so the answer is no.  I was trying to

3  follow on the transcript, which is often not the easiest

4  because you can't see the pictures at the same time.

5      Q.     Well, maybe we can revisit -- relive

6  those days of yesteryear here.

7      Do you see Gateway Health on here; right?

8      A.     That is correct.

9      Q.     And Gateway is shown as having 54 members

10  in Wake County?

11     A.     Yes.

12     Q.     Gateway would not qualify as an entrant

13  under your definition; right?

14     A.     That is correct.

15     Q.     And Mr. Farley treated Gateway as a firm

16  that was in the market; right?

17     A.     He may have.  That's not my analysis.

18     Q.     All right.  Fair enough.  Let's talk

19  about efficiencies for a moment.

20     You saw Mr. Gokhale testify?

21     A.     I did not see his whole testimony.  So I

22  saw --

23     Q.     You were in and out?

24     A.     That's fair.

25     Q.     Okay.  Mr. Gokhale is with Compass

3302

1    Lexecon; is that right?

2          A.     That is correct.

3          Q.     And you're his boss?

4          A.     I think of ourselves as a little more

5    balanced than that.  But it's fair that I'm on the

6    executive committee and, in theory, I'm his boss.

7          Q.     He might see you as his boss.  Let's put

8    it that way.

9          A.     That's fair.

10         Q.     All right.  And you relied upon his work

11   in this matter?

12         A.     Just in the sense that I use his number

13   here.  It doesn't factor into any of my analyses.

14         Q.     It's cited in your report as material you

15   relied on; is that right?

16         A.     That is correct, because I cite the

17   number for the efficiencies.  But I don't do any

18   independent analysis.  The only question with regard to

19   efficiencies that I analyzed was the question of

20   pass-through.

21         Q.     All right.  So you just -- I think you

22   said yesterday you just -- you just took the number from

23   Mr. Gokhale?

24         A.     That is correct.  I did not do any

25   further analysis of the number.

3303

1          Q.     Could we look at Slide 72.

2          Here's where you're taking the number from

3    Mr. Gokhale; right?

4          A.     That is correct.

5          Q.     So the green part of the bar at the

6    bottom, "administrative cost savings," a very high

7    percentage of that is fixed costs?

8          A.     It's not an analysis I've conducted one

9    way or the other.  So I don't have an answer for you.

10         Q.     In general, it's true that administrative

11   costs are very often substantially fixed costs?

12         A.     I'll agree as a general matter, although

13   obviously firms book costs differently.  So if a firm

14   books, say, broker commissions as an administrative cost

15   and for some reason there's an efficiency related to

16   broker commissions and that's a very significant share

17   of broker costs, it could differ on a case-by-case

18   basis.

19         As a general matter, I will agree that

20   administrative costs are usually fixed cost savings.

21         Q.     Okay.  So I was maybe imprecise in my

22   question, because I think you drew an important point.

23         The firm may book, for accounting purposes, the

24   costs as fixed even though you, as an economist, would

25   say they are variable; is that right?

3304

1      A.      As I said on my testimony with

2  Mr. Majoras, economic costs and accounting costs can

3  differ.

4      Q.      And fixed costs are generally not

5  cognizable efficiencies; is that right?

6      A.      As a general matter, that is correct.

7  Although we have to remember that fixed costs are not

8  always fixed forever and they become variable.  And the

9  question is over what time period they become variable

10 because then the variable costs are passed through to

11 consumers.

12     Q.      All right.  Okay.  The blue portion of

13 the bar is called "medical cost savings."

14     Do you see that?

15     A.      Yes, sir.

16     Q.      And you understand that a substantial

17 part of that is taking the better of two provider

18 contracts?

19     A.      I do understand that.

20     Q.      All right.  And isn't it your position

21 elsewhere that provider contracts don't actually differ

22 that much; they all tend to be 100 percent of original

23 Medicare?

24     A.      We have to differentiate between original

25 Medicare and commercial contracts.

3305

1          In commercial contracts, you see a relationship

2     between scale and rates.   In Medicare Advantage

3     contracts the difference is much closer.   Original

4     Medicare acts as a magnet.

5          So in commercial contracts, we observe that.

6     And in Medicare contracts, you see price -- you see

7     rates that hover around 100 percent.

8          Q.    Let's look at Slide 74.

9          I think you explained to us your view that the

10    Aetna-Coventry transaction resulted in increased

11    quality and, in support of that, you supported the

12    changes in star ratings; right?

13         A.    That is correct.

14         Q.    And which of these changes in star

15    ratings do you think are attributable to the

16    Aetna-Coventry merger?

17         A.    I did not do a statistical analysis to

18    measure what was specific to the merger or was part of

19    the overall trend.

20         What I observe is that -- that their star

21    ratings went up faster than other insurers, although

22    that difference may or may not be statistically

23    significant.   That's not an analysis that I conducted.

24         Q.    All right.   So whether you conducted it

25    or not, you testified about it.

1          You're looking at, say, the difference between

2    2013 and 2015?

3          A.    Or 2016, sure.

4          Q.    All right.  And the merger took place in

5    May of 2013; is that right?

6          A.    That is correct.

7          Q.    And this shows star ratings going up

8    three points in the next year and then another three

9    points in -- for 2015; is that right?

10         A.    That is correct.

11         Q.    And the 2015 plan year star ratings

12   reflect data from 2013; isn't that right?

13         A.    That is correct.

14         Q.    There's a two-year lag?

15         A.    That is correct.

16         Q.    So the 2015 star ratings reflecting 2013

17   data, if the merger took place in May, it's hardly

18   likely that that change comes out of any quality

19   increase from the merger; is it?

20         A.    You'd have some time, I agree, that you

21   would not have complete time.  That is correct.

22         Q.    And you didn't study the question, as I

23   think you already told us?

24         A.    No.  The first time that I looked into

25   this issue was in response to the fact that Professor

3307

1    Nevo, in his initial report, only looked at one measure

2    of price, which doesn't capture all of the quality.

3         So I think I had a grand total of about three

4    weeks to look at this question.  And the point is he

5    didn't look at the full -- all that had happened.  And

6    what you observe is that, even though he claims prices

7    went up, their share also went up.

8         And that's telling you that something -- there

9    was other factors at work here because, all other things

10   being equal, we expect, when price goes up, share would

11   go down.

12        Q.    When you did your reduced form

13   regressions that you used as part of the hypothetical

14   monopolist test, what you looked at was price; isn't

15   that right?

16        A.    Different measures of price as well as

17   margin and revenue.

18        Q.    Could we turn to Slide 86.

19        This is where you're talking about the

20   Humana-Arcadian merger; is that right?

21        A.    That is correct.

22        Q.    And one of the things you testified to

23   yesterday, if I heard you correctly, was that Arcadian

24   was struggling financially and that may have been

25   related to the later exit by the divestiture buyers.

3308

1          Am I remembering that right?

2          A.      The words sound -- it sounds about right.

3          Q.      And I take it by the fact that you said

4    it may have been related, that's not a question you

5    studied?

6          A.      That is correct.

7          Q.      It's not an opinion you're offering?

8          A.      That is correct.

9          Q.      That's your speculation?

10         A.      We know that Arcadian was struggling

11   financially and that the next step is:  Is that then

12   analogous to the current situation where you have a

13   merger of two healthy firms?  And the answer to -- my

14   point is that it's not analogous and the divestiture is

15   different.

16         Q.      Well, just focusing on the question of

17   whether it's analogous, just looking at the chart that

18   you presented in Slide 86, the one thing that is clearly

19   different is that there's a lot more to go wrong; right?

20         There's a lot more -- let's put it less -- let

21   me rephrase it.

22         There's a lot more consumers at risk if the

23   Molina divestiture goes wrong than if the

24   Humana-Arcadian divestiture went wrong?

25         A.      I believe there's tradeoffs in these

1    factors because having a bigger footprint gives them

2    more scale and more ability to market their brand.  And

3    so there are certainly tradeoffs that a bigger

4    divestiture may have more risks on one side and more

5    benefits on the other, and those have to be assessed.

6         Q.     You're aware that, in the Humana-Arcadian

7    divestitures, there was a transition services agreement

8    available?

9         A.     The details of the transition services

10   agreement, sitting here today, about that transaction,

11   I'm not aware.

12        Q.     But you're aware there were transaction

13   services agreements?

14        A.     It's not something I've reviewed.  So I

15   can't tell you one way or the other.

16                  (Pause)

17           MR. CONRATH:  May I approach?

18           THE COURT:  Yes.

19   BY MR. CONRATH:

20        Q.     What I've handed you is PX-715, which is

21   a filing from this court, Case No. 1:12-cv-464RBW,

22   Document 1-32 in that docket, which is final judgment in

23   the case of the United States versus Humana, Inc., and

24   Arcadian Management Services.

25           Can I direct your attention to page 13 of

3310

1    Exhibit 715.  Do you see Paragraph P there?

2         And without me reading it, will you just tell

3    me if you agree that that says that a transition

4    services agreement was available to the acquirers in

5    the Humana-Arcadian merger?

6         A.    Did you say P like Peter?

7         Q.    P like Peter, yes.

8         A.    There appears to be an option for

9    transitional support services.

10        MR. CONRATH:  All right.  Your Honor, I'd move

11   the admission of PX-715.

12        MR. MAJORAS:  No objection.

13        THE COURT:  All right.  We'll note what it is,

14   which is an unsigned copy of a document filed in court,

15   but it will be admitted as what it is.

16             (Plaintiffs' Exhibit Number 715

17   admitted into evidence.)

18        THE COURT:  In my world, a judgment doesn't

19   become a judgment until the judge signs it.

20        MR. CONRATH:  Well, that's very well taken,

21   Your Honor.  And I'm sorry to note that that's my

22   perception too.  So we'll see if we have something else

23   to offer you tomorrow.

24   BY MR. CONRATH:

25        Q.    Could you look at Slide 87.

3311

1          A.     (Witness complies with request.)

2          Q.     I'm wrong.  I want to ask you to turn to

3    Slide 92.

4               THE COURT:  Ninety-two?

5               MR. CONRATH:  Ninety-two.

6    BY MR. CONRATH:

7          Q.     So I want to be clear about what we're

8    looking at here.

9          When you say "direct evidence from market

10   outcomes," you're referring under your column to your

11   reduced form regression?

12         A.     That is correct.

13         Q.     All right.  And you, I think --

14         A.     And all the various sensitivity tests,

15   et cetera.

16         Q.     Right.  And I think you agreed with me

17   earlier that the divested logit models that both you and

18   Professor Nevo used is actually also -- is based on

19   direct evidence based on millions of actual consumer

20   choices?

21         A.     That's a demand estimate, yes.  That is

22   correct, based on consumer choices.

23         Q.     And that's -- it's a little bit buried in

24   saying "critical loss," but that's what you mean when

25   you say "critical loss"?

3312

1          A.      Well, as I note, I believe, on the

2   very -- two slides later, critical loss is a product of

3   both diversion and profit margins.

4          Q.      And critical loss is recognized by the

5   merger guidelines as a way to do the hypothetical

6   monopolist test that is appropriate?

7          A.      It is recognized as a way -- I believe

8   the precise words that it uses is to corroborate other

9   evidence.

10         Q.      All right.  And you have said that -- in

11  the course of the GE-Electrolux trial, you said that

12  merger simulation is a more comprehensive model?

13         A.      Than critical loss, for sure.  And in the

14  context of the GE-Electrolux, let's just be clear, I was

15  saying merger simulation is more comprehensive than

16  something called UPP or an upward price pressure

17  analysis, which was introduced as an improvement to the

18  HHI as a screen to which mergers require further

19  investigation and which ones do not.

20         Q.      Right.  And you said, in addition to

21  being more comprehensive, merger simulation is more

22  sophisticated?

23         A.      That is correct.

24         Q.      Let's look at Slide 98.

25         This is the list of academic literature

3313

1    studying MA and nesting parameters; right?

2         A.      That is correct.

3         Q.      All of these researchers started with

4    Medicare Advantage in a single nest; is that right.

5         A.      That is correct.

6         Q.      And all tested whether Medicare Advantage

7    products were an appropriate nest?

8         A.      That is correct, because they found a

9    nesting parameter that is significantly different than

10   zero.

11        Q.      So all found statistically significant

12   nesting parameter for Medicare Advantage?

13        A.      Yes, as did I.

14        Q.      And that means that there are consumers

15   who have a distinct preference for Medicare Advantage

16   plans as compared to original Medicare?

17        A.      That is correct.

18        Q.      So you look principally, I think you told

19   us, to the two papers on this, Guglielmo and Curto?

20        A.      Those are the two most recent papers and

21   used the most recent data and, I think, are the most

22   recent result.

23        Q.      Those are the two that haven't yet been

24   peer-reviewed?

25        A.      Those have not been published, but

3314

1    Professor Nevo cites to them as well as other

2    unpublished papers in the exchange section.  So we have

3    to be consistent here.

4         Q.    I just want to make sure we get the facts

5    out.  I wasn't accusing you of any inconsistency.

6         A.    They are two unpublished papers.  That is

7    correct.

8         Q.    Could we -- I'd like to ask you to look

9    at the Curto paper, if you can.

10        MR. CONRATH:  May I approach, Your Honor?

11        THE COURT:  You may.

12   BY MR. CONRATH:

13        Q.    So do you recognize this?  This is the

14   Curto paper that you have cited; is that correct?

15        A.    Yes.

16        Q.    And this is PX-717?

17        A.    That is correct.

18        Q.    And you've told us, I think, that Curto's

19   preferred nesting parameter is .32?

20        A.    Yes.  I think Professor Nevo and I agree

21   because I'm using his chart.

22        Q.    Right.  And I'd like to direct your

23   attention to page 24 and going from the text that goes

24   from page 24 to 25.

25        Is it correct that that carry-over sentence

3315

1    says, "We also estimate the nested logit parameter,

2    sigma to be significant around 0.32, consistent with

3    our expectation that MA private plans are closer

4    substitutes to one another than they are to traditional

5    Medicare"?

6         A.    You read that correctly.  And the next

7    sentence is directly relevant to that as well, if you

8    don't mind if I read that.

9         Q.    Please go ahead.

10        A.    The implication is that, for a given

11   plan, the other competing MA plans in this market, which

12   have about 20 percent market share, exert just about the

13   same competitive effect as fee-for-service Medicare with

14   80 percent market share.

15        Q.    So with a 20 percent market share, all

16   the other MA plans have as much effect as 80 percent of

17   fee-for-service; is that right?

18        A.    Yes.  Just to be clear, because we should

19   make sure everything is consistent, they're measuring

20   the eligible Medicare population inside the paper

21   somewhat differently than Professor Nevo and I do.  And

22   that's why you have a different MA share versus a

23   Medicare Advantage share.  And so they're estimating

24   their model off of that.

25             So in thinking about the effect of competition,

3316

1    what they're saying in that sentence is that they're

2    finding exactly what I found on the slide prior to the

3    one that we were referencing, that diversion to original

4    Medicare is roughly equal to diversion to Medicare

5    Advantage.

6         So that's exactly what I find, and it's not

7    shocking that we find the same thing given that we have

8    a very similar nesting parameter.

9         Q.    All right.  And you also relied on

10   Dr. Guglielmo's job market paper; is that right?

11        A.    That is correct.

12        Q.    And Dr. Guglielmo's preferred nesting

13   parameter was .41?

14        A.    That is correct.

15        Q.    Did you rerun your work using that

16   nesting parameter that Dr. Guglielmo used?

17        A.    No, I did not.

18        Q.    You also cite a paper by Dr. Dunn; is

19   that right?

20        A.    Yes.  Both -- Professor Nevo and I both

21   cite Dr. Dunn's paper.

22              (Pause)

23        MR. CONRATH:  May I approach, Your Honor?

24        THE COURT:  You may.

25

3317

1    BY MR. CONRATH:

2          Q.      PX-718 is an excerpt from the Journal of

3    Health Economics, an article by Abe Dunn, "The Value of

4    Coverage in the Medicare Advantage Insurance Market."

5          Do you recognize PX-718?

6          A.      Yes, I do.

7          Q.      That's the Dunn paper that you cite?

8          A.      That is correct.

9          Q.      Do you mention in your report the

10   preferred nesting parameter of Dr. Dunn?

11         A.      I can't recall one way or the other.

12         Q.      But you --

13         A.      I think I cite the range of estimates

14   that he has in my report.  And I did that, I think, for

15   all of the papers, if I recall.  We can go to the actual

16   table.

17         Professor Nevo adopted a different approach,

18   which is picking his -- the preferred estimate that was

19   outlined in each report.  But they're both different

20   ways to report the same information.

21         Q.      Okay.  Could we turn to page 847 of

22   PX-718.

23         Do you see that?  Do you have that?

24         I'm directing your attention to the first

25   paragraph under the heading "Five Results."

3318

1       A.      Yes, sir.

2       Q.      About halfway down, do you see where it

3   says, "The nesting parameter"?  Do you have that?

4       A.      Yes, sir.

5       Q.      And does that say, "The nesting parameter

6   that is estimated from the logarithms of the contract's

7   conditional share is highly significant with a

8   coefficient of .67.  This implies a high degree of

9   within-nest correlation among MA plans so that consumers

10  purchasing MA products are likely to substitute among MA

11  plans and less likely to select traditional Medicare and

12  other outside alternatives."

13      Did I read that right?

14      A.      Yes, you did.

15      Q.      And I take it you do not rerun your work

16  using the -- one of the nesting parameters that was

17  within Dr. Dunn's range?

18      A.      No.  His data is quite -- we can go to

19  the precise years.  On the version of the slide I have,

20  I can't see what -- the years that are covered by it.

21      Q.      2004 to 2007.

22      A.      2004 to 2007.  So I focus on the most

23  recent data and focused on Professor Nevo's estimate and

24  my own and tried to understand the difference between

25  our results and which one had more reliable results

3319

1   based on statistical validity, consistency with the

2   recent literature, as well as more economically

3   appropriate.

4          Q.     Could you turn to Slide 103, please.

5          Well, just before leaving that, you did cite

6   Professor Dunn's report -- his article in your

7   article --

8          You did cite Professor Dunn's article in your

9   report at page 87?

10         A.     That's correct.  I cited -- I think there

11  is -- literally every paper that I cite, Professor Nevo

12  cited in every -- it's literally perfect overlap.  We

13  all cited the same literature.  That's why I used his

14  chart, so we didn't have to have a disagreement.

15         Q.     All right.  You remember your discussion

16  about single-county plans; right?

17         A.     Yes, sir.

18         Q.     You know that actually 19 percent of

19  Aetna's plans are single-county plans?

20         A.     Right.  I think I cited -- I think it's

21  about 15, 16 percent for Humana and 19 percent for

22  Aetna.  So that's one fifth or one-sixth, depending upon

23  which firm you looked at.

24         Q.     And you would agree that, if a firm has

25  an incentive, like maybe it can make more money, it has

3320

1    more reason to implement single-county plans than if it

2    does not; right?

3           A.     Holding all else constant, yes.

4           Q.     Right.  So holding all else constant, if

5    a firm acquires market power, it might be more likely to

6    go to the trouble to have single-county plans if that

7    will help it exercise its market power, right, all else

8    equal?

9           A.     All else equal, if you increase the

10   potential benefits of a single-county plans and you have

11   no change in the cost, it moves in that direction.  The

12   question is whether the benefits exceed the costs.

13          And if you look at the preferences that they've

14   revealed, you don't see that happen often in the data.

15   It's about 4 percent of the counties that have

16   single-county plans.

17          Q.     When you testified -- moving to another

18   subject.

19          When you testified in the GE-Electrolux, the

20   question of margins was an issue?

21          A.     Yes, it was.

22          Q.     And when Mr. Demitrack was asking you

23   some questions, you said, I think, that economic margins

24   are not -- economic margins and not accounting margins

25   are the ones that economists should use in their

3321

1    analysis of merger effects?

2         A.    That's correct.

3         Q.    You also agreed -- you said that

4    measuring from accounting data economic margins is

5    challenging; is that right?

6         A.    It can be challenging for sure.  And

7    that's why I said on my direct testimony I can't give a

8    precise point estimate.  What I can do -- given the

9    costs and the structure of this industry, I can bound

10   the estimate because we know certain costs are economic

11   costs.  And that then sets a cap on the economic margin.

12        But I can't give a precise point estimate

13   because figuring out which of the administrative costs

14   actually are economic costs is beyond the scope of the

15   work I've done here.

16        Q.    I think you've said that, in your

17   opinion, margins can't be above 15 percent because of

18   the CMS MLR rules; is that right?

19        A.    On average, you can have time periods

20   where you go above and then you have a period of time --

21   one, two, three years -- to return back below or you're

22   subject to various penalties.

23        So you do see in the data certain counties that

24   are above, but you have issues that you have time that

25   you have to move back below those rules.

3322

1          THE COURT:  Mr. Conrath, just a request from

2     me.  Can you identify where he said something since

3     you're talking about a different trial and this case?

4     And it just helps me to know where --

5          MR. CONRATH:  Yes.  I will be better, and I

6     apologize.

7          THE COURT:  I appreciate it.  Thank you.

8          MR. CONRATH:  I know I should do that every

9     time.

10    BY MR. CONRATH:

11         Q.    So did you hear Mr. Cavanaugh testify in

12    this trial?

13         A.    I was not here sitting in the courtroom

14    for Mr. Cavanaugh's.  I read most of his transcript.

15         Q.    Okay.  Do you recall his testimony that

16    MLR is calculated at a more aggregate level?

17         A.    Yes, I do.

18         Q.    And so that it could vary and probably

19    does vary substantially regionally?

20         A.    That is correct.

21         Q.    And did you hear Mr. Paprocki testify?

22         A.    I read his transcript.

23         Q.    And are you aware that Mr. Paprocki

24    testified that the medical loss ratio is calculated on

25    and aggregated across all the plans within a contract?

3323

1     A.     Right.  And that's why looking at

2  averages is the right way to think about this.

3     Q.     Well, and that can include variation

4  within the plans within a contract; right?

5     A.     Absolutely.

6     Q.     And even more variation within counties;

7  right?

8     A.     That is correct.

9     Q.     And some of Aetna's individual plans do,

10 in fact, have medical loss ratios lower than 85 percent.

11     Do you recall him testifying to that?

12     A.     Those precise words, I don't recall.  But

13 I have analyses that I've conducted that show that there

14 is variation in margins by county.  So there is

15 variation.  That's why, on average, you look at what

16 happens because that takes out the variation.

17     Q.     Ad if there's a medical loss ratio lower

18 than 85 percent, that means the margin is more than 15;

19 right?

20     A.     In those circumstance -- well, not

21 necessarily because there's other costs.  But just

22 looking at medical costs, the answer is that is the

23 case.

24     But that's why you do a variation.  There's a

25 time period that they have to correct.  But you observe

3324

1    in the data, if you look at the averages, what I've

2    showed that they can't be above 15 percent.

3          Q.     And do you recall hearing Mr. Wheatley

4    testify, Mr. Wheatley of Humana?

5          A.     Yes, sir.

6          Q.     And do you recall him saying that, across

7    450 bids -- some big, some small -- you can have

8    substantial variation?

9          A.     Yes.  And in my expert report -- I think

10   in my reply report, I show that variation.

11         Q.     Right.  And you recall Mr. Wheatley

12   testifying that, because of claims of medical

13   experience, it might throw off a negative 30 percent

14   margin or a positive 30 percent margin?

15         A.     In any given plan, yes, sir.

16         Q.     Could we look at Slide 15.

17         This is one of the places where you said that

18   margins cannot go higher than 15 percent?

19         A.     On average, yes, sir.

20         Q.     And in Slide 106, you say the average

21   actual variable margin is 11 percent; right?

22         A.     That is correct.

23         Q.     So even under your theory, there's room

24   for margins to go up between 11 and 15; is that right?

25         A.     Average variable margins could go up.

3325

1   That is correct.

2        Q.     And it could be more in specific

3   counties?

4        A.     That is correct.

5        Q.     Just to go back two slides to Slide 113.

6        This is from a CMS website; is that right?

7        A.     That is correct.

8        Q.     And this CMS website is not something you

9   listed in your reliance materials in either report; is

10  that right?

11       A.     That is correct.

12       Q.     Is this a new opinion that is first

13  expressed at trial?

14       A.     No.  I described the risk-adjustment

15  process -- as part of my report, I have in the appendix

16  a chart from my report that shows how the

17  risk-adjustment process works.

18       Given that, for the first time, I had heard

19  Professor Nevo use -- make the argument about the health

20  or sickness of the marginal customers at trial, I picked

21  the actual words from the CMS website about the

22  risk-adjustment process.

23       So it's no different than my description in my

24  report that's more general about risk adjustment or the

25  chart in my appendix that shows how the risk

3326

1   adjustment -- how the whole bid and risk-adjustment

2   process works.

3           Q.     You heard Professor Frank's testimony?

4           A.     Yes, I did.

5           Q.     And, in fact, you replied in part to his

6   report?

7           A.     Yes, I did.

8           Q.     All right.  And you heard Professor

9   Frank's testimony that risk scores for individuals are

10  subject to being affected by insurers through upcoding?

11          A.     I heard his testimony, that is correct.

12                     (Pause)

13  BY MR. CONRATH:

14          Q.     Please turn to page 125.

15          A.     (Witness complies with request.)

16          Q.     So your Slide 125 and 126 both are

17  reflecting entry questions and includes data, four dots

18  from your work and one from Professor Nevo's; right?

19          A.     That's correct.

20          Q.     And the four dots from yours do not

21  include the 2012 entry cohort; is that right?

22          A.     That is correct.  I focused on the 2013

23  to 2016 cohorts.

24          Q.     One of the things that you presented here

25  in your slides was a kind of a rerunning of Professor

3327

1    Nevo's even-if merger simulation.

2            Do you recall that?

3            A.    Yes, sir.

4            Q.    And you changed the entry -- I think it's

5    Slide 67, 69 -- let's look that up -- 69.

6            So if I understand this right, you left

7    everything else that Professor Nevo did the same, and

8    what you changed was what share the entrant got; right?

9            A.    That is correct.  Literally just took

10   2.7 percent out and put 10 percent in or 20 or 30.

11           Q.    And you recall that one of the things

12   Professor Nevo did to be very conservative was to assume

13   that not that entry took a long time but that it was

14   immediate and not that it was sporadic but that it was

15   in every county; right?

16           A.    He was looking at an equilibrium level,

17   and he did put it in every county.  And I thought I

18   talked about how you would then adjust down to be

19   somewhere in the 10 to 20 percent range as part of my

20   direct testimony.

21           Q.    So, in essence, would it be fair to say

22   that's applying a no-threshold measure of entry saying

23   we'll count entry everywhere; right?  We'll count

24   entry -- the point of that is to treat entry as

25   widespread; right?

3328

1          A.      No, not at all.  I disagree.

2          You could take one of two approaches in how you

3     apply this.  You can say, okay, we observe entrants in,

4     let's just say, 50 percent of the markets.  They have a

5     probability of surviving of, say, 70 percent.  And they

6     achieve a 30 percent market share.  So you can multiply

7     those out, and you get something just above 10 percent.

8          You could -- that's on -- you could apply that

9     10 percent then to all markets.  And that would produce

10    a 2.7 percent decline in average prices.

11         Alternatively, you could just say that you take

12    the conditional probability of surviving.  So you take

13    the 70 percent times 30 percent.  You put the 21 percent

14    in 50 percent of the markets.  The average effect across

15    all 364 markets would be the same in that situation.

16         Q.      If I understand what you said is what you

17    did is you took Professor Nevo's report and the only

18    thing you changed was how big a market share you

19    assigned to the entrant; right?

20         A.      That is correct.

21         Q.      In his assumptions, to be conservative,

22    he assumed entry was so widespread that it was in every

23    county; right?

24         A.      That is correct.

25         Q.      And so you took that into the revised

3329

1    version that you did?

2         A.     That is correct.  And that's why, even

3    though we see the average share of surviving entrants

4    reaching 30 percent, I focused attention between 10 and

5    20 percent because the right way to think about this is,

6    what's the probability of survival times the average

7    share for the surviving ones, and what percentage of the

8    markets have they entered?

9         And when you do that, you get an answer that,

10   depending upon how you look at the data, somewhere

11   between a 10 and 20 percent entrant, which would then

12   mean price declines in Professor Nevo's model.

13        Q.     Just to be clear, what you did was you

14   looked at -- you took your calculation of how much share

15   does an entrant get, which is based on only looking at

16   those who already succeeded to the extent of getting

17   5 percent.

18        So you used a wide-spread definition of where

19   there's entry and a narrow definition of how successful

20   they are?

21        A.     That's absolutely not correct.  Every

22   version that I did included the 5 percent threshold.

23        So when you take the survival rate and multiply

24   it by the average share received by survivals, you're

25   getting, in essence, a conditional probability -- an

3330

1    expected value for the entrant.  And then you multiply

2    it by the percentage of counties that have had an

3    entrant receiving more than a 5 percent share, and you

4    get something between 10 and 20 percent.

5         That's why I focused attention between 10 and

6    20 percent.  So that entire discussion is internally

7    consistent for the treatment of entrants.

8         Q.    So you didn't just adopt Professor Nevo's

9    merger simulation; you actually did these additional

10   calculations that you're now describing?

11        A.    No.  Those are two separate discussions.

12        I take my estimates of entry, the two numbers

13   that you were just looking at, which is the average

14   share, conditional and survival, times the survival

15   rate.  If you just took that, you could then plug that

16   number into Professor Nevo's merger simulation model.

17        You should adjust for how often an entrant --

18   there is an entrant in counties.  And we observe over

19   half of the counties have had entry that meet my

20   5 percent threshold.  And so you'd adjust for that, and

21   so it's internally consistent to then focus in on the 10

22   to 20 percent range.

23        And the only change I made to Professor Nevo's

24   merger simulation model -- and I have, as you know, very

25   significant concerns about its applicability here and it

3331

1    has very significant flaws.  If I just make that change,

2    it shows price decreases within the four corners of what

3    he's done.

4         Q.    Okay.  And so the math you just described

5    means that another important input is that there are a

6    lot of counties that have no entry; is that what you

7    mean?

8         A.    As I said, you could put it in either

9    way.  It shows the same average effect across the 364

10   counties.

11        Q.    Which could mask the substantial effects

12   in counties where there's no entrant and counterbalance

13   by the counties where you put the entrant -- where you

14   included an entrant with the success level of someone

15   who's already passed 5 percent; right?

16        A.    It's looking at the average, just as

17   Professor Nevo's estimate is looking at the average.

18        Q.    Okay.  Could we look at Slide 79, please.

19        So if you look at the text that goes

20   horizontally on the left of Slide 79, what you're

21   looking at here is the survival rate of non-top five

22   MAOs; right?

23        A.    That is correct.

24        Q.    And you're using this here -- we're

25   talking about Molina.

3332

1          You're trying to estimate how likely Molina is

2    to succeed; right?

3          A.    That is correct.

4          Q.    Just so that we're all clear, we're not

5    suggesting Molina -- I mean, Molina is not No. 6; right?

6          A.    No, they are not No. 6.

7          Q.    They are not in the top ten?

8          A.    Not currently.  With the 290,000, I think

9    they would be right around the top ten.

10         Q.    All right.  It's correct that some number

11   of the entrants that are measured in your measure of

12   entrants who succeed at a level of 5 percent and then

13   succeed more, some of those are local providers entering

14   the MA space; is that right?

15         A.    That is correct.

16         Q.    And those typically would have a good

17   local brand in their market?

18         A.    That is correct.

19         Q.    And Moses Cone in Greensboro would be a

20   good example?

21         A.    I'm not going to disagree with you.

22   That's correct.

23         Q.    Okay.  And if you have a good local brand

24   in one market, you can't necessarily take that good

25   brand to a different market and have it be just as

3333

1    valuable; right?

2          A.    Depends on the circumstances.  It depends

3    on the firm.  Many firms have exported their brands from

4    one market to the other and been very successful doing

5    that.

6          Q.    You didn't do a study of that?

7          A.    No, I did not.

8          Q.    All right.  Could you turn to Slide 81.

9          A.    (Witness complies with request.)

10         Q.    So the point of this is to suggest that

11   Molina has advantages over a typical entrant.

12         Let me ask you this:  Did you hear the

13   testimony from Ms. Cocozza that Aetna is careful in the

14   counties that it chooses to enter in a given year?

15         A.    Yes, I did.

16         Q.    And if the divestiture that's at issue in

17   this case goes forward, Molina will not have chosen the

18   counties that it finds itself as an entrant; isn't that

19   correct?

20         A.    They will have the counties, in essence,

21   that the Department of Justice was concerned about.

22         Q.    They are not the counties that Molina

23   chose?

24         A.    That is correct.

25         Q.    And Molina didn't get a chance to be

3334

1    careful not to bite off more than they can chew?

2         A.    It was -- they had that option.  They

3    could have decided not to enter into the agreement.

4         Q.    I think earlier you told us that entry

5    often comes from someone who is in an adjacent county?

6         A.    It takes multiple forms.  One form is

7    being in an adjacent county.

8         Q.    And that's the situation that, in most of

9    the counties where Molina would be getting divestiture

10   assets, they're not already in an adjacent county; is

11   that right?

12        A.    That is correct.  So they would then be a

13   potential entrant to those counties in the future.

14        Q.    All right.  But they don't have the

15   advantage -- whatever causes people to enter into

16   adjacent counties, that's not a factor that helps Molina

17   succeed with the 290,000 people who would get their

18   healthcare?

19        A.    I'd agree with that.  Again, as I think I

20   tried to articulate, they have certain advantages, and

21   they are starting off as -- like an entrant in other

22   ways.  So this is part of the balancing of pros and

23   cons.

24        Q.    Well, really, wouldn't you have to say

25   it's not only -- you say they have advantages.  They

3335

1    have disadvantages too.  They're getting a bunch of

2    counties that they didn't choose.

3        A.    Right.  There are pros and cons.

4        Q.    You say "many advantages" without

5    mentioning the disadvantages; right?

6        A.    I think I talked about them as well from

7    a question from Your Honor, and so there are pros and

8    cons.

9        Q.    So one of the reasons that you suggested

10   Molina might have an opportunity to survive is status

11   quo bias.

12        Do you recall that?

13        A.    Yes, sir.

14        Q.    And you said this will help Molina keep

15   customers because the customers chose the plan?

16        A.    That is correct.

17        Q.    Seniors who chose Humana or Aetna, by

18   implication, you think they're likely to stick with a

19   company that's been -- that basically they receive a

20   notice in the mail that this is your new healthcare

21   company after choosing Aetna or Humana?  Is that how you

22   think that's going to work?

23        A.    If I review the analyses that have been

24   conducted from various sources, the data show that

25   people make decisions based on price and cost and

3336

1   factors about network and other factors that would

2   likely be driving their decisions.

3            And so the benefit designs that they receive

4   will continue when the name on the door has changed from

5   one to the other.  And that's part of the status quo

6   bias, obviously.

7            Q.      And in the counties where Molina gets

8   some divested contracts, Aetna is going to remain -- the

9   combined Aetna-Humana firm will be in that market;

10  right?

11           A.      That is correct.

12           Q.      And Aetna has, you understand, retained

13  the ability to continue to use the Humana brand name?

14           A.      That is correct.

15           Q.      And both of those facts are going to

16  diminish any status quo bias effect that might help

17  Molina; right?

18           A.      So you're -- I'm confused by what you're

19  positing there.  I'm sorry.  I didn't understand the

20  question.

21           Q.      So any senior who chose Aetna for its

22  good reputation or chose Humana for its reputation as a

23  company that reaches out, has a lot of services in the

24  community, anyone who chose them in part because of the

25  brand name is going to have an Aetna or Humana option in

3337

1    the same county.

2         And my question to you is:  That's going to

3    diminish the ordinary status quo bias effect since

4    those are seniors who chose their original plan in part

5    because of Humana or Aetna?

6         A.    So it's a little hard to understand, but

7    I think I understand, which is that is -- is what you're

8    saying, if somebody made a decision based solely about

9    whether -- they made a decision to choose an MA plan

10   just because they like the Humana brand, would they be

11   the type of enrollee that would switch?  And the answer

12   is I guess so.

13        The question is:  Is that a significant number?

14   And during that time, they'll have experience with

15   Molina running their program.  And if they like that,

16   they may change the brand that they like.  And that

17   happens in markets all the time.

18        I've not seen any evidence to suggest from the

19   data that there's a significant -- such a significant

20   brand loyalty that there would be an exodus that would

21   be so significant that they would go from, say, 290,000

22   members to 100,000 members, as proposed by Professor

23   Nevo.

24        Q.    Well, I think you prefaced that by

25   referencing people who chose it only because of Humana.

3338

1    My question was a little broader.

2            If there are people who chose their health plan

3    in part because they like either the Aetna or Humana

4    brand, that fact is going to diminish any status quo

5    bias in favor of Molina, all else equal?

6            A.      If you hold everything else constant.

7    And so you're saying that Molina doesn't have a chance

8    to, during the time period that they would have the

9    Molina brand, build that brand reputation and sort of

10   embed that person wanting to stay with Molina, if you

11   hold all else constant, I'll agree with the proposition

12   because it's a tautology, it seems to me.

13           Q.      One of the other things you said is that

14   seniors do not like disruption to their plans as a

15   reason for why you thought Molina had a chance to

16   survive; right?

17           A.      It was actually a part of Professor

18   Frank's testimony.  That's how he described the status

19   quo bias, and I agree with him.

20           Q.      And a principal element of that is being

21   able to keep your doctor?

22           A.      That is part of it, for sure.

23           Q.      Did you hear the testimony that Molina is

24   not substantially keeping -- is not necessarily keeping

25   the networks that Humana or Aetna have today?

3339

1        A.      I don't remember that precise -- those

2    precise words.

3        Q.      Let me withdraw it and ask it a different

4    way.

5        Do you remember Ms. Rubino testifying that

6    Molina plans to build its own networks?

7        A.      I certainly remember that testimony.

8    Very different concepts, obviously.

9        Q.      So if Molina building new networks leads

10   seniors not to be able to keep the doctor for those

11   seniors who were asking for it, then that's another

12   reason why the status quo bias won't help Molina; right?

13       A.      To be fair, you have to go both ways.

14   They may build a network that adds doctors that attract

15   other enrollees.  So that effect could go in either

16   direction.

17            THE COURT:  Should we take an afternoon break?

18            MR. CONRATH:  A break is always a good idea.

19   I'm in favor of it, Your Honor.

20            THE COURT:  All right.  Should we take a vote?

21            We'll take a 15-minute break and resume at

22   about 3:35.

23            (Recess)

24            THE COURT:  All right.  Welcome back, we're

25   ready to resume.

3340

1          Mr. Conrath?

2          MR. CONRATH:  Thank you, Your Honor.

3    BY MR. CONRATH:

4          Q.    One of the things we were talking about

5    before the break was whether brand is important to

6    Molina's potential for success.

7          Do you recall that?

8          A.    Yes, sir.

9          Q.    And I think your proposition on your

10   Slide 80 is that brand is not critical to Medicare

11   Advantage success; correct?

12         A.    That is correct.

13         Q.    And you agree, though, that it can be

14   important to Medicare Advantage success?

15         A.    I can agree to that.  Yes, sir.

16         Q.    And you remember Ms. Cocozza, Aetna's

17   head of Medicare, testifying that brand is important to

18   some seniors in choosing a Medicare Advantage plan?

19         A.    Yes, sir.

20         Q.    And you remember that document we looked

21   at a little while ago where there was a decision tree

22   that Humana created to explain how seniors choose

23   Medicare plans.

24         And the first choice identified was what brands

25   they're willing to go with?

3341

1          A.      Yes, sir.

2          Q.      And you're aware that Molina has Medicare

3    Advantage operations of any kind, including their

4    special needs plans and dual-eligibles, in just about

5    5 percent of the complaint counties?  Do you remember

6    that testimony from Dr. Burns?

7          A.      I forget if that's on a weighted basis or

8    just on a number basis.  I forget what he actually

9    calculated, sitting here right now today.

10         Q.      But your recollection is that Molina does

11   not have Medicare Advantage participation in a very high

12   percentage of the complaint counties?  Let's just talk

13   about number of counties right now.

14         A.      That's fair.

15         Q.      And would you agree that, outside of

16   where Molina already exists, it doesn't have a strong

17   Medicare Advantage brand; right?

18         A.      In terms of Medicare Advantage, I would

19   agree to that.  They're obviously a very strong Medicaid

20   brand, and they have done well on the exchanges.

21         Q.      And you recall Mr. Bertolini's testimony

22   that Molina has a weak brand in the Medicare Advantage

23   space?

24         A.      I agree with that.

25         Q.      If we look at Slide 83.  That's about

3342

1    Medicaid.  That's nothing to do with the individual

2    Medicare Advantage market.

3         A.    I think --

4         Q.    Sorry.  It's nothing to do with the

5    Medicare Advantage plans that are at issue in this case;

6    is that right?

7         A.    I think there's just a confusion.  82 is

8    Medicaid.

9         Q.    I'm sorry.  82, right.  I misspoke.  Let

10   me start again.

11        Slide 82, showing Medicaid membership growth,

12   has nothing to do with Medicare Advantage; right?

13        A.    It's a different program.  Obviously it

14   involves health insurance and health insurance in

15   particular.  Medicaid is focused on low-income

16   Americans.

17        And then the question is what experience you

18   learn from that program that helps you with regard to

19   Medicare Advantage plans.

20        Q.    And 83 is the exchange membership, again,

21   not having anything to do with the individual Medicare

22   Advantage products at issue in this case?

23        A.    The same answer.  Obviously you get

24   experience from serving -- providing health insurance.

25   You get experience by providing health insurance to

3343

1    low-income Americans.

2          And there is overlap obviously in terms of that

3    experience in the experience you need to serve Medicare

4    Advantage, but it is a different program than Medicare

5    Advantage.  Medicare Advantage has quite unique

6    characteristics.

7          Q.    And if we turn to Slide 84.

8          This is about Molina's Medicare Advantage

9    special needs and Medicare-Medicaid plan membership

10   growth; right?

11         A.    That is correct.

12         Q.    And these are Medicare Advantage products

13   that are not included in the issues that we've been

14   discussing in this case; is that right?

15         A.    That is correct with one small caveat

16   that it -- there are some issues about how you remove

17   them from the data, but with the caveat we're not

18   focused on special needs plans.

19         Q.    And did you -- you cite this growth shown

20   on page 84 as -- if I understood you, to suggest, well,

21   if Molina can do what's shown on Slide 84, maybe they

22   can take these 290,000 and make a success of them; is

23   that approximately your point here?

24         A.    I'm not going to disagree with your

25   oversimplification, but I think that -- there are two

3344

1   points I was making.

2          One, they've been able to grow and bring those

3   members onto their administration, claims administration

4   systems, No. 1.

5          Number 2, I think it's fair that they have

6   focused in areas outside of individual Medicare

7   Advantage and succeeded in those markets that they have

8   focused on.  And that suggests that they have the types

9   of skills that would potentially be able to be carried

10  over to other products.  It doesn't guarantee it.  But

11  it's suggestive that, if they can succeed in one market,

12  that it should be helpful for them in a closely-related

13  market.

14         Q.    All right.  Did you hear the CFO of

15  Molina, Mr. John Molina, testify that they are losing

16  money on the D-SNP and dual-eligible business?

17         A.    I read that testimony.  So I didn't hear

18  it.  I read it.

19         Q.    So at least following the logic you just

20  gave me, that is a reason to call into question the

21  ability to export that experience to a new field that

22  they haven't focused on in the past where it's not

23  successful?

24         A.    Remember, there's a period -- a short

25  period of unprofitability doesn't mean that they expect

3345

1    to be unprofitable for a long period.

2         Q.    So one thing you said in recounting why

3    we might think about their past -- the past experience

4    of Molina was, approximately, they've been able to

5    assign or attract new -- sign up new members and bring

6    them onto their platform.

7         Do you remember that discussion?

8         A.    Yes, sir.

9         Q.    All right.  So that doesn't particularly

10   apply to Medicaid; does it?

11        A.    In what -- I'm confused by your question.

12        Q.    How do you get Medicaid clients?

13        A.    Medicaid is part of a -- you're working

14   with the states as part of a -- it's a state-run program

15   that is, in part, funded by the federal government.

16        Q.    And how do you get Medicaid clients?

17        A.    Sitting here today, the way you're

18   describing it, you get a contract from the state to

19   manage -- my understanding is of this -- and I'm not an

20   expert on Medicaid.  It's been now 20 years since I

21   really focused on Medicaid, and the program has had some

22   evolution in the last 20 years.

23        But you get a contract from the states, and then

24   you run the health insurance through the state basically

25   as part of that contract.

3346

1    Q.    So at least in many states, the way you

2  get Medicaid clients is you bid to get a contract from

3  the state and then the clients are assigned to you?

4    A.    That is an accurate depiction, as I

5  understand it.  But, again, it's now -- I'm two decades

6  out of expertise on that precise enrollment.

7    Q.    Sure.  And you'd agree that that's

8  nothing like the process of getting people to sign up

9  for the kind of Medicare Advantage plans that are at

10  issue in this case?

11    A.    I agree.  It's a different process for

12  sure.

13    Q.    And I think I understood you to say that

14  where the operation of the Medicare Advantage products

15  that Molina does have and maybe if Medicaid would give

16  them a leg up if they were already operating those

17  businesses in a state where they get divestiture assets;

18  is that right?

19    A.    Do you mind repeating your question.  I

20  was a little confused by it.  I'm sorry.

21    Q.    Let me back up.  In the counties where

22  Molina would be getting divestiture lives, in the

23  majority of those counties or the substantial majority

24  of those counties, Molina has no presence; right?

25    A.    That is correct.

3347

1      Q.      In those where Molina already has a

2  presence, did I understand you to say that that would

3  give them a leg up and a chance to succeed?

4      A.      I don't think I quite said that, but I

5  think I was saying that they'll have a leg up because

6  they start off with 290,000 Medicare Advantage members.

7  And that allows them to reduce various risks that a new

8  entrant would have in terms of, for example, revenue

9  risk.  They get that revenue immediately.

10     Q.      Okay.  So you're aware that Molina offers

11 the kind of Medicare Advantage plans that are at issue

12 in this case in four counties in Utah?

13     A.      That is -- I'm not sure if it's precisely

14 four counties, but I know they offer the product in

15 Utah.

16     Q.      And Molina has offered Medicaid plans in

17 Utah for at least 60 years, according to Mario Molina?

18     A.      That is correct.

19     Q.      And Lisa Rubino testified that they have

20 experience with Medicaid plans in Utah for many years;

21 right?

22     A.      I read that testimony.  Yes, sir.

23     Q.      All right.  And Molina has offered

24 special needs plans in Utah for at least eight years,

25 according to Dr. Mario Molina; is that right?

3348

1      A.      I don't recall that specific testimony,

2  but I'm not going to disagree with you one way or the

3  other.  In my conversations with them, they explained

4  that they've been offering SNP plans and Medicaid in

5  Utah.

6      Q.      And Molina has today fewer than 500

7  non-dual Medicare Advantage members in Utah in the

8  counties where they serve?

9      A.      I'm not going to disagree with you.  I

10 haven't done that analysis one way or the other.

11     Q.      All right.  And Molina, according to Lisa

12 Rubino, has less than a 1 percent market share in

13 non-dual Medicare Advantage plans in the four counties

14 in Utah?

15     A.      I'm not going to -- I don't have any data

16 to -- one way or the other.  So sure.

17     Q.      So at least according to your threshold,

18 in Utah where Molina has had Medicaid experience and

19 special needs plan Medicare Advantage experience for 16

20 and 8 years respectively, they haven't entered,

21 according to your definition of entry; is that right?

22     A.      They are not a significantly competitive

23 market player today.  That is correct.

24     Q.      One thing that Molina is going to have to

25 do is sign up provider contracts; is that right?

3349

1          A.     That is correct.

2          Q.     And at one point, you thought that one of

3     the reasons they might be successful at that was that

4     they had 30 percent of one party and 70 percent of the

5     other party contracts potentially assigned to them?

6          A.     That is -- my understanding as part of

7     the ASA is they have the opportunity, if they so desire,

8     to have contracts that are assignable to be assigned to

9     them.

10         Q.     And do you recall at your deposition

11    telling me that you were thinking that they could get as

12    much as 30 percent of one party and 70 percent of the

13    other?

14         A.     Well, that is an analysis of what

15    percentage of the contracts are assignable.  And so that

16    would be the maximum that you could have if they so

17    choose to go that route.

18         Q.     And did you subsequently learn that only

19    8 percent of Aetna's hospital contracts could be

20    assigned to Molina?

21         A.     Sitting here today, I don't know that

22    figure one way or the other.  I was looking across all

23    provider contracts.

24         Q.     Okay.  And are you aware of the testimony

25    at trial that Aetna and Humana are no longer planning to

3350

1    assign contracts to Molina?

2         A.    My understanding is -- sitting here

3    today, I don't have fresh in my mind what the precise

4    testimony was but that Ms. Rubino had decided that they

5    were better off building the networks themselves.  But I

6    thought that's what I read her say, but I'm not the

7    expert on those precise technicalities.

8         Q.    One of the reasons you give for

9    predicting that Molina may be able to get appropriate

10   provider contracts is your claim that original Medicare

11   is -- 100 percent of Medicare Advantage is a magnet for

12   prices; right?

13        A.    Based on my analysis of the contracts,

14   that is correct.

15        Q.    Let's look at one of the slides you

16   presented.  I think it's 137.

17        A.    (Witness complies with request.)

18        Q.    So this is Humana's provider rates for

19   hospitals; right?

20        A.    That is correct.

21        Q.    And while the largest numbers are around

22   100, some of them are 120, 140, 160 percent of Medicare

23   Advantage; that's right?

24        A.    That is correct.  So what -- perhaps I

25   should describe what's here, if that would be helpful to

3351

1    you.

2          So this shows the relationship between the

3    Humana -- the rate that Humana gets with the hospital

4    relative to original Medicare for various hospitals.

5    And it shows along the X axis the Humana share in that

6    market.

7          And the point is that there's no relationship

8    between share scale and the results of those agreements,

9    and that's why you see that there's a grouping right

10   around 100 percent.  You see some above, some below.

11   And that's very different than commercial markets.

12         In commercial markets, you see a much different

13   relationship between scale and the outcomes of

14   negotiations with hospitals or providers.

15         Q.    Well, another thing that it shows is

16   that, frequently, even Humana is negotiating rates that

17   are 120, 140, or 160 percent of original Medicare rates;

18   right?

19         A.    That is correct.  And if you look across

20   each of the entities -- and there's multiple charts

21   here -- you see that there's some that are above, some

22   that are below.  If you look at the averages, they come

23   out right around 100 percent for Molina, for Aetna, and

24   for Humana.

25         Q.    So for Molina -- and that's slide -- do

3352

1    you remember the number of that slide?

2         A.    Slide No. 78.

3         Q.    So just to be clear here, you're

4    comparing hospital and physician rates or Humana

5    physician rates for Aetna.

6         Molina is overall?

7         A.    That is correct.

8         Q.    And that includes such things and durable

9    medical equipment, specialized nursing care, other

10   things?

11        A.    It will include -- all types of providers

12   is the way that they provided the information.

13        Q.    So you couldn't break it out into

14   hospitals or physicians?

15        A.    I couldn't break it out, and I couldn't

16   break out Aetna for hospitals as well.  So that's why I

17   just report physicians for Aetna.  I have a footnote in

18   one of my reports explaining that.

19        Q.    I'm looking at your reply report,

20   page 99, and in particular footnote 217.

21        It says, "Molina's weighted average allowed

22   amount is equivalent to 101 percent of original

23   Medicare" --

24        A.    I'm sorry, Mr. Conrath.  I missed the

25   page number.

3353

1      Q.      Page number 99, footnote 217.  And I'm

2  just going to read that first -- that first sentence.

3          "Molina's weighted average allowed amount is

4  the equivalent to 101 percent of original Medicare

5  rates in 2017".

6          Do you see that?

7      A.      Yes.

8      Q.      That's the 101 percent that's on this

9  Slide 78?

10     A.      That is correct.  And then obviously in

11 the footnote, there are citations to Ms. Rubino's

12 testimony and the testimony of others that have shown

13 that Medicare rates for Medicare Advantage providers are

14 right around 100 percent of original Medicare.

15     Q.      All right.  And you cite first a document

16 for Molina?

17     A.      That is correct.

18         MR. CONRATH:  Can I approach, Your Honor?

19         THE COURT:  You may.

20         And let me, just for the record, say that

21 page 99 is of Defense Exhibit 418.

22 BY MR. CONRATH:

23     Q.      So I've handed up Government

24 Exhibit DX-719, which I'll represent to you is an

25 extract --

3354

1          THE COURT:  So my copy isn't marked, but it's

2     going to be 719?

3          MR. CONRATH:  Let me give you my copy.

4          THE COURT:  No, that's okay.  I can write 719.

5          MR. CONRATH:  Thank you, Your Honor.  I

6     apologize.

7     BY MR. CONRATH:

8          Q.    This is not for the public screen.

9          This is an extract, Mr. Orszag, from the

10    document that you cite there.

11         Do you recognize it?

12         A.    In this form, not at all.

13         Q.    Okay.  Sure.  I'd like you to focus your

14    attention on the upper left-hand quadrant or maybe

15    whatever an eighth would be.

16         Do you see that?

17         A.    Yes, sir.

18         Q.    And do you see that it is broken out by

19    inpatient, home health, outpatient, physician, primary

20    care, physician specialty, and other?

21         A.    On this document, I'm not particularly

22    familiar with the format that you're showing it to me

23    in.

24         Q.    Okay.  So when you said a minute ago that

25    you couldn't look at hospital and physician rates

3355

1    separately, you were forgetting that this document

2    breaks out hospital and physician rates separately?

3        A.    I'm not sure if I've ever seen the top

4    corner of this document.  So one way or the other, I

5    can't give you an answer to that.

6        Q.    Okay.  And without mentioning any

7    numbers, because this is a sealed document, "inpatient,"

8    that refers to hospitals; right?

9        A.    That would be hospitals.

10       Q.    And if we look all the way over at the

11   right, I think I can say it's not 100 percent; is that

12   right?  Or 101?

13           THE COURT:  Let me stop here.

14           MR. CONRATH:  Yes.

15           THE COURT:  First of all, for the record, you

16   haven't identified what entity this relates to.

17           MR. CONRATH:  Yes, this is --

18           THE COURT:  And, secondly, you're acting as if

19   it's in evidence.  It's not in evidence.

20           MR. CONRATH:  Fair point, Your Honor.  PX-719

21   is an excerpt from a document cited in Mr. Orszag's

22   report, which is -- and I'm going to give the page

23   number, MOL1808448.

24           THE COURT:  And MOL is the designation that

25   the material came from Molina?

3356

1      MR. CONRATH:  From Molina.  That's right,

2  Your Honor.  And I move the admission of PX-719.

3      MR. MAJORAS:  Objection, Your Honor.  We've

4  heard apparently testimony from Mr. Conrath as to what

5  this is, not from any witness.  So there's no foundation

6  for it.  It's hearsay.

7      This particular witness has indicated that he

8  can't identify what it is; and, therefore, it should not

9  be admissible.

10      THE COURT:  Well, just a second.  That number

11  that flashed up a moment ago, was it taken from the

12  document?

13      (Discussion held off the record.)

14      MR. CONRATH:  The spreadsheets are not

15  Bates-numbered.  So how do I move a spreadsheet -- I

16  understand it's my problem --

17      THE COURT:  So your representation is --

18      MR. CONRATH:  Is that this is a spreadsheet

19  from the document that was --

20      THE COURT:  Produced by Molina?

21      MR. CONRATH:  -- produced by Molina and which

22  the defendant cites in his reply report.

23      THE WITNESS:  I know that part.  If it's a

24  document produced by Molina, cited by Mr. Orszag in his

25  report, then I'm going to let it in.  So --

3357

1      MR. MAJORAS:  My objection is the foundation

2   for that has not been set forth and that the witness has

3   said that this particular document which has been put

4   before him is one that he does not recognize.

5          I certainly agree that the witness did talk

6   about a document cited in his report, but that

7   foundation needs to be put forth.

8          THE COURT:  Okay.  And we'll see if that

9   foundation is ultimately put forth.  This will be

10   another conditional admission to allow the testimony to

11   go forward.

12          I'm perfectly capable of excluding testimony

13   if it comes -- does not ultimately get admitted, but it

14   will be conditionally admitted.  And we can proceed.

15                  (Plaintiff's Exhibit Number 719

16   admitted into evidence.)

17      MR. CONRATH:  Very well.  Thank you, Your

18   Honor.  And I think I just have a couple questions left

19   on this.

20   BY MR. CONRATH:

21      Q.    Mr. Orszag, if you would look at --

22          THE COURT:  This is a confidential document,

23   though?

24      MR. CONRATH:  Yes.  So it does not come up on

25   the public screen.

3358

1    BY MR. CONRATH:

2         Q.    So my question -- the question that I

3    posed is that "inpatient," the first line on the portion

4    that is in the upper left-hand corner, that refers --

5    "inpatient" inherently refers to hospital; right?

6         A.    Yes.  But I'm a little confused by this

7    because, if I look at this, all of the numbers are

8    absolutely identical for 2015 and 2017.  So I'm not sure

9    if there's -- how the Excel file is working here.

10        And so I'm a little -- having seen this in this

11   form for the first time and not being able to see the

12   cells, I can agree with you that "inpatient" is

13   hospital, but I'm a little confused just looking at this

14   spreadsheet right here right now.

15        Q.    Well, yes.  I think while the cells might

16   be there, I agree that they're not very legible in the

17   size that we have.

18        A.    But I'm making a different point.

19        THE COURT:  I think what he was saying is, if

20   you look at what's under 2015, it's identical to what's

21   under 2017.

22        MR. CONRATH:  Right.  Exactly.  So let me just

23   ask a question.

24   BY MR. CONRATH:

25        Q.    Let's say there is a question about

3359

1    whichever year it is.

2         You'll agree that it's not close to

3    100 percent?

4         MR. MAJORAS:  Your Honor, I'm going to renew

5    my objection.  He's asking questions about the document.

6    He hasn't put forth the foundation.

7         THE COURT:  Well, the document is

8    conditionally admitted.  So you can renew your

9    objection, and it may prove to be successful ultimately.

10        But at the moment, I'm going to allow the

11   testimony on the basis that it is conditionally

12   admitted.

13        Reask the question.  What was the question?

14        MR. CONRATH:  Sure.

15   BY MR. CONRATH:

16        Q.    Focusing on the inpatient --

17        THE COURT:  I think the question was:  You'll

18   agree that it is not close to 100 percent?

19        My problem with the question is it is vague

20   because I have no idea what "it" refers to.

21        MR. CONRATH:  Yes.  All right.  I will

22   rephrase that question.

23   BY MR. CONRATH:

24        Q.    Looking at the information for 2017,

25   looking at the first line labeled "inpatient," will you

3360

1   agree that the percentage on the far right is not close

2   to 100 percent?

3       A.    I would agree that it's significantly

4   above 100 percent, as a factual matter.  Although what

5   it's reporting, I cannot attest to one way or the other.

6       Q.    All right.  And you will agree that the

7   categories here in PX-719 are broken out so that, if a

8   person wanted to, one could look at hospitals and

9   physicians separately from other things?

10      A.    On this table, yes.  And we should just

11  note that the physician number, as reported here,

12  although I'm not sure what it is that's being reported,

13  is below 100 percent.

14      Q.    And if Molina finds itself in a

15  particular market with rates that are substantially

16  above the 100 percent, Molina might find itself in that

17  market at a competitive disadvantage; correct?

18      A.    Potentially they could take lower profit

19  margins than other players, but you can say that's a

20  competitive disadvantage.  Yes, sir.

21      Q.    And even if Molina on average had some

22  high rates and some low rates, if they're at a

23  competitive disadvantage in some counties, that means

24  they're going to be less likely to be a successful

25  competitor in those counties?

3361

1          A.      In those counties.  And where they do

2     better, they'll do better.  So it depends on -- averages

3     can hide the fact that you can do better in some markets

4     and do worse in others.

5          Q.      And you would agree -- you can put that

6     aside.

7          THE COURT:  And it's your obligation, by the

8     end of this trial, to convince me that I should actually

9     admit the document.

10          MR. CONRATH:  I understand, Your Honor.

11     BY MR. CONRATH:

12          Q.      And you agree that the terms of provider

13     contracts are important to the success of a Medicare

14     Advantage organization in addition to the rates?

15          A.      I'm not going to -- not necessarily all

16     terms, but there could be terms that are important, of

17     course.

18          Q.      And terms of a contract, for instance,

19     are how a provider might get to a value-based contract?

20          A.      That may be important, may not be

21     important.  I've listened to testimony from various

22     witnesses sitting here that emphasized how they achieve

23     the value-based contracts over a period of time.

24          Q.      One of the things that might show up in

25     the terms of a contract are additional tasks that a

3362

1    provider will perform that might result in higher star

2    ratings for the plan?

3         A.    That's one thing that could -- as part of

4    a contract that could help the Medicare Advantage

5    organization.

6         Q.    And one of the things that might be terms

7    of the contract are additional tasks that a provider

8    will perform that result in limiting unnecessary

9    utilization?

10        A.    Reducing cost is something that would

11   benefit both the hospital or the provider and the

12   Medicare Advantage organization.

13        Q.    And all those terms are something that

14   Molina would have to be able to negotiate in addition to

15   just rates in order to be successful; isn't that right?

16        A.    That is correct.

17        Q.    And networks are important for success in

18   Medicare Advantage?

19        A.    The answer is maybe, and I can explain.

20   Because obviously you can compete with a small network

21   or a large network.  And different consumers want

22   different-sized networks.

23        And so it depends on what you're targeting and

24   what your business strategy is.  But having -- and so it

25   depends.  But I think generally having more flexibility

3363

1    is a beneficial outcome for the Medicare Advantage

2    organization.

3         Q.    So the information that's on Slide 78

4    doesn't tell us anything about the quality or

5    suitability of the networks that those providers have;

6    right?

7         A.    No.  This is focused on rates.

8         Q.    And different networks might be valuable

9    for different groups of consumers; right?

10        A.    As I just said, yes.

11        Q.    Okay.  And I think -- did you hear

12   Dr. Mario Molina's testimony about some of their current

13   clients and the difficult job they have to provide for

14   clients who have a lot of chronic conditions, including

15   mental illness and homelessness?  You heard that

16   testimony?

17        A.    To be more precise, I read it.  But yes,

18   I did.

19        Q.    And a network that might be great for

20   their current set of clients might not do very well with

21   this typical middle-of-the-road Medicare Advantage

22   customer; right?

23        A.    Obviously there's a lot of overlap, but

24   the answer is you have to negotiate a different contract

25   for Medicare Advantage than you have for, say, a

3364

1   Medicaid program.  Medicaid programs tend to have even

2   lower rates than Medicare.

3           Q.     Could we look at your Slide 88.

4           Sir, I don't see any mention on Slide 88, which

5   is your summary of Molina conclusions about the fact

6   that Molina entered 60-some counties and wound up

7   exiting 50-plus of them.

8           You have to agree that that's a consideration

9   that weighs against the conclusion that Molina will

10  succeed?

11          A.     As a data point, I agree with you.

12          Q.     As an economist, do you agree that the

13  invisible hand of competition will produce a more

14  efficient outcome than government intervention?

15          A.     Not in every circumstance, because

16  markets often fail.  And if markets fail, there is a

17  need for government intervention if that government

18  intervention can be done efficiently.

19          So as a general matter, I have a preference for

20  private markets.  But we also know that private markets

21  sometimes do not act optimally for consumer welfare.

22          And in those circumstances, government

23  intervention to help improve the outcome for consumers

24  and consumer welfare and social welfare is an important

25  element of policy.

3365

1          Q.      That's speaking generally.

2          You haven't offered any opinion about

3   particular market failures in the markets at issue in

4   this case; have you?

5          A.      Well, I'm starting with the premise that

6   the government has made a public policy decision to

7   insert itself and to ensure that seniors have

8   healthcare.  I mean, if we go back prior to 1965, many

9   Americans lived in poverty and didn't get the healthcare

10  that they need when they're seniors, and there was a

11  public policy decision to offer that -- offer the

12  original Medicare program.

13         And so there is a public policy decision to

14  enter this market because they thought it was being

15  underserved.  So as a result, the government is now both

16  a payor, a purchaser and a -- I mean, a payor, a

17  competitor, and a regulator.

18         Q.      And the market -- it was also a public

19  policy decision subsequently to enable private insurers

20  to provide those medical benefits in competition with

21  each other; is that correct?

22         A.      And in competition with original Medicare

23  was one of the specific logics for adding the Medicare

24  Advantage program, as it's now called, although it was

25  called something else previously.

3366

1       Q.      And you don't believe that government can

2   regulate to reach the same price and output outcomes

3   that result from competition; do you?

4       A.      In this case or generally?

5       Q.      Generally.

6       A.      Well, generally, if markets fail, the

7   government intervention may actually produce a better

8   outcome for social welfare if the government can

9   intervene efficiently.

10      And so I can't say that as a general

11  proposition.  Because as somebody who believes that

12  markets can fail and if markets do fail, the insertion

13  of government into that market can -- may produce a

14  better outcome.  Then, again, the government

15  intervention itself may create an even worse situation.

16  It depends on the intervention.

17      Q.      I think you were hearing something in my

18  question that was not there.

19      If markets don't fail, if there is competition

20  in the markets, you don't believe -- I think you told

21  me in at your deposition -- the government can set

22  prices and outcomes more effectively than competition

23  can?

24      A.      With the new caveat that, in the absence

25  of a market failure, I think all economists greatly

3367

1    prefer the invisible hand of competition producing

2    outcomes that are a benefit for society instead of

3    government intervention.

4              Q.    All right.

5              MR. CONRATH:  No further questions, Your

6    Honor.

7              THE COURT:  Mr. Majoras?

8              It may take a minute for Mr. Conrath to clean

9    up all of his various materials.

10             MR. MAJORAS:  And I may be quicker,

11   Your Honor.  I have no questions.

12             THE COURT:  All right.  Take your time

13   cleaning up.

14             I may have just a couple of questions.

15             There was a point, and I think it was with

16   Slide 34 and 35 -- let me see if that's right -- that

17   you were talking about a MedPAC report in which CMS

18   stated, I think you said, that it hoped that the

19   existence of the Accountable Care Organizations in

20   original Medicare would lead seniors enrolled in

21   Medicare Advantage to switch to original Medicare.

22             Did you testify to that effect?

23             THE WITNESS:  Yes, I did.

24             THE COURT:  Is that report -- that MedPAC

25   report part of your materials?

3368

1          THE WITNESS:  Yes, it is.  And if I had maybe

2     about 30 seconds, I think I could find the citation in

3     my actual report, if you'd like that.  Or I'm sure

4     counsel could provide it to you.

5          THE COURT:  Counsel can probably provide it.

6     But the citation to that report and the particular page

7     where that statement is made by CMS is in -- is part of

8     your report?

9          THE WITNESS:  Yes, sir.  So I actually think I

10    found it.  It's on page 64.

11         THE COURT:  Which report?

12         THE WITNESS:  Of DX-0419.

13         THE COURT:  The original?

14         THE WITNESS:  The original report.

15         THE COURT:  And you said 64?

16         THE WITNESS:  Page 64.  So it's 73 in the

17    exhibit number.

18         THE COURT:  Okay.

19         THE WITNESS:  It's a block quote.  And it's

20    from MedPAC, and it cites MedPAC report Congress from

21    June 15, 2015.

22         It says, "If ACOs can generate better care

23    coordination than FFS or original Medicare and have

24    lower overhead than MA plans, then their physicians may

25    be able to offer a level of service that attracts

3369

1   patients away from MA and traditional fee-for-service

2   positions."

3          THE COURT:  And that's true even though the

4   beneficiaries don't get a choice to choose to go into an

5   ACO.

6          THE WITNESS:  That is correct.  So the way I

7   read the report saying is that, if you improve the care

8   coordination, then that will both attract -- in essence,

9   there's -- some of what happens here is that people will

10  get information from brokers, from friends, from all

11  kinds of sources when they make the decision.

12         And if they hear this -- going here will be

13  helpful, it's diverting some people away from

14  traditional fee-for-service medicines and doctors and

15  away from MA.

16         THE COURT:  And let me take a shot at a

17  question relating to Example 5 and Example 6.

18         So assume that we're in a scenario where

19  Example 5 applies, where two thirds of the diversion is

20  escaping the market being tested, the candidate market.

21         Under your reading of Example 6, won't

22  virtually every Example 5 situation also be covered by

23  Example 6?

24         In other words, if two thirds of the diversion

25  is escaping that market, isn't there almost always going

3370

 1     to be a Product C that must be included in the market?

 2             THE WITNESS:  No.

 3             THE COURT:  Why not?

 4             THE WITNESS:  So let's think about a very

 5     simple situation.  And this is, I think, really at the

 6     heart here.  You have to be consistent in the treatment

 7     of original Medicare and Medicare Advantage.

 8             So imagine you have two thirds diversion

 9     outside of -- and I'm now on Example 5 -- and it's going

10     to 50 different players.  The diversion from Product A

11     to Product B would be one third.  The diversion from

12     Product A to Product C in that example would be, in

13     essence, 1 percent to each of those.

14             In that case, you would not include Product C

15     before you include Product B.  So you would stick --

16     Example 6 would not apply, and so you'd just stick with

17     Example 5.

18             THE COURT:  Is that a realistic hypothetical?

19             THE WITNESS:  Yes.  You see that in various

20     markets where folks -- basically diversion is just going

21     outside, and the term that is often used is atomistic.

22     And so it just spreads out to lots of different players

23     outside of the relevant market or the candidate market.

24             In this case, either we should be treating

25     Medicare Advantage and original Medicare as unitary

3371

1    blocks or we should be treating them each individually.

2    So one way to potentially help, I think, about it is --

3    I'm not saying that all original Medicare options should

4    be in the market before you include all Medicare

5    Advantage options.  That would be something that would

6    have to be tested.

7         But as you add products, you can't just pick

8    all the Medicare Advantage products, because there are

9    individual Medicare Advantage products that must violate

10   Example 6.  In that case, you should bring in the

11   original Medicare products that do, the options that

12   violate that, that have higher diversion than to a

13   Medicare Advantage product and you test that candidate

14   market.

15         THE COURT:  That's fine.  All I wanted was an

16   answer.

17         There was a point at which you were talking

18   about Professor Frank's assessment of pass-through, I

19   think, to some extent with approval.  I think you were

20   testifying about the efficiencies analysis.

21         Professor Frank, I think, believes that the

22   pass-through rate, I think it was around 50 percent in

23   his assessment, is indicative of market power in the

24   Medicare Advantage market.

25         Do you agree with him?

3372

1            THE WITNESS:  So this is where a textbook in

2    economics will diverge from, say, the merger guidelines.

3            In the basic economics literature, price above

4    marginal cost is evidence of market power.  So any firm

5    earning, in essence, a profit is considered to have some

6    degree of market power.  And in differentiated product

7    markets, part of that differentiation produces price

8    above marginal costs and some market power.

9            So if you go just to a pure textbook

10   definition of market power, he's technically correct,

11   because that pass-through of less than 100 percent is

12   evidence that there's price above marginal cost.

13           As a matter of economics, the antitrust

14   industrial organization community has not assessed

15   whether there's a potential for substantial lessening of

16   competition based on the pass-through rate.

17           So, for example, there's -- I don't think the

18   issue of pass-through is mentioned anywhere in the

19   merger guidelines until you get to the discussion of

20   efficiencies.  And that's precisely because antitrust

21   economists industrial organization has rejected the idea

22   of using pass-through rates as a measure of the degree

23   of competition in a market.

24           And if you'd like me to go into more detail

25   about this, it may be important.  But the reason is, in

3373

1    oligopoly markets where you don't have perfect

2    competition, the pass-through rate could really be

3    anywhere between zero and 100 percent.  And it depends

4    technically on the curvature of the demand curve given

5    where you are right then.

6            And so that's why the antitrust community has

7    actually rejected using pass-through rates.  I cite in

8    my report to the relevant economics literature about why

9    we've rejected pass-through rates as a measure of

10   competition.

11           So there's a disconnect between, I think, the

12   pure textbook definition and the application in the real

13   world.

14           THE COURT:  Look at Slide 50 for just a

15   second.  Let me make sure I have the right reference.

16           I think you were indicating that total

17   beneficiary cost of Medicare Advantage plans was not

18   varied based on the number or behavior of competitors in

19   the market?

20           THE WITNESS:  That is correct.  So -- sorry.

21           THE COURT:  Given that observation, how do you

22   explain the variation in cost and benefit structure

23   among Medicare Advantage plans in different geographic

24   regions?  If it isn't in response to competition or

25   competitors in that region, what explains it?

3374

1          THE WITNESS:  This is measuring Medicare

2     Advantage competitors.  There's very different

3     provider-side -- so let's just -- I'm going to use an

4     example because it's often easier to explain something

5     with an example.

6          One market, very high hospital cost.  Another

7     market, very low hospital costs.  So in the high

8     hospital cost market, you're going to have high total

9     beneficiary costs because providing insurance in that

10    market is going to be more expensive than in the

11    low-cost market where, let's say, there's lots of

12    hospital competition, for example.

13         What this is doing is it's saying, okay, let's

14    look only -- once we control for the cost of the market,

15    do we see that the number of Medicare Advantage

16    organizations affects the total beneficiary cost.  And

17    the answer is it does not.

18         So I control for all those factors the

19    differences across markets.  And one of the big driving

20    differences is going to be it costs -- it's a lot more

21    expensive to serve somebody with a medical procedure in

22    New York City than it is to serve somebody in, say,

23    South Carolina.  And that's going to drive some of the

24    difference in total beneficiary cost by area.

25         THE COURT:  All right.  Last question:  I

3375

1     think you testified to the effect -- and I may not have

2     the exact language -- that the HHI market measurements

3     don't really work for a market with original Medicare

4     included; correct?

5              THE WITNESS:  That is correct.

6              THE COURT:  Is there any academic support for

7     that conclusion?

8              THE WITNESS:  Well, the academic support for

9     that conclusion would be going back to the original

10    papers that underlie the creation of the HHI.

11              And the underlying economics is that a firm --

12    a larger firm will have -- and this is in the

13    traditional kind of market -- a traditional model of

14    competition with fewer players.  A larger firm will have

15    higher profits.  And so the merger of two smaller

16    players will have a bigger adverse effect on consumer

17    welfare than if, say, that larger firm were somewhat

18    smaller.

19              So that's inherently what the HHI index is

20    telling us.  That's why we square the market shares.

21    It's the logic for squaring the market shares.

22              But the government doesn't have that same

23    profit motive.  It's not making that margin.  So as a

24    result, its behavior is very different than what a

25    profit -- a large firm with a profit motive would be.

3376

1           And I'm not aware, sitting here today, about

2   an academic literature that studies this because it's

3   very rare that you have the government actually as a

4   competitor in the market.  And off the top of my head,

5   really, the only thing I can think about would be postal

6   services and the maybe the railroads, Amtrak.

7           And so you don't often see this as an issue.

8   It's just not something that's ripe for a lot of focus

9   because this just hasn't -- you don't see a lot of

10  markets like this.

11          But if you go to the underlying paper and the

12  underlying logic behind the HHI, it just doesn't -- it

13  fails there.

14          THE COURT:  Any follow-up to any of those?

15          MR. CONRATH:  No, Your Honor.

16          MR. MAJORAS:  No, sir.

17          THE COURT:  All right.  Thank you very much,

18  Mr. Orszag.  We appreciate you coming.

19          (Witness excused.)

20          THE COURT:  Mr. Majoras?

21          MR. MAJORAS:  Your Honor, at this point the

22  defense rests.

23          THE COURT:  All right.  Before you put on your

24  next witness, I'm assuming you have a rebuttal case,

25  Mr. Conrath?

3377

1          MR. CONRATH:  Yes, we do, Your Honor.

2          THE COURT:  All right.  Before you do, let me

3    just run through something so that you can do with it as

4    you wish.

5          With respect to your Exhibits 701 through 719,

6    I have as being admitted into evidence at this time 701,

7    702, 705, 706, 707, 708, 709, 711, 715, and

8    conditionally 719.  I don't think the others technically

9    have been admitted into evidence.

10          So if you need to cure that at some point, you

11    should do so.

12          MR. CONRATH:  Thank you, Your Honor.  I'll

13    double-check and see which ones were only for

14    impeachment.

15          THE COURT:  With that, next witness, please.

16          MR. CONRATH:  Your Honor, while I would

17    normally stay, since I have to put on the next

18    subsequent witness, I'm going to absent myself from the

19    courtroom, if you don't mind.  Mr. Mahr will handle any

20    general questions that may arise.

21          THE COURT:  All right.

22              ***********************

23

24

25

3378

```
 1              C H R I S T I N E   M A Y   H A M M E R,

 2     Having been called as a witness on behalf of the

 3     Plaintiffs and having been first duly sworn by the

 4     Deputy Clerk, was examined and testified as follows:

 5              MR. SIEGEL:  Your Honor, while the witness is

 6     getting situated, just a preliminary matter.

 7              The efficiency testimony that you're about to

 8     hear contains quite a bit of material that the

 9     defendants have designated as confidential.  So to

10     protect that information while keeping the rest of the

11     testimony public, we've highlighted in Ms. Hammer's

12     binder the specific sections of her demonstratives and

13     expert reports that are redacted from public views so

14     she can just look at the paper and not worry about

15     disclosing something.

16              We've talked to the defendants about that, and

17     I believe there's no objection to our doing that.

18              MR. SHUMAKER:  No objection.

19              THE COURT:  Let's proceed that way, and that

20     leaves it mainly in your hands with the caveat that

21     we're going to try and do this through public testimony.

22              MR. SIEGEL:  Great.

23                        DIRECT EXAMINATION

24     BY MR. SIEGEL:

25              Q.    Good afternoon, Ms. Hammer.
```

3379

1          A.     Good afternoon, Mr. Siegel.

2          Q.     Please state your full name for the

3    record.

4          A.     Christine May Hammer.

5          Q.     How are you currently employed?

6          A.     I'm self-employed.

7          Q.     Doing what?

8          A.     I'm an independent consultant.

9          Q.     And how long have you done that?

10         A.     Thirty-five years.

11         Q.     Okay.  And what's your educational

12   background?

13         A.     I have a bachelor's in economics and

14   political science from Indiana University of

15   Pennsylvania and a master's in business administration

16   from the Stanford Graduate School of Business.

17         Q.     Could you please briefly summarize your

18   job history before becoming an independent management

19   consultant.

20         A.     After graduating from Stanford, I went to

21   Pricewaterhouse where I was an auditor and a tax

22   accountant.  Then I went to Management Analysis Center,

23   where I was a management consultant.  And I left

24   Management Analysis Center to go to Crocker Bank, one of

25   my clients.  And then I formed my own firm.

3380

1      Q.      Okay.  Have you consulted independently

2   as your sole occupation since beginning with that

3   endeavor 35 years ago?

4      A.      There were two years that I was -- went

5   back inside a major consulting firm.

6      Q.      Okay.  Other than that, you've been

7   consulting full-time since then?

8      A.      Yes, I have.

9      Q.      Okay.  You mentioned you had an MBA from

10  Stanford.

11      Were there any other additional professional

12  titles or licenses that are relevant to the work you've

13  done in this case?

14      A.      Yes.  I'm a CPA, licensed in California

15  since 1978, and I'm also a chartered global management

16  accountant.

17      Q.      What does your consulting practice focus

18  on?

19      A.      It focuses on both financial and

20  managerial accounting.

21      Q.      And what -- if you could just briefly

22  define "financial and managerial accounting" for the

23  Court.

24      A.      All right.  Financial accounting is

25  really focused on external reporting to stakeholders,

1    the regulatory agencies.  It's what most people think of

2    when they think of what a CPA does.

3         Managerial accounting, however, is focused on

4    the internal users of information, so the management of

5    the company from the board all the way down to the shop

6    floor.  It's the information they need to make wise

7    decisions on how to run business.

8         Q.    Okay.  Can you provide an example of what

9    your -- what kind of matters you work on in your

10   management consulting practice?

11        A.    Yes.  An example would be a very, very

12   large retailer that wanted to expand their prescription

13   drug program asked me to come in and work with them to

14   build the model and then cost all of their drugs that

15   were going to into their formulary.

16        They had a specific price point they wanted to

17   hit, and they wanted to be absolutely sure that the cost

18   was either -- the price was either equal to or greater

19   than the cost.  So it required a significant amount of

20   analysis.

21        Q.    Okay.  And, likewise, could you provide

22   an example of what you do in your litigation consulting

23   practice?

24        A.    Yes.  I do a lot of damages work.  So it

25   would be in all kinds of contexts.  It could be breach

3382

1    of contract, intellectual property, just something where

2    you're calculating profitability, lost profits,

3    reasonable royalties, that kind of thing.

4           Q.    Okay.  Have you ever been qualified

5    before as an expert in a litigated matter?

6           A.    Yes, I have.

7           Q.    How many times?

8           A.    Three times.

9           Q.    And have you -- did you testify in those

10   three matters?

11          A.    Yes, I did.

12          Q.    And have you ever testified as an expert

13   also in an arbitration proceeding?

14          A.    I have.  Three times as well.

15          Q.    Okay.  On those occasions when you were

16   testifying as an expert in court or in arbitrations,

17   were you always testifying on financial accounting and

18   managerial accounting matters?

19          A.    Yes.

20          Q.    Has anyone ever challenged your

21   qualifications to testify as an expert?

22          A.    No.

23          Q.    In your binder, you'll find

24   Exhibits PX-561 and PX-562.  If you could just turn to

25   PX-561.

3383

1    Do you see that?

2        A.    Yes, I do.

3        Q.    Okay.  Is that -- PX-561 a copy of the

4    affirmative expert report you filed in this case dated

5    October 21, 2016?

6        A.    Yes, it is.

7        Q.    Are your qualifications accurately

8    summarized in Section 1 and at paragraphs 24 over to 25

9    of that document?

10       A.    Yes, as well as my litigation experiences

11   attached as Exhibit A, I believe.

12       Q.    Okay.  I was going to ask that next.

13       And then turning also just briefly to PX-562,

14   is that an accurate copy of the supplemental and

15   rebuttal expert report that you filed in this case,

16   dated November 11, 2016?

17       A.    Yes, it is.

18       MR. SIEGEL:  Your Honor, the United States

19   offers Christine Hammer as an expert in financial

20   accounting and managerial accounting.

21            THE COURT:  Mr. Shumaker?

22       MR. SHUMAKER:  No objection, Your Honor.

23            THE COURT:  Without objection, the witness,

24   Ms. Hammer, will be permitted to testify as a expert on

25   the subjects of financial accounting and managerial

3384

1    accounting.

2              And we'll welcome your testimony.

3              Mr. Siegel?

4              MR. SIEGEL:  Thank you.

5    BY MR. SIEGEL:

6         Q.    Ms. Hammer, have you prepared some slides

7    as demonstratives to help explain your testimony today?

8         A.    Yes, I have.

9         Q.    Okay.  If you can turn to the tab called

10   "Presentation" in your binder.

11        A.    Yes.

12        Q.    Are those the slides that you prepared

13   for today's testimony?

14        A.    Yes, they are.

15        Q.    Okay.

16             MR. SIEGEL:  Your Honor, may we display the

17   slides that Ms. Hammer has prepared?

18             THE COURT:  Without objection?

19             MR. SHUMAKER:  No objection, Your Honor.

20             THE COURT:  Without objection, you may.

21   BY MR. SIEGEL:

22        Q.    We have a cover page, but turning over to

23   the first noncover page, Slide 2.

24        What was your assignment and the work that you

25   did in this matter?

3385

1              A.       The Justice Department asked me to assess

2     Mr. Gokhale's efficiency claims, focusing primarily on

3     six criteria.   The first three have to do with

4     cognizability, has Mr. Gokhale shown that his claims are

5     verifiable, merger-specific, and not due to reductions

6     in output or service.

7              The next three are has he shown the evidence of

8     variable versus fixed cost.   In other words, the point

9     being to reduce the variable cost.

10             The next being that has he duly corrected the

11    efficiencies for divestitures and exits from the

12    individual commercial market.

13             And, third, has he correctly attributed the

14    efficiencies to the challenged product in geographic

15    markets.

16             Q.       Okay.   Thanks.   And I'm only going to ask

17    you to follow up on one of those, this is the very last

18    of those, correctly attributed to challenged product in

19    geographic markets.

20             How, if at all, does this relate to the

21    divestitures being offered in this case?

22             A.       Well, this would be after the

23    divestitures.   So in other words, these would be the

24    markets -- product and geographic markets that remain

25    after the divestitures have taken place.

1          Q.     Okay.  Moving over to the next slide.

2     It's a long quote on the merger guidelines.  I'd guess

3     I'd ask you to just read it in and tell us why you chose

4     to feature it here.

5          A.     All right.  I was asked to focus on

6     Mr. Gokhale's reports and the documents that he relied

7     on.  And the quote from the merger guidelines is

8     "Efficiencies are difficult to verify and quantify, in

9     part because much of the information relating to

10    efficiencies is uniquely in the possession of the

11    merging firms.  Moreover, efficiencies projected

12    reasonably and in good faith by the merging firms may

13    not be realized.  Therefore, it is incumbent upon the

14    merging firms to substantiate efficiency claims."

15         And this really, to me, speaks to Mr. Gokhale's

16    job and my job.  I was hoping and expecting him to

17    substantiate the efficiency claims he made so that I

18    could verify them.

19         Q.     I see.  And then turning over to the

20    following slide.  Again, this is a quotation that you

21    have selected from the commentary to the merger

22    guidelines.

23         And I guess I just wanted to ask you again to

24    read it into the record and then tell us why you

25    selected it and its relevance to your work here.

3387

1        A.      "The verification process usually

2   includes, among other things, an assessment of the

3   parties' analytical methods, including the accuracy of

4   the data collection and measurement, an evaluation of

5   the reasonableness of the assumptions in the analysis,

6   and scrutiny into how well the parties' conclusions

7   stand up to modifications and any assumptions (i.e., the

8   robustness of the parties' analysis)."

9        And to verify -- the job of verifying is not the

10  same job as auditing.  Verifying is to make sure --

11  approve that something is true, verifiable, and

12  validated.  In other words, to give credence to whatever

13  it is you're looking at in our case, the sufficiency

14  numbers.

15       And these are -- I thought about it as

16  analytical methods and the pieces that go into assessing

17  the parties' analytical methods.  So the data, the

18  measurement, the reasonableness of the assumptions, and

19  then do they stand up to modifications.

20       Q.     Okay.  Why don't we move on to the next

21  slide.

22       Did you reach any opinions in this matter?

23       A.     I did.  It's my opinion that Mr. Gokhale

24  has failed to demonstrate that the asserted efficiencies

25  are cognizable with one exception.  There's 72.3 FTE

1      synergies in the commercial group that I believe have

2      been shown to be cognizable.

3            Q.     I'm sorry.  You said there are 72.3

4      FTE --

5            A.     Excuse me.  Million dollars in FTE

6      savings --

7            Q.     Okay.

8            A.     -- in the commercial group.

9            Q.     I want to ask you about the subbullets

10     underneath that bullet.  It says support cited in

11     Mr. Gokhale's rebuttal report.

12            What do you mean by that?

13            A.     In Mr. Gokhale's report, I could find no

14     support for any of the FTE efficiencies claimed.  But in

15     his rebuttal report, he cited in a footnote a document

16     that I had not seen before.

17            And when I -- well, as I went through the report

18     and went through all of the citations, I found that

19     there is indeed a spreadsheet that shows that a mapping

20     analysis was done in the commercial group showing how

21     they would bring the Aetna and Humana personnel together

22     in that group.  And I felt it was -- it was sufficient

23     to deem it cognizable.

24            Q.     Okay.  And I want to go to the next

25     subbullet, "No similar report for other FTE synergies."

3389

1         What do you mean by that?

2         A.     Well, I had hoped to find a number of

3    these because it was my understanding from Mr. Gokhale's

4    reports that I would find something similar for each of

5    the functional groups.

6         There were 29 functional groups, and I

7    understood him to say that a similar process had been

8    done.  I did not find those.

9         Q.     And, finally, you make the point here

10   that commercial group is outside the challenged markets.

11        Why is that?

12        A.     Well, because the commercial group is

13   focused on commercial businesses.  And although there is

14   an individual commercial group that's on the exchange,

15   that is a separate business unit and is not subsumed

16   within this commercial group that I was able to find

17   documentation to support.

18        Q.     Okay.  When did you conclude that this

19   $72.3 million in FTE efficiencies is, in fact,

20   cognizable?

21        A.     Well, it took me probably two weeks to go

22   through the -- well, I don't remember how many citations

23   were in the rebuttal report -- but to sort through them

24   and find the 50-plus documents that were new citations

25   and to look at each one, weigh what it had to offer.

1    And I would say it was around Thanksgiving, perhaps two

2    weeks after I received Mr. Gokhale's report.

3            Q.    Okay.  Thanks.  And if we could turn over

4    to the next slide, Slide 6.

5            Is this a continuation of your opinions?

6            A.    Yes, it is.

7            MR. SHUMAKER:  Your Honor, may I object simply

8    to the leading.  I am fine with her using these slides

9    as a reference, but to simply have her reading the

10   slides off is just another way of leading the witness.

11           THE COURT:  Try to avoid leading the witness.

12           MR. SIEGEL:  Okay.

13   BY MR. SIEGEL:

14           Q.    Ms. Hammer, what is this slide meant to

15   depict?

16           A.    The merger guidelines say that cognizable

17   efficiencies are assessed net of cost produced by the

18   merger or incurred in achieving these efficiencies.  And

19   Mr. Gokhale has failed to consider the one-time

20   integration cost of $1.4 million.

21           Q.    On over to Slide 7.

22           What opinions are described on this slide?

23           A.    This -- the first opinion is that

24   Mr. Gokhale has provided no way for a third-party

25   analyst to distinguish between fixed and variable costs

3391

1    in his work.

2         The next is that he hasn't provided sufficient

3    documentation or analysis for the adjustments that were

4    made for the divestitures and the individual commercial

5    exits.

6         And, lastly, that he has not attributed

7    efficiencies to the challenged markets.

8         Q.    Okay.  When did you begin working on this

9    matter?

10        A.    In March of 2016.

11        Q.    And what did you do at that time?

12        A.    I think very early in March I received a

13   white paper and supporting documentation that Professor

14   Zmijewski in Chicago had prepared.  And I spent quite a

15   bit of time reviewing those estimations so that I would

16   have, in a sense, a leg up in getting ready for this

17   trial.

18        Q.    What does this paper -- this white paper

19   concerned what topic?

20        A.    It concerned the Aetna-Coventry merger,

21   and there were a few slides on the current merger.

22        Q.    And what did you do next after reviewing

23   the Dr. Zmijewski white paper and backup?

24        A.    Well, later in the spring and actually

25   more towards the June time frame, a number of Aetna

3392

1    employees were deposed, and I reviewed their deposition

2    transcripts as well as the -- all of the exhibits that

3    were attached.

4         Q.    Which -- if you recall, which depositions

5    did you read?

6         A.    Well, I read Mr. Horst and Mr. Stelben.

7    After that, I believe it was Mr. Paprocki and

8    Mr. Gavores.  I think Ms. Cocozza was significantly

9    after that.  Mr. Bertolini and Mr. Broussard are the

10   people that come to mind right now.

11        Q.    What did you do next in your work process

12   in carrying out your assignment in this case?

13        A.    Well, at the beginning of September, some

14   productions arrived from the independent consultants

15   that were hired by Aetna to work on efficiencies.  And

16   so as they came in in rather rolling production, I would

17   start to analyze their work and start to, you know,

18   understand what their analytical methods were and test

19   them, begin to look for the underlying data and

20   documentation.

21        Q.    Did there come a time when you received

22   interrogatory responses from Aetna?

23        A.    Yes.  September 28, we received the

24   second set of interrogatories.  And that -- that was

25   important because Aetna -- this was -- I'm just going to

3393

1    read this.

2           "Aetna's synergy expert will detail the

3    verifiable and merger-specific synergies that arise from

4    the transaction in a forthcoming report, the synergies

5    report, to be submitted on October 21, 2016.  Aetna also

6    will produce with the synergies report any document or

7    data containing the calculations or models used to

8    quantify and attribute each such efficiency and the

9    associated costs relied upon by the synergy expert in

10   its analysis."

11          Q.    You said you received that September 28?

12          A.    September 28, yes.

13          Q.    Okay.  What was your reaction when you

14   read this interrogatory response?

15          A.    I was worried.  If I didn't get their

16   expert's report until the 21st of August and I had to

17   issue --

18              THE COURT:  Excuse me.

19              THE WITNESS:  I'm sorry.  Thank you.

20          If I didn't receive it until the 21st of

21   October and I had to file a report three weeks later on

22   November 11, I was very worried that I would not have

23   enough time to do a good job.

24   BY MR. SIEGEL:

25          Q.    So what did you do?

3394

1          A.      Well, I reviewed everything else I had.

2     And luckily the Submission 4 analysis came in just two

3     or three days later.  And so I was able to work with

4     Aetna's synergy estimates and actually produce a first

5     report that kind of laid out what I understood the

6     methodology to be, what I saw as problems with it, and

7     then laid out a roadmap of what I needed to do as soon

8     as I received their expert's report.

9          Q.      And when did you receive their expert's

10    report?

11         A.      On -- I think it was on the 21st or the

12    22nd of October.

13         Q.      Okay.  And then what did you do next

14    after receiving Mr. Gokhale's affirmative report?

15         A.      Well, I went through it multiple times.

16    I went through every piece of analysis he provided and

17    then used that as, in a sense, the roadmap to go back

18    through the Submission 4 and the independent

19    consultant's work products to see what he had deemed

20    cognizable and what he hadn't.

21         I removed the things that he hadn't deemed

22    cognizable from my consideration and then continued to

23    focus on what he had -- what he had opined on.

24         Q.      And just in brief, what is Submission 4?

25         A.      Submission 4 -- the process that Aetna

3395

1  has in place for calculating synergies and actually, I

2  believe, integrating the company and recognizing

3  recording those synergies after the fact are done in

4  submissions.  So I haven't seen Submission 1, I don't

5  think, but I've seen Submission 2 and 3.  They were

6  received in perhaps June or July, but four pages, six

7  pages.  So very summarized.

8          But Submission 4 was actually the work product

9  of the 29 functional groups.  And then the medical

10  costs, they were much more detailed.

11          Q.    Okay.  Did you have any help in doing all

12  this work that you described?

13          A.    I did.  I had a large team from

14  Cornerstone Research.

15          Q.    How did you end up working with

16  Cornerstone?

17          A.    I work with them frequently.  And in this

18  matter, they were the ones who had introduced me to the

19  Justice Department.

20          Q.    Okay.  Let's go over to the next slide,

21  Slide 9.  This slide is entitled "Aetna-Coventry."

22          What is it meant to show?

23          A.    Well, Mr. Gokhale believes that the

24  two -- that Aetna-Coventry provides him significant

25  comfort, is I think how he puts it, because he can use

3396

1    that as a baseline.  And these are the similarities that

2    he mentions in his expert report about the two

3    transactions.  And they are not compelling to me.

4          And the first two are increasing its membership

5    base annex up and down and enhancing the geographic

6    profile.  And in my mind, that's what horizontal mergers

7    generally most frequently do.

8          The third one is the -- refers to the process

9    that was used, the one I just described that had

10   Submissions 1, 2, 3, 4.  And presumably there will be a

11   Submission 5.

12         And the fact that the same people and

13   consultants and playbooks were used to estimate the

14   synergies in both transactions, again, that doesn't make

15   me -- it doesn't give me that much comfort because, in

16   almost everything I do, I use a similar process.

17         If it's analyzing and imposing an expert's

18   damage claim, I replicate those numbers and I verify

19   them using supporting documentation.  When I was an

20   auditor, Pricewaterhouse had a standard audit program

21   that they then modified as necessary if the industry

22   were a bank or a warehousing company or a distribution

23   center.

24         It's something that, if you find a good way of

25   doing something, you use that process and modify it as

3397

1    is needed.  So I didn't find that those were things that

2    gave me significant comfort with Aetna-Coventry.

3           Q.     Okay.  Has Aetna -- has Mr. Gokhale

4    provided a basis for believing that the efficiencies

5    that Aetna says it achieved in the Aetna-Coventry

6    transaction are, in fact, cognizable?

7           A.     No, he has not.

8           Q.     Going over to the next slide, Slide 10.

9           What does this chart show?

10          A.     This chart is Mr. Gokhale's cognizable

11   efficiency claims.  I have subdivided them somewhat

12   differently so that we would have all of the

13   administrative costs in one section -- that's the top

14   panel -- all of the medical cost efficiencies in the

15   second panel, and then the revenue efficiencies in the

16   third.

17          Q.     Okay.  And the 72.3 million at the top,

18   FTE duplicative roles, commercial group, is that one

19   that you've talked about so far?

20          A.     Yes.  That's the one that I believe is

21   cognizable.

22          Q.     Okay.  Now, the others, are you going to

23   talk about all these -- each of these individual line

24   items today?

25          A.     No.  I'm not going to have time.

3398

1          THE WITNESS:  However, if you have questions,

2   Your Honor, I would be happy to answer them.

3   BY MR. SIEGEL:

4          Q.    And which of these items are you hoping

5   to focus on most closely?

6          A.    Well, the medical costs, I think, are the

7   most important and pertinent to this matter because they

8   tend to be variable.  Even though Mr. Gokhale didn't

9   provide an analysis, I think common sense and 40 years

10   of being a cost accountant tell me that those medical

11   costs are going to vary with the number of members.

12          Q.    So which particular items within medical

13   costs are you most interested in our talking about

14   today?

15          A.    The pharmacy rebates maximization for

16   $202 million.

17          Q.    Okay.

18          A.    I'm going to talk about the concurrent

19   review and the network efficiencies that are claimed.

20   And then I'll go back and do a few comments about some

21   of the administrative costs that have been brought up.

22          Q.    Okay.  At the very bottom there, I notice

23   there's a line that says "total revenue including shock

24   loss of $8.5 billion, 2018."

25          What does that mean?

1          A.      Well, shock loss is the estimate that

2     the -- I believe it was probably prepared by the

3     investment bankers at Aetna and perhaps Humana.

4          It's the revenue that's expected to be lost as a

5     result of the shock to the membership.  In other words,

6     they are going to lose a significant number of members,

7     and this is their estimation of what that would be.

8          Q.      And why would that be relevant?

9          A.      Well, I could find no references for

10    using revenues as an efficiency.  In other words,

11    revenues can't possibly be a cost savings.  They're a

12    revenue.

13         So -- but I wanted to include them because I'm

14    not a lawyer.  And if Your Honor finds them to be

15    cognizable, I wanted to have them listed all together.

16         And then the shock loss is something -- again,

17    because it's never been written about in this context

18    that I could find, I just thought, well, I'll list it

19    and let the Court deem -- deal with it as they choose.

20    But it's listed so that it's there.

21         Q.      Now, there's another one of the footnotes

22    I want to ask about.  "Mr. Gokhale did not provide

23    estimates for 2017, 2018, 2019."

24         What do you mean by that?

25         A.      Well, Mr. Gokhale did his estimates based

3400

1   on 2020.  And so there are no estimates prior to that

2   point in terms of what he believes the cognizable

3   efficiency claims are.

4        Q.    Okay.  Let me go over to the next slide,

5   Slide 11.

6        What is shown on this slide?

7        A.    This is just -- I have several overview

8   observations, I think three pages of them, that really

9   go across many categories.  And rather than bore you

10  with all of the -- repeating it over and over, I thought

11  if I summarized them in one place, I could just kind of

12  refer to them again and not have to take the time to go

13  through them.

14       Q.    Could you do that, please.

15       A.    All right.  The first one is that

16  Mr. Gokhale has failed to properly assess the

17  assumptions of the underlying methodologies, and he's

18  failed to verify the data.

19       On the next page, I have some things about

20  assumptions.

21       As Mr. Gokhale testified yesterday, he

22  discounted many of the estimates that were the outputs

23  of the models that Aetna and the independent consultants

24  used.  And the slang for that, if you will, in kind of

25  accounting circles is they are called haircuts because

3401

1    you don't go back and refine your model to get a

2    reasonable outcome; you just cut off a portion of the

3    estimate.

4         And I believe that as a -- I don't think that's

5    the best way to do an analysis.  I think the best way is

6    to find a model that fits the business situation and

7    then vary your inputs by doing a sensitivity analysis

8    until you find a range that is reasonable.  And then you

9    usually would present the full range or say I'm

10   presenting the full range.  I think the midpoint is the

11   best choice.  I think the low point is the best choice.

12   And then you justify that based on your business

13   experience.

14        Because the parties know what their experience

15   is in many different areas, and they would have the best

16   means of justifying using their own business records,

17   that any kind of haircut -- any kind of positioning

18   within a range of outcomes that you would get.

19        Q.    What is the typical magnitude of these

20   haircuts or reduction factors that you saw in the models

21   underlying Mr. Gokhale's work?

22        A.    The most frequent were 40 percent,

23   50 percent, and 60 percent.  There were others, but

24   those -- they tended to cluster in that 40 to 60 percent

25   range.

3402

1      Q.      Okay.  And then you have a listing -- the

2  second bullet after "haircut" says

3  "best-of-the-two-contracts approach."

4      At a very basic level, could you just explain

5  what a best-of-the-two-contracts approach is?

6      A.      Yes.  In a simple manner, it's just

7  looking at two parties' contracts and saying which one

8  is best.  The analysis that was done here was done not

9  only for contracts as you saw in the procurement of the

10  consulting procurement, but it was also done in the

11  rebate maximization.  It was on rebate per unit basis.

12  But that is also based on a contract.

13      The same methodology was used in the provider

14  networks by looking did he allow billed ratio.  So it

15  pervades much of the medical cost efficiencies.

16      And as we'll talk about, I think there are a

17  number of flaws that pertain to the particular

18  application of the best of two contracts.

19      Q.      Just in brief, how do you calculate a

20  synergy under a best-of-the-two-contracts approach?

21      A.      How would I calculate it or how was it

22  calculated?

23      Q.      How was it calculated?

24      A.      It was calculated by using a single point

25  in time.  So it could be -- in the case of pharmacy

3403

1    rebates, it was quarter 4 of 2015.  For network

2    providers, it was the fiscal year -- actually, they were

3    on the calendar year.  So it was the calendar year 2015.

4         So it's taking -- the way Mr. Gokhale used it,

5    it is using a single point in time and then calculating

6    the differential at that point of time on a

7    contract-by-contract or drug-by-drug basis, determining

8    the differential, and then multiplying that by a volume

9    of the disadvantaged company to get a number that then

10   is assumed to persist in perpetuity.

11        It's not a one-time number.  It's going forward,

12   we'll always have these savings.

13        Q.    Okay.  And that brings us to the next

14   slide, Slide 13, which is called "Implicit Assumptions

15   in Mr. Gokhale's BOTC Approach."

16        Is that "best of the two contracts"?

17        A.    Yes.  These are the four basic

18   assumptions that, as I went through his

19   best-of-the-two-contracts approach, I kept saying

20   there's something that's -- already there are a lot of

21   things that are wrong with this.  Can I tease out what

22   the different implicit assumptions are that underlie his

23   use of one single point into the best of two contracts.

24        The first one is that the combined volume can be

25   purchased under the terms of the more favorable

3404

```
 1    contract.  And in a few minutes, I'll show you evidence

 2    that the parties turned other that shows that hospitals,

 3    for instance, are not going to readily accept using the

 4    lower of the two contracts for their provider

 5    reimbursements.

 6            Q.    What about the second one, "all suppliers

 7    are interchangeable"?  Is that another one of the

 8    assumptions?

 9            A.    Yes, it is.  Well, it's an observation

10    that kind of pervades the whole BOTC approach.  And this

11    one -- I'll just give you an example because I think

12    it's clear.

13            If you think about this, the people who are in

14    this room, lawyers are not interchangeable.  If I'm here

15    in this courtroom and I'm in an antitrust matter, I do

16    not want a family law practitioner or a boutique IP

17    firm.  I want Jones Day.

18            I'm actually serious.  You want the best people

19    for the particular task you've got at hand.  So I felt

20    that was something that -- that was -- there was an

21    assumption that you could just swap out Jones Day for,

22    you know a venture law group or something.  You just

23    won't do it.

24            And this one -- I think I have to soften it a

25    tad by saying there are certain suppliers that are
```

3405

1   interchangeable.  I don't know enough about Aetna's

2   business, and the analysis didn't provide me with the

3   detail to say there's a whole group of people that we

4   don't care if you go to Printer A or Printer B to get

5   the job done.  We'll take the lowest --

6       I think of those as more commodity purchases

7   where there really isn't that much difference.  And,

8   again, I don't know which of their suppliers and how

9   much of the efficiency that was calculated pertain to

10  those more commodities.

11      Q.   How about the third of the three implicit

12  assumptions that you have listed here?

13      A.   This is the price differentials at that

14  baseline time.  For instance, Quarter 4 of 2014 would

15  have remained in place in perpetuity.  And this is

16  something that says, rather than looking at an average

17  over a long period of time -- which is how I would have

18  done this analysis because I do think it's appropriate

19  to look for differentials in rebates or pricing cost

20  structures.

21      But you do it by using a longitudinal study.

22  You go over time, and you determine what's the average

23  over time.  You compare the other firm's average over

24  time, and you calculate a differential based on that

25  average.

3406

1          I'd like to give you just a quick example, which

2     is, when I was coming here -- I live in California and I

3     was coming to Washington, D.C.  I checked the weather.

4     It's supposed to be 47 degrees in the daytime in

5     Washington, D.C.  It's also 47 degrees in Seattle,

6     Washington, in the month of December.

7          So if I go back to last Friday, it was only

8     27 degrees.  That's a 20-degree differential.  If I had

9     calculated that 20 degree differential, I would have

10     thought that Seattle and Washington -- Seattle,

11     Washington, and Washington, D.C, would be the -- would

12     have -- would be the same.

13          I know over time the average is zero.  There's

14     zero differential between the two if you take it over,

15     in this case, 31 days.  But if you look at any one day,

16     between those two temperatures, you're going to find a

17     difference unless it just happened they both were at

18     50 degrees that day or 60 or whatever they are.

19          But still the point is, if over a long time you

20     find a zero differential, you don't have a differential

21     that you should be quantifying and turning into an

22     efficiencies claim.

23          Q.    What about the fourth of the four

24     assumptions?  What's that about and what's your -- do

25     you agree with it?

3407

1          A.     Well, the price differentials are always

2     due to unique differences in negotiating skill or scale.

3          This is something that we'll see in just a few

4     minutes that Aetna's own people and Humana's people,

5     when they're talking about how their business has

6     evolved since they did the original efficiency

7     calculation, they've already continued their

8     negotiations.  They've continued to make changes.

9          And it's not -- they don't persist -- they don't

10    persist over time, and they aren't always due to

11    differences in skill or scale.  They might be a cost to

12    serve.  If I can serve someone at a lower cost, I might

13    be willing to give them a lower price than someone that

14    it takes more money to serve or someone that's more

15    pleasant to deal with or gives me better terms.

16         There are many things that go into the

17    calculating or determining the price differential.

18         Q.     Let's go over to Slide 14.  This slide

19    I'm going to call your attention to is entirely

20    redacted.  This is not going to be very interesting.

21         A.     Not interesting to anyone else, but...

22         Q.     We've talked to the defense about this.

23    It's okay for you to discuss the category titles at the

24    top of the column.  It's just that none of the drugs or

25    the actual rebate figures should be disclosed.

3408

1          So let me just ask you, to lead you off on

2     this, is this a best-of-the-two-contracts -- let me

3     rephrase it.

4          Does this pertain to a

5     best-of-the-two-contracts example?

6          A.     It does pertain to that.  This is data

7     that I discovered in the PSG production.  PSG is Pharma

8     Strategy Group, and they did the analysis for the drug

9     rebates.

10          Each company turned over a spreadsheet like this

11     to the cleanroom consultants, not to each other.  This

12     data went in to the cleanroom consultant.

13          As I think I alluded to first, the very first

14     thing to do if you want to calculate a differential is

15     to determine if there is actually a difference over time

16     in the prices.  In this case, test rebates.

17          So when I found this sheet and the same sheet --

18     the same formatted sheet for the other company, I was

19     very interested to look for fluctuations, first of all,

20     between the beginning of the year and the end of the

21     year because the end of the year in drugs -- in drug

22     rebates and contracting is often higher because certain

23     contracts will have a volume tiering.

24          So if you get to 10 percent over your last

25     year's volume, you'll -- you will -- once you reach that

3409

1    hurdle, you'll get an incremental rebate.  So you will

2    often see that end-of-year rebates are higher than the

3    beginning-of-year rebates.  But it depends on how the

4    contract is structured.

5         So the total rebates could be the same, but

6    because they have a different structure -- using fourth

7    quarter, I believe, is incorrect because of the fact

8    that some drug contracts have a volume rebate that only

9    comes in at the end of the year -- towards the end of

10   the year and some don't.

11        Q.    And what do the red boxes show on this

12   figure?

13        A.    The red boxes -- let me just -- I should

14   have started by saying the data.  Columns A and

15   Columns B are the 2016 rebates.  Column A is the actual

16   rebates in Quarter 1 of 2016.  Column B is the projected

17   exit rebate in 2016.

18        Q.    What do you mean by "exit rebate"?

19        A.    Exit's the end of the year.  So it would

20   be exactly the same as the contract rate if there's no

21   volume incentive.  But if there is, it will be

22   significantly higher --

23        Q.    Okay.

24        A.    -- based on the different -- whatever

25   your volume increment is.

3410

1      Q.      And I cut you off.

2      The red boxes, what do those indicate?

3      A.      Well, if you look at the red boxes, what

4   they indicate is, is there a difference, are these drugs

5   static which is an underlying assumption in using a

6   single point in time, or are they fluctuating.  And are

7   they fluctuating from the beginning of the year to end

8   of year.

9      So I just put the boxes around them to show that

10  indeed many of the drugs fluctuate.  And they fluctuate

11  quite significantly, in my opinion.

12     Q.      Let's go over Slide 15, the next slide.

13  The drug names and drugmakers are redacted here.

14     What does this example illustrate?

15     A.      This is an example of the rebate

16  maximization work that was done by PSG.  They took the

17  top drugs and several, I think ten, therapy classes and

18  calculated by comparing the two formularies of each

19  company, determined whether they should go with the

20  contract the company --

21     Oh, I can use Humana.  Thank you, Mr. Shumaker.

22     -- whether they should go with Humana's contract

23  or whether they should go with Aetna's contract.  So in

24  this particular Drug 1, Humana is going to use all of

25  Aetna's contracts for this particular manufacturing,

3411

1    including Drug 1.  And the assumption is in this

2    analysis is that single-point rebate deferential,

3    Quarter 4 of 2016, is representative of future rebate

4    differentials in perpetuity.

5         As a result of this assumption and the

6    underlying data, PSG calculated recurring synergies of

7    3.2 million based on the rebate differential they

8    observed in Quarter 4 of 2015.

9         Q.    Let's go over to the next page, Slide 16.

10        Does that refer to the same drug?

11        A.    It does refer to the same drug.  What

12   I've done with this slide is taken -- the column that's

13   headed PSG is showing the rebate.  We've got them -- so

14   it's showing the rebate in Quarter 4 of 2015 that PSG

15   used in doing their deferential calculation.

16        So Company 1 is the first line, and they had a

17   rebate of 40 percent.  Company 2 had a rebate percentage

18   of 28 percent.  So the differential is 12 percent.  And

19   that amount -- that was multiplied Company 2's volume to

20   calculate the synergy of $3.2 million.

21        Now, what I'd like to direct your attention to

22   is that, after picking up the PSG information for this

23   drug, I then took the prior worksheet's information for

24   the two companies -- it's the two worksheets -- and I

25   put beside it what each of their rebates were forecast

3412

1    to be.

2         Well, Quarter 1 of 2016 is what their rebate

3    actually was.  And then we have the projected exit, and

4    then we have 2017 contract and projected exit.

5         And what you see from this is, using a single

6    point in time, the 12 percent is actually backwards from

7    what ultimately happened.  My experience with

8    pharmaceutical manufacturers and the drug companies --

9    the retailers that buy them from, the insurance

10   companies, is that these are very much fluctuating data

11   points.

12        So I don't think this is a trend.  I would not

13   use -- these five data points, I would not view them as

14   sufficient to forecast what will happen in perpetuity

15   because that's not enough data.

16        Q.    Is this a one-off example, this

17   $3.2 million example of a pharmacy rebate maximization

18   synergy?

19        A.    No, this is not a one-off.  I did not

20   make an enormous number of them, but it is not a one-off

21   example.

22             THE COURT:  We're going to have save the

23   discussion of the next drug for the morning.

24        So we'll take our adjournment now and resume

25   tomorrow morning at 9:15.  I do have a civil matter at

3413

1    9:00, but it should not take more than ten minutes.  But

2    just make enough room to allow those lawyers to ply

3    their trade.  And we'll see everyone at 9:15 tomorrow

4    morning.

5                    (Proceedings adjourned at 5:17 p.m.)

6                        *************

7          CERTIFICATE OF OFFICIAL COURT REPORTER

8

9    I, Barbara DeVico, certify that the foregoing is a

10   correct transcript from the record of proceedings in the

11   above-entitled matter.

12

13

14

15

16

17   _____          12-20-16

18   SIGNATURE OF COURT REPORTER                DATE

19

20

21

22

23

24

25